UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
BERT C. ROBERTS, JR,                      :

       Plaintiff,                       :          Case No. 04-CV-4089 (DLC)

                     :

v.                                        :

                     :

ASSOCIATED ELECTRIC & GAS                 :
INSURANCE SERVICES LIMITED,               :
CONTINENTAL CASUALTY COMPANY,             :
GULF INSURANCE COMPANY, SR                :
INTERNATIONAL BUSINESS                    :
INSURANCE COMPANY, STARR                  :
EXCESS LIABILITY INSURANCE                :
INTERNATIONAL LIMITED and TWIN            :
CITY FIRE INSURANCE COMPANY,              :

                     :

       Defendants.                      :
------------------------------------------------------ :
                    x

## GULF INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION ORDERING ADVANCEMENT OF DEFENSE COSTS

     Defendant Gulf Insurance Company ("Gulf"), by and through its attorneys, Drinker

Biddle & Reath LLP, respectfully submits that plaintiff has failed to meet his burden in his

application for a preliminary injunction, pursuant to Fed. R. Civ. P. 65, ordering the advancement

of defense costs  in the underlying securities litigation pending before this Court.  Thus, Gulf

respectfully joins in and incorporates by reference the opposition papers filed by Continental

Casualty Company ("Continental") to plaintiff's application with respect to that issue.

## BACKGROUND AS TO GULF

**The D&O Policies At Issue**

In November 2001, WorldCom, through its broker in New York, applied to Gulf's New York office for coverage under an excess directors and officers liability insurance policy. Exhibit 1 at ¶ 4.[1] The application was on an AIG form and had formed the basis of AIG's issuance of the primary directors & officers insurance policy (the "D&O Application"). Exhibit 1 at ¶ 5. Question 14 of the D&O Application expressly incorporated financial documents posted on WorldCom's internet website and made them a part of the application, including:

- WorldCom's amended 10K and annual report for 2000,
- WorldCom's then-most recent 10Qs, and
- Proxy statements and registration statements filed with the SEC in the prior twelve months.

Exhibit A of Exhibit 1 at pp. 6-7.

Based on the application submitted, Gulf issued to WorldCom an Excess Directors and Officers Liability and Company Indemnification Insurance Policy No. GA 0349844 ("Gulf's Excess D&O Policy"). Complaint at ¶ 17 and Exhibit B of Exhibit 1. Subject to all of its terms, conditions, exclusions and limitations Gulf's Excess D&O Policy covers claims made during the period from December 31, 2001 to December 31, 2002. *Id.* The aggregate limit of liability of Gulf's Excess D&O Policy is $10 million, excess of $80 million. Exhibit B of Exhibit 1. Gulf's Excess D&O Policy would not attach until the $80 million of underlying insurance is exhausted. *Id.*

---

[1] All exhibits are attached to the accompanying Declaration of Alan Joaquin unless otherwise specified.

Gulf's Excess D&O Policy "follow[s] the form, terms, and conditions" of the Primary

Directors, Officers and Corporate Liability Insurance Policy No. 874-91-08  issued by National

Union Fire Insurance Company of Pittsburgh, Pa. ("National Union" or "AIG") to WorldCom

(the "AIG D&O Policy") except as otherwise provided in Gulf's Excess D&O Policy.

Complaint at ¶ 22.

Beginning in 2002, WorldCom told the world that its financial statements for Fiscal Year

2000, Fiscal Year 2001 and each of its Quarters, and the First Quarter of 2002, as set forth in its

Forms 10-Q and 10-K throughout that time period, were materially false and misleading,

including those that were made part of the D&O Application.  Exhibit 2.  To date, it has been

revealed that the WorldCom financial statements overstated the company's income by more than

$11 billion.  Exhibit 3.  Accordingly, the Gulf Excess D&O Policy was issued on the basis of

materially false and misleading statements.


## CONCLUSION

For the reasons stated in the opposition papers filed by Continental, Gulf respectfully

submits that plaintiff has failed to meet his burden in his application for a preliminary injunction

and that Robert's Application for preliminary injunction should be denied.  In the alternative,

should the Court be inclined to grant Roberts' Application, it should require the posting of a bond

by Roberts in an amount sufficient to fully protect the insurers' right of reimbursement of all

defense costs advanced to him.


Dated: New York, New York
       July 14, 2004

DRINKER BIDDLE & REATH LLP
Attorneys for Gulf Insurance Company
Defendant/Movant


By: _____
Jennifer A. Klear (JK 7280)
Alan Joaquin (AJ 8771)
30 Broad Street, 30th Floor
New York, New York  10004
212 248 3140


and -
1500 K Street NW
Suite 1100
Washington, D.C.  20005
202 842 8800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x
BERT C. ROBERTS, JR,                         :
                                             :
          Plaintiff,                         :
                                             :
v.                                           :        Case No. 04-CV-4089 (DLC)
                                             :
ASSOCIATED ELECTRIC & GAS                    :
INSURANCE SERVICES LIMITED,                  :
CONTINENTAL CASUALTY                         :
COMPANY, GULF INSURANCE                      :
COMPANY, SR INTERNATIONAL                    :
BUSINESS INSURANCE COMPANY,                  :
STARR EXCESS LIABILITY                       :
INSURANCE  INTERNATIONAL                     :
LIMITED and TWIN CITY FIRE                   :
INSURANCE COMPANY,                           :
                                             :
          Defendants.                        :
-------------------------------------------------- x

DECLARATION OF  ALAN J. JOAQUIN IN SUPPORT OF DEFENDANTS
GULF INSURANCE COMPANY'S OPPOSITION TO PLAINTIFFS'
APPLICATION FOR A PRELIMINARY INJUNCTION ORDERING
ADVANCEMENMT OF DEFENSE COSTS

I, Alan J. Joaquin, under penalty of perjury, hereby declare as follows:

          1.       I am a partner in the law firm Drinker Biddle & Reath LLP, counsel of

record for defendant Gulf Insurance Company.  I am fully familiar with the facts set forth

herein.

          2.       I submit this Declaration and the exhibits attached hereto in support of

Gulf's Opposition to WorldCom's Motion for Partial Summary Judgment with respect to

severability for "innocent" directors and officers.

          3.       Attached hereto as Exhibit 1 is a copy of the Declaration of Jennifer

Pulice in support of Gulf Insurance Company's Opposition to the Motion of the Debtors

for Partial Summary Judgment filed with the United States Bankruptcy Court for the

Southern District of New York on October 13, 2003. Ms. Pulice is presently on

maternity leave.

        4.      Attached hereto as Exhibit 2 is a copy of WorldCom's Revised Statement

Pursuant to Section 21(a)(1) of the Securities Exchange of 1934, filed on July 8, 2002.

        5.      Attached hereto as Exhibit 3 is a copy of S.E.C. v. WorldCom, Inc., 02

Civ. 4963 (JSR) Opinion and Order (July 7, 2003).

        I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2004.

*EXHIBIT 1*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
In re:                                          :

WORLDCOM, INC.,                                 :      (Hon. Arthur J. Gonzalez)
                                                :      Chapter 11
        Debtor.                                 :
                                                :      Case No. 02-13533 (AJG)
------------------------------------------------ :     (Jointly Administered)
                                                :
WORLDCOM, INC., a Georgia corporation, :
                                                :
        Plaintiff,                              :      Adv. Pro. No. 03-02058
                                                :
v.                                              :
                                                :
ASSOCIATED ELECTRIC & GAS              :
INSURANCE SERVICES LIMITED, et al., :
                                                :
        Defendant.                              :
------------------------------------------------ x

## DECLARATION OF JENNIFER PULICE IN SUPPORT OF DEFENDANT GULF INSURANCE COMPANY'S OPPOSITION TO MOTION OF THE DEBTORS FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO SEVERABILITY OF THE EXCESS DIRECTORS AND OFFICERS AND BLENDED LIABILITY INSURANCE POLICIES FOR INNOCENT INSUREDS AND SUPPORTING ARGUMENT

I, Jennifer Pulice, under penalty of perjury, hereby declare as follows:

        1.      I am competent to testify and have personal knowledge of the matters stated in

this affidavit, and as to those matters stated on information and belief, I believe them to be true.

        2.      I am an underwriter for Defendant Gulf Insurance Company ("Gulf") located in

Gulf's New York City offices.

        3.      I submit this Declaration in support of Gulf's Opposition to WorldCom's Motion

for Partial Summary Judgment with respect to severability for "innocent" directors and officers.

4.    In November 2001, I was involved in reviewing an unsigned but otherwise completed application for excess directors and officers liability coverage, attached hereto as Exhibit A.

5.    The application was submitted to Gulf in November 2001 by WorldCom's broker in New York (Willis). The application was on a form generated by AIG and, upon information and belief, it had formed the basis of AIG's issuance of the primary directors and officers policy.

6.    Based on that application, I caused to be sent to WorldCom's broker a "binder" for an Excess Directors and Officers Liability and Company Indemnification Insurance Policy No. GA 0349844 ("Excess D&O Policy"), attached hereto as Exhibit B. The binder was conditioned upon, among other things, Gulf's receipt of a duly signed and executed renewal application with a "wet signature."

7.    In February 2002, Gulf's New York office received from WorldCom's New York broker the "wet signature" copy of the application, signed by Bernard Ebbers.

8.    Except as otherwise provided in Gulf's Excess D&O Policy, it "follows form" to the primary Directors, Officers and Corporate Liability Insurance Policy No. 874-91-08 issued by National Union Fire Insurance Company of Pittsburgh, Pa. to WorldCom, attached hereto as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 9, 2003.

Jennifer Pulice
Jennifer Pulice
Vice President

*EXHIBIT 1A*

**AIG**

American International Companies®

Name of Insurance Company to which Application is made
(the "Insurer")

## EXECUTIVE AND ORGANIZATION LIABILITY INSURANCE POLICY
## INSURANCE APPLICATION

**NOTICE:    THE POLICY PROVIDES THAT THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE.  FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**IF A POLICY IS ISSUED, IT WILL BE ON A CLAIMS-MADE BASIS.**

I.    APPLICANT'S ORGANIZATIONAL INFORMATION

1.    Applicant's:
    (a)    Name:    WorldCom and its subsidiaries    (the "Applicant")
    (b)    Address:    ~~3 International Drive, Rye Brook, NY 10573~~    1133 19th Street, NW
                                                                                                      Washington, DC  20036

    (c)    State and date of incorporation: Georgia    Date 1983
    (d)    Nature of business:  Telecommunications

    (e)    Primary SIC code(s):  4800
    (f)    Applicant has continually been operating since: 1983
    (g)    Total number of locations:  Please refer to company web site (www.worldcom.com)
    (h)    Does the Applicant operate any retail outlets or branches? [ X ] Yes [  ] No.
            (If "Yes", total number of retail outlets or branches: _____.)
            Please refer to company web site (www.worldcom.com)

II.    INSURANCE INFORMATION

2.    (a)    Limit of Liability requested:    $ 100M

    (b)    Amount of self-insured retention requested (each loss):
            Securities Claims[1]:    $1M
            Employment Practices Claims:    $1M
            All Other Claims:    $1M

---

[1] All terms which appear in Bold type are used in this application with the same respective meanings as they have in the D&O 2/2000 policy.

75012(2/00)

1

III.  STOCK OWNERSHIP

(a)  Are any securities of the Applicant or of any Subsidiary thereof publicly traded or the subject of a shelf registration? [ X ] Yes [ ] No.

(b)  If "Yes" to question 3(a), please attach the following information for each entity

(i)  The name of the entity and the type of securities which are publicly traded or the subject of a shelf registration.

ENTITY                                          SECURITIES

- WorldCom, Inc.                      [ ] equity [ ] debt [ X ] mixed
  - Includes WorldCom Group common stock, MCI Group common stock, Series B, D, E, and F preferred stock, QUIPs securities, WorldCom redeemable preferred stock and various tranches of public debt.
  - NASDAQ Tickers: WCOM, MCIT and MCICP. All other public securities are traded in the public markets but do not have ticker symbols.

- Digex, Inc.                          [ X ] equity [ ] debt [ ] mixed
  - NASDAQ Ticker: DIGX

- Intermedia Communications Inc.       [ ] equity [ ] debt [ X ] mixed
  - Series B preferred stock and various tranches of public debt.

- Embratel Participacoes               [ X ] equity [ ] debt [ ] mixed
  - Brazilian exchange tickers: EBTP3 and EBTP4.
  - American Depositary Receipts NYSE ticker: EMT

(ii) Total number of voting shares outstanding.
Approximately 65,000; DIGX approximately 16,300; Intermedia approximately 300 holders of Series B preferred stock.  Please see most recent WCOM, Intermedia & DIGX 10Q for more information.

(iii) Total number of voting shares owned by members of its Board of Directors (or equivalent governing body) (direct and beneficial) .
Please see latest 10K for WCOM, DIGX and Embratel.

(iv) Total number of voting shares owned by its Executives (direct and beneficial) who are not members of its Board of Directors (or equivalent governing body)
Please see latest 10K for WCOM, DIGX and Embratel.

(vi) Does any shareholder own five percent (5%) or more of the voting shares directly or beneficially?
[ ] Yes [ X ] No. If "Yes," designate name and percentage of holdings.
Exception being that WorldCom, Inc. owns more than 5 percent Digex and Embratel respectively.

(vii) Are there any other securities convertible to voting stock? [ X ] Yes [ ] No. If "Yes" describe fully.
Series B, D, E and F preferred stock is convertible into WorldCom group stock and MCI group common stock. Currently, the series B preferred at WorldCom is generally entitled to one vote per share on matters and Series D, E, and F are generally entitled to one tenth of a vote per share.

75012(2/00)                              2

(c) For those entities proposed for insurance whose securities are not publicly traded or subject of a shelf registration please attach the following information for each entity:
  **Not applicable.**

  (i)  Total number of voting shares outstanding _____

  (ii)  Total number of voting shareholders

  (iii) Total number of voting shares owned by members of its Board of Directors (or equivalent governing body) (direct and beneficial):

  (iv)  Total number of voting shares owned by its Executives (direct and beneficial) who are not members of its Board of Directors (or equivalent governing body):

  (iv)  Does any shareholder own five percent (5%) or more of the voting shares of such entity directly or beneficially?  [  ] Yes  [  ] No. If "Yes," designate name and percentage of holdings.

**IV.    GENERAL ORGANIZATIONAL INFORMATION**

4.    (a) Please provide a complete list of all Executives who are members of the Board of Directors (or equivalent governing body) of the Applicant and of its Subsidiaries by name and affiliation with other organizations.

      (If included as an attachment herein, check here [ **X** ].)

      **Please see attachment A.**

      (b) Please provide a complete list of all Executives of the Applicant and of its Subsidiaries who are not described in 4(a) above, by name and affiliation with other organizations.

      (If included as an attachment herein check here [ **X** ].)

      **Please see attachment A.**

5.    Please list all directly and indirectly owned entities, other than partnerships entities, that are Subsidiaries:

| Name of Organization | Type of Operation | Percentage of Ownership | Date Acquired or Created | Country of Incorporation Domestic/Foreign |
|---|---|---|---|---|
| **Please see attachment B.** | | | | |

      Is coverage to include all Subsidiaries listed? [ **X** ] Yes [  ] No. If "Yes," include complete list of all Executives of each Subsidiary. If "No," include complete list of those Executives of each Subsidiary for which coverage is requested.  If included as an attachment check here [ **X** ].

      **Please see attachment A**

6.  Are there any plans being considered for a merger, an acquisition of a consolidation of or by the Applicant or any of its Subsidiaries? [   ] Yes [   ] No.

Forward looking statements regarding anticipated activity cannot be provided.

    (a)  If "Yes" to 6, have such plans been approved by the Board of Directors (or equivalent governing body) of the Applicant and such entity? [   ] Yes [   ] No. Date of approval _____

    (b)  If "Yes" to 6, have such plans been submitted to the shareholders/members of the Applicant and such entity for approval? [   ] Yes [   ] No. Date of approval _____

7.  Does the Applicant or any of its Subsidiaries anticipate any registration of securities under the Securities Act of 1933 (or any similar state or foreign rule or law) or any other offering of securities within the next twenty-four months? [   ] Yes [   ] No. (If "Yes," give details and submit offering materials if available.)

Forward looking statements regarding anticipated activity cannot be provided.

8.  Has there been or is there now pending any claim(s) or action(s) against or investigation(s) of: (i) the Applicant or any Subsidiary thereof; and/or (ii) any person proposed for insurance in his or her capacity as an Executive of either the Applicant or a Subsidiary of the Applicant. [   ] Yes [   ] No. (If "Yes," attach details.)

9.  (a)  No Executive has knowledge or information of any act, error or omission which might give rise to a Claim or Crisis under the proposed policy, except as follows: (Attach complete details.)

    If the Executives have no such knowledge or information state "None:"

    (b)  Neither the Applicant nor any of its Subsidiaries has knowledge or information of any act, error or omission which might give rise to a Securities Claim or Crisis under the proposed policy, except as follows: (Attach complete details.)

    If the Applicant and the Subsidiaries have no such knowledge or information state "None:"

10.  Has the Applicant, any of its Subsidiaries or any Executives of such entities:

    (a)  Been involved in any antitrust, copyright or patent litigation?  [   ] Yes [ . ] No.

    (b)  Been charged in any civil, criminal or administrative action or proceeding with a violation of any federal, state or foreign antitrust or fair trade law?  [   ] Yes [   ] No.

    (c)  Been charged in any civil, criminal or administrative action or proceeding with a violation of any federal, state or foreign securities law, rule or regulation?  [ . ] Yes [   ] No.

    (d)  Been involved in any representative actions, class actions, or derivative suits?  [   ] Yes [   ] No.

    (If any of the above questions 10(a) – 10(d) are answered "Yes," attach full details.)

It is agreed that with respect to Questions 8, 9 and 10 above, that if such claim, proceeding, action, knowledge, information or involvement exists, then such Claim, proceeding or action and any Claim or action arising from such claim, proceeding, action, knowledge, information or involvement is excluded from the proposed coverage.

75012(2/00)

## V.  INSURANCE HISTORY

11. Current insurance (if none, most recent) for the Applicant and each Subsidiary. If included as an attachment, check here [ X ].   On File.

| | Directors and Officers (Executive) Liability Insurance |
|---|---|
| (a) Name of insurance co. | AIG (Primary), Lloyd's, CNA, Hartford |
| (b) Limit of liability | $100 M. |
| (c) Self-insured retention | $1 M. |
| (d) Policy expiration date | 12/31/2001. |
| (e) Premium (indicate one year or more) | $1,127,485 (3 year policy, annualized premium for 2001). |

12. Has any insurance carrier refused, canceled or non-renewed any directors and officers liability or executive liability insurance coverage? [   ] Yes  [ X ] No. If "Yes," attach full details including when and reason(s). (Missouri Applicants need not reply.)

## VI.  ADDITIONAL INFORMATION

13. Name of General Counsel, Risk Manager and Human Resources Manager (or equivalent positions) for the Applicant, number of years in current position and phone number:

| NAME | YEARS | PHONE NUMBER |
|---|---|---|
| Michael Salsbury,  General Counsel | 6 | 561-730-2851 |
| Dennis Stehle, SVP Human Resources | 17 | 202-887-3373 |
| Susan Mayer, SVP Treasurer | 9 | 202-887-2299 |
| Eric T. Hovanky, Global Risk Manager | 14 | 202-887-2781 |

14. Provide copies of the following for the Applicant and, to the extent available, each of its Subsidiaries. If attached please indicate below. If such information is available on the Organization's website please indicate below and provide website address: www.worldcom.com

| Requested Information | "Attached" | "Website" |
|---|---|---|
| (a) Latest annual report. | | X |
| (b) Latest 10K report filed with the Securities and Exchange Commission (SEC) (or similar state or foreign agency). | | |
| (c) Latest interim financial statement available. | | X |
| (d) All proxy statements and notices of Annual Meeting of Stockholders within the last twelve months. | | X |
| (e) All registration statements filed with the SEC (or similar state or foreign agency) within the last twelve months. | | X |
| (f) Copy (certified by organization's Secretary) of the indemnification provisions of the charter and the by-laws. Also attach a copy of any organization's indemnification agreement. | | X Attachment E |
| (g) Latest CPA management letter along with Applicant's responses to any recommendations made therein. | Not Available | |

~~It is agreed that the Applicant will file with the Insurer, as soon as it becomes available, a copy of each registration statement and annual or interim report which the Applicant or any Subsidiary may from time to time file with the SEC (or similar state or foreign agency).~~

## VII. SEVERABILITY

15. It is further agreed that in regard to the applicability of questions 8, 9 and 10 above, the facts pertaining to and knowledge possessed by any Insured (other than the knowledge and/or information possessed by the person(s) executing the application) shall not be imputed to any other Insured Person; only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer and General Counsel (or equivalent position) of the Organization shall be imputed to the Organization.

THE UNDERSIGNED AUTHORIZED OFFICER/MANAGER OF THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE. THE UNDERSIGNED AUTHORIZED OFFICER/MANAGER AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE

SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO AND BECOME PART OF THE POLICY.

75012(2/00)

6

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF.

NOTICE TO ARKANSAS APPLICANTS: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

NOTICE TO COLORADO APPLICANTS: "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

NOTICE TO DISTRICT OF COLUMBIA APPLICANTS: "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

NOTICE TO FLORIDA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE."

