UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              )
BERT C. ROBERTS, JR.,                         )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )
                                              )
ASSOCIATED ELECTRIC & GAS                     )
INSURANCE SERVICES LIMITED,                   )
CONTINENTAL CASUALTY                          )
COMPANY, GULF INSURANCE                       )
COMPANY, SR INTERNATIONAL                     )
BUSINESS INSURANCE COMPANY,                   )
STARR EXCEL LIABILITY                         )
INSURANCE INTERNATIONAL                       )
LIMITED and TWIN CITY FIRE                    )
INSURANCE COMPANY,                            )
                                              )
            Defendants.                       )
                                              )
ASSOCIATED ELECTRIC & GAS                     )
INSURANCE SERVICES LIMITED.                   )        Civil Action
                                              )
            Counter-Claimant,                 )        Case No. 1:04-CV-04089-DLC
                                              )
      v.                                      )
                                              )        Judge Denise L. Cote
BERT C. ROBERTS,                              )
                                              )        ANSWER TO COMPLAINT
            Counterclaim-Defendant,           )        AND COUNTERCLAIM OF
                                              )        DEFENDANT ASSOCIATED
      and                                     )        ELECTRIC & GAS INSURANCE
                                              )        SERVICES LIMITED
BERNARD EBBERS,                               )
SCOTT D. SULLIVAN,                            )
BETTY L. VINSON,                              )
TROY M. NORMAND,                              )
ESTATE OF JOHN W. SIDGMORE,                   )
RONALD BEAUMONT,                              )
MAX E. BOBBIT,                                )
FRANCESCO GALESI,                             )
JUDITH AREEN,                                 )

CARL J. AYCOCK,                                    )
STILES A. KELLET, JR.,                             )
DAVID F. MYERS,                                    )
GORDON S. MACKLIN,                                 )
JUAN VILLALONGA,                                   )
JOHN A. PORTER,                                    )
BUFORD YATES, JR.,                                 )
JAMES C. ALLEN,                                    )
LAWRENCE A. TUCKER,                                )
CLIFFORD ALEXANDER, JR.,                           )
SUSAN MAYER, and                                   )
JOHN DOES, 1-50, consisting of those               )
unknown directors and/or officers of              )
WorldCom, Inc. against whom                        )
Counter-Claimant is rescinding a certain           )
insurance policy, more fully                       )
described herein,                                  )
                                                   )
            Additional Counterclaim-               )
            Defendants Joined on the               )
            Counterclaim.                          )
                                                   )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>ANSWER</u>

For its Answer to the "Complaint for Declaratory Adjudication of Rights and Ancillary

and Supplemental Relief" (the "Complaint") filed by Plaintiff Bert C. Roberts, Jr. ("Plaintiff"),

Defendant Associated Electric & Gas Insurance Services Limited ("AEGIS"), by and through its

undersigned attorneys, states as follows.

1.     AEGIS lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 1 of Plaintiff's Complaint.

2.     In response to the allegations contained in paragraphs 2 and 3 of Plaintiff's

Complaint, AEGIS denies the allegation that AEGIS has any "coverage obligations" under the

excess Directors and Officers Liability Insurance Policy No. D2306A1A01 that AEGIS issued to

WorldCom, Inc. (the "AEGIS Policy"); states that the AEGIS Policy is void ab initio and subject

to rescission due to material misrepresentations; states that the AEGIS Policy speaks for itself; and lacks knowledge or information sufficient to form a belief as to the truth of all other allegations contained in those paragraphs.

3.     AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4 of Plaintiff's Complaint.

4.     AEGIS admits the allegations contained in paragraph 5 of Plaintiff's Complaint.

5.     AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 6 through 13 of Plaintiff's Complaint.

6.     In response to the allegations contained in paragraph 14 of Plaintiff's Complaint, AEGIS denies that it "insures" Plaintiff and others as alleged because the AEGIS Policy is void ab initio and subject to rescission due to material misrepresentations; and AEGIS lacks knowledge or information sufficient to form a belief as to the truth of all other allegations contained in that paragraph.

7.     In response to the allegations contained in paragraph 15 of Plaintiff's Complaint, AEGIS admits that is issued the AEGIS Policy, states that the AEGIS Policy speaks for itself, and denies all other allegations contained in that paragraph.

8.     AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 16 through 20 of Plaintiff's Complaint.

9.     In response to the allegations contained in paragraph 21 of Plaintiff's Complaint, AEGIS denies the allegations that Plaintiff and "other former co-directors of WorldCom" are "entitled to the benefits" of the AEGIS Policy; states that the Policy is void ab initio and subject to rescission due to material misrepresentations; and lacks knowledge or information sufficient to form a belief as to the truth of all other allegations contained in that paragraph.

10.     In response to the allegations contained in paragraph 22 of Plaintiff's Complaint, AEGIS states that the AEGIS Policy speaks for itself and lacks knowledge or information sufficient to form a belief as to the truth of all other allegations contained in that paragraph.

11.     AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 23 through 30 of Plaintiff's Complaint and states that the primary policy issued by National Union Fire Insurance Company of Pittsburgh, Pennsylvania (the "National Union Policy") speaks for itself.

12.     In response to the allegations contained in paragraph 31 of Plaintiff's Complaint, AEGIS denies that the lawsuits referenced in that paragraph allege "wrongful conduct covered" under the AEGIS Policy; states that the AEGIS Policy is void ab initio and subject to rescission due to material misrepresentations; and lacks knowledge or information sufficient to form a belief as to the truth of all other allegations contained in that paragraph.

13.     In response to the allegations contained in paragraphs 32 and 33 of Plaintiff's Complaint, AEGIS denies the allegation that "coverage" exists under the AEGIS Policy for damages or defense costs in connection with the Securities Litigation; denies that AEGIS has any obligations under the AEGIS Policy; states that the AEGIS Policy is void ab initio and subject to rescission due to material misrepresentations; and lacks knowledge or information sufficient to form a belief as to the truth of all other allegations contained in those paragraphs.

14.     In response to the allegations contained in paragraph 34 of Plaintiff's Complaint, AEGIS denies the allegations that WorldCom "complied with all conditions precedent" in the AEGIS Policy or "is otherwise excused from doing so"; states that the AEGIS Policy is void ab initio and subject to rescission due to material misrepresentations; and lacks knowledge or

information sufficient to form a belief as to the truth of all other allegations contained in that paragraph.

15.    AEGIS denies the allegations contained in paragraph 35 of Plaintiff's Complaint insofar as they are directed at AEGIS and lacks knowledge or information sufficient to form a belief as to the truth of those allegations insofar as they are directed at other defendants.

16.    AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 36 through 39 of Plaintiff's Complaint.

17.    In response to the allegations contained in paragraph 40 of Plaintiff's Complaint, AEGIS admits that it sent the letters referenced in that paragraph to WorldCom's broker, states that the letters speak for themselves, and denies all other allegations contained in that paragraph.

18.    AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 of Plaintiff's Complaint.

19.    AEGIS denies the allegations contained in first sentence of paragraph 42 of Plaintiff's Complaint insofar as they are directed at AEGIS and lacks knowledge or information sufficient to form a belief as to the truth of those allegations insofar as they are directed at other Defendants.  AEGIS admits the allegations contained in the second sentence of paragraph 42 of Plaintiff's Complaint, specifically, that an "actual and justiciable controversy" exists.

20.    In response to the allegations incorporated in paragraph 43 of Plaintiff's Complaint, AEGIS incorporates the responses contained in paragraphs 1 through 19 of the answer.

21.    AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 44 and 45 of Plaintiff's Complaint.

22.     In response to the allegations contained in paragraphs 46 and 47 of Plaintiff's Complaint, AEGIS denies the allegations that it is "obligated" to pay or advance Plaintiff's defense costs and to indemnify Plaintiff and other former directors under the AEGIS Policy; states that the AEGIS Policy is void ab initio and subject to rescission due to material misrepresentations; and lacks knowledge or information sufficient to form a belief as to the truth of all other allegations contained in that paragraph.

23.     AEGIS denies the allegations contained in paragraph 48 of Plaintiff's Complaint insofar as they are directed at AEGIS and lacks knowledge or information sufficient to form a belief as to the truth of those allegations insofar as they are directed at other defendants.

24.     AEGIS admits the allegations contained in paragraph 49 of Plaintiff's Complaint.

25.     AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50 of Plaintiff's Complaint.

26.     In response to the allegations incorporated in paragraph 51 of Plaintiff's Complaint, AEGIS incorporates the responses contained in paragraphs 1 through 25 of this answer.

27.     AEGIS lacks knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraphs 52 and 53 of Plaintiff's Complaint.

28.     AEGIS denies the allegations contained in paragraphs 54 and 55 of Plaintiff's Complaint insofar as they are directed at AEGIS; states that the AEGIS Policy is void ab initio and subject to rescission due to material misrepresentations; and lacks knowledge or information sufficient to form a belief as to the truth of those allegations insofar as they are directed at other Defendants.

29. AEGIS admits the allegation contained in paragraph 56 of Plaintiff's Complaint that an "actual and justiciable controversy" exists but denies that it has any obligations to Plaintiff or other insureds under the AEGIS Policy.

30. In response to the allegations incorporated in paragraph 57 of Plaintiff's Complaint, AEGIS incorporates the responses contained in paragraphs 1 through 29 of this answer.

31. AEGIS lacks knowledge or information sufficient to form a belief as to the allegations contained in paragraph 58 of Plaintiff's Complaint.

32. In response to the allegations contained in paragraphs 59 and 60 of Plaintiff's Complaint, AEGIS denies those allegations insofar as they are directed at AEGIS; states that the AEGIS Policy is void ab initio and subject to rescission due to material misrepresentations; and lacks knowledge or information sufficient to form a belief as to the truth of those allegations insofar as they are directed at other Defendants.

33. AEGIS admits the allegation contained in paragraph 61 of Plaintiff's Complaint that an "actual and justiciable controversy" exists but denies that it has any obligation to Plaintiff or other insureds under the AEGIS Policy.

34. AEGIS denies each allegation contained in Plaintiff's Complaint that is not expressly admitted in this answer.

<u>First Affirmative Defense</u>

35. The AEGIS Policy does not provide coverage to Plaintiff because it is void ab initio and subject to rescission due to material misrepresentations upon which AEGIS relied in issuing the AEGIS Policy, including material misrepresentations made in the application for the

primary National Union Policy and in financial documents WorldCom disclosed in response to questions in such application, upon which AEGIS relied in issuing the AEGIS Policy.

### Second Affirmative Defense

36.     Plaintiff is barred from coverage under the AEGIS Policy as the National Union application warns all District of Columbia applicants that "an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant."

### Third Affirmative Defense

37.     Plaintiff is barred from coverage under the AEGIS Policy as certain directors, officers, and employees of WorldCom perpetrated a fraud on the public, the company's creditors, and business partners by providing false financial information regarding WorldCom that directly influenced the issuance of the AEGIS Policy.

### Fourth Affirmative Defense

38.     Plaintiff is barred from coverage under the AEGIS Policy, in whole or in part, insofar as he asserts claims for indemnity or expenses that are not covered and/or are otherwise precluded under the terms, conditions, definitions, and exclusions of the primary National Union Policy and the AEGIS Policy.

### Fifth Affirmative Defense

39.     Plaintiff is barred from coverage under the AEGIS Policy, in whole or in part, to the extent he recklessly or intentionally disregarded the financial chicanery pervasive within WorldCom's corporate structure.

Sixth Affirmative Defense

40.     Plaintiff is barred from coverage under the AEGIS Policy, in whole or in part, to the extent the claims asserted against him in the underlying lawsuits arose from conduct or inaction leading to his gaining profit or advantage to which he was not legally entitled.

Seventh Affirmative Defense

41.     Plaintiff is barred from coverage under the AEGIS Policy, in whole or in part, to the extent he intentionally or recklessly disregarded the financial manipulations pervasive throughout WorldCom in order to improperly benefit from WorldCom's compensation system.

Eighth Affirmative Defense

42.     Plaintiff's complaint, in whole or in part, fails to state a claim or claims upon which relief may be granted.

Ninth Affirmative Defense

43.     Plaintiff is barred from coverage under the AEGIS Policy to the extent he failed to perform all the acts and satisfy all the conditions required under the Policy when a claim is asserted, including, but not necessarily limited to, the provision of timely, adequate and proper notice, and assistance and cooperation required under the Policy.

Tenth Affirmative Defense

44.     Plaintiff is barred from coverage under the AEGIS Policy to the extent the underlying lawsuits involve claims first made and/or reported, and/or circumstances for which notice has been given prior to the inception date of the AEGIS Policy.

Eleventh Affirmative Defense

45.     Plaintiff is barred from coverage under the AEGIS Policy to the extent the doctrines of waiver, estoppel, laches, unclean hands, set-off, ratification, res judicata, or statutory or contractual limitations periods are applicable.

Twelfth Affirmative Defense

46.     Plaintiff is barred from coverage under the AEGIS Policy to the extent that he has failed to join in this action all parties necessary for the just adjudication of his claims.

Thirteenth Affirmative Defense

47.     Plaintiff is barred from coverage under the AEGIS Policy, in whole or in part, by Endorsement No. 2, Exclusion III(L) of the AEGIS Policy, which provides that AEGIS shall not be liable to make any payment for Ultimate Net Loss "arising from any prior or pending litigation as of December 31, 2001, as well as future claims or litigation based upon the prior or pending litigation or derived from the same or essentially the same facts (actual or alleged) that gave rise to the prior or pending litigation."

Fourteenth Affirmative Defense

48.     Plaintiff is barred from coverage under the AEGIS Policy, in whole or in part, by Exclusion 4(d) of the National Union Policy, the terms of which are generally followed by the AEGIS Policy.

Fifteenth Affirmative Defense

49.     Plaintiff is barred from coverage under the AEGIS Policy, in whole or in part, by Exclusion 4(c) of the National Union Policy, the terms of which are generally followed by the AEGIS Policy.

Sixteenth Affirmative Defense

50.    Plaintiff is barred from coverage under the AEGIS Policy because the Underlying Limit of $70 million has not been exhausted.

Seventeenth Affirmative Defense

51.    The AEGIS Policy is subject to and limited by all of the terms, conditions, definitions, limits of liability, retentions and exclusions therein, and/or all of the terms, conditions, definitions, limits of liability and exclusions of the National Union Policy, that may operate to bar or limit coverage for some or all of the amounts for which Plaintiff and any other insured seeks coverage.  AEGIS reserves the right to raise affirmatively other terms, conditions, definitions, and exclusions contained in the AEGIS Policy and/or the National Union Policy as defenses to coverage as appropriate.

Eighteenth Affirmative Defense

52.    AEGIS denies that it is liable for Plaintiff's attorney fees and costs incurred in bringing this action.

Nineteenth Affirmative Defense

53.    AEGIS reserves the right to assert affirmatively any other matter that constitutes an avoidance or affirmative defense under applicable rules.

Twentieth Affirmative Defense

54.    AEGIS hereby incorporates by reference the allegations and causes of action it asserts in its Counterclaim against Plaintiff.

WHEREFORE, having fully responded to the Complaint, AEGIS respectfully requests that the Complaint be dismissed, that the Court enter judgment in favor of AEGIS, that AEGIS

be awarded its costs and attorneys' fees, and that the Court grant such other and further relief as it may deem just.

## COUNTERCLAIM

1.      This is a Counterclaim for declaratory relief under 28 U.S.C. § 2201.  Counter-claimant AEGIS seeks a declaration that Counterclaim-Defendant Bert C. Roberts and the additional Counterclaim-Defendants joined on this Counterclaim under Rule 13(h) of the Federal Rules of Civil Procedure have no rights under the excess Directors and Officers Liability Insurance Policy No. D2306A1A01 that AEGIS issued to WorldCom, Inc. (the "AEGIS Policy") and that the AEGIS Policy is void ab initio and rescinded as to all Counterclaim-Defendants.

### Jurisdiction and Venue

2.      This Court has jurisdiction over the additional Counterclaim-Defendants pursuant to 28 U.S.C. § 1367, in that the counterclaim arises from the same events, transactions, and occurrences that are alleged in the Complaint and is so related to the claim in the underlying Complaint as to form part of the same case or controversy.

3.      Venue is proper in this district in that a substantial part of the events and omissions giving rise to the Counterclaim occurred in this District.

### The Parties

4.      AEGIS is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

5.      Upon information and belief, Plaintiff is a citizen of the state of Maryland and a former director of WorldCom.

6.    Upon information and belief, Bernard Ebbers ("Ebbers") is a resident of Mississippi and, at all relevant times, was a director and President and Chief Executive Officer of WorldCom.

7.    Upon information and belief, Scott D. Sullivan ("Sullivan") is a resident of Florida and, from 1996 until he was fired by the Board of Directors on June 25, 2002, was a director and Chief Financial Officer of WorldCom.

8.    Upon information and belief, Betty L. Vinson ("Vinson") is a resident of Mississippi and, at all relevant times, was Director of Management Reporting of WorldCom.

9.    Upon information and belief, Troy M. Normand ("Normand") is a resident of Mississippi and, at all relevant times, was Director of Legal Entity Reporting of WorldCom.

10.    Upon information and belief, John W. Sidgmore ("Sidgmore") was a resident of Maryland and, at all relevant times, a director of WorldCom.  Sidgmore was also Chief Operating Officer of WorldCom in 1999.  Sidgmore has since died and the Estate of John W. Sidgmore is named in his stead.

11.    Upon information and belief, Ronald Beaumont ("Beaumont") is a resident of Texas and, at all relevant times, was a director of WorldCom and Chief Operating Officer of WorldCom Group.

12.    Upon information and belief, Max E. Bobbit ("Bobbit") is a resident of Florida and, at all relevant times, was a director, Chairman of the Audit Committee, and member of the Compensation and Stock Options Committee of WorldCom.

13.    Upon information and belief, Francesco Galesi ("Galesi") is resident of New York or, alternatively, Mississippi, and, at all relevant times, was a director and member of the Audit Committee of WorldCom.

14.     Upon information and belief, Judith Areen ("Areen") is a resident of Maryland and, at all relevant times, was a director and member of the Audit Committee of WorldCom.

15.     Upon information and belief, Carl J. Aycock ("Aycock") is resident of Mississippi and, at all relevant times, was a director of WorldCom.

16.     Upon information and belief, Stiles A. Kellet, Jr. ("Kellet") is a resident of Georgia and, at all relevant times, was a director and Chairman of the Compensation and Stock Option Committee of WorldCom.

17.     Upon information and belief, David F. Myers ("Myers") is a resident of Mississippi. Myers joined WorldCom in 1995 and became Controller of WorldCom in 1997. Upon further information and belief, Myers became a Senior Vice President of WorldCom in early 2000 and remained in this position until his resignation on June 25, 2002.

18.     Upon information and belief, Gordon S. Macklin ("Macklin") is a resident of Maryland and, at all relevant times, was a director and member of the Compensation and Stock Option Committee of WorldCom.

19.     Upon information and belief, Juan Villalonga ("Villalonga") resides in Spain and, at all relevant times, was a director of WorldCom, named as such in November 1998.

20.     Upon information and belief, John A. Porter ("Porter") is a resident of Maryland, and, at all relevant times, was a director and Vice Chairman of the Board of Directors of WorldCom.

21.     Upon information and belief, Buford Yates, Jr. ("Yates") is a resident of Mississippi and, from 1997 to August 2002, was the Director of General Accounting of WorldCom.

22.     Upon information and belief, James C. Allen ("Allen") is a resident of Florida or, alternatively, Missouri, and, at all relevant times, was a director of WorldCom.

23.     Upon information and belief, Lawrence A. Tucker ("Tucker") is a resident of Connecticut and, at all relevant times, was a director of WorldCom and a member of the Compensation and Stock Option Committee until late 2000.

24.     Upon information and belief, Clifford Alexander, Jr. ("Alexander") is a resident of the District of Columbia and, at all relevant times, was a director of WorldCom.

25.     Upon information and belief, Susan G. Bell, who, known at all relevant times as Susan Mayer ("Mayer"), is a resident of Mississippi and, at all relevant times, was a Senior Vice President of WorldCom.

26.     Defendants John Does 1-50 ("John Does") are unknown directors and/or officers of WorldCom against whom AEGIS is rescinding the AEGIS Policy and/or is seeking a declaration of no coverage under the AEGIS Policy, and they include any unnamed directors, officers and/or employees who made, assisting in making, had knowledge of or acquiesced in false, incorrect or otherwise inaccurate statements or representations upon which AEGIS relied in issuing the AEGIS Policy.

<u>The National Union and AEGIS Policies</u>

27.     National Union Fire Insurance Company of Pittsburgh Pa. issued a "Directors, Officers and Corporate Liability Insurance Policy", Policy No. 874-91-08, to WorldCom effective December 31, 2001 to December 31, 2002 (the "National Union Policy").  The National Union Policy provides the "primary" layer of director and officer liability coverage with limits of liability of $15 million, subject to a self-insured retention of $5 million in respect

of Securities Claims first made during the Policy Period.  A copy of the National Union Policy is attached at Exhibit 1.

28.     Excess director and officer liability policies were issued to WorldCom for the same period (December 31, 2001 to December 31, 2002) by Continental Casualty Company (first layer $15 million excess of $15 million), SR International Business Insurance Company (second layer $15 million excess of $30 million), Twin City Fire Insurance Company (third layer $15 million excess of $45 million), Starr Insurance Company (fourth layer $10 million excess of $60 million), AEGIS (fifth layer $10 million excess of $70 million), and Gulf Insurance Company (sixth layer $10 million excess of $80 million).

29.     The AEGIS Policy, effective for the period December 31, 2001 through December 31, 2002, affords up to $10 million of insurance for Claims first made during the Policy Period excess of $70 million in Underlying Limits.  The AEGIS Policy would become applicable only after the limits of the primary National Union Policy and the first through fourth excess policies would be exhausted by the payment of defense expenses, judgment, and/or settlements.

30.     The AEGIS Policy, a copy of which is attached as Exhibit 2, follows the terms and conditions of the primary National Union Policy, except as otherwise provided in the AEGIS Policy.

<u>The Application Process</u>

31.     AEGIS agreed to accept the National Union Renewal Application WorldCom submitted to National Union (the "Application") in lieu of an AEGIS application form in connection with underwriting the AEGIS Policy.  The Application, a copy of which is attached at

16

Exhibit 3, was submitted to AEGIS by WorldCom's broker, Willis, Inc., and was relied upon by AEGIS in underwriting the AEGIS Policy.

32.    The Application states that "this Application shall be the basis of the contract should a policy be issued, and it will be attached to and become part of the policy."

33.    The Application includes the following notice for District of Columbia applicants (WorldCom was a District of Columbia applicant):  "An insurer may deny insurance benefits if false information materially related to a claim was provided by an applicant."

34.    Question 14 of the Application requests, among other things, copies of the following documents:  (a) latest annual report; (b) latest 10K filed with the SEC; (c) latest interim financial statements; (d) all proxy statements and notices of annual meetings for the last 12 months; and (e) all registration statements filed with the SEC in the last 12 months. WorldCom responded to Question 14 by stating that the requested information could be obtained on WorldCom's website.

35.    AEGIS relied upon the documents identified in paragraph 34, as well as the Application, in underwriting and issuing the AEGIS Policy.  Included among the documents upon which AEGIS relied were financial documents signed by certain Counterclaim-Defendants, including WorldCom's 2000 10-K.

36.    The AEGIS Policy states that it is issued "in reliance upon all statements made and information furnished to [AEGIS] by the Application attached hereto which is made a part hereof."  Similarly, the primary National Union Policy states that it is issued "in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the materials incorporated herein."

17

## The Misrepresentations and Fraudulent Activities

37.    WorldCom has admitted that much of the financial information identified in paragraph 34, which was provided to AEGIS in connection with underwriting and issuance of the AEGIS Policy and upon which AEGIS relied in underwriting and issuing the AEGIS Policy, was materially false and misleading.  WorldCom's admitted dissemination of materially false and misleading financial information has resulted in WorldCom's bankruptcy (the largest bankruptcy filing in U. S. history), the filing of a civil action by the SEC, the resignations or firing of certain Counterclaim-Defendants, the filing of criminal charges against certain Counterclaim-Defendants, the filing of multiple civil actions by investors, and massive restatements of the Company's financials.

## WorldCom's Disclosures of Fraud

38.    Beginning in June 2002, WorldCom disclosed in a series of public announcements that it had perpetrated a massive fraud upon the public, including AEGIS and its other insurers, by among other things, overstating its income by more than $9 billion for the period encompassing the years 2000, 2001 and the first quarter of 2002.

39.    Initially, on June 25, 2002, in a press release filed with the SEC on a Form 8-8 that same day, World Com revealed that it had improperly classified approximately $3.9 billion in "line cost" expenses as "capital expenditures."  WorldCom further revealed that, "[w]ithout these transfers, the company's reported [earnings] would be reduced . . . [significantly] for 2001 . . . and for [the] first quarter 2002, and the company would have reported a net loss for 2001 and for the first quarter of 2002."  This announcement of a net loss for these periods was in sharp

contrast to the purported profit reported by WorldCom in its original financial statements, which were incorporated by reference into the National Union Application provided to AEGIS.

40.     In early August 2002, WorldCom disclosed additional accounting irregularities and stated that, in total, its financial statements for 2000, 2001 and first and second quarters of 2002 had been overstated by $7.2 billion.

41.     Most recently, on March 12, 2004, WorldCom filed its Form 10-K for the year ending December 31, 2002, in which it restated its financial statements for fiscal years 2000 and 2001 (the "March 2004 Restatement").  Here, WorldCom restated its pre-tax income previously reported at $7.6 billion in 2000 to the real pre-tax loss of $49.9 billion for that year.  For 2001, WorldCom restated its pre-tax income previously reported at $2.3 billion to the real pre-tax loss of $14.5 billion.  See March 2004 Restatement at F.26.

42.     The March 2004 Restatement resulted in a cumulative net reduction of shareholders' equity of $70.8 billion in 2001 and $53.6 billion in 2000, as well as a reduction in previously reported net income of $17.1 billion and $53.1 billion for the years ending on December 31, 2001 and 2000, respectively.  See March 2004 Restatement at F-25.

43.     In the March 2004 Restatement, WorldCom noted that in its restatement process, specifically with respect to those "accounting irregularities" that sparked the Company's downward spiral, "the Company identified a substantial number of material weaknesses in the Company's internal controls, including poor accounting records."  See March 2004 Restatement at F-25.

The SEC Actions and the Criminal Actions

44.     On July 8, 2002, in conjunction with its initial disclosure of the fraud and the need for a restatement, WorldCom filed with the SEC a revised statement pursuant to Section 21(a)(1)

19

of the Securities and Exchange Act of 1934 (the "Section 21(a)(1) Statement"). In this Statement, WorldCom acknowledged that Sullivan, WorldCom's Chief Financial Officer, and Myers, WorldCom's Controller--the very individuals responsible for the preparation of WorldCom's financial statements--were responsible for the improper accounting transactions that had led to the necessity for a restatement.

45.     Myers subsequently resigned as WorldCom's Controller, and Sullivan was terminated without a severance package. The Section 21(a)(1) Statement confirmed that WorldCom's SEC filings during 2001 and the first quarter of 2002 were prepared under the direction of, and signed by, Sullivan. A criminal investigation by the Department of Justice soon followed.

46.     At about this same time, the SEC filed a civil enforcement action charging that WorldCom "as a result of undisclosed and improper accounting, . . . materially overstated the income it reported in its financial statements by $9 billion" and, by doing so, "misled investors." The SEC's first amended complaint alleges that during the period of at least early 1999 through the first quarter of 2002, there was at WorldCom a "chronic and pervasive failure to follow GAAP standards, and to mandate and institute appropriate internal controls." Additional civil enforcement actions followed Myers, Yates, Normand, Vinson and Sullivan based on their involvement in the "massive fraud" at WorldCom. The actions brought by the SEC are collectively referred to herein as the SEC Actions.

47.     On or about August 28, 2002, Sullivan and Yates were indicted on charges of securities fraud and conspiracy to commit securities fraud. The indictment included allegations that Sullivan and Yates were engaged in an illegal scheme to defraud investors, failed to disclose transfers to WorldCom's auditors, and made false statements in public filings.

48.    On or about September 27, 2002, Myers pleaded guilty to securities fraud, conspiracy and making false filing with the SEC.  In connection with is guilty plea, Myers admitted assisting senior WorldCom management in manufacturing phony "profits" for the Company and in defrauding the public as part of a scheme designed to create the appearance that WorldCom was meeting Wall Street's expectations.  Myers also admitted that WorldCom's senior management had instructed him to manipulate WorldCom's financial statements so as to improperly reduce reported costs and increase reported earnings.  Moreover, Myers reiterated what had been previously stated in WorldCom's Section 21(a)(1) Statement--i.e., that there was no documentation to support and no conceivable justification for WorldCom's decision to categorize line costs as capital expenditures rather than expenses.

49.    Three more WorldCom accounting executives--Yates, Vinson and Normand--subsequently pleaded guilty to charges that they helped carry out the massive accounting fraud at WorldCom.

50.    Yates admitted in his guilty plea that Myers and Sullivan personally directed him to perform improper accounting adjustments.  Yates asserted that, at first, he "strenuously objected" to the accounting adjustments he was pressured to make.  He ultimately relented, however, after he was assured that the illegal accounting entries had been approved at WorldCom's highest management levels.

51.    Vinson and Normand, who had oversight responsibilities for WorldCom's financial record-keeping, admitted during the allocutions of their guilty pleas that they had been ordered to transfer enormous sums of expenses in order to hide the company's financial troubles from the public.

52.    Finally, on March 2, 2004, after almost two years of denying any responsibility for or involvement with the enormous fraud committed by WorldCom and certain directors and officers, Sullivan pleaded guilty to conspiracy to commit securities fraud, making false filing with the SEC, keeping false books and records, securities fraud, and willfully causing WorldCom to file false and misleading financial documents.  Sullivan admitted that there was no legitimate justification or basis for the accounting adjustments made to WorldCom's books and that, as a result of these improper actions, WorldCom's financial statements were false and misleading.

53.    Sullivan, Myers, Yates, Normand and Vinson are collectively referred to herein as the "Pleading Defendants."

54.    On May 24, 2004, Ebbers was charged in a nine-count superseding indictment with conspiracy to commit securities fraud, securities fraud, and making false filing with the SEC (the "Indictment").  The Indictment alleges, among other things, that Ebbers and Sullivan conspired by providing false and fraudulent information to the public through fraudulent adjustments to WorldCom's books and records, and by making false and misleading statements and omissions in SEC filings.

55.    The criminal proceedings against Sullivan, Myers, Yates, Normand, Vinson and Ebbers are collectively referred to herein as the "Criminal Actions."

<div align="center">The Fraudulent Scheme</div>

56.    Based on the admissions of WorldCom and its executives, and the investigations by WorldCom's Board of Directors and the government, it is now clear that WorldCom committed a massive fraud on the public, including AEGIS and its other insurers.

57.    Indeed, WorldCom committed actual fraud when its employees, acting at the direction of their superiors in executive management, made significant and improper accounting

entries following the close of many quarters in order to falsely report that WorldCom had achieved the unrealistic revenue growth targets set by Ebbers and Sullivan and disseminated to the public.

58.    None of the accounting manipulations described herein, directed by senior management, including Ebbers and Sullivan, with the assistance of Yates, Normand, Myers and Vinson, had any documentation or support, and were known to be improper at the time they were ordered and carried out.

59.    According to the March 31, 2003 Report of Investigation by the Special Investigative Committee of the Board of Directors of WorldCom, Inc. ("SIC Report"), the earliest known manipulations involved the improper release of depreciation reserves and the reclassification of Selling, General and Administrative ("SG&A") expenses, and over the relevant period (1999 through the beginning of 2002) the combined manipulation of these items resulted in improper and fraudulent entries totaling approximately $2.876 billion.  See SIC Report at 195,212.

60.    Beginning in 1999, many of the improper entries were made to the Corporate Unallocated revenue account in an amount estimated to be well over $1 billion (which was separately reported to Ebbers each month), even though both Ebbers and Sullivan knew that these non-recurring items improperly and deceptively increased the revenues reported.  See SIC Report at 130-31, 134, 136-37.

61.    From the middle of 1999 through 2000, WorldCom reduced its reported "line costs" by approximately $3.3 billion by improperly releasing "accruals" or those reserves set aside for anticipated expenses, often entirely unrelated to the line costs the accruals were being used to offset.  By releasing these reserves, WorldCom was able to offset reported line costs,

reducing expenses and improperly and deceptively increasing the reported pre-tax income.  See SIC Report at 61-62.

62.     By the end of 2000, WorldCom had depleted the available reserves it had previously been manipulating.  However, the continuing pressure on the Company's stock price, and the need to meet those analysts' unrealistic expectations drove Ebbers and Sullivan, with the assistance of the aforementioned defendant officers and employees, to find new ways to manipulate WorldCom's books and defraud its investors, creditors, the financial market, its insurers and the rest of the public at large.  See SIC Report at 89-90.