NOTICE TO KENTUCKY APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

NOTICE TO MAINE APPLICANTS: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

NOTICE TO NEW JERSEY APPLICANTS: "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO NEW MEXICO APPLICANTS: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

7

NOTICE TO NEW YORK APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

NOTICE TO OHIO APPLICANTS: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

NOTICE TO PENNSYLVANIA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO VIRGINIA APPLICANTS: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

Signed _____
               (Applicant)
Date _____ January 23, 2002 _____

Title _____ President _____         Organization _____
      (must be signed by
       Chairman of the Board or President)        (Organization's Seal)

Attest _____

Broker _____

Address _____

       _____

75012(2/00)

Attachment C.

## WorldCom, Inc.
## Directors & Officers

- **BT/MCI Merger Delaware Cases– Claim Filed: Late 1996 – late 1997**

One (1) CONSOLIDATED complaint involving fourteen (14) class action lawsuits filed in Delaware. Complaints initially challenged the failed BT merger, but were amended to challenge the WorldCom merger. The cases generally allege breach of fiduciary duty on the part of various MCI and BT Directors and Officers. Although still technically pending, the cases have been effectively abandoned by the plaintiffs' counsel.

- **BT/MCI Merger 10b-5 Cases**

One (1) CONSOLIDATED class action lawsuit involving three (3) class action lawsuits filed in the District of Columbia. The complaint alleges that certain Directors and Officers violated sections 10(b) and 20 of the Securities Exchange Act of 1934 and Rule 10b-5 of the SEC's regulations. Our motion to dismiss was filed about three years ago. We anticipate a ruling on the motion in the next 6-8 months. The carriers have reserved their rights.

- **MCI/WCOM Merger – Claim Filed: November, 1998**

Drayton Berkley filed a complaint in Mississippi against MCI and WorldCom, alleging dilution of voting rights due to the merger. As no Directors or Officers were named, entity coverage was not triggered. The case settled in September 2001 for $15,000.

- **In-Flight Litigation – CLOSED: Claim Filed 4/19/99**

In-Flight and its creditors filed suit against MCIT, Fred Briggs and Michael Rowny alleging they breached their fiduciary duties by promising investment in their company, which they claim was never delivered. This allegedly hastened their bankruptcy/insolvency. There was a coverage question as to whether Briggs and Rowny were acting in their capacity as members of the In-Flight board of directors. This matter was settled by LPP for approx. $20M without any carrier consultation. The file is closed.

- **Griece (SkyTel) – Claims Filed: May, 1999; CLOSED and WITHDRAWN**

No WorldCom directors or officers named. Complaints are filed by former SkyTel stockholders alleging that MCI WorldCom falsely denied an intention to acquire Skytel. Coverage was denied as the securities holders were not MCI WorldCom stockholders. This settled for $1.4 million.

- **In re MCI WorldCom, Inc. Securities Litigation – Claims Filed 11/17/00 to present**

One (1) CONSOLIDATED complaint in the U.S. District Court for the Southern District of Mississippi involving numerous class action lawsuits originally filed in Mississippi, NY and DC.

The complaints allege that the Company failed to disclose certain material facts during 2000 and allege violations of sections 10(b) and 20 of the Securities Exchange Act of 1934 and Rule 10b-5 of the SEC's regulations.

Sprint Derivative Claims (Amalgamated Bank) – Claims Filed: December, 2000

The complaint alleges that numerous Sprint Officers Directors violated their fiduciary duties to Sprint shareholders by changing the executive stock option program to vest stock options at shareholder approval of a merger, rather than at closing. The complaint alleges that Bernie Ebbers and WorldCom conspired with, and aided and abetted, the Sprint defendants in this breach of fiduciary duty. The primary carrier has reserved its rights. Plaintiffs have voluntarily dismissed WorldCom and Ebbers without prejudice.

PRIVILEGED AND CONFIDENTIAL

Attachment C.

- **Sprint Securities Claims (re Sprint Corporation Securities Litigation)** – Claims Filed: December, 2000

This complaint -- filed by shareholders of Sprint -- alleges that Sprint and its officers and directors, and Bernie Ebbers and WorldCom, made false and misleading statements about Sprint and WorldCom, and the prospects of the Sprint-WorldCom merger gaining regulatory approval, so that Sprint's officers and directors could extract millions of dollars when their stock options vested as of Sprint shareholder approval of the merger. Based on these allegations, the complaint asserts claims (1) against all defendants for violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder and (2) against the Sprint defendants for violation of Section 20(a) of the Act.

- **Mr. Bernie Ebbers Loan/Guarantee Derivative Action (Harbor Finance Partners)** – Claim Filed: November, 2000

The derivative complaint alleges that the WorldCom Directors breached their fiduciary duties by providing loans and loan guarantees to Mr. Ebbers. It also alleges that Mr. Ebbers usurped the Company's corporate opportunities by accepting the loans and guarantees. The primary carrier has reserved its rights. The parties are actively involved in settlement negotiations and we are hopeful that this will be resolved by mid-year 2002.

- **WorldAccess Litigation** – Claim Filed: 6/13/01

Roger Abbott, founder of WorldxChange, and others, alleges that WorldAccess, WorldCom and its various Directors and Officers caused his shares in WorldAccess (those shares received as consideration for the sale of WorldxChange) to be diminished in value when WorldCom allegedly failed to honor a carrier services agreement with World Access. An issue exists concerning named defendant Mr. Tucker concerning as to which D&O coverage is primary, that provided by WorldAccess or WorldCom. LHP is discussing with the co-defendants. To date, there has been no response from the insurance carriers as to coverage. This case is in its early stages.

- **Rhythms Securities Class Action** – Claim Filed: 7/11/01

The complaint alleges that Rhythms NetConnections, Inc. Board of Directors committed violations of federal securities laws as a result of an initial public offering (IPO). Susan Mayer, in her capacity as a WorldCom employee, held a seat on the Rhythms NetConnections Board of Directors and as such has been named a defendant in the litigation. Rhythms D&O insurance is the primary insurance coverage. The case is in its early stages but we expect the individual defendants, including Mayer, to be dismissed.

PRIVILEGED AND CONFIDENTIAL

Attachment D.

**Case:** Wandra McManus v. MCI, Jonelle Birney, et al.
**Claim Summary:** Ms. McManus alleged violations of the D.C. Human Rights Act and several common law claims (wrongful discharge, interference with prospective advantage, intentional infliction of emotional distress), discrimination (race and personal appearance).
Ms. McManus was terminated from her position as a staff assistant during a reduction-in-force (RIF).
**Status:** Summary judgment for MCI (August 1998); affirmed on appeal (April 2000).

**Case:** Nicholas Cicero v. MCII, Jack Logston, et. al.
**Type:** Age discrimination case arising from termination of employment
**Claim Summary:**
**Status:** Settled in November 1998 for $295,000

**Case:** Lawrence Howard v MCIT et al. –
**Claim Summary:** Mr. Howard is a former "legacy MCI" Sales Support Consultant who was terminated when his group was eliminated during a reduction-in-force (RIF) in February 1995. In December 1998, Mr. Howard filed suit in federal court in New York claiming that he had been discriminated against on the basis of his race (black), national origin (African-American), and age in violation of Title VII, the Age Discrimination in Employment Act ("ADEA"), 42 U.S. C. Section 1981, the Rehabilitation Act of 1972, New York State's Constitution, and the New York City Human Rights Act.
Mr. Howard also alleged that he had received lower compensation than had white and younger employees; that he had been passed over for several other job openings in favor of less qualified white and younger employees; that he had been denied severance benefits; that he had not been afforded the same "recall" opportunities as white and younger employees who were terminated; and that he had been subjected to racist and ethnic comments.
**Status:** Settled on March 15, 2001 for $53,000.

**Case:** Crawford, Dianne v. MCI WorldCom Communications, Inc. and Lynn Coker (VP), U.S. District Court for the Southern District of California Filed: May 25, 2000
**Claim Summary:** Plaintiffs alleged breach of implied contract, breach of the covenant of good faith and fair dealing, wrongful termination (race discrimination), violation of public policy, violation of constitutional rights, intentional infliction of emotional distress and negligent infliction of emotional distress.
Ms. Crawford alleged that she was terminated from her sales director position in March 2000 because of her race (African American), in violation of California state law. Crawford, who was one of five sales directors in the California region in 1999, was put on a performance improvement plan and was eventually terminated due to her failure to meet the goals set forth in the plan.
**Status:** Ms. Crawford voluntarily dismissed Lynn Coker from the case on September 28, 2000. On August 13, 2001, the Court granted summary judgment in WorldCom's favor on all of Ms. Crawford's claims. The Court found that Crawford was not treated differently from her similarly situated Caucasian counterparts.

Attachment D.

**Case:** Emigh, Kim v. MCI WorldCom Network Services, Inc., Fred Briggs (Senior VP), Joseph Cook (Senior VP), Michael Smith (Director) and Frank Guckes (Manager). Filed on July 23, 2001.

**Claim Summary:** Mr. Emigh alleges that he was selected for termination in a reduction in force on March 2, 2001 due to his failure to participate in allegedly illegal activity (wrongful termination in violation of public policy). Mr. Emigh, who was employed as a budget manager, alleges that he was requested to allocate to an expense budget certain items that should have been capitalized and that when he refused to do so, he was threatened with adverse action and was later terminated.

The Company's investigation to date reveals no illegal or improper activity by the Company or any of the individuals named in the complaint.

**Status:** WorldCom answered the complaint on August 27, 2001. The parties are currently engaged in discovery.

**Case:** Thomas Harris v. MCI WorldCom Network Services, Inc. and Bob Vetera, U.S. District Court for the Northern District of Oklahoma. Filed 8/31/01

**Claim Summary:** Mr. Harris alleges race discrimination under Title VII. Mr. Harris, an African-American and former paralegal in Wholesale Credit and Collections, contends that he (1) was denied training opportunities, tuition reimbursement, and equal access to promotional opportunities, (2) received disparate discipline, (3) was subjected to a racially hostile work environment, and (4) was forced to resign in August 2000. While named as an individual defendant, former Vice President, Vetera has not been served.

**Status:** The parties are currently engaged in discovery which closes on March 1, 2002. Trial is set for July 15, 2002.

**Case:** Nolito Yu v. MCI WorldCom, U.S. District Court, Northern District of California.

**Claim Summary:** Mr. Yu named Mr. Bernard Ebbers as a defendant in a RICO action. The complaint alleged that Ebbers along with other WorldCom employees broke into plaintiff's house to recover a $28 balance on his phone bill and subsequently followed plaintiff around his hometown.

**Status:** After two amended complaints, the plaintiff's allegations were dismissed with prejudice on September 5, 2001.

**Case:** Sylvia Milliken v. Bernard Ebbers, et al.; County Court for Tarrant County, Texas

**Claim Summary:** Plaintiff sued Mr. Bernard Ebbers and MCI WORLDCOM Communications, Inc. over a billing dispute concerning her long distance telephone account.

**Status:** WorldCom agreed to issue a $300 check to settle the dispute.

**Case:** William P. Sullivan v. Bernie Evers [sic], et al.; District Court for Plymouth, Massachusetts

**Claim Summary:** Mr. Sullivan obtained a default judgment against Mr. Ebbers and Telecom*USA in the amount of $1,727.00, alleging that his long distance telephone service was slammed. Neither defendant was properly served with the complaint.

**Status:** WorldCom was successful in vacating the judgment and having the underlying complaint dismissed.

Attachment D.

**Case:** Elizabeth Marczeski v. MCI WORLDCOM Communications, Inc., et al.; U.S. District Court for the District of Connecticut.

**Claim Summary:** Ms. Marczeski filed action against Bob Kamba, former MCI WorldCom Sr. VP, Robert Patterson and Diana Law, MCI WorldCom employees, Peter Geimer, former MCI WorldCom employee, and many other named parties, claiming harassment, obstruction of justice, and libel.

**Status:** Case was dismissed for want of personal jurisdiction.

*EXHIBIT 1B*

Fax Received: 12/27/2001 04:49PM [] * Pg 2/3

Dec-27-2001 04:53pm From-D&O                                2122813017                    T-115   P.002/003   F-012



December 27, 2001

Willis Corroon Corporation of New York
Seven Hanover Square
New York, NY 10004-2594

Attn:   Jenina Schiller
        Senior Vice President


RE:   Excess D & O Liability and Company Indemnification Binder for:
        WorldCom, Inc.

        Assigned Policy Number: GA0349844
        Policy Period: 12-31-2001 to 12-31-2002
        Reference Number (Please use on all correspondence): 261814 - 391496 0001

---

This will confirm our binding of the captioned account subject to our receipt, review and
underwriting approval of the following information within 10 working days:

1)   Copy of primary policy (and all underlying excess policies if our policy is not the first
     excess policy). In the event that any underlying terms are amended, we must agree
     to such amendments in writing to follow form with them
2)   Please note that this policy is offered excess of the following Underlying
     Policy/Policies: National Union, $15m @ $1.95m, CNA, $15m @ $1.3m; Swiss Re,
     $15m @ $975,000; Hartford, $15m @ $875,000, Starr, $10m @ $550,000; Aceⁱˢ
     $10m @ $550,000;
3)   Duly signed and executed National Union renewal application with wet signature

In the event that the additional information requested reflects any change in the risk which
may be deemed to be a material change in the underwriting exposure by us, we may at our
option withdraw or modify this binder.

| Limit of Liability | Premium (One Year) |
| --- | --- |
| $10,000,000 | $500,000.00 |

The Limit of Liability shown is excess of $80,000,000 plus the underlying retentions.

Please note that defense costs, charges and expenses are included within the Limit of Liability.

GULF INSURANCE GROUP
125 Broad Street, 7th & 8th Floor New York, NY 10004
(212)291-3087  Fax (212)291-3017

23

24

25

**December 27, 2001**
WorldCom, Inc.
Jenina Schiller
Page 2

Gulf Insurance Company Excess D & O Liability and Company Indemnification Policy form (CIRI 7350073501) will be used. Gulf Insurance Company is licensed in all states and the District of Columbia and carries an A.M. Best rating of A+ IX.

We will follow form and be co-terminus with the primary policy and any additional terms and conditions imposed by the underlying excess carriers.

The following endorsements will be attached to the policy effective from inception:
1)      CIRI 73022  (08-1996) Broad Pending & Prior Litigation Exclusion

The commission payable is 0.00%.

Thank you for this opportunity to be of service to you. Please do not hesitate to contact me at (212)291-3087 with any questions or comments.

Very truly yours,

Jennifer D. Pulice
Vice President

*EXHIBIT 1C*

POLICY NUMBER:
*874-91-08*

 *American International Companies*®

RENEWAL OF:
*484-54-78*

## Directors, Officers and Corporate Liability Insurance Policy

☐ AIU Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Penns.
☐ Granite State Insurance Company

☐ Illinois National Insurance Company
☒ National Union Fire Insurance Company of Pitts., PA®
☐ National Union Fire Insurance Company of Louisiana
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

**NOTICE:** EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

**NOTICE:** THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

**NOTICE:** THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

## DECLARATIONS

ITEM 1.  NAMED CORPORATION: *WORLDCON, INC.*

MAILING ADDRESS:  *1133 19TH STREET*
*WASHINGTON, DC 20036*

STATE OF INCORPORATION OF THE NAMED CORPORATION:
*Georgia*

ITEM 2.  SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Corporation

ITEM 3.  POLICY PERIOD:   From: *December 31, 2001*     To: *December 31, 2002*
(12:01 A.M. standard time at the address stated in Item 1.)

ITEM 4.  LIMIT OF LIABILITY:   $15,000,000
aggregate for Coverages A and B combined (including Defense Costs)

*280128*
62334 (5/95)

ITEM 5.  RETENTION:

SECURITIES CLAIMS:

Judgments & Settlements (all coverages)                     None

Defense Costs (non-Indemnifiable Loss)                      None

Defense Costs (Coverage B(i) and
Indemnifiable Loss)                                         *$5,000,000*
                                                            for Loss arising from
                                                            Claims alleging the same
                                                            Wrongful Act or related
                                                            Wrongful Acts (waivable
                                                            under Clause 6 in certain
                                                            circumstances)

OTHER CLAIMS:

Judgments, Settlements and Defense
Costs (non-Indemnifiable Loss)                              None

Judgments, Settlements and Defense
Costs (Indemnifiable Loss)                                  *$5,000,000*
                                                            for Loss arising from
                                                            Claims alleging the same
                                                            Wrongful Act or related
                                                            Wrongful Acts

ITEM 6.  CONTINUITY DATES:

A. Coverages A and B(ii):                                   *August 9, 1991*

B. Coverage B(i):                                           *June 1, 1995*

C. Coverages A and B:
   Outside Entity Coverage (Per Outside Entity)
   See Endorsement # 27

ITEM 7.  PREMIUM:                                           *$1,950,000*

ITEM 8.  NAME AND ADDRESS OF INSURER ("Insurer"):
         (This policy is issued only by the insurance company indicated below.)

         *National Union Fire Insurance Company of Pittsburgh, Pa.*

         *175 Water Street*

         *New York, NY 10038*

280128
62334 (5/95)

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_

SECRETARY

_[signature]_

PRESIDENT

_[signature]_

AUTHORIZED REPRESENTATIVE

COUNTERSIGNATURE DATE

COUNTERSIGNED AT

*WILLIS CORROON CORP OF NY*
*7 HANOVER SQUARE*
*NEW YORK, NY 10004*

280128

62334  (5/95)



## American International Companies®

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in Item 8 of the Declarations, herein called the "Insurer", agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: DIRECTORS AND OFFICERS INSURANCE

This policy shall pay the Loss of each and every Director or Officer of the Company arising from a Claim first made against the Directors or Officers during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except when and to the extent that the Company has indemnified the Directors or Officers. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE B: CORPORATE LIABILITY INSURANCE

This policy shall pay the Loss of the Company arising from a:

    (i)   Securities Claim first made against the Company, or

    (ii)  Claim first made against the Directors or Officers,

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

## 2. DEFINITIONS

(a) "Claim" means:

(1) a written demand for monetary or non-monetary relief; or

(2) a civil, criminal, or administrative proceeding for monetary or non-monetary relief which is commenced by:

(i) service of a complaint or similar pleading; or
(ii) return of an indictment (in the case of a criminal proceeding); or
(iii) receipt or filing of a notice of charges.

The term "Claim" shall include a Securities Claim; provided, however, that with respect to Coverage B(i) only, Claim or Securities Claim shall not mean a criminal or administrative proceeding against the Company.

(b) "Company" means the Named Corporation designated in Item 1 of the Declarations and any Subsidiary thereof.

(c) "Continuity Date" means the date set forth in:

(1) Item 6A of the Declarations with respect to Coverages A and B (ii); or

(2) Item 6B of the Declarations with respect to Coverage B(i); or

(3) Item 6C of the Declarations with respect to Coverages A and B for a Claim against an Insured arising out of such Insured serving as a director, officer, trustee or governor of an Outside Entity.

(d) "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of Officers or employees of the Company.

62335 (5/95)                                        2

(e)  "Director(s) or Officer(s)" or "Insured(s)" means:

    (1)    with respect to Coverages A and B (ii), any past, present or future duly elected or appointed directors or officers of the Company. In the event the Named Corporation or a Subsidiary thereof operates outside the United States, then the terms "Director(s) or Officer(s)" or "Insured(s)" also mean those titles, positions or capacities in such foreign Named Corporation or Subsidiary which is equivalent to the position of Director(s) or Officer(s) in a corporation incorporated within the United States. Coverage will automatically apply to all new Directors and Officers after the inception date of this policy;

    (2)    with respect to Coverage B(i) only, the Company.

(f)  "Listed Event" means any of the following events:

    (1)    any event for which the Company has reported or is required to report on Form 8-K filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934; or

    (2)    any restatement or correction of a Company financial statement contained in any document filed with the Securities and Exchange Commission; or

    (3)    any statement or disclosure made by or on the behalf of the Company relating to a prior forecast, estimate or projection of the Company's earnings or sales made by or on behalf of the Company, which statement or disclosure represents a greater than 15% change from such prior forecast, estimate or projection.

(g)  "Loss" means damages, judgments, settlements and Defense Costs; however, Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Further, with respect to Coverage B only, Loss shall not include damages, judgments or settlements arising out of a Claim alleging that the Company paid an inadequate or unfair price or consideration for the purchase of its own securities or the securities of a Subsidiary.

Notwithstanding the foregoing, with respect to Coverage B(i) only and subject to the other terms, conditions and exclusions of the policy, Loss shall include punitive damages (if insurable by law) imposed upon the Company.

(h) "No Liability" means with respect to a Securities Claim made against the Insured(s): (1) a final judgment of no liability obtained prior to trial, in favor of all Insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all Insureds, after exhaustion of all appeals. In no event shall the term "No Liability" apply to a Securities Claim made against an Insured for which a settlement has occurred.

(i) "Outside Entity" means:

    (1) a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    (2) any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(j) "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy; however, to the extent that coverage under this policy replaces coverage in other policies terminating at noon standard time on the inception date of such coverage hereunder, then such coverage as is provided by this policy shall not become effective until such other coverage has terminated.

(k) "Securities Claim" means a Claim made against an Insured which alleges a violation of the Securities Act of 1933 or the Securities Exchange Act of 1934, rules or regulations promulgated thereunder, the securities laws of any state, or any foreign jurisdiction, and which alleges a Wrongful Act in connection with the claimant's purchase or sale of, or the offer to purchase or sell to the claimant, any securities of the Company, whether on the open market or arising from a public or private offering of securities by the Company.