63.     In the first quarter of 2001 through the first quarter of 2002, WorldCom reduced its reported line costs by approximately $3.9 billion by improperly capitalizing roughly $3.5 billion of those costs, which avoided the immediate impact of properly expensing, or recognizing the costs, and in turn increased pre-tax income.  But for this scheme, WorldCom would have been forced to report pre-tax losses in three of the five quarters in which it engaged in this fraud. See SIC Report at 90-92.

64.     Accounting for line costs in the above manner was a blatant and egregious violation of generally accepted account principles ("GAAP"), which prohibits the capitalization of ongoing expenses, or "line costs", since these expenses do not generate future value.  See SIC Report at 138, 149, 185.

65.     Many of the accounting irregularities and improprieties described in the SIC Report were identified in the March 2004 Restatement as the bases for the significant restatement of various financial figures.

66.     Additional accounting gimmickry, improperly employed in order to create WorldCom's "smoke and mirrors"-styled earnings report, included the improper reduction of

income taxes, the establishment of excess general accrual accounts, which were then released in order to increase reported income and meet those unrealistic targets, allocation of costs, the issuing of tracker stocks, and the improper valuation on balance sheets of WorldCom's goodwill and intangible assets.

67.    All of this financial chicanery was ultimately disseminated to the world via WorldCom's financial filing with the SEC in the form of its 1999, 2000, and 2001 Forms 10-K-, along with all interim financial reporting such as the Forms 10-Q for those relevant years, as wall as WorldCom's prospectuses, proxy statements, and public statements made about its financial health.

68.    Pursuant to the requirements of the Securities Exchange Act of 1934, Sullivan, Alexander, Allen, Areen, Aycock, Bobbit, Ebbers, Galesi, Kellet, Macklin, Roberts, Sidgmore, Tucker, Villalonga (collectively, the "Signatory Defendants") signed WorldCom's Forms 10-K for the years 1998, 1999, 2000 and/or 2001.

69.    This scheme was conceived and directed by WorldCom's senior management, chiefly Ebbers and Sullivan, and carried out by their minions, Vinson, Normand, Myers and Yates, under the watch of a Board of Directors displaying willful and deliberate indifference to the bizarre and destructive management of this Fortune 500 Company.

70.    In sum, it is now clear that WorldCom was nothing like the financially healthy, robust corporation with excellent prospectus for continued growth--and shareholder satisfaction-- that was represented in the false and misleading documents upon which WorldCom predicated its applications for D & O insurance coverage, including its applications for the AEGIS Policy.

71.    The same information WorldCom used to defraud AEGIS and its other insurers was disseminated to, and perpetrated upon, the financial markets and the public.

72.    Immediately following WorldCom's initial disclosure of the fraud, the value of WorldCom shares plummeted to about $0.05 on the NASDAQ exchange and WorldCom was delisted from the exchange.

73.    Based on the revelations of the fraud committed by WorldCom and certain of its directors and officers, beginning in mid-2002, certain shareholders and bondholders of WorldCom have brought a number of class action and shareholder derivative suits against WorldCom and its directors and officers alleging, among other things, violations of state and federal securities laws (the "Private Civil Actions").  Many, but not all, of the Private Civil Actions have been consolidated into the action captioned In re WorldCom Securities Litigation, Civil Action No. 02-3288-DLC (S.D.N.Y.).

## Efforts to Advise WorldCom of the Policy's Rescission

74.    Like the regulatory bodies, law enforcement agencies, and the general public, AEGIS did not discover and could not have, in the exercise of reasonable care, discovered that the financial information reported by WorldCom and incorporated into its Application for the AEGIS Policy, was false and fraudulent until WorldCom publicaly announced its use of the improper and deceptive accounting practices.

75.    As AEGIS began to learn of the magnitude of WorldCom's misrepresentations, it determined that the AEGIS Policy was subject to rescission because of the material misrepresentations made by WorldCom in connection with its application for and procurement of the AEGIS Policy.  On January 8, 2003, counsel for AEGIS sent WorldCom a letter notifying WorldCom that AEGIS was entitled to rescind the Policy.  A copy of that letter is attached at Exhibit 4.

76.    On January 28, 2003, WorldCom brought an adversary proceeding in the bankruptcy court for an adjudication of the rights and responsibilities of WorldCom and its excess insurers under the policies.

77.    On May 14, 2004, U. S. Bankruptcy Court Judge Gonzalez granted the motions to dismiss of AEGIS, Twin City Insurance Company, and Gulf and dismissed the adversary proceeding as against them on the grounds that WorldCom had only a minimal interest in the policies and that, therefore, the bankruptcy court was the improper forum to adjudicate the coverage disputes.

78.    AEGIS now brings this counterclaim for a declaratory judgment that the AEGIS Policy is rescinded and void ab initio as to all insureds, including all Counterclaim-Defendants.

COUNT I

<u>RESCISSION OF THE AEGIS POLICY BASED UPON MATERIAL MISREPRESENTATIONS IN THE POLICY APPLICATION</u>

79.    AEGIS repeats and realleges the allegations of paragraphs 1-78 of this Counterclaim as if fully set forth herein.

80.    WorldCom's past, present and future directors and officers, including Plaintiff and the other Counterclaim-Defendants, are defined as Insureds under the AEGIS Policy in certain circumstances.

81.    All of the Counterclaim Defendants knew, or reasonably should have known, that WorldCom would procure directors and officers liability coverage on their behalf, including the AEGIS Policy.

82.    All of the Counterclaim Defendants knew, or reasonably should have known, that WorldCom would submit an application, including company information and financial

documents, in support of procurement of directors and officers liability coverage, including the AEGIS Policy.

83.     AEGIS issued the AEGIS Policy in reliance on, among other things, the accuracy and truthfulness of the information set forth in financial reports signed by WorldCom's directors and officers, filed with the SEC and incorporated into the National Union Application provided to AEGIS, as well as other publicly available information concerning WorldCom (including but not limited to information set forth in its annual and quarterly reports), and representations made by WorldCom to AEGIS and/or WorldCom's other insurers.

84.     As described above, beginning in at least 1999, WorldCom's SEC filings and other publicly available financial information, including but not limited to its Forms 10-K, Forms 10-Q and annual reports, contained materially false statements and misrepresentations, omitted material information regarding the fraudulent accounting scheme.  In particular, the information set forth in WorldCom's Form 10-K for the year 2000 (including audited financial statements as and for the years ended December 31, 2000, December 31, 1999 and December 31, 1998), which was signed by (or incorporated financial statements set forth in Form(s) 10-K signed by) each of the Signatory Defendants, was materially false and misleading, and the information set forth in WorldCom's Form 10-Q for the second and third quarters of 2001, which were signed by Sullivan, was materially false and misleading.

85.     Each of the Counterclaim Defendants was a senior official, executive and/or director of WorldCom who was privy to confidential and proprietary information concerning the Company's present and future business prospectus and business risks, the Company's accounting practices and procedures, and the Company's financial disclosure practices and procedures.

86.     At a minimum, WorldCom, Ebbers and the Pleading Defendants knew that WorldCom's SEC filings and other publicly available financial documents contained materially false information, statements and omissions as a result of the scheme described above to defraud the public, including AEGIS and WorldCom's other insurers.

87.     Prior to issuing the AEGIS Policy, and with WorldCom's knowledge, AEGIS gathered from publicly available sources financial and other information regarding WorldCom, including information set forth in WorldCom's 2000 Form 10-K (including audited financial statements as and for the years ended December 31, 2000, December 31, 1999 and December 31, 1998) and its Forms 10-Q for the second and third quarters of 2001.  AEGIS relied on the accuracy and the truthfulness of all such information in issuing the AEGIS Policy.

88.     WorldCom expected and intended that AEGIS would review and rely on the information set forth in WorldCom's published financial statements and other reports, including those materials incorporated into the National Union Application, in determining whether to provide WorldCom with the requested coverage.

89.     WorldCom, Ebbers and the Pleading Defendants failed to disclose the scheme to defraud the public and knowingly concealed WorldCom's true financial condition in connection with the issuance of the AEGIS Policy.  WorldCom and the Counterclaim Defendants owed AEGIS a duty to disclose such information in connection with WorldCom's request for the issuance of the AEGIS Policy.

90.     At a minimum, WorldCom, Ebbers and the Pleading Defendants had actual knowledge of the fraudulent statements and material omissions made in WorldCom's public financial documents and other information provided to and/or relied upon by AEGIS in issuing the AEGIS Policy.

91.     WorldCom's misrepresentations, concealment of facts and omissions were made on behalf of itself, as well as on behalf of each of the insureds under the AEGIS Policy, including each of the Defendants in this counterclaim.  Further, the Signatory Defendants signed and certified WorldCom's Forms 10-K for the years 2000, 1999 and/or 1998, thereby making false statements and misrepresentations as to WorldCom's financial performance and condition.

92.     The fraudulent statements, false statements, misrepresentations, concealments and omissions in WorldCom's public financial statements and the National Union Application were material to AEGIS' acceptance of the risk associated with issuing the AEGIS Policy and to the hazard assumed by AEGIS in issuing the AEGIS Policy.

93.     AEGIS relied on those statements and omissions in issuing the AEGIS Policy.

94.     Had AEGIS known the true facts concerning the matters described in the SIC Report, the March 2004 Restatement, the SEC Actions and the Criminal Actions, AEGIS in good faith would not have issued the AEGIS Policy.

95.     AEGIS' underwriters did not know and could not have reasonably been expected to know or discover, prior to the time the coverage was bound, that the financial information proffered by WorldCom in connection with the underwriting of the AEGIS Policy was false and misleading.

96.     The material misrepresentations, false statements, omissions and misleading statements improperly used by WorldCom to procure the AEGIS Policy render it subject to rescission and void ab initio as to all Counterclaim-Defendants.

97.     AEGIS had advised WorldCom that the AEGIS policy is subject to rescission.

98.     In connection with the rescission of the AEGIS Policy, AEGIS will tender the premiums that WorldCom paid for the AEGIS Policy.

99.     AEGIS is entitled to a judgment declaring that the AEGIS Policy is rescinded and void ab initio as to all Counterclaim-Defendants based on material misrepresentations in the Policy Application.

COUNT II

RESCISSION OF THE AEGIS POLICY
BASED UPON FRAUD IN THE INDUCEMENT

100.     AEGIS repeats and realleges the allegations of paragraphs 1-99 of this counterclaim as if fully set forth herein.

101.     WorldCom intentionally included false, fraudulent, and/or materially misleading information in its Application for the AEGIS Policy.

102.     WorldCom was aware that information included in its Application for the AEGIS Policy was false, fraudulent, and/or materially misleading.

103.     WorldCom intended for AEGIS to rely on the false, fraudulent and/or materially misleading information that was included in WorldCom's Application.

104.     AEGIS did not know and could not have reasonably been expected to know, prior to the time the coverage was bound, that information included in WorldCom's Application was false, fraudulent, and/or materially misleading.

105.     AEGIS reasonably relied on the false, fraudulent, and/or materially misleading information WorldCom included in its Application in deciding whether and on what terms to bind coverage and issue the AEGIS Policy.

106.     WorldCom's procurement of the AEGIS Policy by, inter alia, including false, fraudulent and materially misleading information in its Application constitutes fraud in the inducement.

107.    AEGIS is entitled to a judgment declaring that AEGIS Policy is rescinded as to all Counterclaim-Defendants based on fraud in the inducement.

<div align="center">COUNT III</div>

<div align="center">RESCISSION OF THE AEGIS POLICY<br>BASED UPON FRAUD ON THE MARKET</div>

108.    AEGIS repeats and realleges the allegations of paragraphs 1-107 of this counterclaim as if fully set forth herein.

109.    WorldCom knowingly disseminated false and untrue information to the financial markets and the nation.

110.    This false and untrue information about the Company's financial health and governance caused an inflated and untrue picture of the Company's health to be formed in the eyes of the public and financial marketplace.

111.    WorldCom's false financial data was disseminated to and existed within an open and developed securities market, which allowed WorldCom to disseminate its false data to the investing public.

112.    WorldCom employed the following means to disseminate its false information:

    a.    WorldCom common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ;

    b.    As a regulated issuer, WorldCom filed periodic public reports with the SEC and the NASD;

    c.    Securities analysts followed WorldCom stock and issued reports based on published financial results.  Each of these reports was publicly available and entered the public marketplace; and

<div align="center">32</div>

      d.     WorldCom regularly issued press releases, which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

113.    WorldCom's use of these methods ensured that its dissemination of false and misleading financial data would have an enormous impact on the securities market.

114.    WorldCom's directors and officers knew or should have reasonably known that the information being disseminated to the public and financial markets was untrue and false.

115.    This false and untrue information caused WorldCom's stock to rise vastly beyond its true value.

116.    WorldCom's knowing creation and dissemination of the fraudulent financial data vastly increased the "bargained for" fortuitous risk it sought to insure far beyond what it would have been had WorldCom published its true financial results.

117.    WorldCom's intentional, improper, and illegal actions enormously increased the risk which it sought to insure, guaranteeing that when WorldCom's massive fraud was ultimately discovered and revealed, and its stock inevitably crashed, its deceived investors would retaliate with the myriad of lawsuits that have been filed against WorldCom's directors and officers.

118.    The AEGIS Policy was intended to protect WorldCom and its directors and officers against fortuitous liability, and not against liability arising from the intentional and insidious fraud visited upon the public, the financial markets, and its insurers with the intent to create an untrue picture of the Company.

119.    As a matter of equity, WorldCom and the Counterclaim-Defendants cannot benefit from the use of fraudulent information to procure the AEGIS Policy when that same

fraudulent data directly caused the losses for which WorldCom and its directors and officers, including the Counterclaim-Defendants, now seek coverage.

120.    AEGIS is entitled to a judgment declaring that the AEGIS Policy is rescinded and void ab initio as to all Counterclaim-Defendants based on fraud on the market.

COUNT IV

IN THE ALTERNATIVE, FOR DECLARATION OF NO COVERAGE
AGAINST ALL COUNTERCLAIM-DEFENDANTS

121.    AEGIS repeats and realleges the allegations of paragraphs 1 through 120 of this counterclaim as if fully set forth herein.

122.    To the extent the Court does not declare that the AEGIS Policy is rescinded and void ab initio, AEGIS seeks in the alternative a declaration that the AEGIS Policy does not provide coverage for any claims relating to the wrongful conduct of the Counterclaim-Defendants as set forth herein, including but not limited to the Private Civil Actions, the SEC Actions and the Criminal Actions.

123.    The National Union Policy, which is part of the Underlying Insurance for the AEGIS Policy, contains a number of limitations and exclusions that bar or limit coverage for claims against the Counterclaim-Defendants, including but not limited to Exclusion 4(a) through 4(d).

124.    The National Union Policy excludes from the definition of "Loss," among other things, "matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed" and "civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages."

125. Endorsement No. 2, Exclusion III(L) of the AEGIS Policy provides that AEGIS shall not be liable to make any payment for Ultimate Net Loss "arising from any prior or pending litigation as of December 31, 2001, as well as future claims or litigation based upon the prior or pending litigation or derived from the same or essentially the same facts (actual or alleged) that gave rise to the prior or pending litigation."

126. The claims, losses and "Wrongful Acts" alleged in the Private Civil Actions and the Criminal Actions do not arise from "fortuitous" losses. Rather, the claims and losses arise from the fraudulent conduct and criminal scheme of WorldCom that was in progress at the time of the inception of the AEGIS Policy, and the insureds accordingly knew or should have known at or before that time that such conduct would result in claims and losses. As these losses were in progress and known as of the effective date of the AEGIS Policy, coverage for the losses is precluded by the fortuity doctrine, the principles of "known loss" or "loss in progress," and/or is against public policy and uninsurable under the law.

127. Accordingly, the Counterclaim-Defendants are not entitled to coverage under the AEGIS Policy.

WHEREFORE, AEGIS respectfully requests that the Court

(a) enter judgment declaring that the AEGIS Policy is rescinded and void ab initio as to all "Insureds" as that term is contemplated by the AEGIS Policy;

(b) enter judgment declaring that AEGIS has no obligation to defend, pay defense costs, or indemnify any person or entity in connection with nay claim, lawsuit or other legal proceeding, including but not limited to the Private Civil Actions, the SEC Actions and the Criminal Actions;

(c)    enter judgment awarding AEGIS its costs and reasonable attorneys' fees incurred

in this action; and

(d)    award AEGIS such other and further relief as the Court may deem appropriate.

Dated:  Uniondale, New York Scarcella Rosen & Slome LLP
         August 2, 2004

                                    By:  /s/ Louis A. Scarcella
                                         Louis A. Scarcella (LS-3479)
                                         Attorneys for Associated Electric & Gas Insurance
                                         Services Limited
                                         333 Earle Ovington Boulevard
                                         Ninth Floor
Of Counsel:                              Uniondale, New York 11553
                                         (516) 227-1600

Michael Goodstein, Esq.
Bailey Cavalieri LLC
10 West Broad Street, Suite 2100
Columbus, Ohio 43215-3422
(614) 229-3231 (telephone)
(614) 221-0479 (facsimile)
Michael.Goodstein@BaileyCavalieri.com

POLICY NUMBER:
*874-91-08*

 *American International Companies*®

RENEWAL OF:
*484-54-78*

## Directors, Officers and Corporate Liability Insurance Policy

| | |
|---|---|
| ☐ AIU Insurance Company | ☐ Illinois National Insurance Company |
| ☐ American International South Insurance Company | ☒ National Union Fire Insurance Company of Pitts., PA® |
| ☐ Birmingham Fire Insurance Company of Penns. | ☐ National Union Fire Insurance Company of Louisiana |
| ☐ Granite State Insurance Company | ☐ New Hampshire Insurance Company |

(each of the above being a capital stock company)

---

NOTICE:   EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE:   THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE.  AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE:   THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND;   HOWEVER, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

## DECLARATIONS

ITEM 1.   NAMED CORPORATION:  *WORLDCOM, INC.*

MAILING ADDRESS:      *133 19TH STREET*
*WASHINGTON, DC 20036*

STATE OF INCORPORATION OF THE NAMED CORPORATION:
*Georgia*

ITEM 2.   SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Corporation

ITEM 3.   POLICY PERIOD:     From: *December 31, 2001*      To: *December 31, 2002*
(12:01 A.M. standard time at the address stated in Item 1.)

ITEM 4.   LIMIT OF LIABILITY:    $15,000,000
aggregate for Coverages A and B combined (including Defense Costs)

280128
62334 (5/95)

*COPY*

ITEM 5.     RETENTION:

SECURITIES CLAIMS:

Judgments & Settlements (all coverages)          None

Defense Costs (non–Indemnifiable Loss)           None

Defense Costs (Coverage B(i) and
Indemnifiable Loss)                              $5,000,000

for Loss arising from
Claims alleging the same
Wrongful Act or related
Wrongful Acts (waivable
under Clause 6 in certain
circumstances)

OTHER CLAIMS:

Judgments, Settlements and Defense
Costs (non–Indemnifiable Loss)                   None

Judgments, Settlements and Defense
Costs (Indemnifiable Loss)                       $5,000,000

for Loss arising from
Claims alleging the same
Wrongful Act or related
Wrongful Acts

ITEM 6.     CONTINUITY DATES:

A. Coverages A and B(ii):                        August 9, 1991

B. Coverage B(i):                                June 1, 1995

C. Coverages A and B:
   Outside Entity Coverage (Per Outside Entity)
   See Endorsement # N/A

ITEM 7.     PREMIUM:                             $1,950,000

ITEM 8.     NAME AND ADDRESS OF INSURER ("Insurer"):
            (This policy is issued only by the insurance company indicated below.)

            National Union Fire Insurance Company of Pittsburgh, Pa.

            175 Water Street

            New York, NY 10038

280128
62334 (5/95)     COPY

**IN WITNESS WHEREOF,** the Insurer has caused this policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_
_____
SECRETARY

_[signature]_
_____
PRESIDENT

_____
AUTHORIZED REPRESENTATIVE

_____
COUNTERSIGNATURE DATE

_____
COUNTERSIGNED AT

```
WILLIS CORROON CORP OF NY
7 HANOVER SQUARE
NEW YORK, NY 10004
```

_280128_

62334  (5/95)  *COPY*



### American International Companies®

## DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in Item 8 of the Declarations, herein called the "Insurer", agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: DIRECTORS AND OFFICERS INSURANCE

This policy shall pay the Loss of each and every Director or Officer of the Company arising from a Claim first made against the Directors or Officers during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except when and to the extent that the Company has indemnified the Directors or Officers. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE B: CORPORATE LIABILITY INSURANCE

This policy shall pay the Loss of the Company arising from a:

    (i)    Securities Claim first made against the Company, or

    (ii)    Claim first made against the Directors or Officers,

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

2.   **DEFINITIONS**

(a)   "Claim" means:

   (1)   a written demand for monetary or non−monetary relief; or
   (2)   a civil, criminal, or administrative proceeding for monetary or non−monetary relief which is commenced by:

      (i) service of a complaint or similar pleading; or
      (ii) return of an indictment (in the case of a criminal proceeding); or
      (iii) receipt or filing of a notice of charges.

   The term "Claim" shall include a Securities Claim; provided, however, that with respect to Coverage B(i) only, Claim or Securities Claim shall not mean a criminal or administrative proceeding against the Company.

(b)   "Company" means the Named Corporation designated in Item 1 of the Declarations and any Subsidiary thereof.

(c)   "Continuity Date" means the date set forth in:

   (1)   Item 6A of the Declarations with respect to Coverages A and B (ii); or

   (2)   Item 6B of the Declarations with respect to Coverage B(i); or

   (3)   Item 6C of the Declarations with respect to Coverages A and B for a Claim against an Insured arising out of such Insured serving as a director, officer, trustee or governor of an Outside Entity.

(d)   "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of Officers or employees of the Company.

(e)  "Director(s) or Officer(s)" or "Insured(s)" means:

    (1)  with respect to Coverages A and B (ii), any past, present or future duly elected or appointed directors or officers of the Company.  In the event the Named Corporation or a Subsidiary thereof operates outside the United States, then the terms "Director(s) or Officer(s)" or "Insured(s)" also mean those titles, positions or capacities in such foreign Named Corporation or Subsidiary which is equivalent to the position of Director(s) or Officer(s) in a corporation incorporated within the United States.  Coverage will automatically apply to all new Directors and Officers after the inception date of this policy;

    (2)  with respect to Coverage B(i) only, the Company.

(f)  "Listed Event" means any of the following events:

    (1)  any event for which the Company has reported or is required to report on Form 8-K filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934; or

    (2)  any restatement or correction of a Company financial statement contained in any document filed with the Securities and Exchange Commission; or

    (3)  any statement or disclosure made by or on the behalf of the Company relating to a prior forecast, estimate or projection of the Company's earnings or sales made by or on behalf of the Company, which statement  or disclosure represents a greater than 15% change from such prior forecast, estimate or projection.

(g)  "Loss" means damages, judgments, settlements and Defense Costs; however, Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Further, with respect to Coverage B only, Loss shall not include damages, judgments or settlements arising out of a Claim alleging that the Company paid an inadequate or unfair price or consideration for the purchase of its own securities or the securities of a Subsidiary.

Notwithstanding the foregoing, with respect to Coverage B(i) only and subject to the other terms, conditions and exclusions of the policy, Loss shall include punitive damages (if insurable by law) imposed upon the Company.

62335 (5/95)      *COPY*                    3

(h)   "No Liability" means with respect to a Securities Claim made against the Insured(s): (1) a final judgment of no liability obtained prior to trial, in favor of all Insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all Insureds, after exhaustion of all appeals.  In no event shall the term "No Liability" apply to a Securities Claim made against an Insured for which a settlement has occurred.

(i)   "Outside Entity" means:

  (1)   a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

  (2)   any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(j)   "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy; however, to the extent that coverage under this policy replaces coverage in other policies terminating at noon standard time on the inception date of such coverage hereunder, then such coverage as is provided by this policy shall not become effective until such other coverage has terminated.

(k)   "Securities Claim" means a Claim made against an Insured which alleges a violation of the Securities Act of 1933 or the Securities Exchange Act of 1934, rules or regulations promulgated thereunder, the securities laws of any state, or any foreign jurisdiction, and which alleges a Wrongful Act in connection with the claimant's purchase or sale of, or the offer to purchase or sell to the claimant, any securities of the Company, whether on the open market or arising from a public or private offering of securities by the Company.

(l)   "Subsidiary" means:

  (1)   any corporation of which the Named Corporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries;

  (2)   automatically any corporation whose assets total less than 10% of the total consolidated assets of the Company as of the inception date of this policy, which corporation becomes a Subsidiary during the Policy Period.  The Named Corporation shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period;

(3)  any corporation which becomes a Subsidiary during the Policy Period (other than a corporation described in paragraph (2) above) but only upon the condition that within 90 days of its becoming a Subsidiary the Named Corporation shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary.  Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Corporation paying when due any additional premium required by the Insurer relating to such new Subsidiary.

A corporation becomes a Subsidiary when the Named Corporation owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.  A corporation ceases to be a Subsidiary when the Named Corporation ceases to own more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to any Claim made against a Subsidiary or any Director or Officer thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary

(m)  "Wrongful Act" means:

(1)  with respect to individual Directors or Officers, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company, or any matter claimed against them arising out of their serving as a director, officer, trustee or governor of an Outside Entity in such capacities, but only if such service is at the specific written request or direction of the Company,

(2)  with respect to the Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company, but solely as respects a Securities Claim.

3.    **EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of deceased Directors or Officers, and the legal representatives of Directors or Officers in the event of incompetency, insolvency or bankruptcy, who were Directors or Officers at the time the Wrongful Acts upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an individual Director or Officer for all Claims arising solely out of his or her status as the spouse of an individual Director or Officer, including a Claim that seeks damages recoverable from marital community property, property jointly held by the individual Director or Officer and the spouse, or property transferred from the individual Director or Officer to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an individual Director or Officer, subject to the policy's terms, conditions and exclusions.

4.    **EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a)    arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b)    arising out of, based upon or attributable to: (1) profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law; or (2) payments to an Insured of any remuneration without the previous approval of the stockholders of the Company, which payment without such previous approval shall be held to have been illegal;

(c)    arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act;

The Wrongful Act of a Director or Officer shall not be imputed to any other Director or Officer for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(c)

62335 (5/95)         *COPY*              6

(d)    alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)    alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

(f)    alleging, arising out of, based upon or attributable to a Listed Event that occurs no later than 90 days subsequent to the Continuity Date; provided, however, that this exclusion shall only apply with respect to coverage which would have otherwise been afforded under Coverage B(i) of the policy;

(g)    with respect to serving as a director, officer, trustee or governor of an Outside Entity, for any Wrongful Act occurring prior to the Continuity Date if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy;

(h)    alleging, arising out of, based upon or attributable to any actual or alleged act or omission of the Directors or Officers serving in their capacities as directors, officers, trustees or governors of any other entity other than the Company or an Outside Entity, or by reason of their status as directors, officers, trustees or governors of such other entity;

(i)    which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured or the Company; provided, however, this exclusion shall not apply to a wrongful termination of employment Claim brought by a former employee other than a former employee who is or was a Director of the Company;

(j)    for any Wrongful Act arising out of the Insured serving as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or by any director, officer, trustee or governor thereof; or which is brought by any security holder of the Outside Entity, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the Outside Entity, any director, officer, trustee or governor thereof, any Insured or the Company;

(k)    for bodily injury, sickness, disease, death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from libel or slander or defamation or disparagement, or for injury from a violation of a person's right of privacy;

(l)   alleging, arising out of, based upon, attributable to, or in any way involving, directly
      or indirectly:

    (1)   the actual, alleged or threatened discharge, dispersal, release or escape of
            pollutants; or

    (2)   any direction or request to test for, monitor, clean up, remove, contain, treat,
            detoxify or neutralize pollutants,

including but not limited to a Claim alleging damage to the Company or its securities
holders.

Pollutants include (but are not limited to) any solid, liquid, gaseous or thermal irritant
or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and
waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned
or reclaimed;

(m)  for violation(s) of any of the responsibilities, obligations or duties imposed upon
      fiduciaries by the Employee Retirement Income Security Act of 1974, or amendments
      thereto or any similar provisions of state statutory law or common law.

5.   **LIMIT OF LIABILITY – (FOR ALL LOSS – INCLUDING DEFENSE COSTS)**

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's
liability for all Loss, under Coverage A and Coverage B combined, arising out of all Claims
first made against the Insureds during the Policy Period and the Discovery Period (if
applicable); however, the Limit of Liability for the Discovery Period shall be part of, and
not in addition to, the Limit of Liability for the Policy Period.  Further, any Claim which is
made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant
to Clause 7(b) or 7(c) is considered made during the Policy Period or Discovery Period
shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the
Declarations.

**Defense Costs are not payable by the Insurer in addition to the Limit of Liability.
Defense Costs are part of Loss and as such are subject to the Limit of Liability for
Loss.**

6.   **RETENTION CLAUSE**

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in
excess of the Retention amount stated in Item 5 of the Declarations, such Retention
amount to be borne by the Company and/or the Insureds and shall remain uninsured, with
regard to all Loss under: (i) Coverage A or B(ii) for which the Company has indemnified or
is permitted or required to indemnify the Director(s) or Officer(s) ("Indemnifiable Loss"); or
(ii) Coverage B(i).  A single Retention amount shall apply to Loss arising from all Claims
alleging the same Wrongful Act or related Wrongful Acts.

Notwithstanding the foregoing, solely with respect to a Securities Claim under this policy, the Retention shall only apply to Defense Costs; provided, however, no Retention shall apply for a Securities Claim even as respects Defense Costs in the event of a determination of No Liability of all Insureds, and the Insurer shall thereupon reimburse such Defense Costs paid by the Insured.

7.    **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations.**
**If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a)    The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

    (1)    any time during the Policy Period or during the Discovery Period (if applicable); or

    (2)    within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)    If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(c)    If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons, and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

8.    DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF
      DEFENSE COSTS)

Under both Coverage A and Coverage B of this policy, except as hereinafter stated, the
Insurer shall advance, at the written request of the Insured, Defense Costs prior to the
final disposition of a Claim.   Such advanced payments by the Insurer shall be repaid to
the Insurer by the Insureds or the Company severally according to their respective
interests, in the event and to.the extent that the Insureds or the Company shall not be
entitled under the terms and conditions of this policy to payment of such Loss.

**The Insurer does not, however, under this policy, assume any duty to defend.  The
Insureds shall defend and contest any Claim made against them.  The Insureds shall
not admit or assume any liability, enter into any settlement agreement, stipulate to
any judgment, or incur any Defense Costs without the prior written consent of the
Insurer.  Only those settlements, stipulated judgments and Defense Costs which have
been consented to by the Insurer shall be recoverable as Loss under the terms of
this policy.  The Insurer's consent shall not be unreasonably withheld, provided that
the Insurer shall be entitled to effectively associate in the defense and the
negotiation of any settlement of any Claim.**

The Insurer shall have the right to effectively associate with the Company and the
Insureds in the defense of any Claim that appears reasonably likely to involve the Insurer,
including but not limited to negotiating a settlement.   The Company and the Insureds
shall give the Insurer full cooperation and such information as it may reasonably require.

The Insurer may make any settlement of any Claim it deems expedient with respect to
any Insured subject to such Insured's written consent.  If any Insured withholds consent
to such settlement, the Insurer's liability for all Loss on account of such Claim shall not
exceed the amount for which the Insurer could have settled such Claim plus Defense
Costs incurred as of the date such settlement was proposed in writing by the Insurer.

The Company is not covered in.any respect under Coverage A; the Company is covered,
subject to the policy's terms and conditions, only with respect to its indemnification of its
Directors or Officers under Coverage B(ii) as respects a Claim against such Directors and
Officers, and subject to the policy's terms and conditions, under Coverage B(i) for a
Securities Claim made against the Company.   Accordingly, the Insurer has no obligation
under this policy for Defense Costs incurred by, judgments against or settlements by the
Company arising out of a Claim made against the Company other than a covered
Securities Claim, or any obligation to pay Loss arising out of any legal liability that the
Company has to the claimant except as respects a covered Securities Claim against the
Company.

62335 (5/95)        *COPY*                10

With respect to (i) Defense Costs jointly incurred by, (ii) any joint settlement made by, and/or (iii) any adjudicated judgment of joint and several liability against the Company and any Director or Officer, in connection with any Claim other than a Securities Claim, the Company and the Director(s) or Officer(s) and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Company and the Director(s) or Officers(s) and the Insurer, taking into account the relative legal and financial exposures of and the relative benefits obtained by the Directors and Officers and the Company. In the event that a determination as to the amount of Defense Costs to be advanced under the policy cannot be agreed to, then the Insurer shall advance such Defense Costs which the Insurer states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

9.  **PRE-AUTHORIZED SECURITIES DEFENSE ATTORNEYS**

Only with respect to a Securities Claim:

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firms"). The list provides the Insured a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of any Securities Claim made against them.