(l) "Subsidiary" means:

    (1) any corporation of which the Named Corporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries;

    (2) automatically any corporation whose assets total less than 10% of the total consolidated assets of the Company as of the inception date of this policy, which corporation becomes a Subsidiary during the Policy Period. The Named Corporation shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period;

(3)   any corporation which becomes a Subsidiary during the Policy Period (other than a corporation described in paragraph (2) above) but only upon the condition that within 90 days of its becoming a Subsidiary the Named Corporation shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Corporation paying when due any additional premium required by the Insurer relating to such new Subsidiary.

A corporation becomes a Subsidiary when the Named Corporation owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries. A corporation ceases to be a Subsidiary when the Named Corporation ceases to own more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to any Claim made against a Subsidiary or any Director or Officer thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary

(m)   "Wrongful Act" means:

(1)   with respect to individual Directors or Officers, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company, or any matter claimed against them arising out of their serving as a director, officer, trustee or governor of an Outside Entity in such capacities, but only if such service is at the specific written request or direction of the Company.

(2)   with respect to the Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company, but solely as respects a Securities Claim.

3. **EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of deceased Directors or Officers, and the legal representatives of Directors or Officers in the event of incompetency, insolvency or bankruptcy, who were Directors or Officers at the time the Wrongful Acts upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an individual Director or Officer for all Claims arising solely out of his or her status as the spouse of an individual Director or Officer, including a Claim that seeks damages recoverable from marital community property, property jointly held by the individual Director or Officer and the spouse, or property transferred from the individual Director or Officer to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an individual Director or Officer, subject to the policy's terms, conditions and exclusions.

4. **EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a)  arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b)  arising out of, based upon or attributable to: (1) profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law; or (2) payments to an Insured of any remuneration without the previous approval of the stockholders of the Company, which payment without such previous approval shall be held to have been illegal;

(c)  arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act;

The Wrongful Act of a Director or Officer shall not be imputed to any other Director or Officer for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(c)

62335 (5/95)                                                6

(d)  alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)  alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

(f)  alleging, arising out of, based upon or attributable to a Listed Event that occurs no later than 90 days subsequent to the Continuity Date; provided, however, that this exclusion shall only apply with respect to coverage which would have otherwise been afforded under Coverage B(i) of the policy;

(g)  with respect to serving as a director, officer, trustee or governor of an Outside Entity, for any Wrongful Act occurring prior to the Continuity Date if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy;

(h)  alleging, arising out of, based upon or attributable to any actual or alleged act or omission of the Directors or Officers serving in their capacities as directors, officers, trustees or governors of any other entity other than the Company or an Outside Entity, or by reason of their status as directors, officers, trustees or governors of such other entity;

(i)  which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured or the Company; provided, however, this exclusion shall not apply to a wrongful termination of employment Claim brought by a former employee other than a former employee who is or was a Director of the Company;

(j)  for any Wrongful Act arising out of the Insured serving as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or by any director, officer, trustee or governor thereof; or which is brought by any security holder of the Outside Entity, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the Outside Entity, any director, officer, trustee or governor thereof, any Insured or the Company;

(k)  for bodily injury, sickness, disease, death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from libel or slander or defamation or disparagement, or for injury from a violation of a person's right of privacy;

(l)   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

    (1)   the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

    (2)   any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants,

including but not limited to a Claim alleging damage to the Company or its securities holders.

Pollutants include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

(m)   for violation(s) of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974, or amendments thereto or any similar provisions of state statutory law or common law.

## 5.   LIMIT OF LIABILITY – (FOR ALL LOSS – INCLUDING DEFENSE COSTS)

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period. Further, any Claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the Declarations.

**Defense Costs are not payable by the Insurer in addition to the Limit of Liability. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.**

## 6.   RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company and/or the Insureds and shall remain uninsured, with regard to all Loss under: (i) Coverage A or B(ii) for which the Company has indemnified or is permitted or required to indemnify the Director(s) or Officer(s) ("Indemnifiable Loss"); or (ii) Coverage B(i).  A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

Notwithstanding the foregoing, solely with respect to a Securities Claim under this policy, the Retention shall only apply to Defense Costs; provided, however, no Retention shall apply for a Securities Claim even as respects Defense Costs in the event of a determination of No Liability of all Insureds, and the Insurer shall thereupon reimburse such Defense Costs paid by the Insured.

7.  **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a)  The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

   (1)  any time during the Policy Period or during the Discovery Period (if applicable); or

   (2)  within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)  If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(c)  If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons, and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

8. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

Under both Coverage A and Coverage B of this policy, except as hereinafter stated, the Insurer shall advance, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insurer does not, however, under this policy, assume any duty to defend. The Insureds shall defend and contest any Claim made against them. The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

The Insurer shall have the right to effectively associate with the Company and the Insureds in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured subject to such Insured's written consent. If any Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer.

The Company is not covered in any respect under Coverage A; the Company is covered, subject to the policy's terms and conditions, only with respect to its indemnification of its Directors or Officers under Coverage B(ii) as respects a Claim against such Directors and Officers, and subject to the policy's terms and conditions, under Coverage B(i) for a Securities Claim made against the Company. Accordingly, the Insurer has no obligation under this policy for Defense Costs incurred by, judgments against or settlements by the Company arising out of a Claim made against the Company other than a covered Securities Claim, or any obligation to pay Loss arising out of any legal liability that the Company has to the claimant except as respects a covered Securities Claim against the Company.

With respect to (i) Defense Costs jointly incurred by, (ii) any joint settlement made by, and/or (iii) any adjudicated judgment of joint and several liability against the Company and any Director or Officer, in connection with any Claim other than a Securities Claim, the Company and the Director(s) or Officer(s) and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Company and the Director(s) or Officers(s) and the Insurer, taking into account the relative legal and financial exposures of and the relative benefits obtained by the Directors and Officers and the Company. In the event that a determination as to the amount of Defense Costs to be advanced under the policy cannot be agreed to, then the Insurer shall advance such Defense Costs which the Insurer states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

9. **PRE-AUTHORIZED SECURITIES DEFENSE ATTORNEYS**

Only with respect to a Securities Claim:

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firms"). The list provides the Insured a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of any Securities Claim made against them.

The Insureds shall select a Panel Counsel Firm to defend a Securities Claim made against the Insureds in the jurisdiction in which the Securities Claim is brought. In the event a Securities Claim is brought in a jurisdiction not included on the list, the Insureds shall select a Panel Counsel Firm in the listed jurisdiction which is the nearest geographical jurisdiction to either where the Securities Claim is brought or where the corporate headquarters of the Named Corporation is located. In such instance the Insureds also may, with the consent of the Insurer, which consent shall not be unreasonably withheld, select a non-Panel Counsel Firm in the jurisdiction in which the Securities Claim is brought to function as "local counsel" on the Securities Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Securities Claim.

With the express prior written consent of the Insurer, an Insured may select a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Corporation. At the request of the Insured, the Insurer may in its discretion add to the attached list of Panel Counsel Firms for the purposes of defending a Securities Claim made against the Insured in any specified jurisdiction (including a jurisdiction not originally included in the Panel Counsel list) a Panel Counsel Firm not originally listed for such jurisdiction. The Insurer may in its discretion waive, in part or in whole, the provisions of this clause as respects a particular Securities Claim.

## 10.  DISCOVERY CLAUSE

Except as indicated below, if the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right, upon payment of an additional premium of 75% of the "full annual premium", to a period of one year following the effective date of such cancellation or nonrenewal (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy.  As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.  The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal.

In the event of a Transaction, as defined in Clause 12, the Named Corporation shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Corporation may request.  The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide.  In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period.  The Discovery Period is not cancelable.  This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

## 11.  CANCELLATION CLAUSE

This policy may be canceled by the Named Corporation at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent.  This policy may also be canceled by or on behalf of the Insurer by delivering to the Named Corporation or by mailing to the Named Corporation, by registered, certified, or other first class mail, at the Named Corporation's address as shown in Item 1 of the Declarations, written notice stating when, not less than 60 days thereafter, the cancellation shall be effective.  The mailing of such notice as aforesaid shall be sufficient proof of notice.  The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Corporation, the Insurer shall retain the customary short rate proportion of the premium herein.

If this policy shall be canceled by the Insurer, the Insurer shall retain the pro rata proportion of the premium herein.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12. CHANGE IN CONTROL OF NAMED CORPORATION

If during the Policy Period:

    a. the Named Corporation shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

    b. any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of Directors of the Named Corporation, or acquires the voting rights of such an amount of such securities;

        (either of the above events herein referred to as the "Transaction")

then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Corporation shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Corporation shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

## 13. SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer to effectively bring suit in the name of the Company and/or the Insureds. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been judicially determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such Insured was not legally entitled.

62335 (5/95)                                    13

## 14. OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

In the event of a Claim against a Director or Officer arising out of his or her serving as director, officer, trustee or governor of an Outside Entity, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity and any insurance provided to such Outside Entity with respect to its directors, officers, trustees or governors. Further, in the event such other Outside Entity insurance is provided by the Insurer or any member company of American International Group, Inc. ("AIG") (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the maximum aggregate Limit of Liability for all Losses combined covered by virtue of this policy as respects any such Claim shall be reduced by the limit of liability (as set forth on the declarations page) of the other AIG insurance provided to such Outside Entity.

## 15. NOTICE AND AUTHORITY

It is agreed that the Named Corporation shall act on behalf of its Subsidiaries and all Insureds with respect to the giving notice of Claim or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.

## 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

## 17. ARBITRATION

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, shall be submitted to the American Arbitration Association under and in accordance with its then prevailing commercial arbitration rules. The arbitrators shall be chosen in the manner and within the time frames provided by such rules. If permitted under such rules the arbitrators shall be three disinterested individuals having knowledge of the legal, corporate management or insurance issues relevant to the matters in dispute.

62335 (5/95)

Any party may commence such arbitration proceeding in either New York, New York; Atlanta, Georgia; Chicago, Illinois; or Denver, Colorado. The arbitrators shall give due consideration to the general principles of Delaware law in the construction and interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an evenhanded fashion as between the parties, including without limitation, where the language of this policy is alleged to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy (without regard to the authorship of the language, the doctrine of reasonable expectation of the parties and without any presumption or arbitrary interpretation or construction in favor of either party or parties, and in accordance with the intent of the parties.)

The written decision of the arbitrators shall be provided to both parties and shall be binding on them. The arbitrators' award shall not include attorney fees or other costs.

Each party shall bear equally the expenses of the arbitration.

18. **ACTION AGAINST INSURER**

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

19. **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

62335 (5/95)

15

This page intentionally left blank

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

**Alaska**

Davis Wright Tremaine
550 W. Seventh Avenue, Suite 1450
Anchorage, AK 99501
Contact:
David W. Oesting          (907) 257-5300

Foster Pepper & Shefelman
601 West Fifth Avenue #500
Anchorage, AK 99501-2226
Contact:
Peter S. Erlichman
Stellman Keehnel
Tim Filer                 (206) 447-8998

**California**

Brobeck, Phleger & Harrison LLP
Spear Street Tower
One Market
San Francisco, CA 94105
Contact:
Kevin P. Muck
Michael D. Torpey
Sara B. Brody
Tower C. Snow Jr.         (415) 442-0900

Brobeck, Phleger & Harrison LLP
550 South Hope Street
Los Angeles, CA 90071
Contact:
Daniel J. Tyukody
Howard M. Privette        (213) 489-4060

Brobeck, Phleger & Harrison LLP
550 West C Street, Ste. 1300
San Diego, CA 92101
Contact:
Christopher H. McGrath
William F. Sullivan       (619) 234-1966

Brobeck, Phleger & Harrison LLP
Two Embarcadero Place
2200 Geng Road
Palo Alto, CA 94303
Contact: David M. Furbush
Meredith N. Landy         (650) 424-0160

Cooley Godward, LLP
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Contact:
William E. Grauer         (858) 550-6050

Cooley Godward, LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Contact:
Stephen C. Neal           (650) 843-5182
William S. Freeman        (650) 843-5037

Cooley Godward, LLP
One Maritime Plaza, 20th Floor
San Francisco, CA 94111
Contact:
Paul A. Renne             (415) 693-2073
Gordon C. Atkinson        (415) 693-2088

Davis Wright Tremaine
Suite 600
One Embarcadero Center
San Francisco, CA 94111-3834
Contact:
Martin Fineman            (415) 276-6500

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Contact:
Philip Bosl               (213) 229-7543

Gibson, Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza
Irvine, CA 92614-8557
Contact:
Wayne W. Smith            (714) 451-4108

Gibson, Dunn & Crutcher LLP
525 University Ave., Ste. 220
Palo Alto, CA 94301
Contact:
John C. Dickey            (415) 463-7324

Heller, Ellman, White & McAuliffe
333 Bush Street
San Francisco, CA 94104
Contact:
Douglas M. Schwab
M. Laurence Popofsky
Michael J. Shepard        (415) 772-6000

Heller, Ellman, White & McAuliffe
525 University Avenue
Palo Alto, CA 94301
Contact:
Michael L. Charlson
Norman J. Blears          (650) 324-7000

(Revised (6/00)

1

APPENDIX A
## SECURITIES  CLAIMS PANEL COUNSEL LIST

Heller, Ellman, White & McAuliffe
4250 Executive Square
7th Floor
San Diego, CA 92037-9103
Contact:
David E. Kleinfeld          (858) 450-8400

Heller, Ellman, White & McAuliffe
601 South Figueroa Street, 40th Fl.
Los Angeles, CA 90017-5758
Contact:
Jerry L. Marks
Darryl L. Snider          (213) 689-0200

Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
Contact:
Richard Borow
David Schwartz
David Gindler
David Siegel
James F. Elliot
Jim Adler          (310) 277-1010

Latham & Watkins
633 West Fifth Street
Suite 4000
Los Angeles CA, 90071-2007
Contact:
Hugh Steven Wilson          (213) 485-1234

Latham & Watkins
75 Willow Road
Menlo Park, CA 94025
Contact:
Paul H. Dawes          (650) 328-4600

McCutchen Doyle, Brown & Enerson LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-1560
Contact:
John C. Morrissey          (213) 680-6416

McCutchen, Doyle, Brown & Enerson LLP
Three Embarcadero Center
San Francisco, CA 94111
Contact:
David M. Balabanian          (415) 393-2170
Karen L. Kennard          (415) 393-2626

McCutchen, Doyle, Brown & Enerson, LLP
3150 Porter Drive
Palo Alto, CA 94303-1212
Contact:
Mary Huser          (650) 849-4914

Morrison & Foerster
425 Market Street
San Francisco, CA  94104-2482
Contact:
Paul T. Friedman
Melvin R. Goldman          (415) 268-7000

Morrison & Foerster LLP
555 West 5th Street – Suite 3500
Los Angles, CA 90013-1024
Contact:
Robert S. Stern
B. Scott Silverman          (213) 892-5200

Morrison & Foerster, LLP
19900 MacArthur Boulevard, 12th Floor
Irvine, CA 90017
Contact:
Josephine Staton Tucker          (714) 251-7500

Munger, Tolles & Olson
355 South Grand Avenue-35th Floor
Los Angeles, CA 90071-1560
Contact:
Dennis L. Kinnaird          (213) 683-9264
John W. Spiegel          (213) 683-9152
George M. Garvey          (213) 683-9153

O'Melveny & Myers LLP
400 South Hope Street, 15th Floor
Los Angeles, CA 90071-2899
Contact:
Robert Vanderet
Seth Aronson          (213) 430-6000

O'Melveny & Myers LLP
610 Newport Center
Newport Beach, CA 92660
Contact:
Phillip Kaplan
Brett J. Williamson
Michael G. Yoder          (714) 760-9600

O'Melveny & Myers LLP
275 Battery Street
San Francisco, CA 94111
Contact:
Richard Warmer
Daniel Bookin          (415) 984-8700

(Revised (6/00)

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

Orrick Herrington & Sutcliffe LLP
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, CA 94111
Contact:
William Alderman        (415) 773-5944
John H. Kanberg         (415) 773-5469

Orrick Herrington & Sutcliffe LLP
1020 Marsh Road
Menlo Park, CA 94025
Contact:
W. Reece Bader          (650) 614-7440

Paul, Hastings, Janofsky & Walker LLP
555 S. Flower Street
Twenty-Third Floor
Los Angeles, CA 90071-2371
Contact:
J. Allen Maines         (213) 683-6000

Pillsbury Madison & Sutro LLP
650 Town Center Drive, 7th Floor
Costa Mesa, CA 92626-7122
Contact:
Steven O. Kramer
Walter Robinson         (714) 436-6800

Pillsbury Madison & Sutro LLP
101 W. Broadway, Suite 1800
San Diego, CA 92101-8219
Contact:
David E. Kleinfeld      (619) 234-5000

Pillsbury Madison & Sutro LLP
235 Montgomery Street
San Francisco, CA 94104
Contact:
Bruce A. Ericson
William O. Fisher       (415) 983-1000

Sherman & Sterling
555 California Street
San Francisco, CA 94104
Contact:
Susan Samuels Muck      (415) 616-1100
Dean Krystowski
Jeffrey S. Facter

Simpson Thacher & Bartlett
3373 Hillview Avenue
Palo Alto, CA 94304
Contact:
James G. Kreissm an
Charles E. Koob
George M. Newcombe      (650) 251-5000

Simpson Thacher & Bartlett
10 Universal City Plaza
Suite 852
Universal City, CA 91608
Contact:
Barry R. Ostrager
Seth A. Ribner          (818) 755-7000

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Contact:
Frank Rothman
Eric S. Waxman          (213) 687-5000

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 220
Palo Alto, CA 94111
Contact:
James E. Lyons          (650) 470-4500

Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
San Francisco, CA 94301
Contact:
James E. Lyons          (415) 984-2698

Sullivan & Cromwell
1888 Century Park East,
Los Angeles, CA 90067-1725
Contact:
Robert A. Sacks         (310) 712-6600

Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo, Alto, CA 94304-1050
Contact:
Bruce G. Vanyo
Steven M. Schatz
Boris Feldman
Daniel Mitz
David Priebe
David S. Steuer
Eileen Marshall
Martin W. Korman
Sarah Good              (650) 493-9300

(Revised (6/00)

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

<u>Delaware</u>

Blank Rome Comisky & McCauley LLP
1220 Market Street, 8th Floor
Wilmington, DE  19801
Contact:
Cathy L. Reese            (302) 425-6400

Wolf, Block, Schorr and Solis-Cohen LLP
One Rodney Square
10th & King Streets
Wilmington, DE  19801
Contact:
David J. Margules         (302) 777-5860

<u>District of Columbia</u>

Arnold & Porter
555 Twelfth Street, NW
Washington, D.C. 20004-1202
Contact:
Scott Schreiber           (202) 942-5672

Brobeck, Phleger & Harrison LLP
Market Square East, Suite 220
701 Pennsylvania Avenue, NW
Washington, DC  20004
Contact:
John B. Missing           (202) 220-6000

Cahill Gordon & Reindel
1990 K Street, NW, Suite 950
Washington, DC 20006
Contact:
Donald J. Mulvihill       (202) 862-8900

Davis, Polk & Wardwell
1300 I Street, N.W.
Washington, DC 20005
Contact:
Scott W. Muller           (202) 962-7000

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Contact:
F. Joseph Warin           (202) 887-3609

Greenberg Traurig
800 Connecticut Avenue, NW, Suite 500
Washington, D.C. 20036
Contact:
Joe Reeder                (202) 331-3100
C. Allen Foster
Eric C. Rowe

Patton Boggs, L.L.P.
2550 M Street N.W.
Washington, D.C. 20037
Contact:
Lanny Davis               (202) 457-6000
Eric A. Kuwana
Ronald S. Liebman

Sherman & Sterling
801 Pennsylvania Avenue, N.W.
Contact: Washington, DC 20004-2604
Contact:
Thomas S. Martin          (202) 508-8000
Jonathan L. Greenblatt

Sullivan & Cromwell
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5805
Contact:
Margaret K. Pfeiffer
Daryl A. Libow            (202) 956-7500

Willkie Farr & Gallagher
Three Lafayette Centre
1155 21st Street N.W.
Washington, D.C. 20036-3384
Contact:
Kevin B. Clark            (202) 328-8000

<u>Florida</u>

Akerman Senterfitt & Eidson, P.A.
Sun Trust International Center
28th Floor
Miami, FL 33131
Contact:
Stanley H. Wakshlag       (305) 374-5600

Fowler White, Gillen, Boggs, Villareal
and Banker, P.A.
501 East Kennedy Boulevard
Suite 1700
Tampa, Fl 33602
Contact:
Burton W. Wiand
W. Donald Cox             (813) 228-7411

Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131
Contact:
Hillarie Bass             (305) 579-0500

(Revised (6/00)                              4

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

Greenberg Traurig
777 South Flagler Drive
West Palm Beach, FL 33401
Contact:
Mark F. Bideau                    (561) 650-7900

Greenberg Traurig
111 North Orange Avenue
Orlando, FL 32801
Contact:
Tucker H. Byrd                    (407) 420-1000

Greenberg Traurig
101 East College Avenue
Post Office Drawer 1838
Tallahassee, FL 32302
Contact:
Barry Richard                     (850) 222-6891