The Insureds shall select a Panel Counsel Firm to defend a Securities Claim made against the Insureds in the jurisdiction in which the Securities Claim is brought. In the event a Securities Claim is brought in a jurisdiction not included on the list, the Insureds shall select a Panel Counsel Firm in the listed jurisdiction which is the nearest geographical jurisdiction to either where the Securities Claim is brought or where the corporate headquarters of the Named Corporation is located. In such instance the Insureds also may, with the consent of the Insurer, which consent shall not be unreasonably withheld, select a non-Panel Counsel Firm in the jurisdiction in which the Securities Claim is brought to function as "local counsel" on the Securities Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Securities Claim.

With the express prior written consent of the Insurer, an Insured may select a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Corporation. At the request of the Insured, the Insurer may in its discretion add to the attached list of Panel Counsel Firms for the purposes of defending a Securities Claim made against the Insured in any specified jurisdiction (including a jurisdiction not originally included in the Panel Counsel list) a Panel Counsel Firm not originally listed for such jurisdiction. The Insurer may in its discretion waive, in part or in whole, the provisions of this clause as respects a particular Securities Claim.

## 10. DISCOVERY CLAUSE

Except as indicated below, if the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right, upon payment of an additional premium of 75% of the "full annual premium", to a period of one year following the effective date of such cancellation or nonrenewal (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal.

In the event of a Transaction, as defined in Clause 12, the Named Corporation shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Corporation may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Corporation at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent. This policy may also be canceled by or on behalf of the Insurer by delivering to the Named Corporation or by mailing to the Named Corporation, by registered, certified, or other first class mail, at the Named Corporation's address as shown in Item 1 of the Declarations, written notice stating when, not less than 60 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Corporation, the Insurer shall retain the customary short rate proportion of the premium herein.

If this policy shall be canceled by the Insurer, the Insurer shall retain the pro rata proportion of the premium herein.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12. CHANGE IN CONTROL OF NAMED CORPORATION

If during the Policy Period:

    a. the Named Corporation shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

    b. any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of Directors of the Named Corporation, or acquires the voting rights of such an amount of such securities;

        (either of the above events herein referred to as the "Transaction")

then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Corporation shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Corporation shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

## 13. SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer to effectively bring suit in the name of the Company and/or the Insureds. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been judicially determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such Insured was not legally entitled.

14. **OTHER INSURANCE AND INDEMNIFICATION**

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

In the event of a Claim against a Director or Officer arising out of his or her serving as director, officer, trustee or governor of an Outside Entity, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity and any insurance provided to such Outside Entity with respect to its directors, officers, trustees or governors. Further, in the event such other Outside Entity insurance is provided by the Insurer or any member company of American International Group, Inc. ("AIG") (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the maximum aggregate Limit of Liability for all Losses combined covered by virtue of this policy as respects any such Claim shall be reduced by the limit of liability (as set forth on the declarations page) of the other AIG insurance provided to such Outside Entity.

15. **NOTICE AND AUTHORITY**

It is agreed that the Named Corporation shall act on behalf of its Subsidiaries and all Insureds with respect to the giving notice of Claim or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.

16. **ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

17. **ARBITRATION**

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, shall be submitted to the American Arbitration Association under and in accordance with its then prevailing commercial arbitration rules. The arbitrators shall be chosen in the manner and within the time frames provided by such rules. If permitted under such rules the arbitrators shall be three disinterested individuals having knowledge of the legal, corporate management or insurance issues relevant to the matters in dispute.

Any party may commence such arbitration proceeding in either New York, New York; Atlanta, Georgia; Chicago, Illinois; or Denver, Colorado. The arbitrators shall give due consideration to the general principles of Delaware law in the construction and interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an evenhanded fashion as between the parties, including without limitation, where the language of this policy is alleged to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy (without regard to the authorship of the language, the doctrine of reasonable expectation of the parties and without any presumption or arbitrary interpretation or construction in favor of either party or parties, and in accordance with the intent of the parties.)

The written decision of the arbitrators shall be provided to both parties and shall be binding on them. The arbitrators' award shall not include attorney fees or other costs.

Each party shall bear equally the expenses of the arbitration.

## 18. ACTION AGAINST INSURER

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

## 19. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

This page intentionally left blank

COPY

SECURITIES CLAIMS PANEL COUNSEL LIST

## Alaska

Davis Wright Tremaine
550 W. Seventh Avenue, Suite 1450
Anchorage, AK  99501
Contact:
David W. Oesting          (907) 257-5300

Foster Pepper & Shefelman
601 West Fifth Avenue #500
Anchorage, AK  99501-2226
Contact:
Peter S. Erlichman
Stellman Keehnel
Tim Filer                 (206) 447-8998

## California

Brobeck, Phleger & Harrison LLP
Spear Street Tower
One Market
San Francisco, CA 94105
Contact:
Kevin P. Muck
Michael D. Torpey
Sara B. Brody
Tower C. Snow Jr.       (415) 442-0900

Brobeck, Phleger & Harrison LLP
550 South Hope Street
Los Angeles, CA 90071
Contact:
Daniel J. Tyukody
Howard M. Privette       (213) 489-4060

Brobeck, Phleger & Harrison LLP
550 West C Street, Ste. 1300
San Diego, CA 92101
Contact:
Christopher H. McGrath
William F. Sullivan      (619) 234-1966

Brobeck, Phleger & Harrison LLP
Two Embarcadero Place
2200 Geng Road
Palo Alto, CA 94303
Contact: David M. Furbush
Meredith N. Landy        (650) 424-0160

Cooley Godward, LLP
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Contact:
William E. Grauer        (858) 550-6050

Cooley Godward, LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Contact:
Stephen C. Neal          (650) 843-5182
William S. Freeman       (650) 843-5037

Cooley Godward, LLP
One Maritime Plaza, 20th Floor
San Francisco, CA 94111
Contact:
Paul A. Renne            (415) 693-2073
Gordon C. Atkinson       (415) 693-2088

Davis Wright Tremaine
Suite 600
One Embarcadero Center
San Francisco, CA 94111-3834
Contact:
Martin Fineman           (415) 276-6500

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Contact:
Philip Bosl              (213) 229-7543

Gibson, Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza
Irvine, CA 92614-8557
Contact:
Wayne W. Smith           (714) 451-4108

Gibson, Dunn & Crutcher LLP
525 University Ave., Ste. 220
Palo Alto, CA 94301
Contact:
John C. Dickey           (415) 463-7324

Heller, Ellman, White & McAuliffe
333 Bush Street
San Francisco, CA 94104
Contact:
Douglas M. Schwab
M. Laurence Popofsky
Michael J. Shepard       (415) 772-6000

Heller, Ellman, White & McAuliffe
525 University Avenue
Palo Alto, CA 94301
Contact:
Michael L. Charlson
Norman J. Blears         (650) 324-7000

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Heller, Ellman, White & McAuliffe
4250 Executive Square
7th Floor
San Diego, CA 92037-9103
Contact:
David E. Kleinfeld          (858) 450-8400

Heller, Ellman, White & McAuliffe
601 South Figueroa Street, 40th Fl.
Los Angeles, CA 90017-5758
Contact:
Jerry L. Marks
Darryl L. Snider          (213) 689-0200

Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
Contact:
Richard Borow
David Schwartz
David Gindler
David Siegel
James F. Elliot
Jim Adler          (310) 277-1010

Latham & Watkins
633 West Fifth Street
Suite 4000
Los Angeles CA, 90071-2007
Contact:
Hugh Steven Wilson          (213) 485-1234

Latham & Watkins
75 Willow Road
Menlo Park, CA 94025
Contact:
Paul H. Dawes          (650) 328-4600

McCutchen Doyle, Brown & Enerson LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-1560
Contact:
John C. Morrissey          (213) 680-6416

McCutchen, Doyle, Brown & Enerson LLP
Three Embarcadero Center
San Francisco, CA 94111
Contact:
David M. Balabanian          (415) 393-2170
Karen L. Kennard          (415) 393-2626

McCutchen, Doyle, Brown & Enerson, LLP
3150 Porter Drive
Palo Alto, CA 94303-1212
Contact:
Mary Huser          (650) 849-4914

Morrison & Foerster
425 Market Street
San Francisco, CA  94104-2482
Contact:
Paul T. Friedman
Melvin R. Goldman          (415) 268-7000

Morrison & Foerster LLP
555 West 5th Street - Suite 3500
Los Angles, CA 90013-1024
Contact:
Robert S. Stern
B. Scott Silverman          (213) 892-5200

Morrison & Foerster, LLP
19900 MacArthur Boulevard, 12th Floor
Irvine, CA 90017
Contact:
Josephine Staton Tucker          (714) 251-7500

Munger, Tolles & Olson
355 South Grand Avenue-35th Floor
Los Angeles, CA 90071-1560
Contact:
Dennis L. Kinnaird          (213) 683-9264
John W. Spiegel          (213) 683-9152
George M. Garvey          (213) 683-9153

O'Melveny & Myers LLP
400 South Hope Street, 15th Floor
Los Angeles, CA 90071-2899
Contact:
Robert Vanderet
Seth Aronson          (213) 430-6000

O'Melveny & Myers LLP
610 Newport Center
Newport Beach, CA 92660
Contact:
Phillip Kaplan
Brett J. Williamson
Michael G. Yoder          (714) 760-9600

O'Melveny & Myers LLP
275 Battery Street
San Francisco, CA 94111
Contact:
Richard Warmer
Daniel Bookin          (415) 984-8700

Orrick Herrington & Sutcliffe LLP
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, CA 94111
Contact:
William Alderman          (415) 773-5944
John H. Kanberg           (415) 773-5469

Orrick Herrington & Sutcliffe LLP
1020 Marsh Road
Menlo Park, CA 94025
Contact:
W. Reece Bader            (650) 614-7440

Paul, Hastings, Janofsky & Walker LLP
555 S. Flower Street
Twenty-Third Floor
Los Angeles, CA 90071-2371
Contact:
J. Allen Maines           (213) 683-6000

Pillsbury Madison & Sutro LLP
650 Town Center Drive, 7th Floor
Costa Mesa, CA 92626-7122
Contact:
Steven O. Kramer
Walter Robinson           (714) 436-6800

Pillsbury Madison & Sutro LLP
101 W. Broadway, Suite 1800
San Diego, CA 92101-8219
Contact:
David E. Kleinfeld        (619) 234-5000

Pillsbury Madison & Sutro LLP
235 Montgomery Street
San Francisco, CA 94104
Contact:
Bruce A. Ericson
William O. Fisher         (415) 983-1000

Sherman & Sterling
555 California Street
San Francisco, CA  94104
Contact:
Susan Samuels Muck        (415) 616-1100
Dean Krystowski
Jeffrey S. Facter

Simpson Thacher & Bartlett
3373 Hillview Avenue
Palo Alto, CA 94304
Contact:
James G. Kreissman
Charles E. Koob
George M. Newcombe        (650) 251-5000

Simpson Thacher & Bartlett
10 Universal City Plaza
Suite 852
Universal City, CA 91608
Contact:
Barry R. Ostrager
Seth A. Ribner            (818) 755-7000

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Contact:
Frank Rothman
Eric S. Waxman            (213) 687-5000

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 220
Palo Alto, CA 94111
Contact:
James E. Lyons            (650) 470-4500

Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
San Francisco, CA 94301
Contact:
James E. Lyons            (415) 984-2698

Sullivan & Cromwell
1888 Century Park East,
Los Angeles, CA 90067-1725
Contact:
Robert A. Sacks           (310) 712-6600

Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo, Alto, CA 94304-1050
Contact:
Bruce G. Vanyo
Steven M. Schatz
Boris Feldman
Daniel Mitz
David Priebe
David S. Steuer
Eileen Marshall
Martin W. Korman
Sarah Good                (650) 493-9300

## Delaware

Blank Rome Comisky & McCauley LLP
1220 Market Street, 8th Floor
Wilmington, DE  19801
Contact:
Cathy L. Reese          (302) 425-6400

Wolf, Block, Schorr and Solis-Cohen LLP
One Rodney Square
10th & King Streets
Wilmington, DE  19801
Contact:
David J. Margules          (302) 777-5860

## District of Columbia

Arnold & Porter
555 Twelfth Street, NW
Washington, D.C. 20004-1202
Contact:
Scott Schreiber          (202) 942-5672

Brobeck, Phleger & Harrison LLP
Market Square East, Suite 220
701 Pennsylvania Avenue, NW
Washington, DC  20004
Contact:
John B. Missing          (202) 220-6000

Cahill Gordon & Reindel
1990 K Street, NW, Suite 950
Washington, DC 20006
Contact:
Donald J. Mulvihill          (202) 862-8900

Davis, Polk & Wardwell
1300 I Street, N.W.
Washington, DC 20005
Contact:
Scott W. Muller          (202) 962-7000

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Contact:
F. Joseph Warin          (202) 887-3609

Greenberg Traurig
800 Connecticut Avenue, NW, Suite 500
Washington, D.C. 20036
Contact:
Joe Reeder          (202) 331-3100
C. Allen Foster
Eric C. Rowe

Patton Boggs, L.L.P.
2550 M Street N.W.
Washington, D.C. 20037
Contact:
Lanny Davis          (202) 457-6000
Eric A. Kuwana
Ronald S. Liebman

Sherman & Sterling
801 Pennsylvania Avenue, N.W.
Contact: Washington, DC 20004-2604
Contact:
Thomas S. Martin          (202) 508-8000
Jonathan L. Greenblatt

Sullivan & Cromwell
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5805
Contact:
Margaret K. Pfeiffer
Daryl A. Libow          (202) 956-7500

Willkie Farr & Gallagher
Three Lafayette Centre
1155 21st Street N.W.
Washington, D.C. 20036-3384
Contact:
Kevin B. Clark          (202) 328-8000

## Florida

Akerman Senterfitt & Eidson, P.A.
Sun Trust International Center
28th Floor
Miami, FL 33131
Contact:
Stanley H. Wakshlag          (305) 374-5600

Fowler White, Gillen, Boggs, Villareal
and Banker, P.A.
501 East Kennedy Boulevard
Suite 1700
Tampa, Fl 33602
Contact:
Burton W. Wiand
W. Donald Cox          (813) 228-7411

Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131
Contact:
Hillarie Bass          (305) 579-0500

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

Greenberg Traurig
777 South Flagler Drive
West Palm Beach, FL 33401
Contact:
Mark F. Bideau         (561) 650-7900

Greenberg Traurig
111 North Orange Avenue
Orlando, FL 32801
Contact:
Tucker H. Byrd         (407) 420-1000

Greenberg Traurig
101 East College Avenue
Post Office Drawer 1838
Tallahassee, FL 32302
Contact:
Barry Richard         (850) 222-6891

Holland & Knight
400 North Ashley Drive, Suite 2300
Tampa, FL 33602
Contact:
Frederick S. Schrils
G. Calvin Hayes
Francis Curran         (813) 227-8500

Holland & Knight
50 North Laura Street, Suite 3900
P.O. Box 52687 (Zip 32201)
Jacksonville, Fl 32202
Contact:
George E. Schultz, Jr.
Michael G. Tanner
Fred Lotterhos         (904) 353-2000

Holland & Knight
701 Brickell Avenue, Suite 3000
P.O. Box 015441 (Zip 33101)
Miami, FL 33131
Contact:
Greg Baldwin
Tracy A. Nichols         (305) 374-8500

Holland & Knight
315 South Calhoun Street, Suite 600
P.O. Drawer 810 (Zip 32302)
Tallahassee, FL 32301
Contact:
Robert R. Feagin III
Elizabeth Bevington         (850) 224-7000

Holland & Knight
625 North Flagler Drive
P.O. Box 3208 (33402)
West Palm Beach, FL 33401
Contact:
D. Culver Smith, III (Skip)         (513) 833-2000

Holland & Knight
200 South Orange Avenue
SunTrust Building, Suite 2600
P.O. Box 1525 (Zip 32802)
Orlando, FL 32801
Contact:
William Wilson         (407) 425-8500

McGuire Woods Battle & Boothe
3300 Barnett Center
50 North Laura Street
Jacksonville, FL 32202-3635
Contact:
David M. Wells         (904) 798-2693

Steel, Hector & Davis LLP
200 South Biscayne Boulevard
Miami, FL 33131-2398
Contact:
Lewis F. Murphy, P.A.         (305) 577-2957
Wendy Leavitt

Stroock & Stroock & Lavan LLP
200 South Biscayne Boulevard
Miami, FL 33131-2385
Contact:
Richard B. Simring
Robert W. Turken         (305) 358-9900

Zuckerman Spaeder Taylor & Evans LLP
900 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Contact:
Ronald B. Ravikoff
Thomas J. Meeks
Guy A. Rasco         (305) 358-5000

### Georgia

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
Contact:
Peter Q. Bassett         (404) 881-7343
Mary C. Gill         (404) 881-7000
John Goselin         (404) 881-7000
Rodd R. David         (404) 881-7000

SECURITIES CLAIMS PANEL COUNSEL LIST

King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763
Contact:
M. Robert Thornton
Michael R. Smith          (404) 572-4600

Paul Hastings Janofsky & Walker, LLP
600 Peachtree Street, N.W., Suite 2400
Atlanta, GA 30308-2222
Contact:
J. Allen Maines          (404) 815-2500

Smith Gambrell & Russell LLP
3343 Peachtree Road, N.E.
Suite 3100 – Promenade II
Atlanta, GA 30309-3592
Contact:
David A. Handley          (404) 815-3671
John G. Despreit          (404) 815-3730

Illinois

Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL  60606-6677
Contact:
David H. Kistenbroker      (312) 360-6000
Michael L. O'Shaughnessy

Jenner & Block
One IBM Plaza
Chicago, IL 60611
Contact:
Jerold Solovy          (312) 222-9350
Ronald Marmer          (312) 923-2686
J. Kevin McCall          (312) 923-2686

Kirkland & Ellis
2000 East Randolph Drive
Chicago, IL 60601
Contact:
Garrett B. Johnson
Robert J. Kopecky          (312) 861-2000

Sidley & Austin
One First National Plaza
Chicago, IL 60603
Contact:
Walter C. Carlson          (312) 853-7734
Hillie Sheppard          (312) 853-7850
Eugene A. Schoon          (312) 853-7279

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Contact:
Susan Getzendanner
Timothy A. Nelsen          (312) 407-0700

Sonnenschein Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606
Contact:
Christopher Q. King          (312) 876-8224
David L. Schiavone          (312) 876-7483

Louisiana

Locke Liddell & Sapp LLP
601 Poydras Street, Suite 2400
New Orleans, LA  70130-6036
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn          (504) 558-5100

Massachusetts

Hale & Dorr
60 State Street
Boston, MA 02109
Contact:
Jeffrey B. Rudman
John F. Batter
James W. Prendegast          (617) 526-6000

Hutchins Wheeler & Ditmar P.C.
101 Federal Street
Boston, MA  02110
Contact:
David S. Rosenthal
John Hughes          (617) 951-6624

Mintz, Levin, Cohn, Feris, Glovsky &
Popeo P.C.
One Financial Center
Boston, MA 02111
Contact:
Peter M. Saparoff          (617) 542-6000
Patrick J. Sharkey

Ropes & Gray
One International Plaza
Boston, MA 02110-2624
Contact:
John D. Donovan, Jr.          (617) 951-7566

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Skadden, Arps, Slate, Meager & Flom LLP
One Beacon Street
Boston, MA 02108
Contact:
Thomas J. Dougherty
George J. Skelly          (617) 573-4800

Testa, Hurwitz & Thibeault
High Street Tower
125 High Street
Boston, MA 02110
Contact:
Brian E. Pastuszenski     (617) 248-7253
Jordan D. Hershman        (617) 248-7363

### Minnesota

Dorsey & Whitney LLP
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Contact:
Brian E. Palmer
Edward J. Pluimer
J. Jackson
Peter S. Hendrixson
Peter W. Carter
Roger J. Magnuson         (612) 340-2600

Faegre & Benson LLP
90 South Seventh Street
Minneapolis, MN 55402-3901
Contact:
Robert L. Schnell
Thomas L. Kimer           (612) 336-3000

Oppenheimer Wolff & Donnelly LLP
Plaza VII Building, Suite 3400
45 South Seventh Street
Minneapolis, MN 55402
Contact:
Craig W. Gagnon
Michael J. Bleck
Michael E. Keyes          (612) 607-7300

Winthrop & Weinstine, PA
3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Contact:
David P. Pearson
Steven C. Tourek
Thomas H. Boyd            (612) 347-0700

### New York

Arnold & Porter
399 Park Avenue
New York, NY 10022-4690
Contact:
Scott Schreiber           (212) 715-1000
Kent A. Yalowitz

Brobeck, Phleger & Harrison LLP
1633 Broadway, 47th Floor
New York, NY 10019
Contact:
Francis S. Chlapowski
Gregory A. Markel         (212) 581-1600

Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY 10038
Contact:
Dennis J. Block
Howard R. Hawkins
Jeffrey Q. Smith
Jonathan M. Hoff          (212) 504-6000

Cahill Gordon & Reindel
80 Pine Street
New York, NY 10005
Contact:
Charles A. Gilman
Immanuel Kohn
Thomas J. Kavaler         (212) 701-3000

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Contact:
Evan R. Chesler
Francis P. Barron
Julie A. North
Keith R. Hummel
Paul C. Saunders
Peter T. Barbur
Richard W. Clary
Robert H. Baron
Ronald S. Rolfe
Rory O. Millson
Thomas G. Rafferty        (212) 474-1000

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Contact:
Daniel F. Kolb
Frank S. Moseley
Gary G. Lynch
James W.G. Benkard
Robert F. Wise
Robert B. Fiske            (212) 450-4000

Fried, Frank, Harris, Shiver & Jacobson
One New York Plaza
New York, NY 10004
Contact:
Sheldon Raab
Gregory P. Joseph
John A. Borek              (212) 859-8000

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166-0193
Contact:
A. Bendell
B.  David Grais
C. Wesley G. Howell        (212) 351-4000

Greenberg Traurig
MetLife Building
200 Park Avenue
New York City, NY 10166
Contact:
Marshall H. Fishman        (212) 801-9200
Alan Mansfield

Kaye, Scholer, Fiernan, Hays & Handler
425 Park Avenue
New York, NY 10022
Contact:
Frederic W. Yerman         (212) 836-8663

Kirkland & Ellis
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
Contact:
Yosef J. Riemer
Frank M. Holozubiec        (212) 446-4800

Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022
Contact:
Gary Naftalis              (212) 715-9100

Latham & Watkins
885 Third Avenue, Suite 1000
New York, NY  10022-4802
Contact:
Hon. Kenneth Conboy
John J. Kirby              (212) 906-1200

Mayer, Brown & Platt
1675 Broadway
New York, NY  10019
Contact:
Dennis P. Orr
Richard A. Spehr
Steven Wolowitz            (212) 506-2500

Milbank, Tweed Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005
Contact:
Russell Brooks             (212) 530-5554

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY  10104
Contact:
Anthony M. Radice
Jack C. Auspitz            (212) 468-8000

Paul Hastings, Jaofsky & Walker LLP
399 Park Avenue, 31st Floor
New York, NY  10022-4697
Contact:
J. Allen Maines            (212) 318-6000

Paul Weiss Rifkind Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
Martin Flumenbaum
Claudia Hammerman
Daniel J. Beller
Max Gitter
Richard A. Rosen           (212) 373-3000

Roger & Wells LLP
200 Park Avenue
New York, NY 10166
Contact:
James N. Benedict          (212) 878-8000
James B. Weidner
John K. Carroll
Mark Holland
Mark Pomerantz

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Schulte Roth & Zabel LLP
900 Third Avenue
New York, NY  10022
Contact:
Daniel J. Kramer
David M. Brodsky
Irwin J. Sugarman
Robert M. Abrahams          (212) 756-2000

Shearman & Sterling
599 Lexington Avenue
New York, NY  10017
Contact:
Jeremy G. Epstein
R. Paul Wickes              (212) 848-8000

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Contact:
Michael J. Chepiga
Bruce D. Angiolillo
Roy L. Reardon
George M. Newcombe
Paul C. Curnin
Peter Kazanoff             (212) 455-2000

Skadden, Arps, Slate, Meagher & Folm LLP
919 Third Avenue
New York, NY 10022
Contact:
Barry H. Garfinkel
Jonathan J. Lerner
Lea Haber Kuck             (212) 735-3000

Stroock, & Stroock & Lavan LLP
180 Maiden Lane
New  York, NY 10038
Contact:
Melvin A. Brosterman
Lawrence Greenwald
Robert Lewin               (212) 806-5400

Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498
Contact:
D. Stuart Meiklejohn
Gandolfo V. DiBlasi
John L. Warden
John L. Hardiman
Philip L. Graham, Jr.
Richard H. Klapper          (212) 558-4000

Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
Contact:
Irwin H. Warren
Greg A. Danilow
Joseph Allerhand           (212) 310-8000

Wilkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099
Contact:
David L. Foster
Richard L. Posen
Michael R. Young           (212) 728-8000

## Ohio

Jones Day, Reavis & Pogue
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Contact:
John M. Newman             (216) 586-3939
John W. Edwards

## Oregon

Davis Wright Tremaine
2300 First Interstate Tower
1300 S.W. Fifth Avenue
Portland, OR  97201
Contact:
John F. McGrory            (503) 241-2300

Foster Pepper & Shefelman
One Main Place
101 S.W. Main Street, 15th Floor
Portland, OR  97204-3223
Contact:
Peter S. Ehrlichman
Stellman Keehnel
Tim Filer                  (503) 221-7799

Lane Powell Spears Lubersky LLP
601 S.W. Second Avenue, Suite 2100
Portland, OR  97204
Contact:
D. Meredith Wilson
Milo Petranovich
Robert E. Maloney          (503) 778-2100

APPENDIX A

SECURITIES CLAIMS PANEL COUNSEL LIST

## Pennsylvania

Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103-6998
Contact:
Alexander D. Bono
Richard P. McElroy
Jerome R. Richter
Leonard Dubin
Matthew J. Siembieda          (215) 569-5500

Buchanan Ingersoll, PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA  15219-8800
Contact:
John R. Leathers          (412) 562-1880

Cozen and O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103
Contact:
Patrick J. O'Connor
Thomas C. Zielinski
H. Robert Fiebach
Anita B. Weinstein
Steven N. Haas          (800) 665-2000

Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Contact:
Seymour Kurland
Jeffrey G. Weil
Frederick G. Herold          (215) 994-4000

Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA 19103-6993
Contact:
Marc J. Sonnenfeld
Elizabeth Hoop Fay          (215) 963-5000

Pepper, Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Contact:
Barbara W. Mather
Jon A. Baughman
Laurence Z. Shiekman
M. Duncan Grant
Robert L. Hickok
Thomas E. Zemaitis          (215) 981-4000

Wolf, Block, Schorr and Solis-Cohen LLP
12th Floor – Packard Building S.E.
Corner 15th & Chestnut Streets
Philadelphia, PA 19102-2678
Contact:
Jay A. Dubow
Ian A.L. Strogatz
Jerome J. Shestack
M. Norman Goldberger
Mark L. Alderman          (215) 977-2058

## Texas

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675
Contact:
Lou Bickel
Mike Lowenberg          (214) 969-2800

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
Pennzoil Place –South Tower
711 Louisiana Street
Suite 1900
Houston, TX  77002
Contact:
Charlie Moore
Paula Hinton          (713) 220-5800

Baker & Botts, L.L.P.
910 Louisianna
Houston, TX 77002-4995
Contact:
David D. Sterling          (713) 229-1946

Baker & Botts, L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2916
Contact:
Robert W. Jordan          (214) 953-6518

Brobeck, Phleger & Harrison LLP
301 Congress Avenue, Suite 1200
Austin, TX  78701
Contact:
Paul R. Bessette          (512) 477-5495

Fulbright & Jaworski, L.L.P.
1301 McKinney
Suite 5100
Houston, TX 77010
Contact:
Frank G. Jones
Richard N. Carrell          (713) 651-5151

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Fullbright & Jaworski, L.L.P.
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Contact:
Karl G. Dial                    (214) 855-8000

Haynes & Boone, L.L.P.
901 Main Street, Suite 3100
Dallas, TX 75202-3789
Contact:
George Bramblett
Noel Hensley                    (214) 651-5000

Jenkins & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, TX 75202
Contact:
John Gilliam                    (214) 855-4306

Jenkins & Gilchrist
1100 Louisiana, Suite 1800
Houston, TX 77002
Conctact:
John Gilliam                    (713) 951-3300

Locke Liddell & Sapp LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (214) 740-8000

Locke Liddell & Sapp LLP
100 Congress Avenue, Suite 300
Austin, TX 78701-4042
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (512) 305-4700

Locke Liddell & Sapp LLP
700 Lavaca, Suite 800
Austin, TX 78701
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (512) 404-2000

Locke Liddell & Sapp LLP
600 Travis
3400 Chase Tower
Houston, TX 77002
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (713) 226-1200

Thompson & Knight, PC
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201
Contact:
Timothy R. McCormick            (214) 969-1103

Thompson & Knight, PC
98 San Jacinto Boulevard, Suite 1200
Austin, TX 78701
Contact:
Timothy R. McCormick            (512) 469-6100

Thompson & Knight, PC
801 Cherry Street, Suite 1600
Fort Worth, TX 76102
Contact:
Timothy R. McCormick            (817) 347-1700

Thompson & Knight, PC
1700 Texas Commerce Tower
600 Travis
Houston, TX 77002
Contact:
Timothy R. McCormick            (713) 217-2800

Thompson & Knight, PC
1200 Smith Street, Suite 3600
Houston, TX 77002
Contact:
Timothy R. McCormick            (713) 654-8111

Vinson & Elkins L.L.P.
2500 First City Tower
1001 Fannin
Houston, TX 77002-6760
Contact:
David T. Hedges, Jr.            (713) 758-2676
Charles W. Schwartz             (713) 758-3852

Vinson & Elkins L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201-2975
Contact:
Orrin L. Harrison III           (214) 220-7715

(Revised (6/00) *COPY*

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Vinson & Elkins L.L.P.
One American Center, Suite 2700
600 Congress Avenue
Austin, TX 78701-3200
Contact:
Richard D. Milvenan        (512) 495-8542

Wilson, Sonsini, Goodrich & Rosati
8911 Capital of Texas Highway
North Westech 360, Suite 3350
Austin, TX 78759-7427
Contact:
Bruce G. Vanyo
Paul Tobias                (512) 338-5499

Virginia

Cooley Godward, LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
Contact:
Robert R. Vieth           (703) 456-8082

Greenberg Traurig
1750 Tysons Boulevard, 12th Floor
McLean, VA 22102
Contact:
Harry M. Glazer
Joseph T. Casey, Jr.      (703) 749-1300

McGuire Woods Battle & Boothe, L.L.P.
One James Center
901 East Cary Street,
Richmond, VA 23219-4030
Contact:
Warren E. Zirkle          (804) 775-4364

McGuire Woods Battle & Boothe, L.L.P.
Tysons II, Suite 1800
1750 Tysons Boulevard
McLean, VA 22102-3892
Stephen M. Colangelo      (703) 712-5371

Washington

Davis Wright Tremaine
2600 Century Square
1501 Fourth Avenue
Seattle, Washington 98101-1688
Contact:
Stephen M. Rummage        (206) 622-3150
Ladd B. Leavens           (206) 622-3150

Foster Pepper & Shefelman
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-2399
Contact:
Peter S. Ehrlichman
Stellman Keehnel
Tom Filer                 (206) 447-8998

Heller, Ehrman, White & McAuliffe
701 Fifth Avenue
Seattle, WA 98104-7098
Contact:
George E. Greer
Daniel J. Dunne           (206) 447-0900

Lane Powell Spears Lubersky LLP
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
Contact:
Christopher B. Wells
James B. Stoetzer
James L. Robart
Larry S. Gangnes
Rudy A. Englund           (206) 223-7000

Perkins Coie LLP
1201 Third Avenue, Ste. 4800
Seattle, Washington 98101-3099
Contact:
Ronald L. Berenstain
Harry H. Schneider
Barry M. Kaplan           (206) 583-8888

ENDORSEMENT# *1*

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance
company which issued this policy; and 2) "you", "your", "named Insured", "First Named
Insured", and "Insured" mean the Named Corporation, Named Organization, Named
Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other
Insured(s)" means all other persons or entities afforded coverage under the policy.

### WASHINGTON, D.C.
### CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the
cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)    Cancellation

   If this policy has been in effect for thirty (30) days or more, the Insurer may cancel
   this policy only if one or more of the following reasons apply:

   1)    Insured has refused or failed to pay a premium due under the terms of the
         policy;

   2)    Insured or Other Insured(s) have made a material and willful misstatement or
         omission of fact to the Insurer or its employees, agents or brokers in
         connection with any application to, or claim against the Insurer; or

   3)    Property or other interest of the Insured shall have been transferred to a
         person other than the Insured or beneficiary, unless the transfer is
         permissible under the terms of the policy, or unless the property, interest or
         use thereof shall have materially changed with respect to its insurability.