Holland & Knight
400 North Ashley Drive, Suite 2300
Tampa, FL 33602
Contact:
Frederick S. Schrils
G. Calvin Hayes
Francis Curran                    (813) 227-8500

Holland & Knight
50 North Laura Street, Suite 3900
P.O. Box 52687 (Zip 32201)
Jacksonville, Fl 32202
Contact:
George E. Schultz, Jr.
Michael G. Tanner
Fred Lotterhos                    (904) 353-2000

Holland & Knight
701 Brickell Avenue, Suite 3000
P.O. Box 015441 (Zip 33101)
Miami, FL 33131
Contact:
Greg Baldwin
Tracy A. Nichols                  (305) 374-8500

Holland & Knight
315 South Calhoun Street, Suite 600
P.O. Drawer 810 (Zip 32302)
Tallahassee, FL 32301
Contact:
Robert R. Feagin III
Elizabeth Bevington               (850) 224-7000

Holland & Knight
625 North Flagler Drive
P.O. Box 3208 (33402)
West Palm Beach, FL 33401
Contact:
D. Culver Smith, III (Skip)       (513) 833-2000

Holland & Knight
200 South Orange Avenue
SunTrust Building, Suite 2600
P.O. Box 1525 (Zip 32802)
Orlando, FL 32801
Contact:
William Wilson                    (407) 425-8500

McGuire Woods Battle & Boothe
3300 Barnett Center
50 North Laura Street
Jacksonville, FL 32202-3635
Contact:
David M. Wells                    (904) 798-2693

Steel, Hector & Davis LLP
200 South Biscayne Boulevard
Miami, FL 33131-2398
Contact:
Lewis F. Murphy, P.A.             (305) 577-2957
Wendy Leavitt

Stroock & Stroock & Lavan LLP
200 South Biscayne Boulevard
Miami, FL 33131-2385
Contact:
Richard B. Simring
Robert W. Turken                  (305) 358-9900

Zuckerman Spaeder Taylor & Evans LLP
900 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Contact:
Ronald B. Ravikoff
Thomas J. Meeks
Guy A. Rasco                      (305) 358-5000

### Georgia

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
Contact:
Peter Q. Bassett                  (404) 881-7343
Mary C. Gill                      (404) 881-7000
John Goselin                      (404) 881-7000
Rodd R. David                     (404) 881-7000

5

(Revised (6/00)

APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763
Contact:
M. Robert Thornton
Michael R. Smith                    (404) 572-4600

Paul Hastings Janofsky & Walker, LLP
600 Peachtree Street, N.W., Suite 2400
Atlanta, GA 30308-2222
Contact:
J. Allen Maines                     (404) 815-2500

Smith Gambrell & Russell LLP
3343 Peachtree Road, N.E.
Suite 3100 – Promenade II
Atlanta, GA 30309-3592
Contact:
David A. Handley                    (404) 815-3671
John G. Despreit                    (404) 815-3730

### Illinois

Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL  60606-6677
Contact:
David H. Kistenbroker               (312) 360-6000
Michael L. O'Shaughnessy

Jenner & Block
One IBM Plaza
Chicago, IL 60611
Contact:
Jerold Solovy                       (312) 222-9350
Ronald Marmer                       (312) 923-2686
J. Kevin McCall                     (312) 923-2686

Kirkland & Ellis
2000 East Randolph Drive
Chicago, IL 60601
Contact:
Garrett B. Johnson
Robert J. Kopecky                   (312) 861-2000

Sidley & Austin
One First National Plaza
Chicago, IL 60603
Contact:
Walter C. Carlson                   (312) 853-7734
Hillie Sheppard                     (312) 853-7850
Eugene A. Schoon                    (312) 853-7279

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Contact:
Susan Getzendanner
Timothy A. Nelsen                   (312) 407-0700

Sonnenschein Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606
Contact:
Christopher Q. King                 (312) 876-8224
David L. Schiavone                  (312) 876-7483

### Louisiana

Locke Liddell & Sapp LLP
601 Poydras Street, Suite 2400
New Orleans, LA  70130-6036
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                         (504) 558-5100

### Massachusetts

Hale & Dorr
60 State Street
Boston, MA 02109
Contact:
Jeffrey B. Rudman
John F. Batter
James W. Prendegast                 (617) 526-6000

Hutchins Wheeler & Ditmar P.C.
101 Federal Street
Boston, MA  02110
Contact:
David S. Rosenthal
John Hughes                         (617) 951-6624

Mintz, Levin, Cohn, Feris, Glovsky &
Popeo P.C.
One Financial Center
Boston, MA 02111
Contact:
Peter M. Saparoff                   (617) 542-6000
Patrick J. Sharkey

Ropes & Gray
One International Plaza
Boston, MA 02110-2624
Contact:
John D. Donovan, Jr.                (617) 951-7566

(Revised (6/00)                     6

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

Skadden, Arps, Slate, Meager & Flom LLP
One Beacon Street
Boston, MA 02108
Contact:
Thomas J. Dougherty
George J. Skelly           (617) 573-4800

Testa, Hurwitz & Thibeault
High Street Tower
125 High Street
Boston, MA 02110
Contact:
Brian E. Pastuszenski     (617) 248-7253
Jordan D. Hershman        (617) 248-7363

**Minnesota**

Dorsey & Whitney LLP
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Contact:
Brian E. Palmer
Edward J. Pluimer
J. Jackson
Peter S. Hendrixson
Peter W. Carter
Roger J. Magnuson         (612) 340-2600

Faegre & Benson LLP
90 South Seventh Street
Minneapolis, MN 55402-3901
Contact:
Robert L. Schnell
Thomas L. Kimer           (612) 336-3000

Oppenheimer Wolff & Donnelly LLP
Plaza VII Building, Suite 3400
45 South Seventh Street
Minneapolis, MN 55402
Contact:
Craig W. Gagnon
Michael J. Bleck
Michael E. Keyes          (612) 607-7300

Winthrop & Weinstine, PA
3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Contact:
David P. Pearson
Steven C. Tourek
Thomas H. Boyd            (612) 347-0700

**New York**

Arnold & Porter
399 Park Avenue
New York, NY 10022-4690
Contact:
Scott Schreiber           (212) 715-1000
Kent A. Yalowitz

Brobeck, Phleger & Harrison LLP
1633 Broadway, 47th Floor
New York, NY 10019
Contact:
Francis S. Chlapowski
Gregory A. Markel         (212) 581-1600

Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY 10038
Contact:
Dennis J. Block
Howard R. Hawkins
Jeffrey Q. Smith
Jonathan M. Hoff          (212) 504-6000

Cahill Gordon & Reindel
80 Pine Street
New York, NY 10005
Contact:
Charles A. Gilman
Immanuel Kohn
Thomas J. Kavaler         (212) 701-3000

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Contact:
Evan R. Chesler
Francis P. Barron
Julie A. North
Keith R. Hummel
Paul C. Saunders
Peter T. Barbur
Richard W. Clary
Robert H. Baron
Ronald S. Rolfe
Rory O. Millson
Thomas G. Rafferty        (212) 474-1000

(Revised (6/00)

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Contact:
Daniel F. Kolb
Frank S. Moseley
Gary G. Lynch
James W.G. Benkard
Robert F. Wise
Robert B. Fiske                    (212) 450-4000

Fried, Frank, Harris, Shiver & Jacobson
One New York Plaza
New York, NY 10004
Contact:
Sheldon Raab
Gregory P. Joseph
John A. Borek                      (212) 859-8000

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Contact:
A. Bendell
B. David Grais
C. Wesley G. Howell                (212) 351-4000

Greenberg Traurig
MetLife Building
200 Park Avenue
New York City, NY 10166
Contact:
Marshall H. Fishman                (212) 801-9200
Alan Mansfield

Kaye, Scholer, Fiernan, Hays & Handler
425 Park Avenue
New York, NY 10022
Contact:
Frederic W. Yerman                 (212) 836-8663

Kirkland & Ellis
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
Contact:
Yosef J. Riemer
Frank M. Holozubiec                (212) 446-4800

Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022
Contact:
Gary Naftalis                      (212) 715-9100

Latham & Watkins
885 Third Avenue, Suite 1000
New York, NY 10022-4802
Contact:
Hon. Kenneth Conboy
John J. Kirby                      (212) 906-1200

Mayer, Brown & Platt
1675 Broadway
New York, NY 10019
Contact:
Dennis P. Orr
Richard A. Spehr
Steven Wolowitz                    (212) 506-2500

Milbank, Tweed Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005
Contact:
Russell Brooks                     (212) 530-5554

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
Contact:
Anthony M. Radice
Jack C. Auspitz                    (212) 468-8000

Paul Hastings, Jaofsky & Walker LLP
399 Park Avenue, 31st Floor
New York, NY 10022-4697
Contact:
J. Allen Maines                    (212) 318-6000

Paul Weiss Rifkind Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
Martin Flumenbaum
Claudia Hammerman
Daniel J. Beller
Max Gitter
Richard A. Rosen                   (212) 373-3000

Roger & Wells LLP
200 Park Avenue
New York, NY 10166
Contact:
James N. Benedict                  (212) 878-8000
James B. Weidner
John K. Carroll
Mark Holland
Mark Pomerantz

(Revised (6/00)

8

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

Schulte Roth & Zabel LLP
900 Third Avenue
New York, NY 10022
Contact:
Daniel J. Kramer
David M. Brodsky
Irwin J. Sugarman
Robert M. Abrahams          (212) 756-2000

Shearman & Sterling
599 Lexington Avenue
New York, NY 10017
Contact:
Jeremy G. Epstein
R. Paul Wickes              (212) 848-8000

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Contact:
Michael J. Chepiga
Bruce D. Angiolillo
Roy L. Reardon
George M. Newcombe
Paul C. Curnin
Peter Kazanoff             (212) 455-2000

Skadden, Arps, Slate, Meagher & Folm LLP
919 Third Avenue
New York, NY 10022
Contact:
Barry H. Garfinkel
Jonathan J. Lerner
Lea Haber Kuck             (212) 735-3000

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Contact:
Melvin A. Brosterman
Lawrence Greenwald
Robert Lewin               (212) 806-5400

Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498
Contact:
D. Stuart Meiklejohn
Gandolfo V. DiBlasi
John L. Warden
John L. Hardiman
Philip L. Graham, Jr.
Richard H. Klapper         (212) 558-4000

Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
Contact:
Irwin H. Warren
Greg A. Danilow
Joseph Allerhand           (212) 310-8000

Wilkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099
Contact:
David L. Foster
Richard L. Posen
Michael R. Young           (212) 728-8000

### Ohio

Jones Day, Reavis & Pogue
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Contact:
John M. Newman             (216) 586-3939
John W. Edwards

### Oregon

Davis Wright Tremaine
2300 First Interstate Tower
1300 S.W. Fifth Avenue
Portland, OR 97201
Contact:
John F. McGrory            (503) 241-2300

Foster Pepper & Shefelman
One Main Place
101 S.W. Main Street, 15th Floor
Portland, OR 97204-3223
Contact:
Peter S. Ehrlichman
Stellman Keehnel
Tim Filer                  (503) 221-7799

Lane Powell Spears Lubersky LLP
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Contact:
D. Meredith Wilson
Milo Petranovich
Robert E. Maloney          (503) 778-2100

(Revised (6/00)

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

## Pennsylvania

Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103-6998
Contact:
Alexander D. Bono
Richard P. McElroy
Jerome R. Richter
Leonard Dubin
Matthew J. Siembieda        (215) 569-5500

Buchanan Ingersoll, PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219-8800
Contact:
John R. Leathers            (412) 562-1880

Cozen and O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103
Contact:
Patrick J. O'Connor
Thomas C. Zielinski
H. Robert Fiebach
Anita B. Weinstein
Steven N. Haas              (800) 665-2000

Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Contact:
Seymour Kurland
Jeffrey G. Weil
Frederick G. Herold         (215) 994-4000

Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA 19103-6993
Contact:
Marc J. Sonnenfeld
Elizabeth Hoop Fay          (215) 963-5000

Pepper, Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Contact:
Barbara W. Mather
Jon A. Baughman
Laurence Z. Shiekman
M. Duncan Grant
Robert L. Hickok
Thomas E. Zemaitis          (215) 981-4000

Wolf, Block, Schorr and Solis-Cohen LLP
12th Floor – Packard Building S.E.
Corner 15th & Chestnut Streets
Philadelphia, PA 19102-2678
Contact:
Jay A. Dubow
Ian A.L. Strogatz
Jerome J. Shestack
M. Norman Goldberger
Mark L. Alderman            (215) 977-2058

## Texas

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675
Contact:
Lou Bickel
Mike Lowenberg             (214) 969-2800

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
Pennzoil Place –South Tower
711 Louisiana Street
Suite 1900
Houston, TX 77002
Contact:
Charlie Moore
Paula Hinton               (713) 220-5800

Baker & Botts, L.L.P.
910 Louisianna
Houston, TX 77002-4995
Contact:
David D. Sterling          (713) 229-1946

Baker & Botts, L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2916
Contact:
Robert W. Jordan           (214) 953-6518

Brobeck, Phleger & Harrison LLP
301 Congress Avenue, Suite 1200
Austin, TX 78701
Contact:
Paul R. Bessette           (512) 477-5495

Fulbright & Jaworski, L.L.P.
1301 McKinney
Suite 5100
Houston, TX 77010
Contact:
Frank G. Jones
Richard N. Carrell         (713) 651-5151

10

(Revised (6/00)

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

Fullbright & Jaworski, L.L.P.
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Contact:
Karl G. Dial                                    (214) 855-8000

Haynes & Boone, L.L.P.
901 Main Street, Suite 3100
Dallas, TX 75202-3789
Contact:
George Bramblett
Noel Hensley                                    (214) 651-5000

Jenkins & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, TX 75202
Contact:
John Gilliam                                    (214) 855-4306

Jenkins & Gilchrist
1100 Louisiana, Suite 1800
Houston, TX 77002
Conctact:
John Gilliam                                    (713) 951-3300

Locke Liddell & Sapp LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                                     (214) 740-8000

Locke Liddell & Sapp LLP
100 Congress Avenue, Suite 300
Austin, TX 78701-4042
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                                     (512) 305-4700

Locke Liddell & Sapp LLP
700 Lavaca, Suite 800
Austin, TX 78701
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                                     (512) 404-2000

Locke Liddell & Sapp LLP
600 Travis
3400 Chase Tower
Houston, TX 77002
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                                     (713) 226-1200

Thompson & Knight, PC
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201
Contact:
Timothy R. McCormick                            (214) 969-1103

Thompson & Knight, PC
98 San Jacinto Boulevard, Suite 1200
Austin, TX 78701
Contact:
Timothy R. McCormick                            (512) 469-6100

Thompson & Knight, PC
801 Cherry Street, Suite 1600
Fort Worth, TX 76102
Contact:
Timothy R. McCormick                            (817) 347-1700

Thompson & Knight, PC
1700 Texas Commerce Tower
600 Travis
Houston, TX 77002
Contact:
Timothy R. McCormick                            (713) 217-2800

Thompson & Knight, PC
1200 Smith Street, Suite 3600
Houston, TX 77002
Contact:
Timothy R. McCormick                            (713) 654-8111

Vinson & Elkins L.L.P.
2500 First City Tower
1001 Fannin
Houston, TX 77002-6760
Contact:
David T. Hedges, Jr.                            (713) 758-2676
Charles W. Schwartz                             (713) 758-3852

Vinson & Elkins L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201-2975
Contact:
Orrin L. Harrison III                           (214) 220-7715

(Revised (6/00)

**APPENDIX A**
## SECURITIES CLAIMS PANEL COUNSEL LIST

Vinson & Elkins L.L.P.
One American Center, Suite 2700
600 Congress Avenue
Austin, TX 78701-3200
Contact:
Richard D. Milvenan        (512) 495-8542

Wilson, Sonsini, Goodrich & Rosati
8911 Capital of Texas Highway
North Westech 360, Suite 3350
Austin, TX 78759-7427
Contact:
Bruce G. Vanyo
Paul Tobias        (512) 338-5499

**Virginia**

Cooley Godward, LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
Contact:
Robert R. Vieth        (703) 456-8082

Greenberg Traurig
1750 Tysons Boulevard, 12th Floor
McLean, VA 22102
Contact:
Harry M. Glazer
Joseph T. Casey, Jr.        (703) 749-1300

McGuire Woods Battle & Boothe, L.L.P.
One James Center
901 East Cary Street,
Richmond, VA 23219-4030
Contact:
Warren E. Zirkle        (804) 775-4364

McGuire Woods Battle & Boothe, L.L.P.
Tysons II, Suite 1800
1750 Tysons Boulevard
McLean, VA 22102-3892
Stephen M. Colangelo        (703) 712-5371

**Washington**

Davis Wright Tremaine
2600 Century Square
1501 Fourth Avenue
Seattle, Washington 98101-1688
Contact:
Stephen M. Rummage        (206) 622-3150
Ladd B. Leavens        (206) 622-3150

Foster Pepper & Shefelman
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-2399
Contact:
Peter S. Ehrlichman
Stellman Keehnel
Tom Filer        (206) 447-8998

Heller, Ehrman, White & McAuliffe
701 Fifth Avenue
Seattle, WA 98104-7098
Contact:
George E. Greer
Daniel J. Dunne        (206) 447-0900

Lane Powell Spears Lubersky LLP
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
Contact:
Christopher B. Wells
James B. Stoetzer
James L. Robart
Larry S. Gangnes
Rudy A. Englund        (206) 223-7000

Perkins Coie LLP
1201 Third Avenue, Ste. 4800
Seattle, Washington 98101-3099
Contact:
Ronald L. Berenstain
Harry H. Schneider
Barry M. Kaplan        (206) 583-8888

(Revised (6/00)

*EXHIBIT 1C*

ENDORSEMENT# *1*

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance
company which issued this policy; and 2) "you", "your", "named Insured", "First Named
Insured", and "Insured" mean the Named Corporation, Named Organization, Named
Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other
Insured(s)" means all other persons or entities afforded coverage under the policy.

### WASHINGTON, D.C.
### CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the
cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)    Cancellation

    If this policy has been in effect for thirty (30) days or more, the Insurer may cancel
this policy only if one or more of the following reasons apply:

    1)    Insured has refused or failed to pay a premium due under the terms of the
policy;

    2)    Insured or Other Insured(s) have made a material and willful misstatement or
omission of fact to the Insurer or its employees, agents or brokers in
connection with any application to, or claim against the Insurer; or

    3)    Property or other interest of the Insured shall have been transferred to a
person other than the Insured or beneficiary, unless the transfer is
permissible under the terms of the policy, or unless the property, interest or
use thereof shall have materially changed with respect to its insurability.

    The Insurer will mail or deliver to the named Insured notice of cancellation at least
thirty (30) days prior to the date of cancellation. For cancellation as described
under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the
Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)    Nonrenewal

    If the Insurer decides not to renew this policy the Insurer will mail or deliver to the
named Insured the Insurer's notice of nonrenewal at least thirty (30) days before
the end of the policy period.

    The Insurer will mail or deliver notice of cancellation or nonrenewal to the agent or
broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

*END 001*

– 1 –

52136 (8/95)

ENDORSEMENT# *1*   (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

_____
AUTHORIZED REPRESENTATIVE

*END 001*

52136 (8/95)

<u>ENDORSEMENT#</u> *2*

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number *874-91-08*
issued to *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**CAPTIVE INSURANCE COMPANY EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payments for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon, attributable to the ownership, management, maintenance, operation and/or control by the Company of any captive insurance company or entity including but not limited to any Claim(s) alleging the insolvency or bankruptcy of the Named Corporation as a result of such ownership, operation, management and control.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 2*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 3

This endorsement, effective  *12:01 am*    *December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## COMMISSIONS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable to make any payment for Loss in connection with any Claim(s)
made against any Insured(s) alleging, arising out of, based upon, or attributable to:

  (i)   Payments, commissions, gratuities, benefits or any other favors to or for the
        benefit of any full or part-time domestic or foreign government or armed
        services officials, agents, representatives, employees or any members of
        their family or any entity with which they are affiliated; or

  (ii)  Payments, commissions, gratuities, benefits or any other favors to or for the
        benefit of any full or part-time officials, directors, agents, partners,
        representatives, principal shareholders, or owners or employees, or
        "affiliates" (as that term is defined in The Securities Exchange Act of 1934,
        including any officers, directors, agents, owners, partners, representatives,
        principal shareholders or employees of such affiliates) of any customers of
        the company or any members of their family or any entity with which they
        are affiliated; or

  (iii) Political contributions, whether domestic or foreign.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 3*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# *4*

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NUCLEAR ENERGY LIABILITY EXCLUSIONS ENDORSEMENT**
**(BROAD FORM)**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured(s):

A.    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

(1)    nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Company, or discharged or dispersed therefrom; or

(2)    nuclear material contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Company; or

(3)    the furnishing by an Insured or the Company of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

(4)    claims for damages to the Company or its shareholders which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B.    (1)    which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its Limit of Liability; or,

(2)    with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

*END 004*

– 1 –

ENDORSEMENT# *4*    (Continued)

As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means —

(a)   any nuclear reactor,

(b)   any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)   any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all-premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

All other terms, conditions and exclusions remain unchanged.