   The Insurer will mail or deliver to the named Insured notice of cancellation at least
   thirty (30) days prior to the date of cancellation. For cancellation as described
   under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the
   Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)    Nonrenewal

   If the Insurer decides not to renew this policy the Insurer will mail or deliver to the
   named Insured the Insurer's notice of nonrenewal at least thirty (30) days before
   the end of the policy period.

The Insurer will mail or deliver notice of cancellation or nonrenewal to the agent or
broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

*END 001*

52136 (8/95)    *COPY*                    – 1 –

## ENDORSEMENT# *1*    (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

_____

AUTHORIZED REPRESENTATIVE

*END 001*

52136 (8/95)    *COPY*                              – 2 –

ENDORSEMENT # 2

This endorsement, effective  *12:01 am*      *December 31, 2001*      forms a part of
policy number   *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CAPTIVE INSURANCE COMPANY EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payments for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon, attributable to the ownership, management, maintenance, operation and/or control by the Company of any captive insurance company or entity including but not limited to any Claim(s) alleging the insolvency or bankruptcy of the Named Corporation as a result of such ownership, operation, management and control.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 2*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

ENDORSEMENT # 5

This endorsement, effective  *12:01 am*      *December 31, 2001*      forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*


by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### COMMISSIONS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable to make any payment for Loss in connection with any Claim(s)
made against any Insured(s) alleging, arising out of, based upon, or attributable to:

    (i)      Payments, commissions, gratuities, benefits or any other favors to or for the
benefit of any full or part-time domestic or foreign government or armed
services officials, agents, representatives, employees or any members of
their family or any entity with which they are affiliated; or

    (ii)     Payments, commissions, gratuities, benefits or any other favors to or for the
benefit of any full or part-time officials, directors, agents, partners,
representatives, principal shareholders, or owners or employees, or
"affiliates" (as that term is defined in The Securities Exchange Act of 1934,
including any officers, directors, agents, owners, partners, representatives,
principal shareholders or employees of such affiliates) of any customers of
the company or any members of their family or any entity with which they
are affiliated; or

    (iii)    Political contributions, whether domestic or foreign.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


*END 3*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

ENDORSEMENT# *4*

This endorsement, effective *12:01 am*        *December 31, 2001*        forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NUCLEAR ENERGY LIABILITY EXCLUSIONS ENDORSEMENT
### (BROAD FORM)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured(s):

A.   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

   (1)   nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Company, or discharged or dispersed therefrom; or

   (2)   nuclear material contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Company; or

   (3)   the furnishing by an Insured or the Company of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

   (4)   claims for damages to the Company or its shareholders which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B.   (1)   which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its Limit of Liability; or,

   (2)   with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

*END 004*

ENDORSEMENT# *4*    (Continued)

As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means —

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.


**All other terms, conditions and exclusions remain unchanged.**

_____

AUTHORIZED REPRESENTATIVE

*END 004*

ENDORSEMENT # 5

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PUNITIVE DAMAGES FOR SECURITIES CLAIMS

In consideration of the premium charged, it is hereby understood and agreed that the third
paragraph of the Definition of Loss is deleted in its entirety and replaced by the following:

> Notwithstanding the foregoing, solely with respect to Securities Claims, Loss
> shall include (subject to the policy's other terms, conditions and exclusions,
> including but not limited to exclusions relating to personal profit or advantage,
> illegal remuneration, deliberate fraud or criminal acts) punitive and/or exemplary
> damages imposed upon any Insured.

It is further understood and agreed that the enforceability of this endorsement shall be
governed by such applicable law that most favors coverage for punitive damages.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 5*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PRIOR ACTS EXCLUSION

In consideration of  the premium  charged, it  is hereby understood  and agreed  that solely
with respect  to MFS  Communications  Company, Inc.,  the Insurer  shall  not be  liable  to
make any payment for  Loss arising from a  Claim alleging a  Wrongful Act which occurred
prior to September  30, 1995. This  policy only  provides coverage for  Loss arising from  a
Claim alleging a Wrongful Act  occurring on or  after September 30, 1995 and  prior to the
end of the Policy  Period and otherwise covered  by this policy.  Loss(es) arising out  of the
same or relate Wrongful Act(s) shall be deemed to arise from the first such same or related
Wrongful Act.


All other terms, conditions and exclusions remain unchanged.

*END 6*
*COPY*

(2/90)                                    AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 7

This endorsement, effective *12:01 am*   *December 31, 2001*   forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### POLLUTION A-SIDE SHAREHOLDER CLAIM COVERAGE

In consideration for the premium charged, it is hereby understood and agreed that as respects any Claim(s) under Coverage A of this policy only, exclusion (l) of the policy entitled EXCLUSIONS shall not apply to:

Any non-Indemnifiable Loss arising from a Claim(s) which is brought by a shareholder of the Company in the form of a shareholder direct, derivative or class action, but only if such Claim(s) is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any natural person Insured(s) or the Company, or any subsidiary or affiliate of the Company.

Further provided that for the purposes of the applicability of the coverage provided under this endorsement, the Company will be conclusively deemed to have indemnified the Directors or Officers to the extent that the Company is permitted or required to grant such indemnification pursuant to law, common or statutory, or contract or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines or defines such rights of indemnity). The Company hereby agrees to indemnify the Directors or Officers to the fullest extent permitted by law including the making in good faith of any required application for court approval. In no event shall this endorsement be construed to apply to any Claim(s) in which the Company has indemnified or is permitted or required to indemnify the Insureds.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 7*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am      December 31, 2001*    forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### COINSURANCE FOR SECURITIES CLAIMS

In consideration of the premium charged, it is hereby understood and agreed that solely as
respects Securities Claims, the following clause is added to the policy:

**COINSURANCE CLAUSE**

With respect to Loss under: (i) Coverage B(ii) for which the Company has
indemnified or is permitted or required to indemnify the natural person Insured(s),
as defined in subparagraphs (1) and (3) of the Definition of "Director(s) or Officer(s)
or Insured(s)", pursuant to law, common or statutory, or contract or the Charter or
Bylaws of the Company ("Indemnifiable Loss") or (ii) Coverage B(i), the Insurer shall
be liable to pay 80% of such Loss, excess of the retention amount described in
Item 5 of the Declarations as respects the first $10,000,000 Limit of Liability
described in Item 4 of the Declarations, it being a condition of this insurance that
the remaining 20% of each and every such Loss shall be carried by the Insured(s)
at their own risk and be uninsured.

With respect to all Loss other than Loss described in the above paragraph, ("non-
Indemnifiable Loss") the Insurer shall be liable to pay 100% of such Loss, excess of
the retention amount described in Item 5 of the Declarations up to the Limit of
Liability described in Item 4 of the Declarations.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 8*
*COPY*

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 9

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SECURITIES CLAIM DEFINITION AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the definition of "Securities Claim" is hereby deleted in its entirety and replaced with the following:

"Securities Claim" means a Claim, other than an administrative or regulatory proceeding against, or investigation of a Company, made against any Insured:

(1)     alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

    (i)     brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of a Company; or

    (ii)     brought by a security holder of a Company with respect to such security holder's interest in securities of a Company; or

(2)     brought derivatively on the behalf of a Company by a security holder of such Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.

*END 9*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FAILURE TO EFFECT AND/OR MAINTAIN

### INSURANCE EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable for any Loss in connection with any Claim(s) made against any
Insured alleging, arising out of, based upon, attributable to any failure or omission on the
part of the Insureds or the Company to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 10*

*COPY*

(2/90)

AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### "NO LIABILITY" PROVISION DELETED

In consideration of the premium charged, it is hereby understood and agreed that the
policy is hereby amended as follows:

    (1)      The Definition of and all provisions referring to "No Liability" are hereby
            deleted in their entirety; and

    (2)      The last paragraph of Clause 6  RETENTION CLAUSE is hereby deleted in its
            entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 11*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective  *12:01 am*      *December 31, 2001*      forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CrisisFundsm

### (Crisis Communications Management Insurance)

In consideration of the premium charged, it is hereby understood and agreed that this policy
is amended to provide Crisis Management Coverage pursuant to the terms and conditions set
forth below:

1)  The Clause of  the policy entitled  INSURING AGREEMENTS is  amended to add  the
    following new insuring agreement:

    **CRISIS MANAGEMENT COVERAGE**

    This policy shall pay the Crisis Management Loss of the Company arising from a Crisis
    Management Event first commencing during the Policy  Period, up to the  amount of
    the Crisis Management Fund.

2)  The Section  of  the policy  entitled EXCLUSIONS  shall not  be  applicable to  Crisis
    Management Loss.

3)  The Section  of  the  policy entitled LIMIT  OF  LIABILITY, is  amended  to  add  the
    following:

    > The limit of the Insurer's liability for  Crisis Management Loss arising from all
    > Crisis Management Events occurring during the Policy Period, in the aggregate,
    > shall be the amount set forth as the Crisis Management Fund. This limit  shall
    > be the maximum limit of the Insurer under this policy regardless of the number
    > of Crisis  Management Events  occurring during  the  Policy Period. Provided,
    > however, that this single Crisis Management Event(s) limit shall be part of and
    > not in addition to the Limit  of Liability stated in the Item of  the Declarations'
    > page entitled LIMIT OF LIABILITY, which shall in  all events be the  maximum
    > liability of the Insurer for all loss under this policy.

4)  There shall be no  Retention amount applicable to Crisis Management Loss,  and the
    Insurer shall pay such Loss from first dollar subject to the other terms and conditions
    of this endorsement.

5)  An actual or anticipated Crisis Management Event shall be reported to the Insurer as
    soon as practicable but in no event later than thirty (30) days after the Company first
    incurs Crisis  Management Loss  for  which  coverage will  be  requested under  this
    endorsement.

*END 12*

(2/90)   *COPY*

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

6)   The Section of the policy entitled DEFENSE COSTS, SETTLEMENTS, JUDGMENTS
(INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) shall have no applicability to
Crisis Management Events.  There shall be no requirement for the Company to obtain
prior written approval of the Insurer before incurring any Crisis Management Loss,
provided that the Crisis Management Firm selected by the Company to perform the
Crisis Management Services has been approved by the Insurer.

Definitions

For the purposes of this endorsement, the following definitions shall apply:

A)   "Material Effect on the Company's Common Stock Price" shall mean, within a period
of 24 hours, that the price per share of the Company's common stock shall decrease
by the greater of $5 per share or 10% net of the change in the Standard & Poor's
Composite Index.

B)   "Crisis Management Event" shall mean:

I.   One of the following events which, in the good faith opinion of the Chief
Financial Officer of the Company, did cause or is reasonably likely to cause, a
Material Effect on the Company's Common Stock Price:

(1)   Negative earning or sales announcement

The public announcement of the Company's past or future earnings or
sales, which is substantially less favorable than any of the following: (i)
the Company's prior year's earnings or sales for the same period, (ii)
the Company's prior public statements or projections regarding earnings
or sales for such period, or (iii) an outside securities analyst's published
estimate of the Company's earnings or sales.

(2)   Loss of a patent, trademark or copyright or major customer or
contract

The public announcement of an unforeseen loss of: (i) the Company's
intellectual property rights for a patent, trademark or copyright, other
than by expiration; (ii) a major customer or client of the Company; or
(iii) a major contract with the Company.

**END 12**

(2/90)   **COPY**

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

(3)    Product recall or delay

The public announcement of the recall of a major product of the
Company or the unforeseen delay in the production of a major product
of the Company.

(4)    Mass tort

The public announcement or accusation that the Company has caused
the bodily injury, sickness, disease, death or emotional distress of a
group of persons, or damage to or destruction of any tangible group of
properties, including the loss of use thereof.

(5)    Employee layoffs or loss of key executive officer(s)

The public announcement of employee layoffs, or the death or
resignation of one or more key executive officer(s) of the Company.

(6)    Restatement of financial statement

The public announcement of a restatement of the Company's
previously filed financial statements.

(7)    Elimination or suspension of dividend

The public announcement of the elimination or suspension of a regularly
scheduled dividend previously being paid by the Company.

(8)    Write-off of assets

The public announcement that the Company intends to write off a
material amount of its assets.

(9)    Debt restructuring or default

The public announcement that the Company has defaulted or intends to
default on its debt or intends to engage in a debt restructuring.

END 12

COPY

This endorsement, effective  *12:01 am      December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

(10) <u>Bankruptcy</u>

The public announcement that the Company intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the Company; or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

(11) <u>Governmental or regulatory litigation</u>

The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against the Company.

(12) <u>Other</u>

Any other event previously consented to by the Insurer which, in the good faith opinion of the Chief Financial Officer of the Company, did cause or is reasonably likely to cause, a Material Effect on the Company's Common Stock Price, but only if such event is specifically scheduled by written endorsement to the policy.

II.    <u>Unsolicited takeover bid</u>

An unsolicited written offer or bid by any person or entity other than an Insured or any affiliate of any Insured, whether publicly announced or privately made to a director or executive officer of the Company, to effect a Transaction (as Transaction is defined in Clause 12 of the policy) of the Company.

Provided, however, that the term Crisis Management Event shall not include any event relating to:

(1)    any Claim(s) which have been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(2)    any pending or prior litigation as of December 31, 1996;

(3)    the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; provided, however, the

*END 12*

(2/90)      *COPY*

This endorsement, effective  *12:01 am*      *December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

        foregoing shall not apply if the policy contains any endorsement modifying or
deleting, in part or in whole, exclusion (I) of the policy;

(4)    the hazardous properties of nuclear materials; provided, however, the
foregoing shall not apply to any Crisis Management Event(s) arising from the
ownership of, operation of, construction of, management of, planning of,
maintenance of or investment in any nuclear facility.

The descriptions in the headings of the Crisis Management Events are solely for convenience
and form no part of the terms and conditions of coverage.

For the purposes of this endorsement, a Crisis Management Event shall first commence when
the Company or any of its directors or executive officers shall first become aware of the
event and shall conclude at the earliest of the time when the Crisis Management Firm advises
the Company that the crisis no longer exists or when the Crisis Management Fund has been
exhausted.

C)    "Crisis Management Firm" shall mean any public relations firm, crisis management
firm or law firm hired by the Company or its directors, officers or employees to
perform Crisis Management Services in connection with the Crisis Management Event
which has been consented to by the Insurer, the consent for which shall not be
unreasonably withheld. Attached to this endorsement is a list of firms which have
been pre-approved by the Insurer and may be hired by the Company without further
approval by the Insurer:

D)    "Crisis Management Fund" shall mean Fifty Thousand Dollars ($50,000).

E)    "Crisis Management Loss" shall mean the following amounts incurred during the
pendency of or within 90 days prior to and in anticipation of, the Crisis Management
Event, regardless of whether a Claim is ever made against an Insured arising from the
Crisis Management Event and, in the case where a Claim is made, regardless of
whether the amount is incurred prior to or subsequent to the making of the Claim:

(1)    Amounts for which the Company is legally liable for the reasonable and
necessary fees and expenses incurred by a Crisis Management Firm in the
performance of Crisis Management Services for the Company arising from a
Crisis Management Event(s); and

(2)    Amounts for which the Company is legally liable for the reasonable and
necessary printing, advertising, mailing of materials, or travel by directors,

*END 12*

*COPY*

(2/90)

ENDORSEMENT# *72* (continued)

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

officers, employees or agents of the Company or the Crisis Management Firm,
in connection with the Crisis Management Event(s).

F)    "Crisis Management Services" means those services performed by a Crisis
Management Firm in advising the Company or any of its directors, officers or
employees on minimizing potential harm to the Company arising from the Crisis
Management Event, including but not limited to maintaining and restoring investor
confidence in the Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 12*

(2/90)    *COPY*

ENDORSEMENT# 12 (continued)

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PRE-APPROVED CRISIS MANAGEMENT FIRMS

(1)    Abernathy MacGregor Scanlon
        501 Madison Avenue
        New York, NY 10022
        (212) 371-5999
        Contact: James T. M$^{ac}$ Gregor

(2)    Burson-Marsteller
        230 Park Avenue South
        New York, NY 10003-1566
        (212) 614-5236
        Contact: Michael Claes

(3)    Patton Boggs, LLP
        2550 M Street, N.W.
        Washington, D.C. 20037
        (202) 457-6000
        Contact: Thomas H. Boggs

(4)    Kekst and Company
        437 Madison Avenue
        New York, NY 10022
        (212) 593-2655
        Contact: Andrew Baer

(5)    Kroll Associates
        900 Third Avenue
        New York, NY 10022
        (212) 833-3385
        Contact: Richard G. McCormick

(6)    Robinson Lerer & Montgomery
        75 Rockefeller Plaza , 6th floor
        New York, NY 10019
        (212) 484-7721
        Contact: Michael Gross

**END 12**

**COPY**

(2/90)

ENDORSEMENT # 12   (Continued)

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

      (7)    Sard Verbinnen & Co.
              630 Third Avenue
              New York, NY 10017
              (212) 687-8080
              Contact: Paul Verbinnen or George Sard

      (8)    Sitrick & Company
              2029 Century Park East
              Suite 1750
              Los Angeles, CA 90067
              (310) 788-2850
              Contact: Michael Sitrick

      (9)    The MWW Group
              1212 Avenue of the Americas - 5th Floor
              New York, NY 10036
              (212) 827-3757
              Contact: Michael Lendener

*END 12*
*COPY*

(2/90)

                                    AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 13

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## EMPLOYEES AS CO-DEFENDANTS

In consideration of the premium charged, it is hereby understood and agreed that coverage as is afforded by this policy is extended to and the definition of "Insured(s)", and "Director(s) or Officer(s)" is amended to include all employees of the Insured when they are named as co-defendants in a suit or other legal action with a Director or Officer of the Insured.

Only when and to the extent that the Company has indemnified such employees for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-Laws of the Company duly effective under such law which determines and defines such rights of indemnity.

*END 13*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 14

This endorsement, effective *12:01 am   December 31, 2001*   forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PRIOR ACTS EXCLUSION FOR LISTED ENTITIES

In consideration of the premium charged, it is hereby understood and agreed that the term
Company is amended to include the entity(ies) listed below, but only for Wrongful Act(s)
committed by such entity(ies) and/or any Insureds thereof which occurred subsequent to
such entity's respective acquisition/creation date listed below. Losses arising from the
same or related Wrongful Act(s) shall be deemed to arise from the first such same or
related Wrongful Act(s).

| | LISTED ENTITY(IES) | ACQUISITION/CREATION DATE |
|---|---|---|
| 1. | Advanced Telecommunications | January 01, 1983 |
| 2. | IBD Communication Group | December 30, 1994 |
| 3. | WIL Tel Network Services | January 05, 1995 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 14*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of policy number  *874-91-08* issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### GLOBAL EXTENSION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that such coverage as is provided by this policy shall apply worldwide.

It is further understood and agreed that with regard to any Claim(s) made outside the United States of America, Canada or their territories or possessions, and reported to the Insurer under the provisions of this policy, the Insurer shall, when requested to do so in writing by the Named Corporation:

a)    undertake the investigation, settlement and defense of Claim(s) against any Insured(s); (the Insured(s) and the Company shall cooperate in the investigation and defense of such Claim(s) as may be required by the Insurer) and the Insureds or the Company shall not take any action which may prejudice the Insurer in regard to such Claim;

b)    pay covered Loss of any Insured(s) including:

i)    all damages and judgments arising from liability imposed upon the Insureds by reason of a final judgment under law by a court of competent jurisdiction for any alleged Wrongful Acts to which this insurance applies, and;

ii)    all Defense Costs arising from any Claim(s) to which this endorsement applies; and

iii)    all sums for settlements negotiated by the Insurer with the approval of the Company and the Insured(s), provided that if the Company or the Insured(s) refuse to consent to a settlement recommended by the Insurer, the Insurer's obligation and liability for defense under paragraph (a) above shall terminate and the Insurer's liability for payment under this paragraph (b) shall not exceed the amount of the settlement recommended and the expenses under (b) (ii) above as of the time of refusal to consent.

The amounts due under b(i), (ii), (iii) above shall be included in, and not in addition to, the Limit of Liability set forth on the Declaration page of this policy and shall be subject to the applicable Retention(s). The amounts due under this endorsement shall be paid in the currency of the country in which the final adjudication was made, the expenses incurred or the settlement negotiated.

**END 15**

(2/90)    COPY

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*


by    *National Union Fire Insurance Company of Pittsburgh, Pa.*


It is further understood and agreed that the Insurer shall not be held responsible for any
delay or failure to perform its obligation hereunder due to national, federal, state or
municipal action or regulation; strikes or other labor troubles; acts of God, war, riot,
insurrection or mutiny; or any other causes, contingencies, or circumstances outside the
United States not subject to the Insurer's control which make the fulfillment of this
endorsement impracticable; any of which shall, without liability, excuse the insurer from
the obligations set forth in this endorsement.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


*END 15*

*COPY*

{2/90}

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 78

This endorsement, effective *12:01 am*        *December 31, 2001*        forms a part of
policy number  *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SUB-LIMIT FOR SPECIFIED SUBSIDIARIES

In consideration of the premium charged, it is hereby understood and agreed that with
regards to Loss in connection with all claims in which one or more of the persons claimed
against are Directors or Officers of the following Subsidiary(ies): Advantage Companies,
Inc. for one or more alleged Wrongful Acts occurring prior to August 11, 1989 in their
respective capacities as Directors or Officers of such Subsidiary(ies), the aggregate Limit
of Liability for all such claims shall be $1,000,000 (hereinafter called the "sub-limit" of
liability"). This sublimit of liability shall be part of and not in addition to the aggregate limit
of liability stated in Item 4 of the Declarations and will in no way serve to increase the
Insurer's Limit of Liability as therein stated. Claims alleging one or more related or same
Wrongful Act shall be deemed to arise out of the first such same or related Wrongful Act.

It is further understood and agreed that exclusion 9l) is deleted to the extent coverage is
afforded under this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 16*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SUBSIDIARY – ADDITION

### TO THE DEFINITION OF "SUBSIDIARY"

In consideration of the premium charged, it is hereby understood and agreed that the
Definition of "Subsidiary" is hereby amended to include the following entity(ies), subject to
such Subsidiary's respective Continuity Date.

| SUBSIDIARY | CONTINUITY DATE |
|---|---|
| CAI Wireless Communications, Inc. | July 9, 1999 |
| Embratel | September 15, 1998 |
| MCI Communications Corporation | September 15, 1998 |
| Skytel | April 30, 2001 |

For the purpose of the applicability of the coverage provided by this endorsement, the
entities listed above and the Company will be conclusively deemed to have indemnified the
Insureds of the each respective entity to the extent that such entity or the Company is
permitted or required to indemnify such Insureds pursuant to law, common or statutory, or
contract, or its charter or by-laws. The entity and the Company hereby agree to indemnify
the Insureds to the fullest extent permitted by law, including the making in good faith of
any required application for court approval.

Furthermore, for the purpose of the applicability of the coverage provided by this
endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s),
made against any Subsidiary listed above or any Insured(s) thereof:

  (1)   alleging, arising out of, based upon or attributable to any pending or prior
        litigation(s) as of such Subsidiary's respective Continuity Date, or alleging or
        derived from the same or essentially the same facts as alleged in such
        pending or prior litigation(s); or

  (2)   alleging any Wrongful Act occurring prior to such Subsidiary's respective
        Continuity Date, if an Insured knew or could have reasonably foreseen that
        such Wrongful Act could lead to a Claim under this policy.

*END 17*

(2/90)    *COPY*

ENDORSEMENT # 17   (Continued)

This endorsement, effective  *12:01 am      December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

In all events, coverage as is afforded under this endorsement with respect to a Claim made against each respective entity listed above or any Insureds thereof shall only apply for Wrongful Acts committed or allegedly committed after the respective entity's Continuity Date and prior to the time that the Named Corporation ceases to own at least a 51% ownership interest in such entity.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 17*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*      *December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## EMPLOYMENT PRACTICES ENDORSEMENT

### (With Separate Retention and Excess Language)

### *COVERAGE*

In consideration of the premium charged, it is hereby understood and agreed that the coverage as is afforded by this policy is extended to include Employment Practices Claims made against any Insured(s) (defined below), whether such Claims are brought by: (i) a past, present or prospective employee of the Company, whether directly or by class action; or (ii) by the Equal Employment Opportunity Commission (EEOC) or any other similar local, state, federal or foreign governmental authority regulating employment practices; or (iii) by any other person or entity, subject to the terms, conditions and exclusions of this endorsement and the policy.

## DECLARATIONS PAGE

It is further understood and agreed that Item 5. RETENTION of the Declarations page is hereby deleted in its entirety and replaced with the following:

ITEM 5.     RETENTION:

SECURITIES CLAIMS

| | |
|---|---|
| Judgments & Settlements (all coverages) | None |
| Defense Costs (non-Indemnifiable Loss) | None |
| Defense Costs (Coverage B(i) and Indemnifiable Loss ) | $5,000,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

EMPLOYMENT PRACTICES CLAIMS

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |

*END 18*

(2/90)      *COPY*

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Judgments, Settlements and Defense Costs (Indemnifiable Loss) | $5,000,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts |

OTHER CLAIMS:

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |
| Judgments, Settlements and Defense Costs (Indemnifiable Loss) | $5,000,0000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts |

*DEFINITIONS*

It is further understood and agreed that for the purposes of this endorsement only, the
following definitions shall apply:

(1)    "Employment Practices Claims" means any Claim(s) relating to a past,
present or prospective employee of the Company for any actual or alleged:
(i) wrongful dismissal, discharge or termination (either actual or constructive)
of employment; (ii) employment-related misrepresentation; (iii) wrongful
failure to employ or promote; (iv) wrongful deprivation of career opportunity;
(v) wrongful discipline; (vi) failure to grant tenure or negligent employee
evaluation; (vii) failure to provide adequate employee policies and procedure;
(viii) sexual or workplace harassment of any kind, (including the alleged
creation of a harassing workplace environment); or (ix) unlawful
discrimination, whether direct, indirect, intentional or unintentional.

Employment Practices Claims shall include any Claim(s) brought under state,
local, federal or foreign law (whether common or statutory) and shall
include, but not be limited to, allegations of violations of the following
federal laws (as amended), including regulations promulgated thereunder:

1.    Family and Medical Leave Act of 1993;

*END 18*
*COPY*

(2/90)

ENDORSEMENT# *18* (C٢inued)

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

2.    Americans with Disabilities Act of 1992 (ADA);

3.    Civil Rights Act of 1991;

4.    Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990;

5.    Title VII of the Civil Rights Act of 1964, as amended, including the Pregnancy Discrimination Act of 1978;

6.    Civil Rights Act of 1866, Section 1981; and

7.    Fourteenth Amendment of the U.S. Constitution.

(2)    Solely for the purposes of Employment Practices Claims, the terms "Insured(s)" and "Director(s) or Officer(s)" shall also include any past, present or future employee of the Company, whether such individual is in a supervisory, co-worker or subordinate position or otherwise. Coverage shall automatically apply to all new employees after the inception date of the policy.

### *EXCLUSIONS*

It is further understood and agreed that solely in connection with Employment Practices Claims exclusions (i) and (k) are amended as follows:

(1)    Exclusion (i) is amended by deleting the phrase, "wrongful termination of employment claims", and substituting the phrase, "Employment Practices Claims" (as defined in this endorsement) and by deleting the word "former employee" and substituting the word "employee" to read as follows:

(i)    which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured(s); provided, however, this exclusion shall not apply to an Employment Practices Claim brought by an employee other than an employee who is or was a Director of the Company;

*END 18*

This endorsement, effective *12:01 am*        *December 31, 2001*        forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

    (2)      Exclusion (k) is amended by deleting the phrase, "emotional distress", and
by deleting the phrase, "or for injury from libel or slander or defamation or
disparagement, or for injury from a violation of a person's right of privacy",
to read as follows:

        (k)      for bodily injury, sickness, disease, death of any person, or damage
to or destruction of any tangible property, including the loss of use
thereof;

It is further understood and agreed that solely in connection with Employment Practices
Claims, the following exclusions shall apply:

    (1)      The Insurer shall not be liable for any Loss in connection with any Claim(s)
made against any Insured(s) alleging, arising out of, based upon or
attributable to any pending or prior litigation as of August 19, 1994 or
alleging or derived from the same or essentially the same facts as alleged in
such pending or prior litigation.

    (2)      The Insurer shall not be liable for any Loss in connection with any Claim(s)
made against any Insured(s) for any alleged Wrongful Act committed prior to
August 19, 1994 if any Insured(s), as of such date, knew or could have
reasonably foreseen that such Wrongful Act could lead to a Claim.

It is further understood and agreed that the Employment Practices coverage as is provided
by this endorsement shall be specifically excess over the Limit of Liability of $25,000,000
as stated in Policy No. 874-33-15 issued by National Union fire Insurance Company of
Pittsburgh, Pa. to Worldcom, Inc. .

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 18*

*COPY*

(2/90)

AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### Cancellation Clause

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this endorsement, any provision of this policy respecting cancellation is deleted in its entirety except to indicate that this policy may be cancelled by the Insurer for non-payment of premium.

Accordingly, this policy is non-cancellable and all premium shall be deemed earned at inception except for cancellations by the Insurer for non-payment of premium.

*END 19*
*COPY*

(2/90)

AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am   December 31, 2001*   forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ORDER OF PAYMENTS ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that:

1.     In the event of Loss arising from any Claim(s) for which payment is due under the provisions of this policy but which Loss, in the aggregate, exceeds the remaining available Limit of Liability of this policy, then this policy shall:

   (i)     first pay such Loss for which coverage is provided under Coverage A of the policy, then with respect to whatever remaining amount of the Limit of Liability is available after payment of such Loss,

   (ii)     then pay such Loss for which coverage is provided by Coverage B of the policy.

2.     In the event of Loss arising from a Claim(s) for which payment is due under the provisions of this policy (including those circumstances described in part 1 of this endorsement), the Insurer shall at the written request of the Named Corporation:

   (i)     first pay such Loss for which coverage is provided under Coverage A of the policy, then

   (ii)     either pay or hold payment for such Loss for which coverage is provided by Coverage B of the policy.

   In the event that the Insurer withholds payment under Coverage B of the policy pursuant to the above request, then the Insurer shall at any time in the future, at the request of the Company, release such Loss payment to the Company, or make such Loss payment directly to an individual Director or Officer in the event of covered Loss under any Claim(s) covered under this policy pursuant to Coverage A of the policy.

3.     Nothing in this endorsement shall be construed to increase the Limit of Liability of the Insurer under this policy which such Limit of Liability shall remain the maximum liability of the Insurer under all Claims under all Coverage under this policy combined.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 20*

*COPY*

_____
AUTHORIZED REPRESENTATIVE

ENDORSEMENT # 21

This endorsement, effective *12:01 am*      *December 31, 2001*      forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CLAUSE 7(a) AMENDED – NOTICE

### FROM RISK MANAGER OR GENERAL COUNSEL

In consideration of the premium charged, it is hereby understood and agreed that Clause
7. NOTICE/REPORTING PROVISIONS, paragraph (a) is deleted in its entirety and replaced
with the following:

   (a)    The Company shall, as a condition precedent to the obligations of the
Insurer under this policy, give written notice to the Insurer of a Claim made
against an Insured as soon as practicable after the Claim is reported to or
first becomes known by the Risk Manager or the General Counsel (or
equivalent position) of the Company, but in <u>all</u> events a Claim must be
reported no later than either:

      (1)    anytime during the Policy Period or during the Discovery Period (if
applicable); or

      (2)    within thirty (30) days after the end of the Policy Period or the
Discovery Period (if applicable), as long as such Claim(s) is reported
no later than thirty (30) days after the date such Claim was first
made against an Insured.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 21*

*COPY*

(2/90)

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 22

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## FOREIGN CORRUPT PRACTICES ACT EXTENSION

### I.

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. DEFINITIONS (g) "Loss" is amended by addition of the following at the end thereof:

> Loss shall also include (subject to this policy's other terms, conditions and limitations, including but not limited to exclusions relating to profit or advantage, deliberate fraud or deliberate criminal acts): (1) civil penalties assessed against any individual Director or Officer pursuant to Sections (g) 2(B) of the Foreign Corrupt Practices Act, 78dd-2(g)(2)(B).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 22*

*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective  *12:01 am      December 31, 2001*      forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ADDITION TO THE TERM DIRECTOR OR OFFICER

In consideration of the premium charged, it is hereby  understood and agreed that the term
"Director or Officer" is amended to include  any individual(s) of the  Company listed below,
but solely for Wrongful Acts committed in his or her respective capacity(ies) listed below.

| INDIVIDUALS | CAPACITY | CONTINUITY DATE |
|---|---|---|
| Jeff Rushton | CFO of SHL Systemhouse | December 8, 1998 |

It is hereby understood and  agreed that this *policy* shall indemnify the *directors* and
*officers* against *loss* in respect of any *wrongful act* committed whilst acting in the capacity
of a shadow director, as defined under  Section 741 of  the Companies Act  1985, of any
company (any  such company  hereinafter to  be referred  to as the "Shadow  Directorship
company") that is incorporated and/or  domiciled in the UK or  the Republic of Ireland, as a
consequence of being a *director* or *officer* of the *company,* other than in respect of any:

(i)    *claim* made  whether in  the  name of  or  on  behalf  of  any Shadow  Directorship
company or any person who  is now or shall be  a director or officer of  the Shadow
Directorship company; and/or

(ii)   *claim* made whether in the name of or on behalf  or any parent, holding, controlling,
subsidiary, affiliate or  associated company or  representative of  the Shadow
Directorship company.