AUTHORIZED REPRESENTATIVE

*END 004*

EDO592

- 2 -

62739 (5/95)

ENDORSEMENT# 5

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PUNITIVE DAMAGES FOR SECURITIES CLAIMS

In consideration of the premium charged, it is hereby understood and agreed that the third
paragraph of the Definition of Loss is deleted in its entirety and replaced by the following:

> Notwithstanding the foregoing, solely with respect to Securities Claims, Loss
> shall include (subject to the policy's other terms, conditions and exclusions,
> including but not limited to exclusions relating to personal profit or advantage,
> illegal remuneration, deliberate fraud or criminal acts) punitive and/or exemplary
> damages imposed upon any Insured.

It is further understood and agreed that the enforceability of this endorsement shall be
governed by such applicable law that most favors coverage for punitive damages.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 5*

(2/90)

ENDORSEMENT# 6

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PRIOR ACTS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to MFS Communications Company, Inc., the Insurer shall not be liable to make any payment for Loss arising from a Claim alleging a Wrongful Act which occurred prior to September 30, 1995. This policy only provides coverage for Loss arising from a Claim alleging a Wrongful Act occurring on or after September 30, 1995 and prior to the end of the Policy Period and otherwise covered by this policy. Loss(es) arising out of the same or relate Wrongful Act(s) shall be deemed to arise from the first such same or related Wrongful Act.

All other terms, conditions and exclusions remain unchanged.

*END 6*

AUTHORIZED REPRESENTATIVE

(2/90)

## ENDORSEMENT# 7

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### POLLUTION A–SIDE SHAREHOLDER CLAIM COVERAGE

In consideration for the premium charged, it is hereby understood and agreed that as respects any Claim(s) under Coverage A of this policy only, exclusion (l) of the policy entitled EXCLUSIONS shall not apply to:

Any non-Indemnifiable Loss arising from a Claim(s) which is brought by a shareholder of the Company in the form of a shareholder direct, derivative or class action, but only if such Claim(s) is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any natural person Insured(s) or the Company, or any subsidiary or affiliate of the Company.

Further provided that for the purposes of the applicability of the coverage provided under this endorsement, the Company will be conclusively deemed to have indemnified the Directors or Officers to the extent that the Company is permitted or required to grant such indemnification pursuant to law, common or statutory, or contract or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines or defines such rights of indemnity). The Company hereby agrees to indemnify the Directors or Officers to the fullest extent permitted by law including the making in good faith of any required application for court approval. In no event shall this endorsement be construed to apply to any Claim(s) in which the Company has indemnified or is permitted or required to indemnify the Insureds.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 7*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# *8*

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### COINSURANCE FOR SECURITIES CLAIMS

In consideration of the premium charged, it is hereby understood and agreed that solely as respects Securities Claims, the following clause is added to the policy:

**COINSURANCE CLAUSE**

With respect to Loss under: (i) Coverage B(ii) for which the Company has indemnified or is permitted or required to indemnify the natural person Insured(s), as defined in subparagraphs (1), and (3) of the Definition of "Director(s) or Officer(s) or Insured(s)", pursuant to law, common or statutory, or contract or the Charter or Bylaws of the Company ("Indemnifiable Loss") or (ii) Coverage B(i), the Insurer shall be liable to pay 80% of such Loss, excess of the retention amount described in Item 5 of the Declarations as respects the first $10,000,000 Limit of Liability described in Item 4 of the Declarations, it being a condition of this insurance that the remaining 20% of each and every such Loss shall be carried by the Insured(s) at their own risk and be uninsured.

With respect to all Loss other than Loss described in the above paragraph, ("non-Indemnifiable Loss") the Insurer shall be liable to pay 100% of such Loss, excess of the retention amount described in Item 5 of the Declarations up to the Limit of Liability described in Item 4 of the Declarations.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 8*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 9

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

SECURITIES CLAIM DEFINITION AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the definition of "Securities Claim" is hereby deleted in its entirety and replaced with the following:

"Securities Claim" means a Claim, other than an administrative or regulatory proceeding against, or investigation of a Company, made against any Insured:

(1)   alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

(i)   brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of a Company; or

(ii)   brought by a security holder of a Company with respect to such security holder's interest in securities of a Company; or

(2)   brought derivatively on the behalf of a Company by a security holder of such Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.

*END 9*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 10

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number *874-91-08*
issued to    *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## FAILURE TO EFFECT AND/OR MAINTAIN
## INSURANCE EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured alleging, arising out of, based upon, attributable to any failure or omission on the part of the Insureds or the Company to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 10*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 11

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number  874-91-08
issued to   WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

## "NO LIABILITY" PROVISION DELETED

In consideration of the premium charged, it is hereby understood and agreed that the
policy is hereby amended as follows:

(1)   The Definition of and all provisions referring to "No Liability" are hereby
deleted in their entirety; and

(2)   The last paragraph of Clause 6  RETENTION CLAUSE is hereby deleted in its
entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

END 11

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 12

This endorsement, effective *12:01 am*      *December 31, 2001*      forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### CrisisFundsm

### (Crisis Communications Management Insurance)

In consideration of the premium charged, it is hereby understood and agreed that this policy
is amended to provide Crisis Management Coverage pursuant to the terms and conditions set
forth below:

1)   The Clause of the policy entitled INSURING AGREEMENTS is amended to add the
following new insuring agreement:

**CRISIS MANAGEMENT COVERAGE**

This policy shall pay the Crisis Management Loss of the Company arising from a Crisis
Management Event first commencing during the Policy Period, up to the amount of
the Crisis Management Fund.

2)   The Section of the policy entitled EXCLUSIONS shall not be applicable to Crisis
Management Loss.

3)   The Section of the policy entitled LIMIT OF LIABILITY, is amended to add the
following:

The limit of the Insurer's liability for Crisis Management Loss arising from all
Crisis Management Events occurring during the Policy Period, in the aggregate,
shall be the amount set forth as the Crisis Management Fund. This limit shall
be the maximum limit of the Insurer under this policy regardless of the number
of Crisis Management Events occurring during the Policy Period. Provided,
however, that this single Crisis Management Event(s) limit shall be part of and
not in addition to the Limit of Liability stated in the Item of the Declarations'
page entitled LIMIT OF LIABILITY, which shall in all events be the maximum
liability of the Insurer for all loss under this policy.

4)   There shall be no Retention amount applicable to Crisis Management Loss, and the
Insurer shall pay such Loss from first dollar subject to the other terms and conditions
of this endorsement.

5)   An actual or anticipated Crisis Management Event shall be reported to the Insurer as
soon as practicable but in no event later than thirty (30) days after the Company first
incurs Crisis Management Loss for which coverage will be requested under this
endorsement.

**END 12**

(2/90)

ENDORSEMENT # 12    (Continued)

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number  874-91-08
issued to  WORLDCOM, INC.

by  National Union Fire Insurance Company of Pittsburgh, Pa.

6)  The Section of the policy entitled DEFENSE COSTS, SETTLEMENTS, JUDGMENTS
(INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) shall have no applicability to
Crisis Management Events. There shall be no requirement for the Company to obtain
prior written approval of the Insurer before incurring any Crisis Management Loss,
provided that the Crisis Management Firm selected by the Company to perform the
Crisis Management Services has been approved by the Insurer.

<u>Definitions</u>

For the purposes of this endorsement, the following definitions shall apply:

A)  "Material Effect on the Company's Common Stock Price" shall mean, within a period
of 24 hours, that the price per share of the Company's common stock shall decrease
by the greater of $5 per share or 10% net of the change in the Standard & Poor's
Composite Index.

B)  "Crisis Management Event" shall mean:

I.  One of the following events which, in the good faith opinion of the Chief
Financial Officer of the Company, did cause or is reasonably likely to cause, a
Material Effect on the Company's Common Stock Price:

(1)  <u>Negative earning or sales announcement</u>

The public announcement of the Company's past or future earnings or
sales, which is substantially less favorable than any of the following: (i)
the Company's prior year's earnings or sales for the same period, (ii)
the Company's prior public statements or projections regarding earnings
or sales for such period, or (iii) an outside securities analyst's published
estimate of the Company's earnings or sales.

(2)  <u>Loss of a patent, trademark or copyright or major customer or
contract</u>

The public announcement of an unforeseen loss of: (i) the Company's
intellectual property rights for a patent, trademark or copyright, other
than by expiration; (ii) a major customer or client of the Company; or
(iii) a major contract with the Company.

**END 12**

(2/90)

ENDORSEMENT# 12    (Continued)

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number 874-91-08
issued to WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

(3)    Product recall or delay

The public announcement of the recall of a major product of the
Company or the unforeseen delay in the production of a major product
of the Company.

(4)    Mass tort

The public announcement or accusation that the Company has caused
the bodily injury, sickness, disease, death or emotional distress of a
group of persons, or damage to or destruction of any tangible group of
properties, including the loss of use thereof.

(5)    Employee layoffs or loss of key executive officer(s)

The public announcement of employee layoffs, or the death or
resignation of one or more key executive officer(s) of the Company.

(6)    Restatement of financial statement

The public announcement of a restatement of the Company's
previously filed financial statements.

(7)    Elimination or suspension of dividend

The public announcement of the elimination or suspension of a regularly
scheduled dividend previously being paid by the Company.

(8)    Write-off of assets

The public announcement that the Company intends to write off a
material amount of its assets.

(9)    Debt restructuring or default

The public announcement that the Company has defaulted or intends to
default on its debt or intends to engage in a debt restructuring.

END 12

(2/90)

ENDORSEMENT# *12*    (Continued)

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number *874-91-08*
issued to *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

(10)    **Bankruptcy**

The public announcement that the Company intends to file for
bankruptcy protection or that a third party is seeking to file for
involuntary bankruptcy on behalf of the Company; or the imminence of
bankruptcy proceedings, whether voluntary or involuntary.

(11)    **Governmental or regulatory litigation**

The public announcement of the commencement or threat of
commencement of litigation or governmental or regulatory proceedings
against the Company.

(12)    **Other**

Any other event previously consented to by the Insurer which, in the
good faith opinion of the Chief Financial Officer of the Company, did
cause or is reasonably likely to cause, a Material Effect on the
Company's Common Stock Price, but only if such event is specifically
scheduled by written endorsement to the policy.

II.    **Unsolicited takeover bid**

An unsolicited written offer or bid by any person or entity other than an
Insured or any affiliate of any Insured, whether publicly announced or privately
made to a director or executive officer of the Company, to effect a Transaction
(as Transaction is defined in Clause 12 of the policy) of the Company.

Provided, however, that the term Crisis Management Event shall not include any event
relating to:

(1)    any Claim(s) which have been reported, or any circumstances of which notice
has been given, under any policy of which this policy is a renewal or
replacement or which it may succeed in time;

(2)    any pending or prior litigation as of December 31, 1996;

(3)    the actual, alleged or threatened discharge, dispersal, release or escape of
pollutants; or any direction or request to test for, monitor, clean up, remove,
contain, treat, detoxify or neutralize pollutants; provided, however, the

**END 12**

(2/90)

ENDORSEMENT# 12    (Continued)

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number 874-91-08
issued to WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

foregoing shall not apply if the policy contains any endorsement modifying or deleting, in part or in whole, exclusion (l) of the policy;

(4)    the hazardous properties of nuclear materials; provided, however, the foregoing shall not apply to any Crisis Management Event(s) arising from the ownership of, operation of, construction of, management of, planning of, maintenance of or investment in any nuclear facility.

The descriptions in the headings of the Crisis Management Events are solely for convenience and form no part of the terms and conditions of coverage.

For the purposes of this endorsement, a Crisis Management Event shall first commence when the Company or any of its directors or executive officers shall first become aware of the event and shall conclude at the earliest of the time when the Crisis Management Firm advises the Company that the crisis no longer exists or when the Crisis Management Fund has been exhausted.

C)    "Crisis Management Firm" shall mean any public relations firm, crisis management firm or law firm hired by the Company or its directors, officers or employees to perform Crisis Management Services in connection with the Crisis Management Event which has been consented to by the Insurer, the consent for which shall not be unreasonably withheld. Attached to this endorsement is a list of firms which have been pre-approved by the Insurer and may be hired by the Company without further approval by the Insurer:

D)    "Crisis Management Fund" shall mean Fifty Thousand Dollars ($50,000).

E)    "Crisis Management Loss" shall mean the following amounts incurred during the pendency of or within 90 days prior to and in anticipation of, the Crisis Management Event, regardless of whether a Claim is ever made against an Insured arising from the Crisis Management Event and, in the case where a Claim is made, regardless of whether the amount is incurred prior to or subsequent to the making of the Claim:

(1)    Amounts for which the Company is legally liable for the reasonable and necessary fees and expenses incurred by a Crisis Management Firm in the performance of Crisis Management Services for the Company arising from a Crisis Management Event(s); and

(2)    Amounts for which the Company is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by directors,

**END 12**

(2/90)

ENDORSEMENT# 12    (Continued)

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number 874-91-08
issued to WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

officers, employees or agents of the Company or the Crisis Management Firm, in connection with the Crisis Management Event(s).

F)    "Crisis Management Services" means those services performed by a Crisis Management Firm in advising the Company or any of its directors, officers or employees on minimizing potential harm to the Company arising from the Crisis Management Event, including but not limited to maintaining and restoring investor confidence in the Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

END 12

(2/90)

ENDORSEMENT# *12*    (Continued)

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PRE-APPROVED CRISIS MANAGEMENT FIRMS

(1)    Abernathy MacGregor Scanlon
501 Madison Avenue
New York, NY 10022
(212) 371-5999
Contact: James T. M<sup>c</sup> Gregor

(2)    Burson-Marsteller
230 Park Avenue South
New York, NY 10003-1566
(212) 614-5236
Contact: Michael Claes

(3)    Patton Boggs, LLP
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-6000
Contact: Thomas H. Boggs

(4)    Kekst and Company
437 Madison Avenue
New York, NY 10022
(212) 593-2655
Contact: Andrew Baer

(5)    Kroll Associates
900 Third Avenue
New York, NY 10022
(212) 833-3385
Contact: Richard G. McCormick

(6)    Robinson Lerer & Montgomery
75 Rockefeller Plaza , 6th floor
New York, NY 10019
(212) 484-7721
Contact: Michael Gross

*END 12*

(2/90)

ENDORSEMENT# *12*    (Continued)

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number *874-91-08*
issued to *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

    (7)    Sard Verbinnen & Co.
             630 Third Avenue
             New York, NY 10017
             (212) 687-8080
             Contact: Paul Verbinnen or George Sard

    (8)    Sitrick & Company
             2029 Century Park East
             Suite 1750
             Los Angeles, CA 90067
             (310) 788-2850
             Contact: Michael Sitrick

    (9)    The MWW Group
             1212 Avenue of the Americas - 5th Floor
             New York, NY 10036
             (212) 827-3757
             Contact: Michael Lendener

*END 12*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 13

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number  874-91-08
issued to   WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

**EMPLOYEES AS CO-DEFENDANTS**

In consideration of the premium charged, it is hereby understood and agreed that coverage
as is afforded by this policy is extended to and the definition of "Insured(s)", and
"Director(s) or Officer(s)" is amended to include all employees of the Insured when they
are named as co-defendants in a suit or other legal action with a Director or Officer of the
Insured.

Only when and to the extent that the Company has indemnified such employees for such
Loss pursuant to law, common or statutory, or contract, or the Charter or By-Laws of the
Company duly effective under such law which determines and defines such rights of
indemnity.

*END 13*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# *14*

This endorsement, effective *12:01 am      December 31, 2001*      forms a part of
policy number *874-91-08*
issued to *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

PRIOR ACTS EXCLUSION FOR LISTED ENTITIES

In consideration of the premium charged, it is hereby understood and agreed that the term Company is amended to include the entity(ies) listed below, but only for Wrongful Act(s) committed by such entity(ies) and/or any Insureds thereof which occurred subsequent to such entity's respective acquisition/creation date listed below. Losses arising from the same or related Wrongful Act(s) shall be deemed to arise from the first such same or related Wrongful Act(s).

| | LISTED ENTITY(IES) | ACQUISITION/CREATION DATE |
|---|---|---|
| 1. | Advanced Telecommunications | January 01, 1983 |
| 2. | IBD Communication Group | December 30, 1994 |
| 3. | WIL Tel Network Services | January 05, 1995 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 14*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 15

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number    874-91-08
issued to    WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

## GLOBAL EXTENSION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that such coverage as is provided by this policy shall apply worldwide.

It is further understood and agreed that with regard to any Claim(s) made outside the United States of America, Canada or their territories or possessions, and reported to the Insurer under the provisions of this policy, the Insurer shall, when requested to do so in writing by the Named Corporation:

    a)    undertake the investigation, settlement and defense of Claim(s) against any Insured(s); (the Insured(s) and the Company shall cooperate in the investigation and defense of such Claim(s) as may be required by the Insurer) and the Insureds or the Company shall not take any action which may prejudice the Insurer in regard to such Claim;

    b)    pay covered Loss of any Insured(s) including:

        i)    all damages and judgments arising from liability imposed upon the Insureds by reason of a final judgment under law by a court of competent jurisdiction for any alleged Wrongful Acts to which this insurance applies, and;

        ii)    all Defense Costs arising from any Claim(s) to which this endorsement applies; and

        iii)    all sums for settlements negotiated by the Insurer with the approval of the Company and the Insured(s), provided that if the Company or the Insured(s) refuse to consent to a settlement recommended by the Insurer, the Insurer's obligation and liability for defense under paragraph (a) above shall terminate and the Insurer's liability for payment under this paragraph (b) shall not exceed the amount of the settlement recommended and the expenses under (b) (ii) above as of the time of refusal to consent.

The amounts due under b(i), (ii), (iii) above shall be included in, and not in addition to, the Limit of Liability set forth on the Declaration page of this policy and shall be subject to the applicable Retention(s). The amounts due under this endorsement shall be paid in the currency of the country in which the final adjudication was made, the expenses incurred or the settlement negotiated.

**END 15**

(2/90)

<u>ENDORSEMENT# 15</u>   (Continued)

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number  874-91-08
issued to   WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.


It is further understood and agreed that the Insurer shall not be held responsible for any delay or failure to perform its obligation hereunder due to national, federal, state or municipal action or regulation; strikes or other labor troubles; acts of God, war, riot, insurrection or mutiny; or any other causes, contingencies, or circumstances outside the United States not subject to the Insurer's control which make the fulfillment of this endorsement impracticable; any of which shall, without liability, excuse the insurer from the obligations set forth in this endorsement.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


**END 15**

AUTHORIZED REPRESENTATIVE

(2/90)

<u>ENDORSEMENT# 16</u>

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SUB-LIMIT FOR SPECIFIED SUBSIDIARIES

In consideration of the premium charged, it is hereby understood and agreed that with regards to Loss in connection with all claims in which one or more of the persons claimed against are Directors or Officers of the following Subsidiary(ies): Advantage Companies, Inc. for one or more alleged Wrongful Acts occurring prior to August 11, 1989 in their respective capacities as Directors or Officers of such Subsidiary(ies), the aggregate Limit of Liability for all such claims shall be $1,000,000 (hereinafter called the "sub-limit" of liability"). This sublimit of liability shall be part of and not in addition to the aggregate limit of liability stated in Item 4 of the Declarations and will in no way serve to increase the Insurer's Limit of Liability as therein stated. Claims alleging one or more related or same Wrongful Act shall be deemed to arise out of the first such same or related Wrongful Act.

It is further understood and agreed that exclusion 9l) is deleted to the extent coverage is afforded under this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 16*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 17

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SUBSIDIARY – ADDITION
## TO THE DEFINITION OF "SUBSIDIARY"

In consideration of the premium charged, it is hereby understood and agreed that the Definition of "Subsidiary" is hereby amended to include the following entity(ies), subject to such Subsidiary's respective Continuity Date.

| SUBSIDIARY | CONTINUITY DATE |
|---|---|
| CAI Wireless Communications, Inc. | July 9, 1999 |
| Embratel | September 15, 1998 |
| MCI Communications Corporation | September 15, 1998 |
| Skytel | April 30, 2001 |

For the purpose of the applicability of the coverage provided by this endorsement, the entities listed above and the Company will be conclusively deemed to have indemnified the Insureds of the each respective entity to the extent that such entity or the Company is permitted or required to indemnify such Insureds pursuant to law, common or statutory, or contract, or its charter or by-laws. The entity and the Company hereby agree to indemnify the Insureds to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

Furthermore, for the purpose of the applicability of the coverage provided by this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s), made against any Subsidiary listed above or any Insured(s) thereof:

(1) alleging, arising out of, based upon or attributable to any pending or prior litigation(s) as of such Subsidiary's respective Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation(s); or

(2) alleging any Wrongful Act occurring prior to such Subsidiary's respective Continuity Date, if an Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

**END 17**

(2/90)

ENDORSEMENT# *17*     (Continued)

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number *874-91-08*
issued to     *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

In all events, coverage as is afforded under this endorsement with respect to a Claim made
against each respective entity listed above or any Insureds thereof shall only apply for
Wrongful Acts committed or allegedly committed after the respective entity's Continuity
Date and prior to the time that the Named Corporation ceases to own at least a 51%
ownership interest in such entity.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

**END 17**

_____
AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# *18*

This endorsement, effective *12:01 am*   *December 31, 2001*   forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**EMPLOYMENT PRACTICES ENDORSEMENT**

(With Separate Retention and Excess Language)

*COVERAGE*

In consideration of the premium charged, it is hereby understood and agreed that the coverage as is afforded by this policy is extended to include Employment Practices Claims made against any Insured(s) (defined below), whether such Claims are brought by: (i) a past, present or prospective employee of the Company, whether directly or by class action; or (ii) by the Equal Employment Opportunity Commission (EEOC) or any other similar local, state, federal or foreign governmental authority regulating employment practices; or (iii) by any other person or entity, subject to the terms, conditions and exclusions of this endorsement and the policy.