Furthermore, provided that for the purpose of the  applicability of the coverage provided by
this endorsement, the Company will be  conclusively deemed to have  indemnified the
persons afforded coverage  by this endorsement to  the extent that the  Company is
permitted or required  to indemnify such  persons pursuant to law (common or statutory),
contract, or  the  charter or by-laws  of the Company  (which are hereby  deemed to adopt
the broadest provision of  the law which determines, or defines such rights  of indemnity).
The Company hereby agrees to  indemnify such persons to  the fullest extent permitted  by
law, including the making  in good faith of  any required application  for court approval and
the passing of any required corporate resolution or the execution of any contract.

It is further understood  and agreed that only  as respects any  additional coverage granted
by virtue of  this endorsement, the Insurer  shall not  be liable  for any  Loss in connection
with any Claim(s) made against an Insured:

(1)    alleging, arising out of, based upon  or attributable to any  pending or  prior
litigation as of  each individual's respective  Continuity Date  listed above, or
alleging or derived from the same  or essentially the same facts  as alleged in
such pending or prior litigation; and

*END 23*

(2/90)    *COPY*

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*


by    *National Union Fire Insurance Company of Pittsburgh, Pa.*



(2)    alleging any   Wrongful Act  occurring  prior to  each  individual's respective
Continuity Date if the  Insured knew or  could have reasonably foreseen  that
such Wrongful Act could lead to a Claim under this policy.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


*END 23*

*COPY*

AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DISCOVERY CLAUSE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to the extent necessary for the policy to provide the following:

Clause 10. DISCOVERY CLAUSE is deleted in its entirety and replaced with the following:

## 10.    DISCOVERY CLAUSE

Except as indicated below, if the Insurer shall refuse to renew this policy, the Named Corporation shall have the right upon payment of an additional premium amount as shall be determined by the Insurer in its sole and absolute discretion, to a period of one year following the effective date of such nonrenewal (herein referred to as the "Discovery Period"), in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate unless written notice of election of a Discovery Period together with any additional premium due is received by the Insurer no later than thirty (30) days subsequent to the effective date of the nonrenewal.

In the event of a Transaction as defined in Clause 12, the Named Corporation shall have the right, within 30 days of the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Corporation may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions, exclusions and additional premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at inception of the Discovery Period. The Discovery Period is not cancelable. This Clause 10 and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 24*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*   *December 31, 2001*   forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

.

### ADDITION TO THE TERM "DIRECTOR(S) OR OFFICER(S)" OR "INSURED(S)"

In consideration of the premium charged, it is hereby understood and agreed that coverage as is afforded by this policy is extended to and the definition of term "Director(s) or Officer(s)" or "Insured(s)" is amended to include the members of the Advisory Board, solely in their capacity as such members, subject to the following September 15, 1998.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the Company is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The Company hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s) made against an Insured:

(1)     alleging, arising out of, based upon or attributable to any pending or prior litigation as of each individual's respective Continuity Date listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

(2)     alleging any Wrongful Act occurring prior to each individual's respective Continuity Date if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 25*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ADDITION TO THE TERM "DIRECTOR(S) OR OFFICER(S)" OR "INSURED(S)"
### (GENERAL COUNSEL)

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. DEFINITIONS, Definition of "Director(s) or Officer(s)" or "Insured(s)" is hereby amended to include the General Counsel of the Named Corporation, subject to the following Continuity Date: September 15, 1998.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the Company is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The Company hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s) made against an Insured:

(1)    alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

(2)    alleging any Wrongful Act occurring prior to the Continuity Date listed above, if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 26*
*COPY*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

# DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY. PLEASE READ IT CAREFULLY.

*Words and phrases which appear in all capital letters have the special meanings set forth in Section II. Definitions*



**Associated Electric
& Gas Insurance
Services Limited
Hamilton, Bermuda**

# DECLARATIONS

POLICY NO. D2306A1A01

DECLARATIONS NO. 1

**Item 1:**   This POLICY provides indemnification with respect to the DIRECTORS and OFFICERS of:

WorldCom, Inc.
1133 19th Street
Washington, DC 20036

**Item 2:**   POLICY PERIOD: from the 31st day of December, 2001, to the 31st day of December, 2002 both days at 12:01 A.M. Standard Time at the address of the COMPANY.

**Item 3:**   RETROACTIVE DATE: the  1st day of January, 1983 at 12:01 A.M.  Standard Time  at the address of the COMPANY.

**Item 4:**   POLICY PREMIUM:         $550,000

**Item 5:**   Limits of Liability:
A.  $10,000,000          Each WRONGFUL ACT
B.  $10,000,000          Aggregate Limit of Liability for the POLICY PERIOD

**Item 6:**   UNDERLYING LIMITS:
This POLICY is written as  EXCESS      Insurance

A.  If this POLICY is written as Primary Insurance with respect to Insuring Agreement I(A)(2) only:
(1)  $---------          Each WRONGFUL ACT not arising from NUCLEAR OPERATIONS
(2)  $---------          Each WRONGFUL ACT arising from NUCLEAR OPERATIONS

© 2000 ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED
AEGIS AND THE AEGIS LOGO ARE SERVICE MARKS OF ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

# DECLARATIONS
### continued

**POLICY NO.** D2306A1A01

**DECLARATIONS NO.** 1

B.  If this POLICY is written as Excess Insurance:
- (1) (a) $70,000,000      Each WRONGFUL ACT
- (b) $70,000,000      In the Aggregate for all WRONGFUL ACTS
- (2)     $70,000,000      Each WRONGFUL ACT not covered under Underlying Insurance
- (3) In the Event of Exhaustion of the UNDERLYING LIMIT stated in Item 6(B)(1)(b) above with respect to Insuring Agreement I(A)(2) only:
  - (a) $5,000,000      Each WRONGFUL ACT not arising from NUCLEAR OPERATIONS
  - (b) $5,000,000      Each WRONGFUL ACT arising from NUCLEAR OPERATIONS

**Item 7:**     Any notice to be provided or any payment to be made hereunder to the COMPANY shall be made to:

     NAME         Mr. Eric Hovanky
     TITLE          Director of Risk Management
     ENTITY       WorldCom, Inc.
     ADDRESS    500 Clinton Center Dr
                    Clinton, MS 39056-5630

**Item 8:**     Any notice to be provided or any payment to be made hereunder to the INSURER shall be made to:

     NAME         AEGIS Insurance Services, Inc.
     ADDRESS    10 Exchange Place
                    Jersey City, New Jersey  07302

**ENDORSEMENTS ATTACHED AT POLICY ISSUANCE: 1-3**

Countersigned at      **Jersey City, New Jersey**

On   January 4, 2002

AEGIS Insurance Services, Inc.

By    *Sandra X. Johnson*

           Authorized Representative

AEGIS

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 1 _____ Effective Date of Endorsement December 31, 2001 _____

Attached to and forming part of POLICY No. D2306A1A01 _____

COMPANY WorldCom, Inc. _____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## FOLLOWING FORM ENDORSEMENT

I.    This POLICY will follow the terms and conditions of Policy No. 8749108

Issued by Natural Union Fire Insurance Company of Pittsburgh, PA

Dated:  December 31, 2001 except for the following which shall remain in effect.

      1.      Items 1 through 8 of the Declarations of the Policy

      2.      Conditions:

            (C)      "Notice of Claim",

            (L)      "Discovery Period" and

            (M)      "Cancellation"

      3.      Insuring Agreement (B) " Limits of Liability" Section (1)

_Sandra A. Johson_
Signature of Authorized Representative

6251 (7/1999)

Page 1 of 1

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 2 _____ Effective Date of Endorsement December 31, 2001 _____

Attached to and forming part of POLICY No. D2306A1A01 _____

COMPANY   WorldCom, Inc. _____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## PRIOR OR PENDING LITIGATION (BROAD FORM)

Section III, EXCLUSIONS, is amended by the addition of the following:

(L)  Arising from any prior or pending litigation as of December 31, 2001, as well as all future claims or litigation based upon the prior or pending litigation or derived from the same or essentially the same facts (actual or alleged) that gave rise to the prior or pending litigation.

_Sandra A. Johnson_
Signature of Authorized Representative

6210  (1/2000)

Page 1 of 1

☘AEGIS

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 3 _____    Effective Date of Endorsement  December 31, 2001 _____

Attached to and forming part of POLICY No.  D2306A1A01 _____

COMPANY  WorldCom, Inc. _____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### NON-VOTING MEMBERS ENDORSEMENT

This POLICY provides only limited membership rights.  YOU will not be entitled to vote on any matter submitted to the members of the INSURER.

Sandra A. Hluson

Signature of Authorized Representative

6259 (10/2001)

Page 1 of 1

# POLICY OF DIRECTORS AND OFFICERS LIABILITY INSURANCE EFFECTED WITH ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED HAMILTON, BERMUDA

(hereinafter referred to as the "POLICY")

### THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY. PLEASE READ IT CAREFULLY.

*Words and phrases which appear in all capital letters have the special meanings set forth in Section II. Definitions.*

**In consideration of** the payment of premium, and in reliance upon all statements made and information furnished to Associated Electric & Gas Insurance Services Limited (hereinafter referred to as the "INSURER") by the Application attached hereto which is hereby made a part hereof, and subject to all the terms hereinafter provided, the INSURER agrees as follows:

## I.  INSURING AGREEMENT

### (A) *Indemnity*

(1) The INSURER shall pay on behalf of the DIRECTORS and OFFICERS any and all sums which they shall become legally obligated to pay as ULTIMATE NET LOSS for which the COMPANY has not provided reimbursement, by reason of any WRONGFUL ACT which takes place during the COVERAGE PERIOD and is actually or allegedly caused, committed or attempted by the DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS, provided such ULTIMATE NET LOSS arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased.

(2) The INSURER shall pay on behalf of the COMPANY any and all sums it has incurred, as required or permitted by applicable common or statutory law or under provisions of the COMPANY'S Charter or Bylaws effected pursuant to such law, as ULTIMATE NET LOSS, to indemnify DIRECTORS or OFFICERS for ULTIMATE NET LOSS which they are legally obligated to pay by reason of any WRONGFUL ACT which takes place during the COVERAGE PERIOD and is actually or allegedly caused, committed or attempted by such DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS, provided the ULTIMATE NET LOSS arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased.

### (B) *Limits of Liability*

(1) The INSURER shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of the UNDERLYING LIMITS as stated in Item 6 of the Declarations as a result of each WRONGFUL ACT covered under Insuring Agreement I(A)(I) or I(A)(2) or both, and then only up to the Limit of Liability stated in Item 5A of the Declarations and further subject to the aggregate Limit of Liability stated in Item 5B of the Declarations as the maximum amount payable hereunder in the aggregate for all CLAIMS first made against the DIRECTORS or OFFICERS during both:

(a) the POLICY PERIOD and

(b) the DISCOVERY PERIOD, if purchased.

Notwithstanding the foregoing, in the event that the INSURER cancels or refuses to renew this POLICY, and a DISCOVERY PERIOD extension is purchased by the COMPANY, then the aggregate Limit of Liability stated in Item 5B of the Declarations shall be reinstated but only with respect to CLAIMS first made against the DIRECTORS or OFFICERS during such DISCOVERY PERIOD.

(2) Multiple CLAIMS arising out of the same WRONGFUL ACT, even if made against different DIRECTORS or OFFICERS, shall be deemed to be a single CLAIM arising from a single WRONGFUL

© 1999 ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED
AEGIS AND THE AEGIS LOGO ARE SERVICE MARKS OF ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

ACT and to have been reported during the POLICY PERIOD or, if purchased, during the DISCOVERY PERIOD in which the first of such multiple CLAIMS is made against any of the DIRECTORS or OFFICERS. The Limits of Liability and UNDERLYING LIMITS, stated in Items 5 and 6 of the Declarations respectively, shall apply only once regardless of the number of CLAIMS arising out of the same WRONGFUL ACT. All interrelated acts shall be deemed to be a single WRONGFUL ACT.

(3) The inclusion herein of more than one DIRECTOR or OFFICER, or the application of both Insuring Agreements I(A)(1) and I(A)(2), shall not operate to increase the INSURER'S Limits of Liability as stated in Item 5 of the Declarations.

(4) With respect to ULTIMATE NET LOSS arising out of any WRONGFUL ACT in connection with service for a NOT-FOR-PROFIT ORGANIZATION as provided in Section II(E)(2), if:

    (a) such WRONGFUL ACT results in liability being imposed upon one or more DIRECTORS and OFFICERS under this POLICY and also upon directors and officers and general partners under any other directors and officers or general partner liability insurance policies issued by the INSURER to any organization; and

    (b) the total of the ULTIMATE NET LOSS under this POLICY and the ultimate net loss under such other policies issued by the INSURER equals or exceeds $35,000,000;

the maximum amount payable by the INSURER under this POLICY in the aggregate for all ULTIMATE NET LOSS resulting from such WRONGFUL ACT shall be the lesser of the applicable Limit of Liability provided by this POLICY or the product of:

    (i) the applicable Limit of Liability provided by this POLICY divided by the total limits of liability per wrongful act applicable to such wrongful act under all policies issued by the INSURER; and

    (ii) $35,000,000.

If the amount paid under this POLICY with respect to such WRONGFUL ACT exceeds the COMPANY'S proportionate share of the $35,000,000 as determined above, the COMPANY shall refund such excess to the INSURER promptly.

(C) *UNDERLYING LIMITS*

(1) If this POLICY is written as Primary Insurance with respect to Insuring Agreement I(A)(2), the UNDERLYING LIMIT for the COMPANY for each WRONGFUL ACT shall be as stated in Item 6A(1) of the Declarations, unless it is based upon, arises out of or is attributable to NUCLEAR OPERATIONS, in which event it shall be as stated in Item 6A(2) of the Declarations;

(2) If this POLICY is written as Excess Insurance:

    (a) with respect to Insuring Agreements I(A)(1) and I(A)(2), the UNDERLYING LIMIT for each WRONGFUL ACT shall be as stated in Item 6B(1)(a) of the Declarations and the maximum UNDERLYING LIMIT for all WRONGFUL ACTS shall be as stated in Item 6B(1)(b) of the Declarations;

    (b) with respect to ULTIMATE NET LOSS covered hereunder:

        (i) in the event of reduction of the underlying aggregate limit as stated in Item 6B(1)(b), the UNDERLYING LIMIT shall be such reduced underlying aggregate limit; or

        (ii) in the event of exhaustion of the underlying aggregate limit as stated in Item 6B(1)(b), the UNDERLYING LIMIT shall be as stated in Item 6B(3) of the Declarations;

    (c) with respect to any WRONGFUL ACT covered hereunder but not covered under such Underlying Insurance, the UNDERLYING LIMIT shall be as stated in Item 6B(2) of the Declarations; and

    (d) nothing herein shall make this POLICY subject to the terms and conditions of any Underlying Insurance.

&AEGIS

(3) Only payment of inoemnity or defense expenses which, except for the amount thereof, would have been indemnifiable under this POLICY, may reduce or exhaust an UNDERLYING LIMIT.

(4) In the event that both Insuring Agreement I(A)(1) and I(A)(2) are applicable to INDEMNITY and DEFENSE COST resulting from a WRONGFUL ACT then:

    (a) if this POLICY is written as Primary Insurance, the UNDERLYING LIMIT applicable to such WRONGFUL ACT shall be the UNDERLYING LIMIT stated in Item 6A of the Declarations; and

    (b) if this POLICY is written as Excess Insurance and the UNDERLYING LIMIT has been exhausted, the UNDERLYING LIMIT applicable to such WRONGFUL ACT shall be the UNDERLYING LIMIT stated in Item 6B(3);

and there shall be no UNDERLYING LIMIT applicable with respect to coverage provided under Insuring Agreement I(A)(1).

(5) The UNDERLYING LIMITS stated in Item 6 of the Declarations applicable to Insuring Agreement I(A)(2) shall apply to all INDEMNITY and/or DEFENSE COST for which indemnification of the DIRECTORS and/or OFFICERS by the COMPANY is legally permissible, whether or not such indemnification is granted by the COMPANY.

## II.  DEFINITIONS

(A) CLAIM: The term "CLAIM" shall mean:

(1) any demand, suit or proceeding against any DIRECTORS and/or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, which seeks actual monetary damages or other relief and which may result in any DIRECTORS and/or OFFICERS becoming legally obligated to pay ULTIMATE NET LOSS by reason of any WRONGFUL ACT actually or allegedly caused, committed or attempted during the COVERAGE PERIOD by the DIRECTORS and/or OFFICERS while acting in their capacity as such; or

(2) written notice to the INSURER during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, by the DIRECTORS, OFFICERS and/or the COMPANY, describing with the specificity set forth in Condition (C) hereof, circumstances of which they are aware involving an identifiable WRONGFUL ACT actually or allegedly caused, committed or attempted during the COVERAGE PERIOD by the DIRECTORS and/or OFFICERS while acting in their capacity as such, which circumstances are likely to give rise to a demand, suit or proceeding being made against such DIRECTORS and/or OFFICERS.

A CLAIM shall be deemed to be first made against a DIRECTOR or OFFICER at the earlier of the time at which a demand, suit or proceeding is first made against the DIRECTOR or OFFICER, as set forth in section (1) of this Definition or the time at which written notice is given to the INSURER, as set forth in section (2) of this Definition.

Multiple demands or suits arising out of the same WRONGFUL ACT or interrelated acts shall be deemed to be a single "CLAIM".

(B) COMPANY: The term "COMPANY" shall mean, subject to Condition (A), hereof: (a) the organization(s) named in Item 1 of the Declarations and any subsidiaries of such organization(s), and (b) any debtor-in-possession in a bankruptcy proceeding in which the debtor is an organization named in Item 1 of the Declarations and any SUBSIDIARIES of such organization(s).

(C) COVERAGE PERIOD: The term "COVERAGE PERIOD" shall mean the period of time from the RETROACTIVE DATE to the termination of the POLICY PERIOD.

(D) DEFENSE COST: The term "DEFENSE COST" shall mean all expense incurred by or on behalf of the DIRECTORS, OFFICERS or, where reimbursable under Insuring Agreement I(A)(2), the COMPANY in the investigation, negotiation, settlement and defense of any CLAIM except all salaries, wages and benefit expenses of DIRECTORS, OFFICERS, or the COMPANY.

(E) DIRECTOR and OFFICER: The terms "DIRECTOR" and "OFFICER" as used herein, either in the singular or plural, shall mean:

6100 (1/2000)

(1) any person who was, is now, or shall be a director, officer or trustee of the COMPANY and any other employee of the COMPANY who may be acting in the capacity of a director, officer or trustee of the COMPANY with the express authorization of a director, officer or trustee of the COMPANY;

(2) any director, officer or trustee of the COMPANY who is serving or has served at the specific request of the COMPANY as a director, officer, trustee or in an equivalent executive position of any outside NOT-FOR-PROFIT ORGANIZATION.

(3) the estates, heirs, legal representatives or assigns of deceased persons who were directors, officers or trustees of the COMPANY at the time the WRONGFUL ACTS upon which such CLAIMS were based were committed, and the legal representatives or assigns of directors, officers or trustees of the COMPANY in the event of their incompetency, insolvency or bankruptcy;

provided, however, that the terms "DIRECTOR" and "OFFICER" shall not include a trustee appointed pursuant to Title 11, United States Code, or pursuant to the Securities Investor Protection Act, a receiver appointed for the benefit of creditors by Federal or State courts, an assignee for the benefit of creditors or similar fiduciary appointed under Federal or State laws for the protection of creditors or the relief of debtors.

In the event that a CLAIM which is within the coverage afforded under this POLICY is made against any DIRECTOR or OFFICER and such CLAIM includes a claim against the lawful spouse of such DIRECTOR or OFFICER solely by reason of (a) such spousal status or (b) such spouse's ownership interest in property or assets which are sought as recovery for WRONGFUL ACTS of a DIRECTOR or OFFICER, such spouse shall be deemed to be a DIRECTOR or OFFICER hereunder, but solely with respect to such claim. In no event, however, shall the lawful spouse of a DIRECTOR or OFFICER be deemed to be a DIRECTOR or OFFICER as regards any CLAIM in respect of which there is a breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by or claimed against such spouse, acting individually or in his or her capacity as the spouse of a DIRECTOR or OFFICER.

(F) DISCOVERY PERIOD: The term "DISCOVERY PERIOD" shall mean the period of time set forth in Condition (L).

(G) INDEMNITY: The term "INDEMNITY" shall mean all sums which the DIRECTORS, OFFICERS or, where reimbursable under Insuring Agreement 1 (A) (2), the COMPANY shall become legally obligated to pay as damages, whether by adjudication or compromise with the consent of the INSURER, after making proper deductions for UNDERLYING LIMITS and all recoveries, salvages and valid and collectible insurance. Where permitted by law, INDEMNITY shall include exemplary and punitive damages awarded against the DIRECTORS or OFFICERS where permitted by law.   The enforceability of any claim for coverage hereunder of punitive or exemplary damages shall be governed by the applicable law which most favors such coverage.

(H) INSURER: The term "INSURER" shall mean Associated Electric & Gas Insurance Services Limited, Hamilton, Bermuda, a non-assessable mutual insurance company.

(I) NOT-FOR-PROFIT ORGANIZATION: The term "NOT-FOR-PROFIT ORGANIZATION" shall mean:

(1) an organization, no part of the income or assets of which is distributable to its owners, stockholders or members and which is formed and operated for a purpose other than pecuniary profit or financial gain of its owners, stockholders or members, including but not limited to any organization exempt from taxation pursuant of Section 501 of the Internal Revenue Code of 1986 (as amended) ; or

(2) a political action committee which is defined for these purposes as a separate segregated fund to be utilized for political purposes as described in the United States Federal Election Campaign Act (2 U.S.C. 441b(2)(C)).

(J) NUCLEAR OPERATIONS: The term "NUCLEAR OPERATIONS" shall mean the design, engineering, financing, construction, operation, maintenance, use, ownership, conversion or decommissioning of any nuclear facility.

(K) POLICY: The term "POLICY" shall mean this insurance policy, including the Application, the Declarations and any endorsements issued by the INSURER to the organization first named in Item 1 of the Declarations for the POLICY PERIOD listed In Item 2 of the Declarations.

(L) POLICY PERIOD: The term "POLICY PERIOD" shall mean the period of time stated in Item 2 of the Declarations.

(M) RETROACTIVE DATE: The term "RETROACTIVE DATE" shall mean the date stated in Item 3 of the Declarations; provided, however, with respect to any WRONGFUL ACT actually or allegedly caused, committed or attempted by the DIRECTORS or OFFICERS of any SUBSIDIARY formed or acquired by the COMPANY or any of its SUBSIDIARIES after inception of the POLICY PERIOD of this POLICY, or after inception of any other policy issued by the INSURER to the COMPANY for a prior policy period, the term "RETROACTIVE DATE" shall mean the date of such formation or acquisition.

(N) SUBSIDIARIES: The term "SUBSIDIARY" shall mean any entity more than fifty percent (50%) of whose outstanding securities or financial interest representing the present right to vote for the election of directors (or the appointment of a general partner in respect of a limited partnership or manager in respect of a limited liability company) are owned by the COMPANY and/or one or more of its "SUBSIDIARIES".

(O) ULTIMATE NET LOSS: The term "ULTIMATE NET LOSS" shall mean the total INDEMNITY and DEFENSE COST with respect to each WRONGFUL ACT to which this POLICY applies, provided that ULTIMATE NET LOSS does not include any amount allocated, pursuant to Condition (T), to CLAIMS against persons or entities other than DIRECTORS and OFFICERS or to non-covered matters.

(P) UNDERLYING LIMITS: The term "UNDERLYING LIMITS" shall mean the amounts stated in Item 6 of the Declarations.

(Q) WRONGFUL ACT: The term "WRONGFUL ACT" shall mean any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by any DIRECTOR or OFFICER while acting individually or collectively in their capacity as such, or claimed against them solely by reason of their being DIRECTORS or OFFICERS.

All such interrelated breaches of duty, neglects, errors, misstatements, misleading statements or omissions actually or allegedly caused, committed or attempted by or claimed against one or more of the DIRECTORS or OFFICERS shall be deemed to be a single "WRONGFUL ACT".

## III. EXCLUSIONS

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS arising from any CLAIM(S) made against any DIRECTOR or OFFICER:

(A) (1) for any fines or penalties imposed in a criminal suit, action or proceeding;

(2) for any fines or penalties imposed in conjunction with political contributions, payments, commissions or gratuities; or

(3) for any other fines or penalties imposed by final adjudication of a court of competent jurisdiction or any agency or commission possessing quasi-judicial authority; or

(4) where, at inception of the POLICY PERIOD, such DIRECTOR or OFFICER had knowledge of a fact or circumstance which was likely to give rise to such CLAIM(S) and which such DIRECTOR or OFFICER failed to disclose or misrepresented in the Application or in the process of preparation of the Application, other than in a Renewal Application; provided, however, that this exclusion shall not apply to such CLAIM(S) made against any DIRECTOR or OFFICER other than such DIRECTOR or OFFICER who failed to disclose or misrepresented such fact or circumstance; provided further that this exclusion shall not limit the INSURER'S right to exercise any remedy available to it with respect to such failure to disclose or misrepresentation other than the remedy provided for in this Exclusion.

(B) with respect to Insuring Agreement I(A)(1) only:

(1) based upon, arising out of or attributable to such DIRECTOR or OFFICER having gained any personal profit, advantage or remuneration to which such DIRECTOR or OFFICER was not legally entitled if:

(a) a judgment or other final adjudication adverse to such DIRECTOR or OFFICER establishes that he in fact gained such personal profit, advantage or remuneration; or

(b) such DIRECTOR or OFFICER has entered into a settlement agreement to repay such personal profit, advantage or remuneration to the COMPANY;

(2) for an accounting o—profits made from the purchase or sale u₇ such DIRECTOR or OFFICER of securities of the COMPANY within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any other federal or state statutory or common law;

(3) brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of such DIRECTOR or OFFICER if a final adjudication establishes that acts of active and deliberate dishonesty were committed or attempted with actual dishonest purpose and intent and were material to the cause of action so adjudicated; or

(4) where such payment would be contrary to applicable law.

(C) for bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person, death of any person or for physical injury to or destruction of tangible property or the loss of use thereof.

(D) for injury based upon, arising out of or attributable to:

(1) false arrest, wrongful detention or wrongful imprisonment or malicious prosecution;

(2) wrongful entry, wrongful eviction or other invasion of the right of private occupancy;

(3) discrimination or sexual harassment;

(4) publication or utterance:

(a) of a libel or slander or other defamatory or disparaging material; or

(b) in violation of an individual's right of privacy; or

(5) with respect to the COMPANY'S advertising activities: piracy, plagiarism, unfair competition, idea misappropriation under implied contract, or infringement of copyright, title, slogan, registered trademark, service mark, or trade name.

(E) for violation(s) of any responsibility, obligation or duty imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto or by similar common or statutory law of the United States of America or any state or other jurisdiction therein.

(F) based upon, arising out of or attributable to:

(1) the rendering of advice with respect to;

(2) the interpreting of; or

(3) the handling of records in connection with the enrollment, termination or cancellation of employees under the COMPANY'S group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

(G) (1) arising from any circumstances, written notice of which has been given under "any policy" or any discovery period thereof, which policy expired prior to or upon the inception of this POLICY; or

(2) which is one of a number of CLAIMS arising out of the same WRONGFUL ACT, if any CLAIM of such multiple CLAIMS was made against the DIRECTORS or OFFICERS during "any policy" or any discovery period thereof, which policy expired prior to or upon the inception of this POLICY.

The term "any policy" refers to any Directors and Officers Liability Insurance Policy, any General Partners Liability Insurance Policy or any other policy affording substantially similar coverage (whether issued by the INSURER or any other carrier).

(H) if any other policy or policies also afford(s) coverage in whole or in part for such CLAIM(S); except, this exclusion shall not apply:

(1) to the amount of ULTIMATE NET LOSS with respect to such CLAIM(S) which is in excess of the limit of liability of such other policy or policies and any applicable deductible or retention thereunder; or

(2) with respect to coverage afforded such CLAIM(S) by any other policy or policies purchased or issued specifically as insurance underlying or in excess of the coverage afforded under this POLICY;

provided always that nothing herein shall be construed to cause this POLICY to contribute with any other policy or policies or to make this POLICY subject to any of the terms of any other policy or policies.

(I) for any WRONGFUL ACT which took place in whole or in part prior to the RETROACTIVE DATE.

(J) by, on behalf of, in the right of, at the request of, or for the benefit of, any security holder of the COMPANY, any DIRECTOR or OFFICER, or the COMPANY, unless such CLAIM is:

(1) made derivatively by an security holder of the COMPANY for the benefit of the COMPANY and such security holder is:

(a) acting totally independent of, and totally without the suggestion, solicitation, direction, assistance, participation or intervention of any DIRECTOR or OFFICER, or the COMPANY; and

(b) not any entity within the definition of the term "COMPANY"; or

(2) made non-derivatively by a security holder who is not:

(a) a DIRECTOR or OFFICER; or

(b) any entity with the definition of the term "COMPANY"; or

(3) made non-derivatively by an OFFICER acting totally independent of, and totally without the suggestion, solicitation, direction, assistance, participation or intervention of any other DIRECTOR or OFFICER, or the COMPANY and arising from the wrongful termination of that OFFICER; or

(4) made by a DIRECTOR or OFFICER in the form of a cross-claim or third party claim for contribution or indemnity, which is part of and results directly from a CLAIM which is not otherwise excluded by the POLICY; or

(5) made solely and entirely in a jurisdiction other than the United States of America, its territories and possessions and is subject to the substantive and procedural laws of such foreign jurisdiction.

(K) where such CLAIM(S) arise out of such DIRECTOR'S or OFFICER'S activities as a director, officer or trustee of any entity other than:

(1) the COMPANY; or

(2) any outside NOT-FOR-PROFIT ORGANIZATION as provided in Section II(E)(2).

## IV. CONDITIONS

(A) *Acquisition, Merger and Dissolution*

(1) (a)  If, after the inception of the POLICY PERIOD,

(i) the COMPANY or any of its SUBSIDIARIES forms or acquires any SUBSIDIARY or acquires any entity by merger into or consolidation with the COMPANY or any SUBSIDIARY, and

(ii) the total assets of such formed or acquired entity are not greater than fifteen percent (15%) of the COMPANY'S total assets,

coverage shall be provided for the DIRECTORS and OFFICERS of such entity from the date of formation, acquisition, merger or consolidation, respectively, but only with respect to WRONGFUL ACTS actually or allegedly caused, committed or attempted during that part of the POLICY PERIOD which is subsequent to the formation, acquisition, merger or consolidation.

(b) In respect of any SUBSIDIARY formed or acquired after the inception of the POLICY PERIOD and not subject to paragraph (a) above, or of any entity acquired by merger into or consolidation with

the COMPANY or any SUBSIDIARY after the inception of the POLICY PERIOD and not subject to paragraph (a) above, the COMPANY shall report such formation or acquisition within ninety (90) days thereafter and, if so reported, upon payment of an additional premium and upon terms as may be required by the INSURER, such coverage shall be provided for the DIRECTORS and OFFICERS of such newly formed or acquired SUBSIDIARY or merged or consolidated entity, but only with respect to WRONGFUL ACTS actually or allegedly caused, committed, or attempted during that part of the COVERAGE PERIOD which is subsequent to such acquisition, merger or consolidation.

(2) If, prior to or after inception of the POLICY PERIOD, the COMPANY or any of its SUBSIDIARIES is or has been acquired by or merged into any other entity, or is or has been dissolved, coverage under this POLICY shall continue for the POLICY PERIOD but only for DIRECTORS and OFFICERS of the COMPANY or its SUBSIDIARIES who were serving as such prior to such acquisition, merger or dissolution and only with respect to WRONGFUL ACTS actually or allegedly caused, committed or attempted during that part of the COVERAGE PERIOD which is prior to such acquisition, merger or dissolution.

(B) *Non-Duplication of Limits*

To avoid the duplication of the INSURER'S Limits of Liability stated in Item 5 of the Declarations, the DIRECTORS, OFFICERS and COMPANY agree that:

(1) in the event the INSURER provides INDEMNITY or DEFENSE COSTS for any WRONGFUL ACT under this POLICY, neither the DIRECTORS, OFFICERS nor the COMPANY shall have any right to additional INDEMNITY or DEFENSE COSTS for such WRONGFUL ACT under any other policy issued by the INSURER to the DIRECTORS, OFFICERS or COMPANY that otherwise would apply to such WRONGFUL ACT; and

(2) in the event the INSURER provides INDEMNITY or DEFENSE COSTS for any WRONGFUL ACT under any other policy issued by the INSURER to the DIRECTORS, OFFICERS, or COMPANY, neither the DIRECTORS, OFFICERS nor the COMPANY shall have any right to additional INDEMNITY or DEFENSE COSTS for such WRONGFUL ACT under this POLICY.