**DECLARATIONS PAGE**

It is further understood and agreed that Item 5. RETENTION of the Declarations page is hereby deleted in its entirety and replaced with the following:

ITEM 5.    RETENTION:

SECURITIES CLAIMS

| | |
|---|---|
| Judgments & Settlements (all coverages) | None |
| Defense Costs (non-Indemnifiable Loss) | None |
| Defense Costs (Coverage B(i) and Indemnifiable Loss ) | $5,000,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

EMPLOYMENT PRACTICES CLAIMS

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |

**END 18**

(2/90)

<u>ENDORSEMENT#</u> *18*    (Continued)

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

Judgments, Settlements and Defense
Costs (Indemnifiable Loss)

$5,000,000 for Loss
arising from Claims alleging
the same Wrongful Act or
related Wrongful Acts

<u>OTHER CLAIMS:</u>

Judgments, Settlements and Defense
Costs (non-Indemnifiable Loss)

None

Judgments, Settlements and Defense
Costs (Indemnifiable Loss)

$5,000,0000 for Loss
arising from Claims alleging
the same Wrongful Act or
related Wrongful Acts

<u>*DEFINITIONS*</u>

It is further understood and agreed that for the purposes of this endorsement only, the
following definitions shall apply:

(1)    "Employment Practices Claims" means any Claim(s) relating to a past,
present or prospective employee of the Company for any actual or alleged:
(i) wrongful dismissal, discharge or termination (either actual or constructive)
of employment; (ii) employment-related misrepresentation; (iii) wrongful
failure to employ or promote; (iv) wrongful deprivation of career opportunity;
(v) wrongful discipline; (vi) failure to grant tenure or negligent employee
evaluation; (vii) failure to provide adequate employee policies and procedure;
(viii) sexual or workplace harassment of any kind, (including the alleged
creation of a harassing workplace environment); or (ix) unlawful
discrimination, whether direct, indirect, intentional or unintentional.

Employment Practices Claims shall include any Claim(s) brought under state,
local, federal or foreign law (whether common or statutory) and shall
include, but not be limited to, allegations of violations of the following
federal laws (as amended), including regulations promulgated thereunder:

1.    Family and Medical Leave Act of 1993;

*END 18*

(2/90)    *COPY*

ENDORSEMENT# 18    (Cor...nued)

This endorsement, effective  12:01 am    December 31, 2001    forms a part of
policy number  874-91-08
issued to  WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

2.    Americans with Disabilities Act of 1992 (ADA);

3.    Civil Rights Act of 1991;

4.    Age Discrimination in Employment Act of 1967 (ADEA),
including the Older Workers Benefit Protection Act of 1990;

5.    Title VII of the Civil Rights Act of 1964, as amended, including
the Pregnancy Discrimination Act of 1978;

6.    Civil Rights Act of 1866, Section 1981; and

7.    Fourteenth Amendment of the U.S. Constitution.

(2)    Solely for the purposes of Employment Practices Claims, the terms
"insured(s)" and "Director(s) or Officer(s)" shall also include any past,
present or future employee of the Company, whether such individual is in a
supervisory, co-worker or subordinate position or otherwise. Coverage shall
automatically apply to all new employees after the inception date of the
policy.

## EXCLUSIONS

It is further understood and agreed that solely in connection with Employment Practices
Claims exclusions (i) and (k) are amended as follows:

(1)    Exclusion (i) is amended by deleting the phrase, "wrongful termination of
employment claims", and substituting the phrase, "Employment Practices
Claims" (as defined in this endorsement) and by deleting the word "former
employee" and substituting the word "employee" to read as follows:

(i)    which is brought by any Insured or by the Company; or which is
brought by any security holder of the Company, whether directly or
derivatively, unless such security holder's Claim is instigated and
continued totally independent of, and totally without the solicitation
of, or assistance of, or active participation of, or intervention of, any
Insured(s); provided, however, this exclusion shall not apply to an
Employment Practices Claim brought by an employee other than an
employee who is or was a Director of the Company;

END 18
COPY

<u>ENDORSEMENT#</u> *18*   (Cc nued)

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

(2)   Exclusion (k) is amended by deleting the phrase, "emotional distress", and by deleting the phrase, "or for injury from libel or slander or defamation or disparagement, or for injury from a violation of a person's right of privacy", to read as follows:

(k)   for bodily injury, sickness, disease, death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

It is further understood and agreed that solely in connection with Employment Practices Claims, the following exclusions shall apply:

(1)   The Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon or attributable to any pending or prior litigation as of August 19, 1994 or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

(2)   The Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured(s) for any alleged Wrongful Act committed prior to August 19, 1994 if any Insured(s), as of such date, knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim.

It is further understood and agreed that the Employment Practices coverage as is provided by this endorsement shall be specifically excess over the Limit of Liability of <u>$25,000,000</u> as stated in Policy No. <u>874-33-15</u> issued by National Union fire Insurance Company of Pittsburgh, Pa. to Worldcom, Inc. .

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 18*                                    AUTHORIZED REPRESENTATIVE
(2/90)     *COPY*

ENDORSEMENT# *19*

This endorsement effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

**Cancellation Clause**

In consideration of the premium charged, it is hereby understood and agreed that
notwithstanding any other provision of this endorsement, any provision of this policy
respecting cancellation is deleted in its entirety except to indicate that this policy may be
cancelled by the Insurer for non-payment of premium.

Accordingly, this policy is non-cancellable and all premium shall be deemed earned at
inception except for cancellations by the Insurer for non-payment of premium.

*END 19*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 20

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number 874-91-08
issued to WORLDCOM, INC.

by  National Union Fire Insurance Company of Pittsburgh, Pa.

## ORDER OF PAYMENTS ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that:

1.  In the event of Loss arising from any Claim(s) for which payment is due under the provisions of this policy but which Loss, in the aggregate, exceeds the remaining available Limit of Liability of this policy, then this policy shall:

    (i)  first pay such Loss for which coverage is provided under Coverage A of the policy, then with respect to whatever remaining amount of the Limit of Liability is available after payment of such Loss,

    (ii)  then pay such Loss for which coverage is provided by Coverage B of the policy.

2.  In the event of Loss arising from a Claim(s) for which payment is due under the provisions of this policy (including those circumstances described in part 1 of this endorsement), the Insurer shall at the written request of the Named Corporation:

    (i)  first pay such Loss for which coverage is provided under Coverage A of the policy, then

    (ii)  either pay or hold payment for such Loss for which coverage is provided by Coverage B of the policy.

    In the event that the Insurer withholds payment under Coverage B of the policy pursuant to the above request, then the Insurer shall at any time in the future, at the request of the Company, release such Loss payment to the Company, or make such Loss payment directly to an individual Director or Officer in the event of covered Loss under any Claim(s) covered under this policy pursuant to Coverage A of the policy.

3.  Nothing in this endorsement shall be construed to increase the Limit of Liability of the Insurer under this policy which such Limit of Liability shall remain the maximum liability of the Insurer under all Claims under all Coverage under this policy combined.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 20*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 21

This endorsement, effective 12:01 am     December 31, 2001     forms a part of
policy number   874-91-08
issued to   WORLDCOM, INC.

by     National Union Fire Insurance Company of Pittsburgh, Pa.

### CLAUSE 7(a) AMENDED – NOTICE
### FROM RISK MANAGER OR GENERAL COUNSEL

In consideration of the premium charged, it is hereby understood and agreed that Clause 7. NOTICE/REPORTING PROVISIONS, paragraph (a) is deleted in its entirety and replaced with the following:

(a)    The Company shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured as soon as practicable after the Claim is reported to or first becomes known by the Risk Manager or the General Counsel (or equivalent position) of the Company, but in all events a Claim must be reported no later than either:

    (1)    anytime during the Policy Period or during the Discovery Period (if applicable); or

    (2)    within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim(s) is reported no later than thirty (30) days after the date such Claim was first made against an Insured.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**END 21**

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 22

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number *874-91-08*
issued to     *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**FOREIGN CORRUPT PRACTICES ACT EXTENSION**

I.

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. DEFINITIONS (g) "Loss" is amended by addition of the following at the end thereof:

Loss shall also include (subject to this policy's other terms, conditions and limitations, including but not limited to exclusions relating to profit or advantage, deliberate fraud or deliberate criminal acts): (1) civil penalties assessed against any individual Director or Officer pursuant to Sections (g) 2(B) of the Foreign Corrupt Practices Act, 78dd-2(g)(2)(B).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 22*

AUTHORIZED REPRESENTATIVE

(2/90)

## ENDORSEMENT# 23

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ADDITION TO THE TERM DIRECTOR OR OFFICER

In consideration of the premium charged, it is hereby understood and agreed that the term "Director or Officer" is amended to include any individual(s) of the Company listed below, but solely for Wrongful Acts committed in his or her respective capacity(ies) listed below.

| INDIVIDUALS | CAPACITY | CONTINUITY DATE |
|---|---|---|
| Jeff Rushton | CFO of SHL Systemhouse | December 8, 1998 |

It is hereby understood and agreed that this *policy* shall indemnify the *directors* and *officers* against *loss* in respect of any *wrongful act* committed whilst acting in the capacity of a shadow director, as defined under Section 741 of the Companies Act 1985, of any company (any such company hereinafter to be referred to as the "Shadow Directorship company") that is incorporated and/or domiciled in the UK or the Republic of Ireland, as a consequence of being a *director* or *officer* of the *company*, other than in respect of any:

(i) *claim* made whether in the name of or on behalf of any Shadow Directorship company or any person who is now or shall be a director or officer of the Shadow Directorship company; and/or

(ii) *claim* made whether in the name of or on behalf or any parent, holding, controlling, subsidiary, affiliate or associated company or representative of the Shadow Directorship company.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the Company is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The Company hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s) made against an Insured:

(1) alleging, arising out of, based upon or attributable to any pending or prior litigation as of each individual's respective Continuity Date listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

**END 23**

(2/90)

ENDORSEMENT# *23*    (Continued)

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

(2)    alleging any  Wrongful Act  occurring  prior to  each  individual's respective
Continuity Date if the  Insured knew or  could have reasonably foreseen  that
such Wrongful Act could lead to a Claim under this policy.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 23*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 24

This endorsement, effective *12:01 am      December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DISCOVERY CLAUSE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to the extent necessary for the policy to provide the following:

Clause 10. DISCOVERY CLAUSE is deleted in its entirety and replaced with the following:

**10.     DISCOVERY CLAUSE**

Except as indicated below, if the Insurer shall refuse to renew this policy, the Named Corporation shall have the right upon payment of an additional premium amount as shall be determined by the Insurer in its sole and absolute discretion, to a period of one year following the effective date of such nonrenewal (herein referred to as the "Discovery Period"), in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate unless written notice of election of a Discovery Period together with any additional premium due is received by the Insurer no later than thirty (30) days subsequent to the effective date of the nonrenewal.

In the event of a Transaction as defined in Clause 12, the Named Corporation shall have the right, within 30 days of the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Corporation may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions, exclusions and additional premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at inception of the Discovery Period. The Discovery Period is not cancelable. This Clause 10 and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 24*

(2/90)

ENDORSEMENT# 25

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ADDITION TO THE TERM "DIRECTOR(S) OR OFFICER(S)" OR "INSURED(S)"

In consideration of the premium charged, it is hereby understood and agreed that coverage as is afforded by this policy is extended to and the definition of term "Director(s) or Officer(s)" or "Insured(s)" is amended to include the members of the Advisory Board, solely in their capacity as such members, subject to the following September 15, 1998.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the Company is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The Company hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s) made against an Insured:

(1)    alleging, arising out of, based upon or attributable to any pending or prior litigation as of each individual's respective Continuity Date listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

(2)    alleging any Wrongful Act occurring prior to each individual's respective Continuity Date if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 25*

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 26

This endorsement, effective 12:01 am     December 31, 2001     forms a part of
policy number  874-91-08
issued to  WORLDCOM, INC.

by     National Union Fire Insurance Company of Pittsburgh, Pa.

## ADDITION TO THE TERM "DIRECTOR(S) OR OFFICER(S)" OR "INSURED(S)" (GENERAL COUNSEL)

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. DEFINITIONS, Definition of "Director(s) or Officer(s)" or "Insured(s)" is hereby amended to include the General Counsel of the Named Corporation, subject to the following Continuity Date: September 15, 1998.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the Company is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The Company hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s) made against an Insured:

   (1)   alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

   (2)   alleging any Wrongful Act occurring prior to the Continuity Date listed above, if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

END 26

_____
AUTHORIZED REPRESENTATIVE

(2/90)

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.
## CLAIM REPORTING INFORMATION SHEET

Reported Under Policy/Bond Number: _____

Type Of Coverage: _____

Insured's Name, As Given On Policy Declarations (Face Page): _____

_____

Contact Person: _____

Title: _____

Phone: _____

_____

Case Or Claimant Name: _____

If The Party Involved Is Different From "Insured" Name (As Given On Policy

Declarations) State Relationship: _____

_____

Insurance Broker/Agent: _____

Address: _____

Contact Person: _____

Phone: _____

Name Of Underwriter (If Known): _____

_____

Please Provide The Information Requested Above So
That We May Expedite Our Service To You.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

49114 SP90M (5/96)

*EXHIBIT 2*

Re:  <u>WorldCom, Inc., HO-09440</u>

**Revised Statement Pursuant to Section 21(a)(1) of the Securities Exchange Act of 1934**

1.   This **revised** statement is submitted by WorldCom, Inc. (the "Company") in response to the Commission's June 26, 2002 Order (the "Order") directing the Company to describe in detail the facts and circumstances underlying the events described in and leading to the Company's June 25, 2002 press release (the "Release") regarding its intention to restate its 2001 and first quarter 2002 financial statements.  The information provided in this Statement reflects the Company's best understanding as of this date.  However, in light of the Company's prompt determination, disclosed in the Release, that a full investigation of the circumstances giving rise to the need for the restatement should be performed by a party independent of the Company (see paragraph 20 below), which investigation commenced on June 24, 2002, and the short amount of time available, the Company's own review of those circumstances necessarily has been limited.  **The Company is relying on the independent investigation already underway to determine all the relevant facts and will take further action as appropriate upon conclusion of the investigation.  The Company has not conducted in-depth interviews of present or former directors, officers, or employees.**  The majority of the information set forth in this Statement is based on the Company's information and belief and does not reflect information as to which the undersigned has personal knowledge.  This Statement is not intended to be exhaustive but rather a summary of key events.

**<u>Preparation of the Company's 2001 and 2002 Financial Statements</u>**

2.   The Company's financial statements for 2001 and for the first quarter of 2002 were prepared under the direction of Scott D. Sullivan, the Company's Chief Financial Officer and Secretary.  **Mr. Sullivan reported to Bernard J. Ebbers, Chief Executive Officer of the Company until April 29, 2002, when Mr. Ebbers resigned and was succeeded as CEO by John W. Sidgmore.**  David F. Myers, Senior Vice President and Controller of the Company, reported to Mr. Sullivan and assisted in the preparation of these financial statements.  The Company's SEC filings during this period were prepared under the direction of, and signed by, Mr. Sullivan.  **The Company's directors, including Mr. Ebbers and Mr. Sullivan, also sign the annual Form 10-K filing.**

2A.  **During 2001 to the present, the members of the Audit Committee of the Company's Board of Directors were:  Max Bobbitt, Chairman, James Allen, Judith Areen, and Francesco Galesi, all of whom are independent directors.**

3.   Prior to May 16, 2002, Andersen LLP ("Andersen") was the Company's external auditor.  Andersen audited the Company's 2001 financial statements and reviewed the Company's first quarter 2002 financial statements.  During this period, Andersen's engagement

partner on the Company's audits was Mel Dick. Andersen gave an unqualified opinion on the Company's 2001 financial statements following its audit.

3A.     **On February 6, 2002, the Audit Committee met with Andersen to discuss Andersen's audit of the Company's consolidated results of operations and financial position as of and for the year ended December 31, 2001. Andersen's presentation (Exhibit 1 to this Statement) noted, among other things: (a) there were no significant or unusual transactions, or material transactions in controversial or emerging areas for which there was a lack of authoritative guidance or consensus, (b) Andersen had assessed the Company's key accounting practices to determine whether management had adequate controls to prevent a material error in the financial statements as a result of a failure to properly record data in the general ledger, (c) it was Andersen's assessment that the Company's processes for line cost accruals and for capitalization of assets in Plant, Property & Equipment accounts were effective, (d) it was Andersen's assessment that the Company's process for formulating judgments and estimates for accrued line costs was effective, noting that line costs (see paragraph 5 below) as a percentage of revenue had remained flat at 41.9% on a YTD basis. During the meeting, Andersen advised in response to specific questions by the Committee that Andersen had no disagreements with management and that there were no accounting positions taken by the Company with which Andersen was not comfortable.**

4.     On May 16, 2002, KPMG LLP was appointed as the Company's external auditors. KPMG assigned Farrell Malone as the engagement partner on this audit.

### Discovery of the Line Cost Transfers

5.     During May 2002, Cynthia Cooper, Vice President – Internal Audit, began an investigation of certain of the Company's capital expenditures and capital accounts. **This audit had been scheduled for third quarter 2002, but Ms. Cooper advanced it.** Ms. Cooper determined that a number of questionable transfers had been made into the Company's capital accounts during 2001 and the first quarter of 2002. The transfers involved a portion of the costs associated with network services and facilities provided by third parties, designated "line costs" by the Company, that previously had been treated as expenses in the Company's financial statements. Ms. Cooper discussed these entries with Mr. Sullivan and with Mr. Myers. **According to a memorandum prepared by Ms. Cooper (Exhibit 2 to this Statement), she discussed her investigation with Mr. Sullivan on June 11, 2002. Mr. Sullivan asked her to delay her review until the third quarter of 2002 and to audit the second quarter 2002 numbers. However, Ms. Cooper continued the audit. According to the June 12 memorandum, Mr. Sullivan indicated the line cost transfers began in the third quarter of 2001, and that previously these costs had been expensed. Ms. Cooper furnished a copy of the June 12 memorandum to Company management subsequent to the June 25, 2002 meeting with the SEC staff (see paragraph 22 below). The Company has provided the**

3

memorandum to the Department of Justice, the SEC, and the independent investigator.

6.     On or about June 12, 2002, Ms. Cooper and Glyn Smith, another member of the Company's Internal Audit staff who had assisted Ms. Cooper's investigation, contacted Max E. Bobbitt, Chairman of the Audit Committee of the Board of Directors of the Company, and discussed the line cost transfers. Mr. Bobbitt asked Ms. Cooper to contact Mr. Malone, and the three spoke later that day.

7.     On or about June 13, 2002, Ms. Cooper met with Mr. Bobbitt and Mr. Malone in Clinton, Miss. to discuss her investigation. It was agreed that the transfers required further discussion with Mr. Sullivan and Mr. Myers. **According to a memorandum prepared by Ms. Cooper (Exhibit 3 to this Statement), Ms. Cooper stated during this discussion that she believed the Audit Committee should be apprised of the facts known to date. Mr. Bobbitt and Mr. Malone of KPMG believed it was premature to raise the issue at the Audit Committee meeting on June 14, 2002, because Internal Audit was still in the middle of the audit and support had not yet been obtained. It was agreed that Internal Audit would carry on with the audit as planned on Monday morning (June 17). Ms. Cooper's personal attorney furnished a copy of this memorandum to Company management on July 1, 2002. The Company has given the memorandum to the Department of Justice, the SEC, and the independent investigator.**

7A.    **On or about June 13, 2002, Mr. Sullivan indicated to Mr. Sidgmore that the SG&A and capital expenditure reduction measures planned for the second quarter of 2002 may not have the desired impact on net income due to writedowns that were planned for the quarter.**

7B.    **On June 14, 2002, at a regularly scheduled Board meeting, Mr. Sullivan noted that the financial report for second quarter 2002 would be complex, including the previously announced $15 to $20 billion goodwill impairment charge, severance charges, and charges for cancelled capital projects, discontinued operations, and other items. Mr. Sullivan indicated that he would continue to examine the Company's line cost commitments.**

8.     On or about June 17, 2002, Ms. Cooper and Mr. Smith interviewed Mr. Myers in Clinton, Miss. Ms. Cooper briefed Mr. Malone and then they jointly called Mr. Bobbitt. The three agreed that Mr. Malone should interview Mr. Sullivan and Mr. Myers as soon as possible.

9.     On or about June 18, 2002, Mr. Malone interviewed Mr. Myers in Clinton, Miss. regarding the transfers and then briefed Mr. Bobbitt. **On either June 17 or June 18, Mr. Myers indicated that large transfers were made in 2001 and the first quarter of 2002 and that there was no directly applicable accounting support for the transfers.** Thereafter, it was agreed that Mr. Malone, Ms. Cooper, Mr. Bobbitt, and Mr. Smith would travel to Washington, D.C. and that Mr. Malone would interview Mr. Sullivan there.

4

10.    On or about June 19, 2002, Mr. Bobbitt contacted Judith Areen, another member of the
       Audit Committee, and briefed her on the situation. Mr. Bobbitt and Ms. Areen contacted
       outside counsel for the Audit Committee, Simpson Thacher & Bartlett, to inform them
       that KPMG was looking into accounting issues for the period commencing during 2001
       and the first quarter of 2002, and to seek legal advice.