(C) *Notice of Claim*

As a condition precedent to any rights under this POLICY, the DIRECTOR, OFFICER, COMPANY, or the COMPANY'S authorized representative shall give written notice to the INSURER as soon as practicable after the COMPANY'S risk manager or general counsel first become aware of any CLAIM, which notice shall include the nature of the WRONGFUL ACT, the alleged injury, the names of the claimants, and the manner in which the DIRECTOR, OFFICER or COMPANY first become aware of the CLAIM, and shall cooperate with the INSURER and give such additional information as the INSURER may reasonably require.

The Application for this POLICY and any information contained therein shall not constitute a notice of CLAIM.

(D) *Cooperation and Settlements*

In the event of any WRONGFUL ACT which may involve this POLICY, the DIRECTORS, OFFICERS or COMPANY without prejudice as to liability, may proceed immediately with settlements which in their aggregate do not exceed the UNDERLYING LIMITS. The COMPANY shall notify the INSURER of any such settlements made.

The INSURER shall not be called upon to assume charge of the investigation, settlement or defense of any demand, suit or proceeding, but the INSURER shall have the right and shall be given the opportunity to associate with the DIRECTORS, OFFICERS and COMPANY or any underlying insurer, or both, in the investigation, settlement, defense and control of any demand, suit or proceeding relative to any WRONGFUL ACT where the demand, suit or proceeding involves or may involve the INSURER. At all times, the DIRECTORS, OFFICERS and COMPANY and the INSURER shall cooperate in the investigation, settlement and defense of such demand, suit or proceeding.

The DIRECTORS, OFFICERS and COMPANY and their underlying insurer(s) shall, at all times, use diligence and prudence in the investigation, settlement and defense of demands, suits or other proceedings.

(E) *Appeals*

In the event that the DIRECTORS, OFFICERS, COMPANY or any underlying insurer elects not to appeal a judgment in excess of the UNDERLYING LIMITS, the INSURER may elect to conduct such appeal at its own cost and expense and shall be liable for any taxable court costs and interest incidental thereto, but in no event shall the total liability of the INSURER, exclusive of the cost and expense of appeal, exceed its Limits of Liability stated in Item 5 of the Declarations.

(F) *Subrogation*

In the event of any payment under this POLICY, the INSURER shall be subrogated to the extent of such payment to all rights of recovery thereof, and the DIRECTORS, OFFICERS and COMPANY shall execute all papers required and shall do everything that may be necessary to enable the INSURER to bring suit in the name of the DIRECTORS, OFFICERS or COMPANY.

(G) *Bankruptcy or Insolvency*

Bankruptcy or insolvency of the COMPANY shall not relieve the INSURER of any of its obligations hereunder.

In the event of bankruptcy or insolvency of the COMPANY, subject to all the terms of this POLICY, the INSURER shall pay on behalf of the DIRECTORS and OFFICERS under Insuring Agreement I(A)(1) (in excess of the UNDERLYING LIMITS, if any, applicable to Insuring Agreement I(A)(1)) for ULTIMATE NET LOSS they shall become legally obligated to pay which would have been indemnified by the COMPANY and reimbursable by the INSURER under Insuring Agreement I(A)(2) but for such bankruptcy or insolvency; provided, however, that the INSURER shall be subrogated, to the extent of any payment, to the rights of the DIRECTORS and OFFICERS to receive indemnification from the COMPANY but only up to the amount of the UNDERLYING LIMITS applicable to Insuring Agreement I(A)(2) less the amount of the UNDERLYING LIMITS, if any, applicable to Insuring Agreement I(A)(1).

(H) *Uncollectibility of Underlying Insurance*

Notwithstanding any of the terms of this POLICY which might be construed otherwise, if this POLICY is written as excess over any Underlying Insurance, it shall drop down only in the event of reduction or exhaustion of any aggregate limits contained in such Underlying Insurance and shall not drop down for any other reason including, but not limited to, uncollectibility (in whole or in part) because of the financial impairment or insolvency of an underlying insurer. The risk of uncollectibility of such Underlying Insurance (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the DIRECTORS, OFFICERS and the COMPANY and is not in any way or under any circumstances insured or assumed by the INSURER.

(I) *Maintenance of UNDERLYING LIMITS*

If this POLICY is written as Excess Insurance, it is a condition of this POLICY that any UNDERLYING LIMITS stated in Item 6 of the Declarations shall be maintained in full force and effect, except for reduction or exhaustion of any underlying aggregate limits of liability, during the currency of this POLICY. Failure of the COMPANY to comply with the foregoing shall not invalidate this POLICY but in the event of such failure, without the agreement of the INSURER, the INSURER shall only be liable to the same extent as it would have been had the COMPANY complied with this Condition.

(J) *Changes and Assignment*

The terms of this POLICY shall not be waived or changed, nor shall an assignment of interest be binding, except by an endorsement to this POLICY issued by the INSURER.

(K) *Outside NOT-FOR-PROFIT ORGANIZATION*

If any DIRECTOR or OFFICER is serving or has served at the specific request of the COMPANY as a DIRECTOR or OFFICER of an outside NOT-FOR-PROFIT ORGANIZATION, the coverage afforded by this POLICY:

(1) shall be specifically excess of any other indemnity or insurance available to such DIRECTOR or OFFICER by reason of such service; and

(2) shall not be construed to extend to the outside NOT-FOR-PROFIT ORGANIZATION in which the DIRECTOR or OFFICER is serving or has served, nor to any other director, officer or employee of such outside NOT-FOR-PROFIT ORGANIZATION.

(L) *DISCOVERY PERIOD*

(1) in the event of cancellation or nonrenewal of this POLICY by the INSURER, the COMPANY shall have the right, upon execution of a warranty that all known CLAIMS and facts or circumstances likely to give rise to a CLAIM have been reported to the INSURER and payment of an additional premium to be determined by the INSURER which shall not exceed two hundred percent (200%) of the Rated Premium, to an extension of the coverage afforded by this POLICY with respect to any CLAIM first made against any INSURED during the period of twelve (12) months after the effective date of such cancellation or nonrenewal, but only with respect to any WRONGFUL ACT committed during the COVERAGE PERIOD. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of cancellation or nonrenewal.

The offer by the INSURER of renewal on terms, conditions or premiums different from those in effect during the POLICY PERIOD shall not constitute cancellation or refusal to renew this POLICY.

(2) In the event of cancellation or nonrenewal of this POLICY by the COMPANY, the COMPANY shall have the right upon payment of an additional premium, which shall not exceed one hundred percent (100%) of the Rated Premium, to an extension of coverage afforded by this POLICY with respect to any CLAIM first made against any INSURED during the period of twelve (12) months after the effective date of such cancellation or nonrenewal, but only with respect to any WRONGFUL ACT during the COVERAGE PERIOD. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of cancellation or nonrenewal.

(3) In the event of renewal terms and conditions different from those in effect during the POLICY PERIOD, the COMPANY shall have the right upon payment of an additional premium, to be determined by the INSURER but which shall not exceed one hundred percent (100%) of the Rated Premium, to an extension of the original terms and conditions of this POLICY with respect to any CLAIM first made against any DIRECTOR or OFFICER during the period twelve (12) months after the effective date of renewal, but only with respects to any WRONGFUL ACT committed during the COVERAGE PERIOD and not covered by the renewal terms and conditions. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of renewal.

(M) *Cancellation*

This POLICY may be cancelled:

(1) at any time by the COMPANY by mailing written notice to the INSURER stating when thereafter cancellation shall be effective; or

(2) at any time by the INSURER by mailing written notice to the COMPANY stating when, not less than ninety (90) days from the date such notice was mailed, cancellation shall be effective, except in the event of cancellation for nonpayment of premiums, such cancellation shall be effective ten (10) days after the date notice thereof is mailed.

Proof of mailing the notice to the address in Item 7 of the Declarations shall be sufficient proof of notice and the POLICY PERIOD shall end on the effective date and hour of cancellation stated in the notice. Delivery of such notice either by the NAMED INSURED or the COMPANY shall be equivalent to mailing.

In the event of cancellation by the INSURER, the premium retained by the INSURER shall be the pro-rata proportion of the Rated Premium and the unearned Continuity Credit. In the event of cancellation by the COMPANY the premium retained by the INSURER shall be the short rate proportion of the Rated Premium and the unearned Continuity Credit.

(N) *Currency*

All amounts stated herein are expressed in United States Dollars and all amounts payable hereunder are payable in United States Dollars.

(O) *Sole Agent*

The COMPANY first named in Item 1 of the Declarations shall be deemed the sole agent of each DIRECTOR and OFFICER for the purpose of requesting any endorsement to this POLICY, making premium payments and adjustments, receipting for payments of INDEMNITY and receiving notifications, including notice of cancellation from the INSURER.

(P) *Acts, Omissions or Warranties*

The acts, omissions or warranties of any DIRECTOR or OFFICER shall not be imputed to any other DIRECTOR or OFFICER with respect to the coverages applicable under this POLICY.

(Q) *Dispute Resolution and Service of Suit*

Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, shall be resolved in accordance with the procedures specified in this Section IV(Q), which shall be the sole and exclusive procedures for the resolution of any such controversy or dispute.

(1) Negotiation. The COMPANY and the INSURER shall attempt in good faith to resolve any controversy or dispute arising out of or relating to this POLICY promptly by negotiations between executives who have authority to settle the controversy. Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within fifteen (15) days the receiving party shall submit to the other a written response. The notice and the response shall include (a) a statement of each party's position and a summary of arguments supporting that position, and (b) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within thirty (30) days after delivery of the disputing party's notice, the executives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored. If the matter has not been resolved within sixty (60) days of the disputing party's notice, or if the parties fail to meet within thirty (30) days, either party may initiate mediation of the controversy or claim as provided hereinafter.

All negotiations pursuant to this clause will be kept confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

(2) Mediation. If the dispute has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation under the then current CPR Institute Model Procedure for Mediation of Business Disputes. The neutral third party will be selected from the CPR Institute Panels of Neutrals, with the assistance of the CPR Institute.

(3) Arbitration. Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, which has not been resolved by non-binding means as provided herein within ninety (90) days of the initiation of such procedure, shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes (the "CPR Rules") by three (3) independent and impartial arbitrators. The COMPANY and the INSURER each shall appoint one arbitrator; the third arbitrator, who shall serve as the chair of the arbitration panel, shall be appointed in accordance with the CPR Rules. If either the COMPANY or the INSURER has requested the other to participate in a non-binding procedure and the other has failed to participate, the requesting party may initiate arbitration before expiration of the above period. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1 et seg., and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof. The terms of this POLICY are to be construed in an evenhanded fashion as between the COMPANY and the INSURER in accordance with the laws of the jurisdiction in which the situation forming the basis for the controversy arose. Except for any CLAIM for coverage of punitive or exemplary damage shall be governed by the applicable law that most favors such coverage. Where the language of this POLICY is

AEGIS

deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of this POLICY without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the COMPANY or the INSURER. In reaching any decision the arbitrators shall give due consideration for the customs and usages of the insurance industry. The arbitrators are not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives any such damages.

In the event of a judgment being entered against the INSURER on an arbitration award, the INSURER at the request of the COMPANY, shall submit to the jurisdiction of any court of competent jurisdiction within the United States of America, and shall comply with all requirements necessary to give such court jurisdiction and all matters relating to such judgment and its enforcement shall be determined in accordance with the law and practice of such court.

(4) **Service of Suit.** Service of process in such suit or any other suit instituted against the INSURER under this POLICY may be made upon Messrs. LeBoeuf, Lamb, Greene & MacRae, L.L.P., 125 West 55th Street, New York, New York 10019. The INSURER will abide by the final decision of the court in such suit or of any appellate court in the event of any appeal. Messrs. LeBoeuf, Lamb, Greene & MacRae, L.L.P. are authorized and directed to accept service of process on behalf of the INSURER in any such suit and, upon the COMPANY'S request, to give a written undertaking to the COMPANY'S that they will enter a general appearance upon the INSURER'S behalf in the event such suit is instituted. Nothing in this clause constitutes or should be understood to constitute a waiver of the INSURER'S right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek to transfer a case to another court as permitted by the laws of the United States.or of any state in the United States.

(R) *Severability*

In the event that any provision of this POLICY shall be declared or deemed to be invalid or unenforceable under any applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining portion of this POLICY.

(S) *Non-assessability*

The COMPANY (and, accordingly, any DIRECTOR or OFFICER for whom the COMPANY acts as agent) shall only be liable under this POLICY for the premium stated in Item 4 of the Declarations. Neither the COMPANY nor any DIRECTOR or OFFICER for whom the COMPANY acts as agent shall be subject to any contingent liability or be required to pay any dues or assessments in addition to the premium described above.

(T) *Allocation*

If a CLAIM is made against both the DIRECTORS and OFFICERS and others, including the COMPANY, or if a CLAIM against the DIRECTORS and OFFICERS includes both covered and non-covered matters, the DIRECTORS and OFFICERS, the COMPANY and the INSURER shall allocate any defense costs, settlement, judgment or other loss on account of such CLAIM between covered ULTIMATE NET LOSS attributable to the CLAIM against the DIRECTORS and OFFICERS and non-covered loss. Such allocation shall be based upon the relative exposure of each party to such CLAIM for covered and non-covered matters and the relative benefit to each party from the defense or settlement of such CLAIM.

If the DIRECTORS and OFFICERS, COMPANY and the INSURER agree on an allocation of DEFENSE COSTS, the INSURER shall advance on a current basis DEFENSE COSTS allocated to the covered ULTIMATE NET LOSS. If the DIRECTORS and OFFICERS, COMPANY and the INSURER cannot agree on an allocation:

(1) no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(2) the INSURER shall advance on a current basis DEFENSE COSTS which the INSURER believes to be covered under this POLICY until a different allocation is negotiated, mediated or arbitrated; and

(3) any disagreement on the allocation of DEFENSE COSTS is to be settled in accordance with Condition (Q).

6100 (1/2000)                    [12 of 13]

Any negotiated, mediated or arbitrated allocation of DEFENSE COSTS on account of a CLAIM shall be applied retroactively to all DEFENSE COSTS on account of such CLAIM, notwithstanding any prior advancement to the contrary. Any allocation or advancement of DEFENSE COSTS on account of a CLAIM shall not apply to or create any presumption with respect to the allocation of INDEMNITY on account of such CLAIM.  Advancement by the INSURER of DEFENSE COSTS shall be conditioned upon the DIRECTORS, OFFICERS or COMPANY, as applicable, providing a satisfactory written undertaking to repay the INSURER any DEFENSE COSTS finally established not to be insured.

IN WITNESS WHEREOF, Associated Electric & Gas Insurance Services Limited has caused this POLICY to be signed by its Chairman at Hamilton, Bermuda. However, this POLICY shall not be binding upon the INSURER unless countersigned on the Declaration Page by a duly authorized representative of the INSURER.

Bernard J. Kennedy, Chairman

Alan J. Maguire, President
and Chief Executive Officer

# DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY.  PLEASE READ IT CAREFULLY.

*Words and phrases which appear in all capital letters have the special meanings set forth in Section II. Definitions*



**AEGIS**
Associated Electric
& Gas Insurance
Services Limited
Hamilton, Bermuda

# DECLARATIONS

**POLICY NO. D2306A1A01**

**DECLARATIONS NO. 1**

**Item 1:**   This POLICY provides indemnification with respect to the DIRECTORS and OFFICERS of:

WorldCom, Inc.
1133 19th Street
Washington, DC 20036

**Item 2:**   POLICY PERIOD: from the 31st day of December, 2001, to the 31st day of December, 2002 both days at 12:01 A.M. Standard Time at the address of the COMPANY.

**Item 3:**   RETROACTIVE DATE: the  1st day of January, 1983 at 12:01 A.M.  Standard Time  at the address of the COMPANY.

**Item 4:**   POLICY PREMIUM:        $550,000

**Item 5:**   Limits of Liability:
    **A.**  $10,000,000          Each WRONGFUL ACT
    **B.**  $10,000,000          Aggregate Limit of Liability for the POLICY PERIOD

**Item 6:**   UNDERLYING LIMITS:
    This POLICY is written as  EXCESS        Insurance

    **A.**  If this POLICY is written as Primary Insurance with respect to Insuring Agreement I(A)(2) only:
        (1) $---------          Each WRONGFUL ACT not arising from NUCLEAR OPERATIONS
        (2) $---------          Each WRONGFUL ACT arising from NUCLEAR OPERATIONS

© 2000 ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED
AEGIS AND THE AEGIS LOGO ARE SERVICE MARKS OF ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

⚛AEGIS

# DECLARATIONS
### continued

POLICY NO. D2306A1A01

DECLARATIONS NO. 1

B. If this POLICY is written as Excess Insurance:
  (1) (a) $70,000,000    Each WRONGFUL ACT
      (b) $70,000,000    In the Aggregate for all WRONGFUL ACTS
  (2)     $70,000,000    Each WRONGFUL ACT not covered under Underlying
                         Insurance

  (3) In the Event of Exhaustion of the UNDERLYING LIMIT stated in Item 6(B)(1)(b) above with
      respect to Insuring Agreement I(A)(2) only:
      (a) $5,000,000    Each WRONGFUL ACT not arising from NUCLEAR
                        OPERATIONS
      (b) $5,000,000    Each WRONGFUL ACT arising from NUCLEAR
                        OPERATIONS

Item 7:    Any notice to be provided or any payment to be made hereunder to the COMPANY
           shall be made to:

           NAME       Mr. Eric Hovanky
           TITLE      Director of Risk Management
           ENTITY     WorldCom, Inc.
           ADDRESS    500 Clinton Center Dr
                      Clinton, MS 39056-5630

Item 8:    Any notice to be provided or any payment to be made hereunder to the INSURER shall
           be made to:

           NAME       AEGIS Insurance Services, Inc.
           ADDRESS    10 Exchange Place
                      Jersey City, New Jersey  07302

## ENDORSEMENTS ATTACHED AT POLICY ISSUANCE: 1-3

Countersigned at    Jersey City, New Jersey

On  January 4, 2002

AEGIS Insurance Services, Inc.

By  _Sandra K. Johnson_
              Authorized Representative

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 1_____ Effective Date of Endorsement December 31, 2001_____

Attached to and forming part of POLICY No. D2306A1A01_____

COMPANY WorldCom, Inc._____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.


### FOLLOWING FORM ENDORSEMENT

I.   This POLICY will follow the terms and conditions of Policy No. 8749108

Issued by Natural Union Fire Insurance Company of Pittsburgh, PA

Dated:  December 31, 2001 except for the following which shall remain in effect.


1.    Items 1 through 8 of the Declarations of the Policy

2.    Conditions:

(C)    "Notice of Claim",

(L)    "Discovery Period" and

(M)    "Cancellation"

3.    Insuring Agreement (B) " Limits of Liability" Section (1)


_Sandra A. Johnson_
Signature of Authorized Representative


6251 (7/1999)

Page 1 of 1

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 2 _____ Effective Date of Endorsement  December 31, 2001 _____

Attached to and forming part of POLICY No.  D2306A1A01 _____

COMPANY   WorldCom, Inc. _____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

### PRIOR OR PENDING LITIGATION (BROAD FORM)

Section III, EXCLUSIONS, is amended by the addition of the following:

(L)   Arising from any prior or pending litigation as of December 31, 2001, as well as all future claims or litigation based upon the prior or pending litigation or derived from the same or essentially the same facts (actual or alleged) that gave rise to the prior or pending litigation.

_Sandra A. Johson_
Signature of Authorized Representative

6210  (1/2000)                                                                                     Page 1 of 1

▲AEGIS

# ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

Endorsement No. 3_____     Effective Date of Endorsement  December 31, 2001_____

Attached to and forming part of POLICY No. D2306A1A01_____

COMPANY WorldCom, Inc._____

It is understood and agreed that this POLICY is hereby amended as indicated. All other terms and conditions of this POLICY remain unchanged.

## NON-VOTING MEMBERS ENDORSEMENT

This POLICY provides only limited membership rights.  YOU will not be entitled to vote on any matter submitted to the members of the INSURER.

*Sandra A. Johnson*

Signature of Authorized Representative

6259 (10/2001)

Page 1 of 1

# POLICY OF DIRECTORS AND OFFICERS LIABILITY INSURANCE EFFECTED WITH ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED HAMILTON, BERMUDA

(hereinafter referred to as the "POLICY")

THIS IS A "CLAIMS-FIRST-MADE" INSURANCE POLICY. PLEASE READ IT CAREFULLY.

*Words and phrases which appear in all capital letters have the special meanings set forth in Section II. Definitions.*

**In consideration of** the payment of premium, and in reliance upon all statements made and information furnished to Associated Electric & Gas Insurance Services Limited (hereinafter referred to as the "INSURER") by the Application attached hereto which is hereby made a part hereof, and subject to all the terms hereinafter provided, the INSURER agrees as follows:

## I.   INSURING AGREEMENT

### (A) *Indemnity*

(1) The INSURER shall pay on behalf of the DIRECTORS and OFFICERS any and all sums which they shall become legally obligated to pay as ULTIMATE NET LOSS for which the COMPANY has not provided reimbursement, by reason of any WRONGFUL ACT which takes place during the COVERAGE PERIOD and is actually or allegedly caused, committed or attempted by the DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS, provided such ULTIMATE NET LOSS arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased.

(2) The INSURER shall pay on behalf of the COMPANY any and all sums it has incurred, as required or permitted by applicable common or statutory law or under provisions of the COMPANY'S Charter or Bylaws effected pursuant to such law, as ULTIMATE NET LOSS, to indemnify DIRECTORS or OFFICERS for ULTIMATE NET LOSS which they are legally obligated to pay by reason of any WRONGFUL ACT which takes place during the COVERAGE PERIOD and is actually or allegedly caused, committed or attempted by such DIRECTORS or OFFICERS while acting in their respective capacities as DIRECTORS or OFFICERS, provided the ULTIMATE NET LOSS arises from a CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased.

### (B) *Limits of Liability*

(1) The INSURER shall only be liable hereunder for the amount of ULTIMATE NET LOSS in excess of the UNDERLYING LIMITS as stated in Item 6 of the Declarations as a result of each WRONGFUL ACT covered under Insuring Agreement I(A)(l) or I(A)(2) or both, and then only up to the Limit of Liability stated in Item 5A of the Declarations and further subject to the aggregate Limit of Liability stated in Item 5B of the Declarations as the maximum amount payable hereunder in the aggregate for all CLAIMS first made against the DIRECTORS or OFFICERS during both:

(a) the POLICY PERIOD and

(b) the DISCOVERY PERIOD, if purchased.

Notwithstanding the foregoing, in the event that the INSURER cancels or refuses to renew this POLICY, and a DISCOVERY PERIOD extension is purchased by the COMPANY, then the aggregate Limit of Liability stated in Item 5B of the Declarations shall be reinstated but only with respect to CLAIMS first made against the DIRECTORS or OFFICERS during such DISCOVERY PERIOD.

(2) Multiple CLAIMS arising out of the same WRONGFUL ACT, even if made against different DIRECTORS or OFFICERS, shall be deemed to be a single CLAIM arising from a single WRONGFUL

ACT and to have been reported during the POLICY PERIOD or, ...purchased, during the DISCOVERY PERIOD in which the first of such multiple CLAIMS is made against any of the DIRECTORS or OFFICERS. The Limits of Liability and UNDERLYING LIMITS, stated In Items 5 and 6 of the Declarations respectively, shall apply only once regardless of the number of CLAIMS arising out of the same WRONGFUL ACT. All interrelated acts shall be deemed to be a single WRONGFUL ACT.

(3) The inclusion herein of more than one DIRECTOR or OFFICER, or the application of both Insuring Agreements I(A)(1) and I(A)(2), shall not operate to increase the INSURER'S Limits of Liability as stated In Item 5 of the Declarations.

(4) With respect to ULTIMATE NET LOSS arising out of any WRONGFUL ACT in connection with service for a NOT-FOR-PROFIT ORGANIZATION as provided in Section II(E)(2), if:

    (a) such WRONGFUL ACT results in liability being imposed upon one or more DIRECTORS and OFFICERS under this POLICY and also upon directors and officers and general partners under any other directors and officers or general partner liability insurance policies issued by the INSURER to any organization; and

    (b) the total of the ULTIMATE NET LOSS under this POLICY and the ultimate net loss under such other policies issued by the INSURER equals or exceeds $35,000,000;

the maximum amount payable by the INSURER under this POLICY in the aggregate for all ULTIMATE NET LOSS resulting from such WRONGFUL ACT shall be the lesser of the applicable Limit of Liability provided by this POLICY or the product of:

    (i) the applicable Limit of Liability provided by this POLICY divided by the total limits of liability per wrongful act applicable to such wrongful act under all policies issued by the INSURER; and

    (ii) $35,000,000.

If the amount paid under this POLICY with respect to such WRONGFUL ACT exceeds the COMPANY'S proportionate share of the $35,000,000 as determined above, the COMPANY shall refund such excess to the INSURER promptly.

(C) *UNDERLYING LIMITS*

    (1) If this POLICY is written as Primary Insurance with respect to Insuring Agreement I(A)(2), the UNDERLYING LIMIT for the COMPANY for each WRONGFUL ACT shall be as stated In Item 6A(1) of the Declarations, unless it is based upon, arises out of or is attributable to NUCLEAR OPERATIONS, in which event it shall be as stated In Item 6A(2) of the Declarations;

    (2) If this POLICY Is written as Excess Insurance:

        (a) with respect to Insuring Agreements I(A)(1) and I(A)(2), the UNDERLYING LIMIT for each WRONGFUL ACT shall be as stated In Item 6B(1)(a) of the Declarations and the maximum UNDERLYING LIMIT for all WRONGFUL ACTS shall be as stated in Item 6B(1)(b) of the Declarations;

        (b) with respect to ULTIMATE NET LOSS covered hereunder:

            (i) in the event of reduction of the underlying aggregate limit as stated in Item 6B(1)(b), the UNDERLYING LIMIT shall be such reduced underlying aggregate limit; or

            (ii) in the event of exhaustion of the underlying aggregate limit as stated in Item 6B(1)(b), the UNDERLYING LIMIT shall be as stated In Item 6B(3) of the Declarations;

        (c) with respect to any WRONGFUL ACT covered hereunder but not covered under such Underlying Insurance, the UNDERLYING LIMIT shall be as stated in Item 6B(2) of the Declarations; and

        (d) nothing herein shall make this POLICY subject to the terms and conditions of any Underlying Insurance.

≜AEGIS

(3) Only payment of indemnity or defense expenses which, except for the amount thereof, would have been indemnifiable under this POLICY, may reduce or exhaust an UNDERLYING LIMIT.

(4) In the event that both Insuring Agreement I(A)(1) and I(A)(2) are applicable to INDEMNITY and DEFENSE COST resulting from a WRONGFUL ACT then:

   (a) if this POLICY is written as Primary Insurance, the UNDERLYING LIMIT applicable to such WRONGFUL ACT shall be the UNDERLYING LIMIT stated in Item 6A of the Declarations; and

   (b) if this POLICY is written as Excess Insurance and the UNDERLYING LIMIT has been exhausted, the UNDERLYING LIMIT applicable to such WRONGFUL ACT shall be the UNDERLYING LIMIT stated in Item 6B(3);

   and there shall be no UNDERLYING LIMIT applicable with respect to coverage provided under Insuring Agreement I(A)(1).

(5) The UNDERLYING LIMITS stated in Item 6 of the Declarations applicable to Insuring Agreement I(A)(2) shall apply to all INDEMNITY and/or DEFENSE COST for which indemnification of the DIRECTORS and/or OFFICERS by the COMPANY is legally permissible, whether or not such indemnification is granted by the COMPANY.

## II. DEFINITIONS

(A) CLAIM: The term "CLAIM" shall mean:

   (1) any demand, suit or proceeding against any DIRECTORS and/or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, which seeks actual monetary damages or other relief and which may result in any DIRECTORS and/or OFFICERS becoming legally obligated to pay ULTIMATE NET LOSS by reason of any WRONGFUL ACT actually or allegedly caused, committed or attempted during the COVERAGE PERIOD by the DIRECTORS and/or OFFICERS while acting in their capacity as such; or

   (2) written notice to the INSURER during the POLICY PERIOD or during the DISCOVERY PERIOD, if purchased, by the DIRECTORS, OFFICERS and/or the COMPANY, describing with the specificity set forth in Condition (C) hereof, circumstances of which they are aware involving an identifiable WRONGFUL ACT actually or allegedly caused, committed or attempted during the COVERAGE PERIOD by the DIRECTORS and/or OFFICERS while acting in their capacity as such, which circumstances are likely to give rise to a demand, suit or proceeding being made against such DIRECTORS and/or OFFICERS.

   A CLAIM shall be deemed to be first made against a DIRECTOR or OFFICER at the earlier of the time at which a demand, suit or proceeding is first made against the DIRECTOR or OFFICER, as set forth in section (1) of this Definition or the time at which written notice is given to the INSURER, as set forth in section (2) of this Definition.

   Multiple demands or suits arising out of the same WRONGFUL ACT or interrelated acts shall be deemed to be a single "CLAIM".

(B) COMPANY: The term "COMPANY" shall mean, subject to Condition (A), hereof: (a) the organization(s) named in Item 1 of the Declarations and any subsidiaries of such organization(s), and (b) any debtor-in-possession in a bankruptcy proceeding in which the debtor is an organization named in Item 1 of the Declarations and any SUBSIDIARIES of such organization(s).

(C) COVERAGE PERIOD: The term "COVERAGE PERIOD" shall mean the period of time from the RETROACTIVE DATE to the termination of the POLICY PERIOD.

(D) DEFENSE COST: The term "DEFENSE COST" shall mean all expense incurred by or on behalf of the DIRECTORS, OFFICERS or, where reimbursable under Insuring Agreement I(A)(2), the COMPANY in the investigation, negotiation, settlement and defense of any CLAIM except all salaries, wages and benefit expenses of DIRECTORS, OFFICERS, or the COMPANY.

(E) DIRECTOR and OFFICER: The terms "DIRECTOR" and "OFFICER" as used herein, either in the singular or plural, shall mean:

(1) any person who was, is now, or shall be a director, officer or trustee of the COMPANY and any other employee of the COMPANY who may be acting in the capacity of a director, officer or trustee of the COMPANY with the express authorization of a director, officer or trustee of the COMPANY;

(2) any director, officer or trustee of the COMPANY who is serving or has served at the specific request of the COMPANY as a director, officer, trustee or in an equivalent executive position of any outside NOT-FOR-PROFIT ORGANIZATION.

(3) the estates, heirs, legal representatives or assigns of deceased persons who were directors, officers or trustees of the COMPANY at the time the WRONGFUL ACTS upon which such CLAIMS were based were committed, and the legal representatives or assigns of directors, officers or trustees of the COMPANY in the event of their incompetency, insolvency or bankruptcy;

provided, however, that the terms "DIRECTOR" and "OFFICER" shall not include a trustee appointed pursuant to Title 11, United States Code, or pursuant to the Securities Investor Protection Act, a receiver appointed for the benefit of creditors by Federal or State courts, an assignee for the benefit of creditors or similar fiduciary appointed under Federal or State laws for the protection of creditors or the relief of debtors.

In the event that a CLAIM which is within the coverage afforded under this POLICY is made against any DIRECTOR or OFFICER and such CLAIM includes a claim against the lawful spouse of such DIRECTOR or OFFICER solely by reason of (a) such spousal status or (b) such spouse's ownership interest in property or assets which are sought as recovery for WRONGFUL ACTS of a DIRECTOR or OFFICER, such spouse shall be deemed to be a DIRECTOR or OFFICER hereunder, but solely with respect to such claim. In no event, however, shall the lawful spouse of a DIRECTOR or OFFICER be deemed to be a DIRECTOR or OFFICER as regards any CLAIM in respect of which there is a breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by or claimed against such spouse, acting individually or in his or her capacity as the spouse of a DIRECTOR or OFFICER.

(F) DISCOVERY PERIOD: The term "DISCOVERY PERIOD" shall mean the period of time set forth in Condition (L).

(G) INDEMNITY: The term "INDEMNITY" shall mean all sums which the DIRECTORS, OFFICERS or, where reimbursable under Insuring Agreement 1 (A) (2), the COMPANY shall become legally obligated to pay as damages, whether by adjudication or compromise with the consent of the INSURER, after making proper deductions for UNDERLYING LIMITS and all recoveries, salvages and valid and collectible insurance. Where permitted by law, INDEMNITY shall include exemplary and punitive damages awarded against the DIRECTORS or OFFICERS where permitted by law. The enforceability of any claim for coverage hereunder of punitive or exemplary damages shall be governed by the applicable law which most favors such coverage.