11.    On or about June 19, 2002, Mr. Malone interviewed Mr. Sullivan in Washington, D.C.
       regarding the transfers and then briefed Mr. Bobbitt.

**The Audit Committee's Review**

12.    On or about June 20, 2002, Mr. Bobbitt met with Mr. Sullivan and advised him that the
       Audit Committee was reviewing the propriety of transferring line costs to capital
       accounts.

13.    On June 20, 2002, Ms. Areen and Mr. Bobbitt consulted with Simpson Thacher &
       Bartlett. It was agreed that Mr. Bobbitt would schedule an Audit Committee meeting in
       Washington, D.C. that afternoon.

14.    On June 20, 2002, Mr. Bobbitt notified John W. Sidgmore, Chief Executive Officer of
       the Company, of the Audit Committee's review. Mr. Bobbitt asked that Mr. Sidgmore
       brief Michael H. Salsbury, General Counsel of the Company, on the situation and that
       both of them attend the Audit Committee meeting later that day. Upon learning of the
       situation, Mr. Salsbury caused a notice to be sent to Mr. Sullivan and persons who
       reported to him, including Mr. Myers, to preserve all documents and records relating to
       the capitalization of line costs by the Company. **Bert C. Roberts, Jr., Chairman of the
       Board of the Company, was advised of the situation later that day.**

15.    The June 20 Audit Committee meeting was attended by Mr. Bobbitt, Ms. Areen,
       Francesco Galesi, members of the Committee, by Mr. Sullivan and Mr. Myers, by Ms.
       Cooper and Mr. Smith, by Mr. Malone and Stanley Kroll of KPMG, by Mr. Sidgmore,
       Mr. Salsbury, and Ronald R. Beaumont, Chief Operating Officer of the Company, and by
       attorneys from Simpson Thacher & Bartlett. Mr. Malone described the circumstances
       underlying the transfer of line costs to the Company's capital accounts at the end of each
       of the second, third, and fourth quarters of 2001 and the first quarter of 2002. Mr.
       Malone stated that the transfers, in his view, did not comply with generally accepted
       accounting principles (GAAP), and, in particular, Mr. Malone noted the absence of
       documentation supporting the transfers. Mr. Sullivan presented his reasoning regarding
       the appropriateness of the transfers in light of economic conditions in 2001 and early
       2002. **He stated that beginning in 1999 the Company had spent billions to expand
       its systems and had incurred costs pursuant to long-term contracts for unused
       capacity. Based on the principle of matching costs and revenues, it was Mr.
       Sullivan's intent that certain costs not be expensed until the Company realized
       matching revenue. However, revenues had not grown. He added that accounting
       for line costs required significant judgments to be made, and that the line cost
       transfers were not made in order to allow the Company to meet earnings
       projections. Mr. Sullivan said that he made the transfers pursuant to high-level**

5

**estimates based on quarterly line cost reports.** Mr. Sullivan stated that there may have been a transfer of line costs to capital accounts in the first quarter of 2001 as well. He requested additional time to support and document the transfers. Mr. Sullivan also indicated that in light of the decline in the Company's revenues in the first quarter of 2002, he believed the transfers no longer could be supported and had planned an appropriate writedown of the Company's capital accounts in the second quarter of 2002. **Mr. Sullivan stated that he had originated the request for Ms. Cooper's review, but that he had asked Ms. Cooper to hold off on her report to allow him to address the situation.** Mr. Malone disagreed that a writedown could be taken in the second quarter of 2002. Later in the meeting, Mr. Malone indicated that KPMG had not reached a final conclusion as to restatement. It was agreed that the Audit Committee would reconvene at 5 p.m. on June 24, 2002, to make a final determination on these issues. **Internal Audit was instructed to continue its investigation.**

16.     On the afternoon of June 21, 2002, Mr. Sidgmore met with the Board of WorldCom, attorneys from Simpson Thacher & Bartlett and from Weil, Gotshal & Manges LLP (additional outside counsel for the Company) to brief them on the issues being reviewed by the Audit Committee. **Mr. Sullivan confirmed that the capitalization of line costs extended back into the first quarter of 2001.** Mr. Salsbury advised that if it were concluded that the transfers were inappropriate and that as a result the Company's financial statements for 2001 and the first quarter of 2002 would have to be restated, a full investigation of the facts and circumstances underlying the transfers would have to be conducted. To ensure completeness and accuracy, a committee of the Board rather than the Company's management would need to arrange and direct an independent investigation.

17.     On or about June 21, 2002, Mr. Bobbitt contacted Steve Rodgers of Andersen, and on or about June 22, 2002, Mr. Bobbitt contacted Mark Schoppet, a former Andersen partner who had been the audit engagement partner in connection with Andersen's audit of the Company's financial statements for 2000 and prior years, and briefed them on the situation. Ken Avery, another former Andersen partner who had been involved in audits of the Company's financial statements, also was contacted.

18.     During June 21-24, 2002, Mr. Sullivan prepared a short memorandum **(Exhibit 4 to this statement)** outlining his position on the transfers. On or about June 24, 2002, Mr. Sullivan met with Mr. Schoppet and Mr. Avery to discuss why he believed the transfers had been appropriate and why a writedown should be permitted in the second quarter of 2002, rather than a restatement. Mr. Malone also attended this meeting.

19.     On June 24, 2002, the Audit Committee conducted an expanded Audit Committee meeting with senior management and a number of additional directors, attorneys from Simpson Thacher & Bartlett, attorneys from Weil, Gotshal & Manges LLP, and representatives from KPMG. Mr. Rodgers and Richard Howell attended the meeting by telephone on behalf of Andersen. Andersen informed the Company that in light of the transfers of line costs during 2001 and the first quarter of 2002, Andersen's opinion regarding the Company's 2001 financial statements no longer could be relied upon. They stated that Andersen had not known of the transfers, but declined to respond to questions

6

regarding how Andersen's audit activities could have failed to discover the transfers. **Mr. Rodgers and Mr. Howell indicated that they had not seen Mr. Sullivan's memorandum, but that it had been read to them and they did not accept it as compliant with GAAP.** While noting that KPMG had neither audited nor formally reviewed any of the financial statements in question, Mr. Malone and Teresa Iannaconi of KPMG observed that they agreed with Andersen's conclusion that the transfers in question could not be supported by GAAP. **Mr. Sullivan indicated that the line costs were long-term contracts entered into in connection with the Company's investment in its network and in anticipation of gaining customers that ultimately were not gained.** In light of the positions of Andersen and KPMG, the Committee concluded that they should report to the Board that a restatement of the Company's financial statements for 2001 and first quarter 2002 would be necessary. The amounts of the transfers by quarter were $771 million in the first quarter of 2001, $610 million in the second quarter of 2001, $743 million in the third quarter of 2001, $931 million in the fourth quarter of 2001, and $797 million in the first quarter of 2002. A full Board meeting was scheduled for the morning of June 25, 2002. Mr. Sullivan and Mr. Myers were advised that if they did not resign from their positions with the Company before the Board meeting, they would be terminated.

20.    Later on June 24, 2002, the Audit Committee met with William McLucas of Wilmer, Cutler & Pickering and retained him to investigate the facts and circumstances leading up to the Company's misstatement of its financial results in 2001 and in the first quarter of 2002 in the amount and manner subsequently announced by the Company in the Release. The investigation is underway and is expected to continue for approximately eight to twelve weeks.

**The Company's Recent Actions**

21.    At the Board's June 25, 2002 meeting, following a report by the Audit Committee, the Board determined to (i) restate the Company's financial statements for 2001 and first quarter 2002 and request KPMG to undertake a full audit of the Company's 2001 financial statements, (ii) inform the SEC of the Board's decision and the events leading up to it, (iii) terminate Mr. Sullivan without severance, (iv) accept the resignation of Mr. Myers without severance, and (v) after meeting with the SEC, publicly announce the Board's actions.

22.    After the Board meeting, the Company requested a meeting with the staff of the SEC as promptly as possible. The meeting occurred at 3:30 p.m. on June 25, 2002. During the meeting, the SEC staff was given an overview of the information set forth in this Statement, to the extent it was then known by the Company.

23.    As promptly as practicable after meeting with SEC staff, the Company issued the Release.

7

24.   The Audit Committee is reviewing the Company's financial records for 2001, 2000, and
1999 and has requested KPMG's assistance in this review.  In particular, questions have
been raised regarding certain material reversals of reserve accounts during 2000 and
1999.  No conclusion has been reached regarding these entries.  If, after review, the
Company believes additional actions are required, it will make an announcement
promptly.

Affirmed as accurate:

WorldCom, Inc.

/s/ Michael H. Salsbury_____
By:  Michael H. Salsbury
         General Counsel

Dated:  **July 8**, 2002.

ANDERSEN

Report to the Audit Committee
Year Ended December 31, 2001



WORLDCOM

February 6, 2002

Note: This presentation is intended solely for the information and use of management and the Audit Committee of the Board of Directors of WorldCom, Inc. and is not intended to be used by anyone other than those specified parties.



February 4, 2002

Audit Committee of the Board of Directors WorldCom, Inc.

Clinton, Mississippi

Members of the Audit Committee:

Over the next few days we will be completing our audit procedures on WorldCom, Inc.'s consolidated results of operations and financial position, as well as, WorldCom Group and MCI Group as of and for the year ended December 31, 2001. At the February 6th meeting we will be prepared to discuss with the Committee the results of our audit procedures and respond to any questions. In addition, we will discuss with the Committee certain matters, including our independence as external auditors of the Company, which is required by professional standards and the Securities and Exchange Commission.

We will be prepared to respond to questions from the Committee and management about the enclosed materials on February 6th. Of course, we will be pleased to address any questions you have prior to that time. We look forward to meeting with you next week.

Very truly yours,

ARTHUR ANDERSEN LLP

Melvin Dick

1

## Purpose of Our Report

- Summarize our audit approach and audit results for the year ended December 31, 2001

- Discuss our views regarding WorldCom's key accounting principles and practices, transaction processes and judgments and estimates used in the preparation of the WorldCom, Inc., WorldCom Group and MCI Group financial statements

- Communicate matters required by professional standards

- Provide an opportunity for the Audit Committee to ask questions of us as part of discharging their due diligence responsibility

2

## Overall Summary of Results

- WorldCom, Inc. and WorldCom Group and MCI Group balance sheets and income statements are fairly presented in accordance with accounting principles generally accepted in the United States.

- Work is in progress on review of financial statement disclosures and other information to be included in the WorldCom, Inc. Annual Report and SEC filings.

3

# Required Communications to the Audit Committee – Quality of the Company's Financial Reporting

**Significant Accounting Policies**

- There were no significant changes in accounting policies in the current year.

- We noted no significant or unusual transactions, or material transactions in controversial or emerging areas for which there is a lack of authoritative guidance or consensus.

**Management Judgments and Accounting Estimates**

- Accounting estimates are an integral part of the financial statements prepared by management and are based upon management's current judgments. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ markedly from management's current judgments.

- We are satisfied as to the reasonableness of management's current judgments regarding such estimates in the context of the financial statements taken as a whole, based on our knowledge of management's process for making such judgments, inquiries of management and others regarding such matters, and other audit procedures applied during our engagement.

- Those items representing particularly sensitive accounting estimates are discussed in the following slides.

4

# WorldCom Key - Accounting Principles and Practices

- Revenue Recognition

- Affiliated Transactions

- Capitalization of Internal Use Software

- Income Taxes

- PP & E - Proper Capitalization of Assets

- Pensions

- Long-Term Asset Valuation

- Securitization of Receivables

- Earnings Per Share

- Comprehensive Income

- Segment Disclosure

- Valuation of Assets - Foreign Currency Translation

- New Accounting Standards

- Business Combinations

- Stock Options

5

# WorldCom Key - Accounting Principles and Practices

## Area

- Revenue Recognition
- Affiliated Transactions
- Capitalization of Internal Use Software
- Income Taxes
- PP & E - Proper Capitalization of Assets
- Pensions
- Long-Term Asset Valuation
- Securitization of Receivables
- Earnings Per Share
- Comprehensive Income
- Segment Disclosure
- Valuation of Assets - Foreign Currency Translation
- New Accounting Standards
- Business Combinations
- Stock Options

## Assessment



9

# Process Effectiveness Assessment - Transaction Processes

- We have held updated discussions with members of management and performed testing related to key transaction processes in order to assess their effectiveness in preventing a material misstatement in the financial statements and to determine whether or not any significant changes have occurred.

- In forming our assessment of each process, we determined whether management has adequate controls to prevent a material error in the financial statements as a result of a failure to properly:
  - capture transactions
  - process data
  - record data in the general ledger

- In assessing the effectiveness of each process in preventing a material misstatement in the financial statements, we have utilized the following scale:
  - Process is effective
  - Process is effective, however certain process improvement opportunities were identified
  - Process is ineffective

7

# WorldCom Key - Transaction Processing Areas

## Area

- Revenues
  - Revenue Assurance
  - Revenue Adjustments
  - Customer Setup
  - Management reports

- Line Costs
  - Line Cost Accrual
  - Line Cost Disputes
  - Line Cost Allocation Report

- Property Plant & Equipment
  - Capitalization of Assets
  - Capitalization of Internal Use Software

- Financial Reporting Process
  - Consolidation
  - Post-closing adjustments
  - Preparation of financial statements – in process
  - SEC filings – in process

## Assessment

8

# Process Effectiveness Assessment - Key Judgment and Estimate Processes

- We have reviewed management's process for formulating each key judgment and estimate in order to assess its effectiveness in preventing a material misstatement in the financial statements. We have updated these procedures on a quarterly basis through discussion and analytical reviews and through our preliminary and final testing.

- In forming our assessment of each process, we considered the following:
  - is management using the proper data to formulate the particular judgment or estimate (e.g., historical bad debt rates, historical data, trends, etc.)?
  - does the Company have controls in place to ensure that the data utilized has integrity?
  - is management using the data in the proper way (i.e., rendering an appropriate conclusion)?

- In assessing the effectiveness of each process in preventing a material misstatement in the financial statements, we utilized the following scale:
  - Process is effective
  - Process is effective, however certain process improvement opportunities were identified
  - Process is ineffective

6

# WorldCom Key - Judgments and Estimates

| Area | Assessment |
|---|---|
| Allowance for Doubtful Accounts |  |
| Accrued Line Costs | |
| Line Cost Disputes | |
| Purchase Accounting | |
| Income Tax Reserves | |
| Legal Reserves and Contingent Liabilities | |
| Asset Depreciable Lives | |
| Impairment of Long-Lived Assets | |

10

# WorldCom Judgment and Estimate Processes

| Judgment or Estimate | Description | Process Changes | Discussion and Other | Assessment | Residual Audit Risk |
|---|---|---|---|---|---|
| Allowance for Doubtful Accounts | The Company maintains reserves designed to cover amounts in accounts receivable which will not be collected. | None | Initial reserves are provided based upon a historical average of net write-offs in relation to billings; additional amounts are provided for conservatism or alternatively via specific reserves.

Various analytical measures are employed to assess the adequacy of the reserve.

The Company performs a "look-back" test which compares reserves to subsequent net write-offs to determine the accuracy of the reserve estimation process. | ● | None Noted |

11

# WorldCom Judgment and Estimate Processes

| Judgment or Estimate | Description | Process Changes | Discussion and Other | Assessment | Residual Audit Risk |
|---|---|---|---|---|---|
| Line Cost Accrual | Line costs represent charges from LECs for leased lines or traffic termination. | None | Accruals are based on metered traffic as determined by WorldCom. Disputed amounts are reserved for separately see discussion below. | ● | None |
| | Line costs as a percentage of revenues have remained flat at 41.9% on a YTD basis. | | | | |
| | Line costs are allocated between the WorldCom Group and MCI Group based on minutes of use and revenues. | | | | |
| Line Cost Disputes | Generally, WorldCom accrues 100% of LEC billed amounts prior to dispute resolution. | None | LEC under billing dispute amounts are maintained for a period of 12 months and are reversed on a monthly basis. | ● | None |

12

# WorldCom Judgment and Estimate Processes

| Judgment or Estimate | Description | Process Changes | Discussion and Other | Assessment | Residual Audit Risk |
|---|---|---|---|---|---|
| Purchase Accounting | In conjunction with the Company's numerous purchase transactions the Company has recorded goodwill and intangible balances of approximately $46 billion. This amount, included in intangibles, represents the largest single asset on the balance sheet and represents excess of purchase price over net assets acquired coupled with unfavorable commitments pursuant to APB 16.

Goodwill is divided between the tracked entities based on the respective fair values at date of acquisition.

The Company is conducting impairment reviews of all intangible assets and expects to complete this assessment in accordance with the provisions of SFAS No. 142. | None | In the current year, the Company recorded approximately $5 billion of goodwill additions related primarily to the Intermedia transaction. We worked with the Company to ensure that these additions were recorded properly with respect to authoritative accounting literature.

Consistent with the provisions of SFAS No. 142, the Company anticipates disclosing an impairment charge range in conjunction with the 2001 Form 10-K. | ● | None |

13

# WorldCom Judgment and Estimate Process

| Judgment or Estimate | Description | Process Changes | Discussion and Other | Assessment | Residual Audit Risk |
|---|---|---|---|---|---|
| Income Tax Reserves | Reserves are established as necessary for any tax audit exposures. | None | The Company evaluates the need for reserves related to any tax exposures for U.S. federal, foreign, state and local, property, excise, and sales and uses taxes. | ● | None |
| Legal Reserve and Contingent Liabilities | Reserves are established as necessary for legal and regulatory matters. | None | The Company monitors the statues of pending and threatened legal and regulatory matters and provides reserves and/or disclosures based on the expected outcome. | ● | None |
| Asset Depreciable Lives and Impairment | The Company's largest tangible assets relate to the network. Changes in technology over the past years requires management to periodically analyze assigned depreciable lives to determine their appropriateness. | None | We completed a benchmark study with industry standards and found that the Company's lives compared favorably with that of the industry averages. | ● | None |

14

# Required Communications to the Audit Committee

**Audit Adjustments**

• We will provide a list of all audit adjustments and discuss both recorded and passed adjustments at the Committee meeting.

**Disagreements with Management**

• There were no disagreements with management on financial, accounting and reporting matters which, if not satisfactorily resolved, would have been material to the financial statements or which might cause a modification of our auditors' report.

**Irregularities or Illegal Acts**

• We are not aware of any irregularities or illegal acts committed by the Company or its employees.

**Consultation by Management with Other Accountants**

• We are not aware of any consultations by management with other independent public accountants during the year about auditing or accounting matters.

**Difficulties Encountered in Performing the Audit**

• We encountered no significant difficulties in performing our audit procedures to date.

**Major Issues Discussed with Management Prior to Appointment**

• No major issues were discussed with management in connection with our appointment as auditors, including the application of generally accepted accounting principles or generally accepted auditing standards.

15

# Required Communications to the Audit Committee

**Communications Regarding Internal Controls**

- Our review of internal controls was made for the purpose of determining the required scope of our audit procedures, not to render a separate opinion regarding the Company's internal control structure.

- There were no material weaknesses in internal controls noted in our testing and evaluation.

**Auditor's Responsibility for Other Information in Documents Containing Audited Financial Statements**

- We will review the non-financial information included in the Form 10-K (including management's discussion and analysis of financial condition and results of operations) for consistency with information contained in the audited financial statements.

**Communications Regarding Auditor Independence**

- We are not aware of any issues related to Arthur Andersen's independence that occurred during the Company's fiscal year through the date of this meeting other than those disclosed in the attached letter, which also describes the scope of our services provided during fiscal 2001.

16



## Internal Audit Correspondence

| Audit: | [illegible] |
|---|---|
| Date: | [illegible] |
| Participants: | [illegible] |
| Method of Communication: | [illegible] |

Cynthia Cooper and Glyn Smith telephoned Max Bobbit to discuss issues surrounding the Capitalization of Line Costs under the description "Prepaid Capacity."  Cynthia briefed Max on the communications with San Jeev Sethi, Mark Abide, David Myers and Scott Sullivan.

Cynthia described the timing and amounts of the journal entries, discovered to date , related to Prepaid Capacity including:

- $743M in 3Q01
- $941M in 4Q01
- $818M in 1Q02

These entries total $2.5B.  Cynthia also discussed an additional $115M in reductions to depreciation expense which was part of these entries and $600M of unrelated Cap Ex additions, both of  which audit is still researching.

Glyn related the following key points from the 6/11/02 meeting with Scott Sullivan:

- Scott asked Audit to delay the current review until 3Q02 and to audit the 2Q02 numbers.
- Scott noted there were several Cap Ex issues which needed to be cleared up in 2Q02.
- When asked by Cynthia to explain Prepaid Capacity Costs, Scott indicated that while revenues had declined, the costs related to certain leases were fixed creating a matching problem.  He stated Prepaid Capacity represented costs associated with no or low utilized Sonet Rings and lines which are being capitalized.
- Scott indicated this treatment of line costs started in 3Q01 and continued through 1Q02. Previously, these costs had been expensed.
- Scott indicated that going forward, these costs would either be expensed or recognized as a restructuring charge.
- Scott indicated that this and other Capitalization issues would be corrected in 2Q02.

Cynthia also noted that Scott stated that the Company will no longer capitalize line cost labor going forward.