(H) INSURER: The term "INSURER" shall mean Associated Electric & Gas Insurance Services Limited, Hamilton, Bermuda, a non-assessable mutual insurance company.

(I) NOT-FOR-PROFIT ORGANIZATION: The term "NOT-FOR-PROFIT ORGANIZATION" shall mean:

(1) an organization, no part of the income or assets of which is distributable to its owners, stockholders or members and which is formed and operated for a purpose other than pecuniary profit or financial gain of its owners, stockholders or members, including but not limited to any organization exempt from taxation pursuant of Section 501 of the Internal Revenue Code of 1986 (as amended) ; or

(2) a political action committee which is defined for these purposes as a separate segregated fund to be utilized for political purposes as described in the United States Federal Election Campaign Act (2 U.S.C. 441b(2)(C)).

(J) NUCLEAR OPERATIONS: The term "NUCLEAR OPERATIONS" shall mean the design, engineering, financing, construction, operation, maintenance, use, ownership, conversion or decommissioning of any nuclear facility.

(K) POLICY: The term "POLICY" shall mean this insurance policy, including the Application, the Declarations and any endorsements issued by the INSURER to the organization first named in Item 1 of the Declarations for the POLICY PERIOD listed In Item 2 of the Declarations.

(L) POLICY PERIOD: The term "POLICY PERIOD" shall mean the period of time stated in Item 2 of the Declarations.

(M) RETROACTIVE DATE: The term "RETROACTIVE DATE" shall mean the date stated in Item 3 of the Declarations; provided, however, with respect to any WRONGFUL ACT actually or allegedly caused, committed or attempted by the DIRECTORS or OFFICERS of any SUBSIDIARY formed or acquired by the COMPANY or any of its SUBSIDIARIES after inception of the POLICY PERIOD of this POLICY, or after inception of any other policy issued by the INSURER to the COMPANY for a prior policy period, the term "RETROACTIVE DATE" shall mean the date of such formation or acquisition.

(N) SUBSIDIARIES: The term "SUBSIDIARY" shall mean any entity more than fifty percent (50%) of whose outstanding securities or financial interest representing the present right to vote for the election of directors (or the appointment of a general partner in respect of a limited partnership or manager in respect of a limited liability company) are owned by the COMPANY and/or one or more of its "SUBSIDIARIES".

(O) ULTIMATE NET LOSS: The term "ULTIMATE NET LOSS" shall mean the total INDEMNITY and DEFENSE COST with respect to each WRONGFUL ACT to which this POLICY applies, provided that ULTIMATE NET LOSS does not include any amount allocated, pursuant to Condition (T), to CLAIMS against persons or entities other than DIRECTORS and OFFICERS or to non-covered matters.

(P) UNDERLYING LIMITS: The term "UNDERLYING LIMITS" shall mean the amounts stated in Item 6 of the Declarations.

(Q) WRONGFUL ACT: The term "WRONGFUL ACT" shall mean any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by any DIRECTOR or OFFICER while acting individually or collectively in their capacity as such, or claimed against them solely by reason of their being DIRECTORS or OFFICERS.

All such interrelated breaches of duty, neglects, errors, misstatements, misleading statements or omissions actually or allegedly caused, committed or attempted by or claimed against one or more of the DIRECTORS or OFFICERS shall be deemed to be a single "WRONGFUL ACT".

## III.  EXCLUSIONS

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS arising from any CLAIM(S) made against any DIRECTOR or OFFICER:

(A) (1) for any fines or penalties imposed in a criminal suit, action or proceeding;

(2) for any fines or penalties imposed in conjunction with political contributions, payments, commissions or gratuities; or

(3) for any other fines or penalties imposed by final adjudication of a court of competent jurisdiction or any agency or commission possessing quasi-judicial authority; or

(4) where, at inception of the POLICY PERIOD, such DIRECTOR or OFFICER had knowledge of a fact or circumstance which was likely to give rise to such CLAIM(S) and which such DIRECTOR or OFFICER failed to disclose or misrepresented in the Application or in the process of preparation of the Application, other than in a Renewal Application; provided, however, that this exclusion shall not apply to such CLAIM(S) made against any DIRECTOR or OFFICER other than such DIRECTOR or OFFICER who failed to disclose or misrepresented such fact or circumstance; provided further that this exclusion shall not limit the INSURER'S right to exercise any remedy available to it with respect to such failure to disclose or misrepresentation other than the remedy provided for in this Exclusion.

(B) with respect to Insuring Agreement I(A)(1) only:

(1) based upon, arising out of or attributable to such DIRECTOR or OFFICER having gained any personal profit, advantage or remuneration to which such DIRECTOR or OFFICER was not legally entitled if:

(a) a judgment or other final adjudication adverse to such DIRECTOR or OFFICER establishes that he in fact gained such personal profit, advantage or remuneration; or

(b) such DIRECTOR or OFFICER has entered into a settlement agreement to repay such personal profit, advantage or remuneration to the COMPANY;

(2) for an accounting of profits made from the purchase or sale by such DIRECTOR or OFFICER of securities of the COMPANY within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any other federal or state statutory or common law;

(3) brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of such DIRECTOR or OFFICER if a final adjudication establishes that acts of active and deliberate dishonesty were committed or attempted with actual dishonest purpose and intent and were material to the cause of action so adjudicated; or

(4) where such payment would be contrary to applicable law.

(C) for bodily injury, mental anguish, mental illness, emotional upset, sickness or disease sustained by any person, death of any person or for physical injury to or destruction of tangible property or the loss of use thereof.

(D) for injury based upon, arising out of or attributable to:

(1) false arrest, wrongful detention or wrongful imprisonment or malicious prosecution;

(2) wrongful entry, wrongful eviction or other invasion of the right of private occupancy;

(3) discrimination or sexual harassment;

(4) publication or utterance:

(a) of a libel or slander or other defamatory or disparaging material; or

(b) in violation of an individual's right of privacy; or

(5) with respect to the COMPANY'S advertising activities: piracy, plagiarism, unfair competition, idea misappropriation under implied contract, or infringement of copyright, title, slogan, registered trademark, service mark, or trade name.

(E) for violation(s) of any responsibility, obligation or duty imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto or by similar common or statutory law of the United States of America or any state or other jurisdiction therein.

(F) based upon, arising out of or attributable to:

(1) the rendering of advice with respect to;

(2) the interpreting of; or

(3) the handling of records in connection with the enrollment, termination or cancellation of employees under the COMPANY'S group life insurance, group accident or health insurance, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social security, disability benefits and any other employee benefit programs.

(G) (1) arising from any circumstances, written notice of which has been given under "any policy" or any discovery period thereof, which policy expired prior to or upon the inception of this POLICY; or

(2) which is one of a number of CLAIMS arising out of the same WRONGFUL ACT, if any CLAIM of such multiple CLAIMS was made against the DIRECTORS or OFFICERS during "any policy" or any discovery period thereof, which policy expired prior to or upon the inception of this POLICY.

The term "any policy" refers to any Directors and Officers Liability Insurance Policy, any General Partners Liability Insurance Policy or any other policy affording substantially similar coverage (whether issued by the INSURER or any other carrier).

(H) if any other policy or policies also afford(s) coverage in whole or in part for such CLAIM(S); except, this exclusion shall not apply:

(1) to the amount of ULTIMATE NET LOSS with respect to such CLAIM(S) which is in excess of the limit of liability of such other policy or policies and any applicable deductible or retention thereunder; or

(2) with respect to coverage afforded such CLAIM(S) by any other policy or policies purchased or issued specifically as insurance underlying or in excess of the coverage afforded under this POLICY;

provided always that nothing herein shall be construed to cause this POLICY to contribute with any other policy or policies or to make this POLICY subject to any of the terms of any other policy or policies.

(I) for any WRONGFUL ACT which took place in whole or in part prior to the RETROACTIVE DATE.

(J) by, on behalf of, in the right of, at the request of, or for the benefit of, any security holder of the COMPANY, any DIRECTOR or OFFICER, or the COMPANY, unless such CLAIM is:

(1) made derivatively by an security holder of the COMPANY for the benefit of the COMPANY and such security holder is:

(a) acting totally independent of, and totally without the suggestion, solicitation, direction, assistance, participation or intervention of any DIRECTOR or OFFICER, or the COMPANY; and

(b) not any entity within the definition of the term "COMPANY"; or

(2) made non-derivatively by a security holder who is not:

(a) a DIRECTOR or OFFICER; or

(b) any entity with the definition of the term "COMPANY"; or

(3) made non-derivatively by an OFFICER acting totally independent of, and totally without the suggestion, solicitation, direction, assistance, participation or intervention of any other DIRECTOR or OFFICER, or the COMPANY and arising from the wrongful termination of that OFFICER; or

(4) made by a DIRECTOR or OFFICER in the form of a cross-claim or third party claim for contribution or indemnity, which is part of and results directly from a CLAIM which is not otherwise excluded by the POLICY; or

(5) made solely and entirely in a jurisdiction other than the United States of America, its territories and possessions and is subject to the substantive and procedural laws of such foreign jurisdiction.

(K) where such CLAIM(S) arise out of such DIRECTOR'S or OFFICER'S activities as a director, officer or trustee of any entity other than:

(1) the COMPANY; or

(2) any outside NOT-FOR-PROFIT ORGANIZATION as provided in Section II(E)(2).


## IV. CONDITIONS

(A) *Acquisition, Merger and Dissolution*

(1) (a)   If, after the inception of the POLICY PERIOD,

(i) the COMPANY or any of its SUBSIDIARIES forms or acquires any SUBSIDIARY or acquires any entity by merger into or consolidation with the COMPANY or any SUBSIDIARY, and

(ii) the total assets of such formed or acquired entity are not greater than fifteen percent (15%) of the COMPANY'S total assets,

coverage shall be provided for the DIRECTORS and OFFICERS of such entity from the date of formation, acquisition, merger or consolidation, respectively, but only with respect to WRONGFUL ACTS actually or allegedly caused, committed or attempted during that part of the POLICY PERIOD which is subsequent to the formation, acquisition, merger or consolidation.

(b) In respect of any SUBSIDIARY formed or acquired after the inception of the POLICY PERIOD and not subject to paragraph (a) above, or of any entity acquired by merger into or consolidation with

the COMPANY or any SUBSIDIARY after the inception of the POLICY PERIOD and not subject to paragraph (a) above, the COMPANY shall report such formation or acquisition within ninety (90) days thereafter and, if so reported, upon payment of an additional premium and upon terms as may be required by the INSURER, such coverage shall be provided for the DIRECTORS and OFFICERS of such newly formed or acquired SUBSIDIARY or merged or consolidated entity, but only with respect to WRONGFUL ACTS actually or allegedly caused, committed, or attempted during that part of the COVERAGE PERIOD which is subsequent to such acquisition, merger or consolidation.

(2) If, prior to or after inception of the POLICY PERIOD, the COMPANY or any of its SUBSIDIARIES is or has been acquired by or merged into any other entity, or is or has been dissolved, coverage under this POLICY shall continue for the POLICY PERIOD but only for DIRECTORS and OFFICERS of the COMPANY or its SUBSIDIARIES who were serving as such prior to such acquisition, merger or dissolution and only with respect to WRONGFUL ACTS actually or allegedly caused, committed or attempted during that part of the COVERAGE PERIOD which is prior to such acquisition, merger or dissolution.

(B) *Non-Duplication of Limits*

To avoid the duplication of the INSURER'S Limits of Liability stated in Item 5 of the Declarations, the DIRECTORS, OFFICERS and COMPANY agree that:

(1) in the event the INSURER provides INDEMNITY or DEFENSE COSTS for any WRONGFUL ACT under this POLICY, neither the DIRECTORS, OFFICERS nor the COMPANY shall have any right to additional INDEMNITY or DEFENSE COSTS for such WRONGFUL ACT under any other policy issued by the INSURER to the DIRECTORS, OFFICERS or COMPANY that otherwise would apply to such WRONGFUL ACT; and

(2) in the event the INSURER provides INDEMNITY or DEFENSE COSTS for any WRONGFUL ACT under any other policy issued by the INSURER to the DIRECTORS, OFFICERS, or COMPANY, neither the DIRECTORS, OFFICERS nor the COMPANY shall have any right to additional INDEMNITY or DEFENSE COSTS for such WRONGFUL ACT under this POLICY.

(C) *Notice of Claim*

As a condition precedent to any rights under this POLICY, the DIRECTOR, OFFICER, COMPANY, or the COMPANY'S authorized representative shall give written notice to the INSURER as soon as practicable after the COMPANY'S risk manager or general counsel first become aware of any CLAIM, which notice shall include the nature of the WRONGFUL ACT, the alleged injury, the names of the claimants, and the manner in which the DIRECTOR, OFFICER or COMPANY first become aware of the CLAIM, and shall cooperate with the INSURER and give such additional information as the INSURER may reasonably require.

The Application for this POLICY and any information contained therein shall not constitute a notice of CLAIM.

(D) *Cooperation and Settlements*

In the event of any WRONGFUL ACT which may involve this POLICY, the DIRECTORS, OFFICERS or COMPANY without prejudice as to liability, may proceed immediately with settlements which in their aggregate do not exceed the UNDERLYING LIMITS. The COMPANY shall notify the INSURER of any such settlements made.

The INSURER shall not be called upon to assume charge of the investigation, settlement or defense of any demand, suit or proceeding, but the INSURER shall have the right and shall be given the opportunity to associate with the DIRECTORS, OFFICERS and COMPANY or any underlying insurer, or both, in the investigation, settlement, defense and control of any demand, suit or proceeding relative to any WRONGFUL ACT where the demand, suit or proceeding involves or may involve the INSURER. At all times, the DIRECTORS, OFFICERS and COMPANY and the INSURER shall cooperate in the investigation, settlement and defense of such demand, suit or proceeding.

The DIRECTORS, OFFICERS and COMPANY and their underlying insurer(s) shall, at all times, use diligence and prudence in the investigation, settlement and defense of demands, suits or other proceedings.

### (E) *Appeals*

In the event that the DIRECTORS, OFFICERS, COMPANY or any underlying insurer elects not to appeal a judgment in excess of the UNDERLYING LIMITS, the INSURER may elect to conduct such appeal at its own cost and expense and shall be liable for any taxable court costs and interest incidental thereto, but in no event shall the total liability of the INSURER, exclusive of the cost and expense of appeal, exceed its Limits of Liability stated in Item 5 of the Declarations.

### (F) *Subrogation*

In the event of any payment under this POLICY, the INSURER shall be subrogated to the extent of such payment to all rights of recovery thereof, and the DIRECTORS, OFFICERS and COMPANY shall execute all papers required and shall do everything that may be necessary to enable the INSURER to bring suit in the name of the DIRECTORS, OFFICERS or COMPANY.

### (G) *Bankruptcy or Insolvency*

Bankruptcy or insolvency of the COMPANY shall not relieve the INSURER of any of its obligations hereunder.

In the event of bankruptcy or insolvency of the COMPANY, subject to all the terms of this POLICY, the INSURER shall pay on behalf of the DIRECTORS and OFFICERS under Insuring Agreement I(A)(1) (in excess of the UNDERLYING LIMITS, if any, applicable to Insuring Agreement I(A)(1)) for ULTIMATE NET LOSS they shall become legally obligated to pay which would have been indemnified by the COMPANY and reimbursable by the INSURER under Insuring Agreement I(A)(2) but for such bankruptcy or insolvency; provided, however, that the INSURER shall be subrogated, to the extent of any payment, to the rights of the DIRECTORS and OFFICERS to receive indemnification from the COMPANY but only up to the amount of the UNDERLYING LIMITS applicable to Insuring Agreement I(A)(2) less the amount of the UNDERLYING LIMITS, if any, applicable to Insuring Agreement I(A)(1).

### (H) *Uncollectibility of Underlying Insurance*

Notwithstanding any of the terms of this POLICY which might be construed otherwise, if this POLICY is written as excess over any Underlying Insurance, it shall drop down only in the event of reduction or exhaustion of any aggregate limits contained in such Underlying Insurance and shall not drop down for any other reason including, but not limited to, uncollectibility (in whole or in part) because of the financial impairment or insolvency of an underlying insurer. The risk of uncollectibility of such Underlying Insurance (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the DIRECTORS, OFFICERS and the COMPANY and is not in any way or under any circumstances insured or assumed by the INSURER.

### (I) *Maintenance of UNDERLYING LIMITS*

If this POLICY is written as Excess Insurance, it is a condition of this POLICY that any UNDERLYING LIMITS stated in Item 6 of the Declarations shall be maintained in full force and effect, except for reduction or exhaustion of any underlying aggregate limits of liability, during the currency of this POLICY. Failure of the COMPANY to comply with the foregoing shall not invalidate this POLICY but in the event of such failure, without the agreement of the INSURER, the INSURER shall only be liable to the same extent as it would have been had the COMPANY complied with this Condition.

### (J) *Changes and Assignment*

The terms of this POLICY shall not be waived or changed, nor shall an assignment of interest be binding, except by an endorsement to this POLICY issued by the INSURER.

### (K) *Outside NOT-FOR-PROFIT ORGANIZATION*

If any DIRECTOR or OFFICER is serving or has served at the specific request of the COMPANY as a DIRECTOR or OFFICER of an outside NOT-FOR-PROFIT ORGANIZATION, the coverage afforded by this POLICY:

(1) shall be specifically excess of any other indemnity or insurance available to such DIRECTOR or OFFICER by reason of such service; and

(2) shall not be construed to extend to the outside NOT-FOR-PROFIT ORGANIZATION in which the DIRECTOR or OFFICER is serving or has served, nor to any other director, officer or employee of such outside NOT-FOR-PROFIT ORGANIZATION.

(L) *DISCOVERY PERIOD*

(1) In the event of cancellation or nonrenewal of this POLICY by the INSURER, the COMPANY shall have the right, upon execution of a warranty that all known CLAIMS and facts or circumstances likely to give rise to a CLAIM have been reported to the INSURER and payment of an additional premium to be determined by the INSURER which shall not exceed two hundred percent (200%) of the Rated Premium, to an extension of the coverage afforded by this POLICY with respect to any CLAIM first made against any INSURED during the period of twelve (12) months after the effective date of such cancellation or nonrenewal, but only with respect to any WRONGFUL ACT committed during the COVERAGE PERIOD. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of cancellation or nonrenewal.

The offer by the INSURER of renewal on terms, conditions or premiums different from those in effect during the POLICY PERIOD shall not constitute cancellation or refusal to renew this POLICY.

(2) In the event of cancellation or nonrenewal of this POLICY by the COMPANY, the COMPANY shall have the right upon payment of an additional premium, which shall not exceed one hundred percent (100%) of the Rated Premium, to an extension of coverage afforded by this POLICY with respect to any CLAIM first made against any INSURED during the period of twelve (12) months after the effective date of such cancellation or nonrenewal, but only with respect to any WRONGFUL ACT during the COVERAGE PERIOD. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of cancellation or nonrenewal.

(3) In the event of renewal terms and conditions different from those in effect during the POLICY PERIOD, the COMPANY shall have the right upon payment of an additional premium, to be determined by the INSURER but which shall not exceed one hundred percent (100%) of the Rated Premium, to an extension of the original terms and conditions of this POLICY with respect to any CLAIM first made against any DIRECTOR or OFFICER during the period twelve (12) months after the effective date of renewal, but only with respects to any WRONGFUL ACT committed during the COVERAGE PERIOD and not covered by the renewal terms and conditions. This right of extension shall terminate unless written notice of such election is received by the INSURER within thirty (30) days after the effective date of renewal.

(M) *Cancellation*

This POLICY may be cancelled:

(1) at any time by the COMPANY by mailing written notice to the INSURER stating when thereafter cancellation shall be effective; or

(2) at any time by the INSURER by mailing written notice to the COMPANY stating when, not less than ninety (90) days from the date such notice was mailed, cancellation shall be effective, except in the event of cancellation for nonpayment of premiums, such cancellation shall be effective ten (10) days after the date notice thereof is mailed.

Proof of mailing the notice to the address in Item 7 of the Declarations shall be sufficient proof of notice and the POLICY PERIOD shall end on the effective date and hour of cancellation stated in the notice. Delivery of such notice either by the NAMED INSURED or the COMPANY shall be equivalent to mailing.

In the event of cancellation by the INSURER, the premium retained by the INSURER shall be the pro-rata proportion of the Rated Premium and the unearned Continuity Credit. In the event of cancellation by the COMPANY the premium retained by the INSURER shall be the short rate proportion of the Rated Premium and the unearned Continuity Credit.

(N) *Currency* —

All amounts stated herein are expressed in United States Dollars and all amounts payable hereunder are payable in United States Dollars.

(O) *Sole Agent*

The COMPANY first named in Item 1 of the Declarations shall be deemed the sole agent of each DIRECTOR and OFFICER for the purpose of requesting any endorsement to this POLICY, making premium payments and adjustments, receipting for payments of INDEMNITY and receiving notifications, including notice of cancellation from the INSURER.

(P) *Acts, Omissions or Warranties*

The acts, omissions or warranties of any DIRECTOR or OFFICER shall not be imputed to any other DIRECTOR or OFFICER with respect to the coverages applicable under this POLICY.

(Q) *Dispute Resolution and Service of Suit*

Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, shall be resolved in accordance with the procedures specified in this Section IV(Q), which shall be the sole and exclusive procedures for the resolution of any such controversy or dispute.

(1) Negotiation.  The COMPANY and the INSURER shall attempt in good faith to resolve any controversy or dispute arising out of or relating to this POLICY promptly by negotiations between executives who have authority to settle the controversy.  Any party may give the other party written notice of any dispute not resolved in the normal course of business.  Within fifteen (15) days the receiving party shall submit to the other a written response.  The notice and the response shall include (a) a statement of each party's position and a summary of arguments supporting that position, and (b) the name and title of the executive who will represent that party and of any other person who will accompany the executive.  Within thirty (30) days after delivery of the disputing party's notice, the executives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored.  If the matter has not been resolved within sixty (60) days of the disputing party's notice, or if the parties fail to meet within thirty (30) days, either party may initiate mediation of the controversy or claim as provided hereinafter.

All negotiations pursuant to this clause will be kept confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

(2) Mediation.  If the dispute has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation under the then current CPR Institute Model Procedure for Mediation of Business Disputes.  The neutral third party will be selected from the CPR Institute Panels of Neutrals, with the assistance of the CPR Institute.

(3) Arbitration.  Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, which has not been resolved by non-binding means as provided herein within ninety (90) days of the initiation of such procedure, shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes (the "CPR Rules") by three (3) independent and impartial arbitrators.  The COMPANY and the INSURER each shall appoint one arbitrator; the third arbitrator, who shall serve as the chair of the arbitration panel, shall be appointed in accordance with the CPR Rules.  If either the COMPANY or the INSURER has requested the other to participate in a non-binding procedure and the other has failed to participate, the requesting party may initiate arbitration before expiration of the above period.  The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.  The terms of this POLICY are to be construed in an evenhanded fashion as between the COMPANY and the INSURER in accordance with the laws of the jurisdiction in which the situation forming the basis for the controversy arose.  Except for any CLAIM for coverage of punitive or exemplary damage shall be governed by the applicable law that most favors such coverage.  Where the language of this POLICY is

deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of this POLICY without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the COMPANY or the INSURER. In reaching any decision the arbitrators shall give due consideration for the customs and usages of the insurance industry. The arbitrators are not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives any such damages.

In the event of a judgment being entered against the INSURER on an arbitration award, the INSURER at the request of the COMPANY, shall submit to the jurisdiction of any court of competent jurisdiction within the United States of America, and shall comply with all requirements necessary to give such court jurisdiction and all matters relating to such judgment and its enforcement shall be determined in accordance with the law and practice of such court.

(4) Service of Suit. Service of process in such suit or any other suit instituted against the INSURER under this POLICY may be made upon Messrs. LeBoeuf, Lamb, Greene & MacRae, L.L.P., 125 West 55th Street, New York, New York 10019. The INSURER will abide by the final decision of the court in such suit or of any appellate court in the event of any appeal. Messrs. LeBoeuf, Lamb, Greene & MacRae, L.L.P. are authorized and directed to accept service of process on behalf of the INSURER in any such suit and, upon the COMPANY'S request, to give a written undertaking to the COMPANY'S that they will enter a general appearance upon the INSURER'S behalf in the event such suit is instituted. Nothing in this clause constitutes or should be understood to constitute a waiver of the INSURER'S right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek to transfer a case to another court as permitted by the laws of the United States or of any state in the United States.

(R) *Severability*

In the event that any provision of this POLICY shall be declared or deemed to be invalid or unenforceable under any applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining portion of this POLICY.

(S) *Non-assessability*

The COMPANY (and, accordingly, any DIRECTOR or OFFICER for whom the COMPANY acts as agent) shall only be liable under this POLICY for the premium stated in Item 4 of the Declarations. Neither the COMPANY nor any DIRECTOR or OFFICER for whom the COMPANY acts as agent shall be subject to any contingent liability or be required to pay any dues or assessments in addition to the premium described above.

(T) *Allocation*

If a CLAIM is made against both the DIRECTORS and OFFICERS and others, including the COMPANY, or if a CLAIM against the DIRECTORS and OFFICERS includes both covered and non-covered matters, the DIRECTORS and OFFICERS, the COMPANY and the INSURER shall allocate any defense costs, settlement, judgment or other loss on account of such CLAIM between covered ULTIMATE NET LOSS attributable to the CLAIM against the DIRECTORS and OFFICERS and non-covered loss. Such allocation shall be based upon the relative exposure of each party to such CLAIM for covered and non-covered matters and the relative benefit to each party from the defense or settlement of such CLAIM.

If the DIRECTORS and OFFICERS, COMPANY and the INSURER agree on an allocation of DEFENSE COSTS, the INSURER shall advance on a current basis DEFENSE COSTS allocated to the covered ULTIMATE NET LOSS. If the DIRECTORS and OFFICERS, COMPANY and the INSURER cannot agree on an allocation:

(1) no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(2) the INSURER shall advance on a current basis DEFENSE COSTS which the INSURER believes to be covered under this POLICY until a different allocation is negotiated, mediated or arbitrated; and

(3) any disagreement on the allocation of DEFENSE COSTS is to be settled in accordance with Condition (Q).

Any negotiated, mediated or arbitrated allocation of DEFENSE COSTS on account of a CLAIM shall be applied retroactively to all DEFENSE COSTS on account of such CLAIM, notwithstanding any prior advancement to the contrary. Any allocation or advancement of DEFENSE COSTS on account of a CLAIM shall not apply to or create any presumption with respect to the allocation of INDEMNITY on account of such CLAIM. Advancement by the INSURER of DEFENSE COSTS shall be conditioned upon the DIRECTORS, OFFICERS or COMPANY, as applicable, providing a satisfactory written undertaking to repay the INSURER any DEFENSE COSTS finally established not to be insured.

IN WITNESS WHEREOF, Associated Electric & Gas Insurance Services Limited has caused this POLICY to be signed by its Chairman at Hamilton, Bermuda. However, this POLICY shall not be binding upon the INSURER unless countersigned on the Declaration Page by a duly authorized representative of the INSURER.

Bernard J. Kennedy, Chairman

Alan J. Maguire, President
and Chief Executive Officer



American International Companies®

Name of Insurance Company to which Application is made
(the "Insurer")

### EXECUTIVE AND ORGANIZATION LIABILITY INSURANCE POLICY
### INSURANCE APPLICATION

**NOTICE:** THE POLICY PROVIDES THAT THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

IF A POLICY IS ISSUED, IT WILL BE ON A CLAIMS-MADE BASIS.

---

## I. APPLICANT'S ORGANIZATIONAL INFORMATION

1. **Applicant's:**
   - (a) Name: **WorldCom and its subsidiaries**     (the "**Applicant**")
   - (b) Address: ~~2 International Drive, Rye Brook, NY 10573~~ 1133 19th Street, NW Washington, DC 20036

   - (c) State and date of incorporation: **Georgia**     Date **1983**
   - (d) Nature of business: **Telecommunications**

   - (e) Primary SIC code(s): **4800**
   - (f) **Applicant** has continually been operating since: **1983**
   - (g) Total number of locations: Please refer to company web site (www.worldcom.com)
   - (h) Does the **Applicant** operate any retail outlets or branches? [ X ] Yes  [  ] No. (If "Yes", total number of retail outlets or branches: _____.)
     **Please refer to company web site (www.worldcom.com)**

## II. INSURANCE INFORMATION

2. (a) Limit of Liability requested:          $ 100M

   (b) Amount of self-insured retention requested (each loss):
   | | |
   |---|---|
   | Securities Claims[1]: | $1M |
   | Employment Practices Claims: | $1M |
   | All Other Claims: | $1M |

---

[1] All terms which appear in **Bold** type are used in this application with the same respective meanings as they have in the **D&O 2/2000** policy.

1

III.  STOCK OWNERSHIP

(a)  Are any securities of the Applicant or of any Subsidiary thereof publicly traded or the subject of a shelf registration?  [ X ] Yes  [  ] No.

(b)  If "Yes" to question 3(a), please attach the following information for each entity

(i)  The name of the entity and the type of securities which are publicly traded or the subject of a shelf registration.

<u>ENTITY</u>                                                            <u>SECURITIES</u>

- WorldCom, Inc.                              [  ] equity  [  ] debt  [ X ] mixed
  – Includes WorldCom Group common stock, MCI Group common stock, Series B, D, E, and F preferred stock, QUIPs securities, WorldCom redeemable preferred stock and various tranches of public debt.
  – NASDAQ Tickers: WCOM, MCIT and MCICP. All other public securities are traded in the public markets but do not have ticker symbols.

- Digex, Inc.                                       [ X ] equity  [  ] debt  [  ] mixed
  – NASDAQ Ticker:  DIGX

- Intermedia Communications Inc.        [  ] equity  [  ] debt  [ X ] mixed
  – Series B preferred stock and various tranches of public debt.

- Embratel Participacoes               [ X ] equity  [  ] debt  [  ] mixed
  – Brazilian exchange tickers: EBTP3 and EBTP4.
  – American Depositary Receipts NYSE ticker: EMT

(ii) Total number of voting shares outstanding.
Approximately 65,000; DIGX approximately 16,300; Intermedia  approximately 300 holders of Series B preferred stock.  Please see most recent WCOM, Intermedia & DIGX 10Q for more information.

(iii) Total number of voting shares owned by members of its Board of Directors (or equivalent governing body) (direct and beneficial).
Please see latest 10K for WCOM,  DIGX and Embratel.

(iv) Total number of voting shares owned by its Executives (direct and beneficial) who are not members of its Board of Directors (or equivalent governing body)
Please see latest 10K for WCOM, DIGX and Embratel.

(vi) Does any shareholder own five percent (5%) or more of the voting shares directly or beneficially?
[  ] Yes  [ X ] No. If "Yes," designate name and percentage of holdings.
Exception being that WorldCom, Inc. owns more than 5 percent Digex and Embratel respectively.

(vii) Are there any other securities convertible to voting stock?  [ X ] Yes  [  ] No.  If "Yes" describe fully.
Series B, D, E and F preferred stock is convertible into WorldCom group stock and MCI group common stock. Currently, the series B preferred at WorldCom is generally entitled to one vote per share on matters and Series D, E, and F are generally entitled to one tenth of a vote per share.

5012(2/00)                                                    2

(c) For those entities proposed for insurance whose securities are not publicly traded or subject of a shelf registration please attach the following information for each entity:
   Not applicable.

   (i)  Total number of voting shares outstanding _____
   (ii) Total number of voting shareholders _____.
   (iii) Total number of voting shares owned by members of its Board of Directors (or equivalent governing body) (direct and beneficial): _____.
   (iv) Total number of voting shares owned by its **Executives** (direct and beneficial) who are not members of its Board of Directors (or equivalent governing body): _____.
   (iv) Does any shareholder own five percent (5%) or more of the voting shares of such entity directly or beneficially?  [  ] Yes  [  ] No. If "Yes," designate name and percentage of holdings.

## IV.  GENERAL ORGANIZATIONAL INFORMATION

4.   (a) Please provide a complete list of all **Executives** who are members of the Board of Directors (or equivalent governing body) of the **Applicant** and of its **Subsidiaries** by name and affiliation with other organizations.

   (If included as an attachment herein, check here [ **X** ].)

   **Please see attachment A.**

   (b) Please provide a complete list of all **Executives** of the **Applicant** and of its **Subsidiaries** who are not described in 4(a) above, by name and affiliation with other organizations.

   (If included as an attachment herein check here [ **X** ].)

   **Please see attachment A.**

5.   Please list all directly and indirectly owned entities, other than partnerships entities, that are **Subsidiaries**:

| Name of Organization | Type of of Operation | Percentage of Ownership | Date Acquired or Created | Country of Incorporation Domestic/Foreign |
|---|---|---|---|---|

   **Please see attachment B.**

Is coverage to include all **Subsidiaries** listed? [ **X** ] Yes  [  ] No. If "Yes," include complete list of all **Executives** of each **Subsidiary**. If "No," include complete list of those **Executives** of each **Subsidiary** for which coverage is requested. If included as an attachment check here [ **X** ].