Cynthia indicated Audit's plans were to:

- Continue with the audit
- Meet with Ferrell Malone, KPMG, to determine if their were standards supporting these entries
- Review AA workpapers related to Cap Ex
- Request supporting documentation for these entries from David Myers.

Max asked Cynthia to discuss these issues with Ferrell Malone, KPMG, before the 6/14/02 Audit Committee Meeting. Cynthia noted that Audit had previously met with Ferrell to discuss these issues based on research completed at that time (6/5/02) and plans to meet with Ferrell again in the afternoon (6/12/02) to update him on research completed to date. Max stated the matter would be discussed in the Executive Session of the AC meeting with Ferrell and Cynthia present.

Max then asked Cynthia to refrain from discussing this matter with David Myers or Scott Sullivan until a consensus is reached at the Audit Committee Meeting on how to proceed.

M :JOE M. HOLLOMON & ASSOC'S.        FAX NO. :6013531308        Jul. 01 2002 03:58PM P2

# WORLDCOM

## Internal Audit Correspondence

| Audit | Capex |
|---|---|
| Date | 6/13/02 |
| Persons | Cynthia Cooper, Max Bobbitt, and Ferrell Malone |
| Method of Communication | Meeting at Hampton Inn Conference Room - Clinton MS |

Max Bobbitt called Cynthia Cooper and asked that she meet him and Ferrell Malone at the Hampton Inn to discuss issues related to the Capex Audit. Max requested Cynthia bring a schedule of Line Costs as a percentage of Revenue.

Max stated that he had discussed the issue of prepaid capacity with Ferrell and that they believed the best course of action would be for KPMG to address it as part of their Q102 audit. Cynthia stated that she believed IA needed to complete the Capex audit as well as any audit testing related to this issue.

At the meeting, Cynthia provided Max and Ferrell with a summary of journal entries capitalizing line costs for Q201 through Q102 and a summarized Consolidated Statement of Operations as originally reported and with the effects of capitalized line cost reversals. Cynthia, Ferrell and Max discussed the schedules. w/p I.3

Max stated that he believed it was premature to discuss the prepaid capacity issue at the 6/14/02 AC meeting. Cynthia stated that she believed the AC should be apprised of the facts to date. Ferrell agreed that it was premature to discuss the issue with the AC because IA was still in the middle of the audit and support had not yet been obtained.

Max stated that he wanted to share the schedules with Scott Sullivan on the return flight from Jackson after the AC meeting. Cynthia and Ferrell both agreed it would be best for Max to just ask Scott about the issue without presenting Scott with preliminary schedules. Max agreed he would discuss the issue with Scott on the return flight and that IA could carry on with their audit as planned Monday morning (6/17).

June 24, 2002

MCI and WorldCom merged in September 1998. Shortly after the merger, in April 1999, we sold the SHL business for $1.65B (subsequently finalized at $1.4B) and announced that we would be using the entire proceeds to further expand our capital spending to expand the Company's network. This was the beginning of an extended capital investment campaign that continued through the end of 2000 to increase the size of our Internet backbone, further build out our business local capabilities, expand our data network, to construct the first Pan European network including local facilities in Europe, and to expand spending in several areas – collocation, MMDS wireless spectrum, etc.

At the same time, the telecommunications industry was experiencing rapid development and increased competition from new entrants. With intense competition, it was important for the Company to have the ability to enter the market quickly, and offer the best network to our customers with very little provisioning time.

The decision to significantly increase capital investment was based upon the common belief at the time that the Internet and data demand would continue at the 8 times annual growth factor the industry was experiencing. It was this growth that supported the Company's goal of maintaining a strong double digit growth rate while expanding margins from using it's own facilities. Subsequently, neither materialized in the 2001 time period.

During this network growth period, the Company utilized long-term fixed rate leases to connect the owned network to the ILEC's facilities. These commitments were vital to network expansion and future revenue growth for the Company.

Additionally, the Company also entered into various network leases to complement the service offerings for data, Internet and local service. The lease commitments were entered into to obtain access to large amounts of capacity under the theory that revenue would follow and fully absorb these costs and to expedite "time to market." We believe that this provided an advantage over our competitors and created the leader in Internet backbone at OC 192-c . The commitments were entered into with the knowledge that we would incur an expense prematurely and the revenues would be earned subsequent to that date. The Company was willing to absorb this cost prior to recognizing the revenue stream because it believed that the future revenues would be matched up with these costs. These commitments were entered into as the result of customers for which services would be rendered and the lease commitments were entered into to expedite the customer provisioning and revenue stream in accordance with SAB 101 and as further supplemented by FASB 91, direct and indirect costs associated with obtaining a customer may be deferred and amortized over the revenue stream associated with that contract. The Company also factored in these costs in the development of pricing and all costs were

expected to be recovered through future revenue streams.
Subsequent to the asset being put into service, the Company continued to incur costs associated with network lease commitments as noted above. The portion of these commitments that were not being utilized was deferred until the related benefit (i.e. revenues) was generated.

At the time of the cost deferral, management had determined that future economic benefit would be derived from these contractual commitments as the revenues from these service offerings reached projected levels. At that time, management fully believed that the projected revenue increases would more than offset the future lease commitments and deferred costs under the agreements. Therefore, the cost deferrals for the unutilized portion of the contract was considered to be an appropriate inventory of this capacity and would ultimately be fully amortized prior to the termination of the contractual commitment.

The classification of these costs as an asset does not contradict the definition of an asset in FASB Concept Statement No. 6. "Assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events." (FASB CON No. 6, par. 25). "An asset has three essential characteristics: (a) it embodies a probable future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash inflows, (b) a particular entity can obtain the benefit and control others' access to it, and (c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred." (FASB CON No. 6, par. 26).

At all times, management understood that an expense or loss would be recognized upon evidence that previously recognized future economic benefits of an asset would not ultimately be realized.

The second quarter of 2002 was the first time in the Company's history where there had been a sequential quarterly revenue decrease for two consecutive quarters on an equivalent business day basis. The decreases were the result of challenges of a weak economy, which directly affected WorldCom by the degree to which the Company's customers groomed and downsized their networks and to a lesser degree, bankruptcies, foreign exchange losses and product migrations.

Additionally, during the second quarter of 2002, the Company's President and CEO resigned, the Company's debt rating was lowered to junk status and there were widespread liquidity concerns. All of these events, including revenue for the May 2002 period, contributed to the Company's determination, in the second quarter of 2002, that future economic benefits of the deferred costs would not ultimately be realized.

The Company reviews and closes line costs on a quarterly basis. In the third month of each quarter, network management, line cost personnel and finance personnel meet to review line costs. During this meeting, trend analysis and network utilization reports are

reviewed and discussed. Based on the information compiled at these meetings a quarterly estimate of underutilized capacity is made to defer these costs.

The preparation of the Company's financial statements requires the Company to make estimates and assumptions that affect the reported amount of assets and liabilities as well as the reported amounts of expenses, including line costs. Significant management judgements and estimates must be made and used in connection with establishing these amounts.

Because of the volume and size of our network, the Company was not able to obtain a circuit by circuit analysis of the network for the cost deferral. Instead, estimates were made, based on information available and recorded at the end of each quarter.

*EXHIBIT 3*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,        02 civ. 4963 (JSR)

      - v -         OPINION AND ORDER

WORLDCOM, INC.,

      Defendant.

-------------------------------------------------------------------

JED S. RAKOFF, U.S.D.J.

   This case raises fundamental questions about how market regulators, and the courts, should respond when criminals use the vehicle of a public company to commit a massive fraud. While the persons who perpetrated the fraud can be criminally prosecuted, the exposure of the fraud often creates liquidity pressures that can drive the company into bankruptcy, leaving unsecured creditors with little and shareholders with nothing. Innocent employees may find their jobs in jeopardy, and, if the company is very large, entire segments of the market may be disrupted. In a situation where immense financial suffering is therefore likely, is there nothing government regulators can do to restore equilibrium?

   In the case of WorldCom, Inc., we have perhaps the largest accounting fraud in history, with the company's income overstated by an estimated $11 billion, its balance sheet overstated by more than $75 billion, and the loss to shareholders estimated at as much as $200 billion. Those individual who allegedly perpetrated the fraud are either under indictment or being criminally investigated by the Department of Justice; creditors are seeking recompense in the Bankruptcy Court (in the matters before Judge Gonzalez); and shareholders and employees are seeking through private class actions (in the matters before Judge Cote) to recover what they can, if not from the company {which is in bankruptcy), then from other alleged participants in the effectuation of the fraud. These are the traditional responses.

   In the instant lawsuit, however, the Securities and Exchange Commission (the

"Commission") I with the full cooperation of the company's new management and significant encouragement from the Court-appointed Corporate Monitor (Richard C. Breeden, Esq.), has sought something different:

      -- not just to clean house but to put the company on a new and positive footing;

      -- not just to enjoin future violations but to create models of corporate governance and internal compliance for this and other companies to follow;

      -- not just to impose penalties but to help stabilize and reorganize the company and thereby help preserve more than 50,000 jobs and obtain some modest, if inadequate, recompense for those shareholder victims who would otherwise recover nothing whatever from the company itself.

The first step in this journey, taken at the very outset of the litigation, was the joint decision of the parties to have the Court appoint a Corporate Monitor to oversee the proposed transformation. While the Corporate Monitor's efforts were initially directed at preventing corporate looting and document destruction, his role and duties have steadily expanded, with the parties' full consent, to the point where he now acts not only as financial watchdog (in which capacity he has saved the company tens of millions of dollars) but also as an overseer who has initiated vast improvements in the company's internal controls and corporate governance. Few if any companies have ever been subject to such wide-ranging internal oversight imposed from without; but to the company's credit it has fully supported the Corporate Monitor's efforts and the strict discipline thereby imposed.

Under the Corporate Monitor's watchful eye, the company has replaced its entire board of directors, hired a new and dynamic chief executive officer and begun recruiting other senior managers from without, fired or accepted the resignation of every employee accused by either the board's own Special Investigative Committee or the Bankruptcy Examiner of having participated in the fraud, and terminated even those employees who, while not accused of personal misconduct, are alleged to have been insufficiently attentive in preventing the fraud. In this connection, the company has already spent more than $50 million of its own money to fund unrestricted investigations by both the Special Investigative Committee and the Bankruptcy

Examiner, and their detailed reports have been given wide publicity.

The company has also consented to a permanent injunction authorizing the Corporate Monitor to undertake a complete overhaul of the company's corporate governance and authorizing a group of highly-qualified independent consultants to ascertain that the company has fully eliminated the many defects in the company's internal controls detected after a comprehensive review by the company's new outside auditors. The new corporate governance strictures will, among much else, mandate an active, informed, and highly independent board, prohibit related-party transactions and conflicts of interest, require a unique shareholder role in the nomination of directors, and impose significant restrictions on executive compensation packages. Moreover, even though not all of the specific changes in corporate governance and internal controls have yet been formulated, the company has committed in advance to adopt and adhere to all corporate governance and internal control recommendations made by the Corporate Monitor and the independent consultants, subject only to appeal to this Court. Finally, the company has agreed to impose all internal controls required by Section 404 of the Sarbanes-Oxley Act by no later than June 30, 2004, a full year earlier than the Act requires.

The permanent injunction also requires the company to provide a large segment of its employees with specialized training in accounting principles, public reporting obligations, and business ethics, in accordance with programs being specially developed for the company by New York University and the University of Virginia. At the behest of the Corporate Monitor, the Court also obtained from the new Chief Executive Officer a sworn, "Ethics Pledge," requiring, on pain of dismissal, a degree of transparency well beyond S.E.C. requirements. The company has since required its senior management to sign a similar pledge, and has plans to obtain similar pledges from virtually all employees.

The Court is aware of no large company accused of fraud that has so rapidly and so completely divorced itself from the misdeeds of the immediate past and undertaken such extraordinary steps to prevent such misdeeds in the future. While the Court, at the parties' express request, will continue to retain jurisdiction for however long it takes to make certain that these new controls and procedures are fully implemented and secured, the Court is satisfied that

the steps already taken have gone a very long way toward making the company a good corporate citizen.

This is not to say that the sins of the past can be forgotten or wholly forgiven. No matter now much the company has transformed itself, no matter how different a company it is now from the company that was used as a vehicle to commit the aforementioned frauds, those frauds were still colossal and must be punished.

The best punishment, unquestionably, is the criminal prosecution of those persons found to have perpetrated the frauds. Such punishment, however, is not within the prerogatives of the Commission (let alone the Court hearing this lawsuit) but rather is the responsibility, in the first instance, of the Department of Justice.

In this lawsuit, the Commission could theoretically seek the effective liquidation of the company. Several of the company's competitors, notably Verizon and AT&T, have urged such an outcome, arguing that it is unfair that, as a result of the bankruptcy laws, WorldCom, the wrongdoer, may emerge from bankruptcy with less of a debt load than that assumed by its competitors. This argument, however, has not commended itself to the Commission, and does not persuade this Court. Corporate reorganization under Chapter 11 of the bankruptcy laws always confers a competitive advantage to the debtor in terms of elimination of debt; yet companies rarely seek bankruptcy except as a last resort, for it involves numerous competitive disadvantages as well{ not only in public relations and customer dissatisfaction but in future capacity to borrow and to raise capital. Moreover, whatever advantages in debt reduction WorldCom will realize from bankruptcy reorganization, any suggestion that companies as large and well-positioned as Verizon and AT&T will not be able to compete effectively with the new WorldCom/MCI lacks credence. Verizon, indeed, already enjoys a special competitive advantage of its own by virtue of its status under FCC rules as a de facto local monopoly.

To kill the company, by contrast, would unfairly penalize its 50,000 innocent employees, remove a major competitor from a market that involves significant barriers to entry, and set at naught the company's extraordinary efforts to become a model corporate citizen. It would also unfairly impact creditors, over 90 percent of whom have stated their support for the company's

plan of reorganizations in recognition that it affords them far more value than liquidation.
Finally, it would undercut the basic tenets of bankruptcy reorganization, a unique innovation of
United States bankruptcy law that has contributed materially to the conservation of economic
resources and the stability of the U.S. economy.  Accordingly, the Commission has sought
neither outright liquidation nor a monetary penalty so large as to make liquidation inevitable, and
the Court sees no reason not to defer to that judgment.

What, then, is the proper monetary penalty?  From the Commission's standpoint, it must
be one large enough to reflect the magnitude of the fraud and yet not so large as to force the
company into liquidation and thereby undercut the Commission's own intensive efforts to reform
the company through injunctive relief.  The matter is further complicated by the bankruptcy laws
and by section 308(a) of the Sarbanes-Oxley Act.  Under the' bankruptcy laws, the commission's
penalty claim is treated as simply another claim by one of many unsecured creditors, a group
that, under the plan of reorganization presently pending before Judge Gonzalez, will generally
recover about one-third of every dollar claimed.  Under any analysis, moreover, secured creditors
have a better legal claim than the Commission to WorldCom's limited assets (estimated, on a
liquidation basis, at between four and six billion dollars), so that the kind of multi-billion dollar
penalty that might otherwise be worth considering is not even an option except for the purpose
(already rejected) of forcing liquidation.

As for section 308(a), while it gives the Commission the opportunity to pay any penalty it
recovers to the shareholder victims rather than to the U.S. Treasury, a penalty that was premised
primarily on that basis might arguably run afoul of the provisions of the Bankruptcy Code that
subordinate shareholder claims below all others.  As a general rule, defrauded shareholders can
not expect to recover one penny in bankruptcy and nothing in section 308(a) suggests that
Congress intended to give shareholders a greater priority in bankruptcy than they previously
enjoyed.

This is not to say, however that the Commission cannot give its penalty recovery to the
shareholders, as section 308(a) so laudably prescribes, or that it cannot take some account of
shareholder loss in formulating the size and nature of its penalty: for while the securities laws limit

the size of the penalty to the amount that the company has gained from its fraud (an amount here estimated at between ten and seventeen billion dollars), that does not mean that the Commission cannot rationally take account of shareholder loss as a relevant factor in determining the size of the penalty up to that limit. What the Commission may not do, at least in a case in which the company is in bankruptcy, is determine the size of the penalty primarily on the basis of how much shareholder loss will thereby be recompensed, for this would not only be adverse to the priorities established under the bankruptcy laws but also would run contrary to the primary purposes of S.E.C. fraud penalties themselves. See S.E.C. v. Fischbach Corp., 133 F, 3d 170, 175 (2d Cir. 1997) (compensation of victims is "a distinctly secondary goal" of S.E.C. actions).

Given all these complications, difficulties, and uncertainties, the Commission has wisely chosen, in formulating a penalty proposal in this case, to look to the penalties it has imposed in prior cases and the factors there considered, See, e.g., S.E.C. v. Kane, 2003 WL 1741293 at *4 (S.D.N.Y. Apr. 1, 2003) (describing factors commonly considered in making S.E.C. penalty determinations). On that basis, the Commission has' negotiated a settlement that results in a penalty dozens of times larger than any it previously imposed against a public company, thereby reflecting the huge size of the instant fraud and the need to deter others similarly situated.

Specifically, in their initially proposed settlement of the monetary penalty, dated May 19, 2003, the parties proposed a penalty of approximately $1.5 billion, which, after the discount in bankruptcy, would result in an actual payment of $500 million, or 50 times the largest such penalty previously imposed. In response, the Court gave all interested parties the opportunity to submit papers in opposition to the proposed settlement, and then conducted a lengthy public hearing on June 11, 2003, so as to air the concerns thus raised.

In particular, the Court took note of the concern that the penalty, despite its substantial size relative to the company's liquidation value, might not adequately take account of the larger value the company was projected to have upon reorganization (somewhere between twelve and fifteen billion dollars) . This concern might be mitigated, it was suggested, by modifying the settlement so as to increase somewhat the size of the penalty and make the increase payable in common stock. Such a modification, while avoiding additional cash outlays at a time when the

company's cash was limited, would make the total penalty more commensurate with the company's estimated reorganization value. By virtue of section 308(a), a further consequence would be to give the victim shareholders the opportunity to participate, albeit modestly, in any increase in the company's value following its emergence from bankruptcy.

Responsive to these concerns, the parties filed on July 2, 2003 a revised proposed settlement of the monetary penalty aspect of this lawsuit. The revised settlement proposes, first, an overall penalty of $2.25 billion (or more than 40 percent of the mean estimated liquidation value of the company and more than 15 percent of the mean estimated reorganization value of the company). Taking account of the bankruptcy discount, it proposes, second, that if the Bankruptcy Court approves both the settlement and the plan of reorganization, the actual penalty payment will be $750 million -- or 75 times greater than any prior such penalty.

Third, it proposes that, of the $750 million, $500 million will be paid in cash and the other $250,000 in the form of the company's new common stock, as valued in accordance with the plan of reorganization. (If, instead, the company is forced into liquidation, the penalty payment will be limited to the $500 million in cash, since the enhanced reorganization value will not have been realized.) Fourth, it proposes that these payments will be made initially to a Distribution Agent appointed by this Court, who will then undertake to distribute the cash and, at a suitable time, the proceeds of the stock, to the victim shareholders, as determined by the Distribution Agent and the Court in accordance with guidelines set forth in the Commission's prior submissions and a more detailed plan to be hereafter submitted.

The parties strongly urge approval of the revised settlement as being in the public interest. Before signing the proposed settlement, moreover, the Commission, cognizant that any settlement to be approved by the Bankruptcy Court must also be consistent with the best interests of the creditors, requested and received the signed endorsement of the Official Committee of Unsecured Creditors of WorldCom, Inc. (representing the creditors affected by the settlement), who approved the settlement and promised to support it before the Bankruptcy Court. See Consent and Undertaking of Defendant WorldCom, Inc., dated July 3, 2003, at 10.

A Court reviews such a settlement proposal not on the basis of what it might itself

determine is the appropriate penalty but on the basis of whether the settlement is fair, reasonable, and adequate. See S.E.C. v. Wang, 944 F.2d 80, 85 (2d Cir. 1991); United States v. Cannons Engineering Corp., 899 F.2d 79, 84 (1st Cir. 1990). Moreover, where one of the settling parties is a public agency, its determinations as to why and to what degree the settlement advances the public interest are entitled to substantial deference. See F.T.C. v. Standard Financial Management Corp., 830 F.2d 404, 408 (1st Cir. 1987); S.E.C. v. Randolph, 736 F.2d 525, 530 (9th Cir. 1984) ("The initial determination whether the consent decree is in the public interest is best left to the S.E.C. and its decision deserves our deference.").

Here, the Court is satisfied that the Commission has carefully reviewed all relevant considerations and has arrived at a penalty that, while taking adequate account of the magnitude of the fraud and the need for punishment and deterrence, fairly and reasonably reflects the realities of this complex situation. Undoubtedly the settlement will be criticized by, among others, those shareholders unfamiliar with the severe limits imposed on their recovery by the bankruptcy laws, those competitors whose own self-interest blinds them to the broader range of public policies that such a settlement implicates, and those professed pundits and ideologues for whom anything less than a corporate death penalty constitutes an "outrage."  But the Court is convinced, for the reasons already outlined above, that the proposed settlement is not only fair and reasonable but as good an outcome as anyone could reasonably expect in these difficult circumstances.

Accordingly the settlement of the monetary penalty phase of this litigation is hereby approved, and the Court will enter today the Final Judgment as to Monetary Relief in the form submitted by the parties.

SO ORDERED.

ED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        July 7, 2003