   **Please see attachment A**

5012(2/00)                                3

6. Are there any plans being considered for a merger, an acquisition or a consolidation of or by the **Applicant** or any of its **Subsidiaries**? [ ] Yes [ ] No.

**Forward looking statements regarding anticipated activity cannot be provided.**

(a) If "Yes" to 6, have such plans been approved by the Board of Directors (or equivalent governing body) of the **Applicant** and such entity? [ ] Yes [ ] No. Date of approval ______________.

(b) If "Yes" to 6, have such plans been submitted to the shareholders/members of the **Applicant** and such entity for approval? [ ] Yes [ ] No. Date of approval __________.

7. Does the **Applicant** or any of its **Subsidiaries** anticipate any registration of securities under the Securities Act of 1933 (or any similar state or foreign rule or law) or any other offering of securities within the next twenty-four months? [ ] Yes [ ] No. (If "Yes," give details and submit offering materials if available.)

**Forward looking statements regarding anticipated activity cannot be provided.**

8. Has there been or is there now pending any claim(s) or actions against or investigation(s) of: (i) the **Applicant** or any **Subsidiary** thereof; and/or (ii) any person proposed for insurance in his or her capacity as an **Executive** of either the **Applicant** or a **Subsidiary** of the **Applicant**. [ ] Yes [ ] No. (If "Yes," attach details.)

NOT REQUIRED AS RENEWAL PROGRAM

9. (a) No **Executive** has knowledge or information of any act, error or omission which might give rise to a **Claim** or **Crisis** under the proposed policy, except as follows: (Attach complete details.)

If the **Executives** have no such knowledge or information state "None:"

(b) Neither the **Applicant** nor any of its **Subsidiaries** has knowledge or information of any act, error or omission which might give rise to a **Securities Claim** or **Crisis** under the proposed policy, except as follows: (Attach complete details.)

If the **Applicant** and the **Subsidiaries** have no such knowledge or information state "None:"

10. Has the **Applicant**, any of its **Subsidiaries** or any **Executives** of such entities:

(a) Been involved in any antitrust, copyright or patent litigation? [ ] Yes [ ] No.

(b) Been charged in any civil, criminal or administrative action or proceeding with a violation of any federal, state or foreign antitrust or fair trade law? [ ] Yes [ ] No.

(c) Been charged in any civil, criminal or administrative action or proceeding with a violation of any federal, state or foreign securities law, rule or regulation? [ ] Yes [ ] No.

(d) Been involved in any representative actions, class actions, or derivative suits? [ ] Yes [ ] No.

**(If any of the above questions 10(a) – 10(d) are answered "Yes," attach full details.)**

It is agreed that with respect to Questions 8, 9 and 10 above, that if such claim, proceeding, action, knowledge, information or involvement exists, then such **Claim**, proceeding or action and any **Claim** or action arising from such claim, proceeding, action, knowledge, information or involvement is excluded from the proposed coverage.

## V.  INSURANCE HISTORY

1. Current insurance (if none, most recent) for the **Applicant** and each **Subsidiary**. If included as an attachment, check here [ **X** ].  On File.

| (a) Name of insurance co. | Directors and Officers (Executive) Liability Insurance<br>AIG (Primary), Lloyd's, CNA, Hartford |
|---|---|
| (b) Limit of liability | $100 M. |
| (c) Self-insured retention | $1 M. |
| (d) Policy expiration date | 12/31/2001. |
| (e) Premium (indicate one year or more) | $1,127,483 (3 year policy, annualized premium for 2001). |

12. Has any insurance carrier refused, canceled or non-renewed any directors and officers liability or executive liability insurance coverage? [  ] Yes  [ **X** ] No.  If "Yes," attach full details including when and reason(s). (Missouri **Applicants** need not reply.)

## VI. ADDITIONAL INFORMATION

13. Name of General Counsel, Risk Manager and Human Resources Manager (or equivalent positions) for the **Applicant**, number of years in current position and phone number:

| NAME | YEARS | PHONE NUMBER |
|---|---|---|
| Michael Salsbury,  General Cousel | 6 | 561-750-2851 |
| Dennis Sickle, SVP Human Resources | 17 | 202-887-3373 |
| Susan Mayer, SVP Treasurer | 8 | 202-887-2299 |
| Eric T. Hovanky, Global Risk Manager | 14 | 202-887-2781 |

75012(2/00)

14. Provide copies of the following for the **Applicant** and, to the extent available, each of its **Subsidiaries**. If attached please indicate below. If such information is available on the **Organization's** website please indicate below and provide website address: **www.worldcom.com**

| Requested Information | "Attached" | "Website" |
|---|---|---|
| (a) Latest annual report. | | X |
| (b) Latest 10K report filed with the Securities and Exchange Commission (SEC) (or similar state or foreign agency). | | X |
| (c) Latest interim financial statement available. | | X |
| (d) All proxy statements and notices of Annual Meeting of Stockholders within the last twelve months. | | X |
| (e) All registration statements filed with the SEC (or similar state or foreign agency) within the last twelve months. | | X |
| (f) Copy (certified by organization's Secretary) of the indemnification provisions of the charter and the by-laws. Also attach a copy of any organization's indemnification agreement. | | X Attachment E |
| (g) Latest CPA management letter along with **Applicant's** responses to any recommendations made therein. | Not Available | |

~~It is agreed that the Applicant will file with the Insurer, as soon as it becomes available, a copy of each registration statement and annual or interim report which the Applicant or any Subsidiary may from time to time file with the SEC (or similar state or foreign agency).~~

## VII. SEVERABILITY

15. It is further agreed that in regard to the applicability of questions 8, 9 and 10 above, the facts pertaining to and knowledge possessed by any **Insured** (other than the knowledge and/or information possessed by the person(s) executing the application) shall not be imputed to any other **Insured Person**; only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer and General Counsel (or equivalent position) of the **Organization** shall be imputed to the **Organization**.

THE UNDERSIGNED AUTHORIZED OFFICER/MANAGER OF THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE. THE UNDERSIGNED AUTHORIZED OFFICER/MANAGER AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE

SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO AND BECOME PART OF THE POLICY.

6

75012(2/00)

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION ND MADE A PART HEREOF.

NOTICE TO ARKANSAS APPLICANTS:  "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

NOTICE TO COLORADO APPLICANTS: "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES.  ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

NOTICE TO DISTRICT OF COLUMBIA APPLICANTS: "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

NOTICE TO FLORIDA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION ONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE."

NOTICE TO KENTUCKY APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

NOTICE TO MAINE APPLICANTS: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

NOTICE TO NEW JERSEY APPLICANTS: "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO NEW MEXICO APPLICANTS: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

75012(2/00)

NOTICE TO NEW YORK APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

NOTICE TO OHIO APPLICANTS: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

NOTICE TO PENNSYLVANIA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO VIRGINIA APPLICANTS:   "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

Signed _____
                    (Applicant)
Date _____ January 23, 2002 _____

Title _____ President _____        Organization _____
      (must be signed by
      Chairman of the Board or President)                (Organization's Seal)

Attest _____

Broker _____

Address _____

        _____

8

75012(2/00)

WorldCom, Inc.
Directors & Officers

- BT/MCI Merger Delaware Cases– Claim Filed: Late 1996 – late 1997

One (1) CONSOLIDATED complaint involving fourteen (14) class action lawsuits filed in Delaware. Complaints initially challenged the failed BT merger, but were amended to challenge the WorldCom merger. The cases generally allege breach of fiduciary duty on the part of various MCI and BT Directors and Officers. Although still technically pending, the cases have been effectively abandoned by the plaintiffs' counsel.

- BT/MCI Merger 10b-5 Cases

One (1) CONSOLIDATED class action lawsuit involving three (3) class action lawsuits filed in the District of Columbia. The complaint alleges that certain Directors and Officers violated sections 10(b) and 20 of the Securities Exchange Act of 1934 and Rule 10b-5 of the SEC's regulations. Our motion to dismiss was filed about three years ago. We anticipate a ruling on the motion in the next 6-8 months. The carriers have reserved their rights.

- MCI/WCOM Merger – Claim Filed: November, 1998

Drayton Berkley filed a complaint in Mississippi against MCI and WorldCom, alleging dilution of voting rights due to the merger. As no Directors or Officers were named, entity coverage was not triggered. The case settled in September 2001 for $15,000.

- In-Flight Litigation – CLOSED; Claim Filed 4/19/99

In-Flight and its creditors filed suit against MCIT, Fred Briggs and Michael Rowny alleging they breached their fiduciary duties by promising investment in their company, which they claim was never delivered. This allegedly hastened their bankruptcy/insolvency. There was a coverage question as to whether Briggs and Rowny were acting in their capacity as members of the In-Flight board of directors. This matter was settled by LPP for approx. $20M without any carrier consultation. The file is closed.

- Grieco (SkyTel) – Claims Filed: May, 1999; CLOSED and WITHDRAWN

No WorldCom directors or officers named. Complaints are filed by former SkyTel stockholders alleging that MCI WorldCom falsely denied an intention to acquire Skytel. Coverage was denied as the securities holders were not MCI WorldCom stockholders. This settled for $1.4 million.

- In re MCI WorldCom, Inc. Securities Litigation – Claims Filed: 11/17/00 to present

One (1) CONSOLIDATED complaint in the U.S. District Court for the Southern District of Mississippi involving numerous class action lawsuits originally filed in Mississippi, NY and DC.

The complaints allege that the Company failed to disclose certain material facts during 2000 and allege violations of sections 10(b) and 20 of the Securities Exchange Act of 1934 and Rule 10b-5 of the SEC's regulations.

Sprint Derivative Claims (Amalgamated Bank) – Claims Filed: December, 2000

The complaint alleges that numerous Sprint Officers Directors violated their fiduciary duties to Sprint shareholders by changing the executive stock option program to vest stock options at shareholder approval of a merger, rather than at closing. The complaint alleges that Bernie Ebbers and WorldCom conspired with, and aided and abetted, the Sprint defendants in this breach of fiduciary duty. The primary carrier has reserved its rights. Plaintiffs have voluntarily dismissed WorldCom and Ebbers without prejudice.

PRIVILEGED AND CONFIDENTIAL

- **Sprint Securities Claims (re Sprint Corporation Securities Litigation)** – Claims Filed: December, 2000

This complaint -- filed by shareholders of Sprint -- alleges that Sprint and its officers and directors, and Bernie Ebbers and WorldCom, made false and misleading statements about Sprint and WorldCom, and the prospects of the Sprint-WorldCom merger gaining regulatory approval, so that Sprint's officers and directors could extract millions of dollars when their stock options vested as of Sprint shareholder approval of the merger. Based on these allegations, the complaint asserts claims (1) against all defendants for violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder and (2) against the Sprint defendants for violation of Section 20(a) of the Act.

- **Mr. Bernie Ebbers Loan/Guarantee Derivative Action (Harbor Finance Partners)** – Claim Filed: November, 2000

The derivative complaint alleges that the WorldCom Directors breached their fiduciary duties by providing loans and loan guarantees to Mr. Ebbers. It also alleges that Mr. Ebbers usurped the Company's corporate opportunities by accepting the loans and guarantees. The primary carrier has reserved its rights. The parties are actively involved in settlement negotiations and we are hopeful that this will be resolved by mid-year 2002.

- **WorldAccess Litigation** – Claim Filed: 6/13/01

Roger Abbott, founder of WorldxChange, and others, alleges that WorldAccess, WorldCom and its various Directors and Officers caused his shares in WorldAcess (those shares received as consideration for the sale of WorldxChange) to be diminished in value when WorldCom allegedly failed to honor a carrier services agreement with World Access. An issue exists concerning named defendant Mr. Tucker concerning as to which D&O coverage is primary, that provided by WorldAccess or WorldCom. LPP is discussing with the co-defendants. To date, there has been no response from the insurance carriers as to coverage. This case is in its early stages.

- **Rhythms Securities Class Action** – Claim Filed: 7/11/01

The complaint alleges that Rhythms NetConnections, Inc. Board of Directors committed violations of federal securities laws as a result of an initial public offering (IPO). Susan Mayer, in her capacity as a WorldCom employee, held a seat on the Rhythms NetConnections Board of Directors and as such has been named a defendant in the litigation. Rhythms D&O insurance is the primary insurance coverage. The case is in its early stages but we expect the individual defendants, including Mayer, to be dismissed..

PRIVILEGED AND CONFIDENTIAL

**Case:** Wandra McManus v. MCI, Jonelle Birney, et al.
**Claim Summary:** Ms. McManus alleged violations of the D.C. Human Rights Act and several common law claims (wrongful discharge, interference with prospective advantage, intentional infliction of emotional distress), discrimination (race and personal appearance).
Ms. McManus was terminated from her position as a staff assistant during a reduction-in-force (RIF).
**Status:** Summary judgment for MCI (August 1998); affirmed on appeal (April 2000).

**Case:** Nicholas Cicero v. MCII, Jack Logston, et. al.
**Type:** Age discrimination case arising from termination of employment
**Claim Summary:**
**Status:** Settled in November 1998 for $295,000

**Case:** Lawrence Howard v. MCIT et al. –
**Claim Summary:** Mr. Howard is a former "legacy MCI" Sales Support Consultant who was terminated when his group was eliminated during a reduction-in-force (RIF) in February 1995. In December 1998, Mr. Howard filed suit in federal court in New York claiming that he had been discriminated against on the basis of his race (black), national origin (African-American), and age in violation of Title VII, the Age Discrimination In Employment Act ("ADEA"), 42 U.S. C. Section 1981, the Rehabilitation Act of 1972, New York State's Constitution, and the New York City Human Rights Act.
Mr. Howard also alleged that he had received lower compensation than had white and younger employees; that he had been passed over for several other job openings in favor of less qualified white and younger employees; that he had been denied severance benefits; that he had not been afforded the same "recall" opportunities as white and younger employees who were terminated; and that he had been subjected to racist and ethnic comments.
**Status:** Settled on March 15, 2001 for $53,000.

**Case:** Crawford, Dianne v. MCI WorldCom Communications, Inc. and Lynn Coker (VP), U.S. District Court for the Southern District of California Filed: May 25, 2000
**Claim Summary:** Plaintiffs alleged breach of implied contract, breach of the covenant of good faith and fair dealing, wrongful termination (race discrimination), violation of public policy, violation of constitutional rights, intentional infliction of emotional distress and negligent infliction of emotional distress.
Ms. Crawford alleged that she was terminated from her sales director position in March 2000 because of her race (African American), in violation of California state law. Crawford, who was one of five sales directors in the California region in 1999, was put on a performance improvement plan and was eventually terminated due to her failure to meet the goals set forth in the plan.
**Status:** Ms. Crawford voluntarily dismissed Lynn Coker from the case on September 28, 2000. On August 13, 2001, the Court granted summary judgment in WorldCom's favor on all of Ms. Crawford's claims. The Court found that Crawford was not treated differently from her similarly situated Caucasian counterparts.

Case:  Emigh, Kim v. MCI WorldCom Network Services, Inc., Fred Briggs (Senior VP), Joseph Cook (Senior VP), Michael Smith (Director) and Frank Guckes (Manager). Filed on July 23, 2001.

Claim Summary:  Mr. Emigh alleges that he was selected for termination in a reduction in force on March 2, 2001 due to his failure to participate in allegedly illegal activity (wrongful termination in violation of public policy). Mr. Emigh, who was employed as a budget manager, alleges that he was requested to allocate to an expense budget certain items that should have been capitalized and that when he refused to do so, he was threatened with adverse action and was later terminated.

The Company's investigation to date reveals no illegal or improper activity by the Company or any of the individuals named in the complaint.

Status:  WorldCom answered the complaint on August 27, 2001. The parties are currently engaged in discovery.

Case:  Thomas Harris v. MCI WorldCom Network Services, Inc. and Bob Vetera, U.S. District Court for the Northern District of Oklahoma. Filed 8/31/01

Claim Summary:  Mr. Harris alleges race discrimination under Title VII. Mr. Harris, an African-American and former paralegal in Wholesale Credit and Collections, contends that he (1) was denied training opportunities, tuition reimbursement, and equal access to promotional opportunities, (2) received disparate discipline, (3) was subjected to a racially hostile work environment, and (4) was forced to resign in August 2000. While named as an individual defendant, former Vice President, Vetera has not been served.

Status:  The parties are currently engaged in discovery which closes on March 1, 2002. Trial is set for July 15, 2002.

Case:  Nolito Yu v. MCI WorldCom, U.S. District Court, Northern District of California.

Claim Summary:  Mr. Yu named Mr. Bernard Ebbers as a defendant in a RICO action. The complaint alleged that Ebbers along with other WorldCom employees broke into plaintiff's house to recover a $28 balance on his phone bill and subsequently followed plaintiff around his hometown.

Status:  After two amended complaints, the plaintiff's allegations were dismissed with prejudice on September 5, 2001.

Case:  Sylvia Milliken v. Bernard Ebbers, et al.; County Court for Tarrant County, Texas

Claim Summary:  Plaintiff sued Mr. Bernard Ebbers and MCI WORLDCOM Communications, Inc. over a billing dispute concerning her long distance telephone account.

Status:  WorldCom agreed to issue a $300 check to settle the dispute.

Case:  William P. Sullivan v. Bernie Evers [sic], et al.; District Court for Plymouth, Massachusetts

Claim Summary:  Mr. Sullivan obtained a default judgment against Mr. Ebbers and Telecom*USA in the amount of $1,727.00, alleging that his long distance telephone service was slammed. Neither defendant was properly served with the complaint.

Status:  WorldCom was successful in vacating the judgment and having the underlying complaint dismissed.

**Case:** Elizabeth Marczeski v. MCI WORLDCOM Communications, Inc., et al.; U.S. District Court for the District of Connecticut.

**Claim Summary:** Ms. Marczeski filed action against Bob Kamba, former MCI WorldCom Sr. VP, Robert Patterson and Diana Law, MCI WorldCom employees, Peter Geimer, former MCI WorldCom employee, and many other named parties, claiming harassment, obstruction of justice, and libel.

**Status:** Case was dismissed for want of personal jurisdiction.

# ARTER & HADDEN LLP

### ATTORNEYS AT LAW

*founded 1843*

| Cleveland | | San Diego |
|---|---|---|
| Columbus | One Columbus | San Francisco |
| Dallas | 10 West Broad Street, Suite 2100 | Washington, D.C. |
| Dayton | Columbus, Ohio 43215-3422 | Woodland Hills |
| Irvine | | *Affiliate Office* |
| Los Angeles | | Geneva, Switzerland |

*telephone* 614.221.3155

*facsimile* 614.221.0479

Direct Dial: 614/229-3213
Email: Dan.Bailey@ArterHadden.com

January 8, 2003

Kyla Frazier, CPCU, ARe
Risk Manager
WorldCom, Inc.
1133 19th Street, NW
Washington, D.C. 20036

Re:    Insurer:          AEGIS
       Policyholder:     WorldCom, Inc.
       Policy:           Excess Directors and Officers Liability Insurance
       Policy No.:       D2306A1A01
       AEGIS File No.:   2306-30642

Dear Ms. Frazier:

On behalf of Associated Electric & Gas Insurance Services Limited ("AEGIS"), this letter acknowledges receipt of a November 15, 2002 letter from Michael J. White of Willis which enclosed copies of the complaints filed in the lawsuits listed as Numbers A41 and A42 on Exhibit A hereto (collectively, the "Lawsuits")[1] and updates AEGIS' coverage analysis with respect to all submitted Claims under the above-referenced Excess Directors and Officers Liability Insurance Policy ("Excess Policy").

We are directing this letter to you as the authorized insurance representative of WorldCom, Inc. ("WorldCom") and the directors and officers who are named as defendants in the Pending Claims. To the extent you are not acting on behalf of WorldCom or the individual insureds for insurance coverage purposes, we request that you forward a copy of this letter to them or to their insurance representatives for their information and notify us with whom we should be communicating in the future.

As explained in our letter of July 30, 2002, coverage afforded under the Excess Policy generally follows the terms and conditions of Policy No. 8749108 issued to WorldCom by National Union Fire Insurance Company dated December 31, 2001 ("Primary Policy"), except as

---

[1] In letters to you dated July 30, August 15 and 27, September 6 and 24, October 4 and 18 and November 4 and 15, 2002 ("Prior Letters"), AEGIS previously acknowledged receipt of the lawsuits listed as Numbers A1 through A40, B1-B2, C1-C3, D1 and E1 on Exhibit A hereto ("Other Lawsuits"). Also attached hereto is Exhibit B, which reflects the lawsuits from the list you attached to your July 31, 2002 letter for which we have not yet received copies of the complaints. The Lawsuits and Other Lawsuits are collectively referred to herein as "Pending Claims."

# ARTER & HADDEN LLP

Kyla Frazier, CPCU, ARe
January 8, 2003
Page 2

otherwise provided in the Excess Policy. Consistent with our request in our July 30 letter and each of the other Prior Letters, we are still awaiting copies from you of coverage correspondence from National Union setting forth its coverage position with respect to this matter. Please provide us with a copy of such correspondence and the coverage letters from all other underlying insurers when you receive them.

Although AEGIS cannot complete its preliminary coverage analysis under the Excess Policy with respect to the Pending Claims until we have received and analyzed the requested correspondence from the underlying insurers, AEGIS believes it prudent to identify for you at this time the following coverage issues which collectively appear to eliminate coverage under the Excess Policy for most if not all loss incurred by Insureds as a result of the Pending Claims.

A.   Prior Litigation

Endorsement No. 2 of the Policy adds Exclusion III(L), which provides that AEGIS shall not be liable to make any payment for Ultimate Net Loss "arising from any prior or pending litigation as of December 31, 2001, as well as future claims or litigation based upon the prior or pending litigation or derived from the same or essentially the same facts (actual or alleged) that gave rise to the prior or pending litigation." In 2000, a securities class action entitled In re MCI WorldCom, Inc. Securities Litigation, United States District Court, Southern District of Mississippi, Case No. 3:00CV833BN ("Prior Litigation") was brought on behalf of all persons who acquired WorldCom securities between February 10, 2000 and November 1, 2000. Plaintiffs in the Prior Litigation, like plaintiffs in the Pending Claims, alleged that defendants WorldCom and certain of its Directors and Officers issued a series of materially false and misleading statements regarding WorldCom's finances in order to mask WorldCom's financial decline. Specifically, plaintiffs in the Prior Litigation alleged that defendants adopted improper accounting practices "to report favorable financial results in line with analysts' estimates despite the significant and worsening financial decline WorldCom was then experiencing." (paragraph 5 of Consolidated Amended Class Action Complaint). This is the "same or essentially the same" alleged wrongdoing as set forth in the Pending Claims, which arise out of WorldCom's improper accounting practices and admitted overstatement of more than $7.2 billion in profits over several years, including the time period at issue in the Prior Litigation. Like the allegations in the Prior Litigation, this gross overstatement of profits and the improper accounting practices underlying such overstatement allegedly enabled WorldCom to meet Wall Street's estimates.

Based on the foregoing, under Exclusion III(L) of the AEGIS Excess Policy, any Ultimate Net Loss incurred in connection with the Pending Claims would be excluded from coverage to the extent that the Pending Claims are based upon or derived from the same or essentially the same wrongdoing alleged in the Prior Litigation.

In addition, Exclusion 4(d) of the National Union Policy (the terms of which are generally followed by the AEGIS Excess Policy) provides that the Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured alleging, arising

# ARTER & HADDEN LLP

Kyla Frazier, CPCU, ARe
January 8, 2003
Page 3

out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time. As discussed above, it appears that the Pending Claims arise from the same circumstances and allege the same or related wrongdoing as that alleged in the Prior Litigation, which was reported under the prior WorldCom D&O insurance program. AEGIS did not participate in that prior D&O insurance program. Thus, no coverage is available under the AEGIS Excess Policy to the extent the Pending Claims allege, arise out of, are based upon or are attributable to the facts alleged or the same or related Wrongful Acts alleged or contained in the Prior Litigation.

B.     Application



The preamble to the Excess Policy states that the Excess Policy is issued "in reliance upon all statements made and information furnished to [AEGIS] by the Application attached hereto which is hereby made a part hereof." Similarly, the preamble to the Primary Policy (the terms of which are generally followed by the AEGIS Excess Policy) states that the Policy is issued "in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the materials incorporated therein." AEGIS agreed to accept the National Union Renewal Application ("Application") in lieu of an AEGIS Application form in connection with underwriting the Excess Policy. That National Union Application was submitted to AEGIS and was relied upon by AEGIS. The Application states that "this Application shall be the basis of the contract should a policy be issued, and it will be attached to and become part of the policy."

Question 14 of the Application requests, among other things, copies of the following documents: (a) latest annual report; (b) latest 10K filed with the SEC; (c) latest interim financial statements; (d) all proxy statements and notices of annual meetings for the last 12 months; and (e) all registration statements filed with the SEC in the last 12 months. The Insureds answered these requests in the Application by stating that this requested information was available on WorldCom's website. Based on the foregoing, AEGIS obtained from the internet and reviewed this information in connection with its underwriting of the Excess Policy. WorldCom has now admitted much of the financial information in those documents was materially false and misleading. AEGIS is not liable with respect to the Pending Claims to the extent AEGIS is entitled to rescind the Excess Policy based upon the Insureds' misrepresentations and omissions of material facts in connection with AEGIS' underwriting of the Excess Policy.

C.     No Entity Coverage

Pursuant to a settlement agreement with National Union, the Insureds and National Union agreed that the National Union Primary Policy was rescinded and void ab initio with respect to any coverage that might have been available to WorldCom under the National Union Primary Policy. As set forth above, the AEGIS Excess Policy follows form to the National Union

# ARTER & HADDEN LLP

Kyla Frazier, CPCU, ARe
January 8, 2003
Page 4

Primary Policy. Because, the Insureds have agreed that the National Union Primary Policy is void ab initio as to WorldCom, no coverage for WorldCom ever existed under the National Union Primary Policy, and thus no such coverage ever existed under the Excess Policy. Therefore, AEGIS shall not be responsible for any Ultimate Net Loss incurred by WorldCom in connection with the Pending Claims.

D.    Criminal or Fraudulent Acts

Pursuant to Exclusion 4(c) of the Primary Policy, AEGIS shall not be liable to make any payment for Loss in connection with a Claim arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act. Betty Vinson, Troy Norman, Buford Yates and David Myers have each pled guilty to criminal charges of conspiracy, securities and/or mail fraud with respect to the matters alleged in or underlying the Pending Claims. As a result, no coverage exists under the AEGIS Excess Policy for such individuals or any other Insured who in fact committed criminal or deliberate fraudulent acts.

* * *

Please keep us closely advised of material developments in the Pending Claims and related matters. In addition, please provide us with copies of the initial complaints filed in the lawsuits listed in the updated Exhibit B hereto and any consolidated amended complaint(s), Motions to Dismiss and other material filings in any Pending Claims, when filed.

In addition to the coverage defenses summarized above, AEGIS continues to fully reserve all of its rights and defenses under the Excess Policy, the Primary Policy and available at law with respect to this matter, including without limitation any rights and defenses with respect to any information which the Insureds provided to or failed to provide to AEGIS or the underlying insurers in connection with underwriting the Excess Policy or the underlying policies.

We appreciate your assistance and cooperation, and encourage you to contact us if you have any questions or concerns regarding this matter.

Sincerely,

ARTER & HADDEN LLP

Dan A. Bailey

Enclosures

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

BERT C. ROBERTS, JR.,                         )
                                              )
              Plaintiff,                      )
                                              )
      v.                                      )
                                              )
ASSOCIATED ELECTRIC & GAS                     )
INSURANCE SERVICES LIMITED,                   )
CONTINENTAL CASUALTY                          )
COMPANY, GULF INSURANCE                       )
COMPANY, SR INTERNATIONAL                     )
BUSINESS INSURANCE COMPANY,                   )
STARR EXCEL LIABILITY                         )
INSURANCE INTERNATIONAL                       )
LIMITED and TWIN CITY FIRE                    )
INSURANCE COMPANY,                            )
                                              )
              Defendants.                     )
                                              )
ASSOCIATED ELECTRIC & GAS                     )
INSURANCE SERVICES LIMITED.                   )        Civil Action
                                              )
              Counter-Claimant,               )        Case No. 1:04-CV-04089-DLC
                                              )
      v.                                      )
                                              )        Judge Denise L. Cote
BERT C. ROBERTS,                              )
                                              )
                                              )
              Counterclaim-Defendant,         )
                                              )
      and                                     )
                                              )
BERNARD EBBERS,                               )
SCOTT D. SULLIVAN,                            )
BETTY L. VINSON,                              )
TROY M. NORMAND,                              )
ESTATE OF JOHN W. SIDGMORE,                   )
RONALD BEAUMONT,                              )
MAX E. BOBBIT,                                )
FRANCESCO GALESI,                             )
JUDITH AREEN,                                 )
CARL J. AYCOCK,                               )

```
STILES A. KELLET, JR.,                          )
DAVID F. MYERS,                                 )
GORDON S. MACKLIN,                              )
JUAN VILLALONGA,                                )
JOHN A. PORTER,                                 )
BUFORD YATES, JR.,                              )
JAMES C. ALLEN,                                 )
LAWRENCE A. TUCKER,                             )
CLIFFORD ALEXANDER, JR.,                        )
SUSAN MAYER, and                                )
JOHN DOES, 1-50, consisting of those            )
unknown directors and/or officers of            )
WorldCom, Inc. against whom                     )
Counter-Claimant is rescinding a certain        )
insurance policy, more fully                    )
described herein,                               )
                                                )
            Additional Counterclaim-            )
            Defendants Joined on the            )
            Counterclaim.                       )
                                                )
--------------------------------------------------------x
```

## AFFIDAVIT OF SERVICE

```
STATE OF NEW YORK              )
                               ) ss.:
COUNTY OF NASSAU               )
```

      I, **Dara Opisso**, being duly sworn, depose and say: I am not a party to this action, am over 18 years of age and am employed by Scarcella Rosen & Slome LLP.

      On the **2nd day of August, 2004**, I served a true copy of the **Answer to Complaint and Counterclaim of Defendant Associated Electric & Gas Insurance Services Limited** by e-mail (Service List A) and by U.S. postal mail (Service List B):

                    /s/ Dara Opisso
                    Dara Opisso

Sworn to before me this
2nd day of August, 2004
/s/ Regina Maldonato
Notary Public, State of New York
No. 01MA4810983
Qualified in Nassau County
Commission Exp. 12/31/06

**<u>SERVICE LIST A</u>**

Cory E. Friedman c.friedman@att.net, George Ridge gridge@attorneyjax.com, Wallace A. Christensen wchristensen@rdblaw.com, John W. Duchelle jduchelle@rdblaw.com, Marc E. Rindner mrindner@rdblaw.com, Daniel A. Cohen dcohen@kvwmail.com, Charles Hyman chyman@kplaw.net, Richard A. Kissel rkissel@kplaw.net, Alan J. Joaquin alan.Joaquin@dbr.com, Wayne E. Borgeest wborgeest@kbrny.com, Ann Marie Collins acollins@kbrny.com,

## SERVICE LIST B

Cory E. Friedman, Esq.
123 East 75th Street
New York, New York 10021
Attorney for Bert C. Roberts, Jr.

George E. Ridge, Esq.
William G. Cooper, Esq.
Cooper Ridge & Lantinberg, P.A.
200 West Forsyth Street, Suite 1200
Jacksonville, Florida 32202
Attorneys for Bert C. Roberts, Jr.

Jennifer A. Klear, Esq.
Drinker Biddle & Reath LLP
30 Broad Street, 30th Floor
New York, New York 10004
Attorneys for Gulf Insurance Company

Alan J. Joaquin, Esq.
Janet McFadden, Esq.
Drinker Biddle & Reath LLP
1500 K. Street NW, Suite 1100
Washington, D.C. 20005
Attorneys for Gulf Insurance Company

Wallace A. Christensen, Esq.
Ross Dixon & Bell
2001 K Street NW
Washington, D.C. 20006
Attorneys for Continental Casualty
Company

Daniel A. Cohen, Esq.
Kornstein Veisz Wexler & Pollard, LLP
757 Third Avenue
New York, New York 10017
Attorneys for Continental Casualty
Company

Wayne E. Borgeest, Esq.
Kaufman, Borgeest & Ryan
99 Park Avenue
New York, New York 10016
Attorneys for Twin City Fire Insurance
Company

Richard A. Kissel, Esq.
Charles Hyman, Esq.
Kissel & Pesce LLP
555 White Plains Road, 5th Floor
Tarrytown, New York 10591
Attorneys for SR International Business
Insurance Company

Julianna Ryan, Esq.
Kaufman Borgeest & Ryan LLP
99 Park Avenue, 19th Floor
New York, New York 10016
Attorneys for Starr Excess Liability
Insurance